UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TREVOR WAYNE,<br><br>        Plaintiff,<br><br>    v.<br><br>MAXEON SOLAR TECHNOLOGIES, LTD., et al.,<br><br>        Defendants. | Case No. 24-cv-03869-EMC<br><br>**ORDER APPOINTING LEAD PLAINTIFF AND APPROVING SELECTION OF LEAD COUNSEL**<br><br>Docket Nos. 20, 26, 30 |

The above-referenced case is a federal securities fraud class action. Defendants are Maxeon Solar Technologies, Ltd. and two company officers, William Mulligan (CEO) and Kai Strohbecke (CFO). Currently pending before the Court are three competing motions for appointment as Lead Plaintiff and approval of Lead Counsel.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** the motion filed by Jeyakumar VS Menon and **DENIES** the motions filed by Preston A. Ross and Mark Regan.

## I.     FACTUAL & PROCEDURAL BACKGROUND

A.   Operative Complaint

The following allegations are made in the operative complaint (filed by the law firm Glancy Prongay on behalf of the individual plaintiff Trevor Wayne).

Maxeon is a global manufacturer and marketer of solar technology. *See* Compl. ¶¶ 2, 17. It "went public in August 202 through a strategic spin off from Sun Power." Compl. ¶ 17. Post-spinoff, Maxeon and SunPower continued to have a relationship. They entered into a Master Supply Agreement under which "SunPower was obligated to purchase certain minimum product

volumes; and Maxeon was prohibited from selling certain modules to customers other than SunPower and could not circumvent that exclusivity provision via SunPower dealers." Compl. ¶ 17.

Initially, SunPower was Maxeon's biggest customer, "representing 26.7% of the Company's total revenue for fiscal year 2022." Compl. ¶ 17. However, in mid-2023, a dispute between the two companies arose. "Maxeon alleged SunPower was withholding approximately $29 million in past due invoices[,] and SunPower alleged that Maxeon was in breach of the parties' master supply agreement's non-circumvention clause." Compl. ¶ 18. In July 2023, Maxeon stopped shipments to SunPower. *See* Compl. ¶ 18. The companies eventually settled their dispute in November 2023 but terminated the Master Supply Agreement. *See* Compl. ¶ 18.

The putative class consists of those persons and entities that purchased or otherwise acquired Maxeon securities between November 15, 2023, and May 29, 2024. *See* Compl. ¶ 1. The class period starts on November 15, 2023, because that was the day "Maxeon issued a press release announcing the Company's third quarter 2023 financial results, including that the dispute with SunPower was resolved, thereby 'clearing the way for Maxeon to aggressively ramp sales into the US market.'" Compl. ¶ 19. According to Plaintiffs, this and other statements made about Maxeon's third quarter and fourth quarter financial results for 2023 were misleading because they

> failed to disclose to investors: (1) that Maxeon relied on the exclusive sales of certain products to SunPower; (2) that, following the termination of the Master Supply Agreement, the Company was unable to "aggressively ramp sales"; (3) that, as a result, its revenue substantially declined; (4) that, as a result, the Company suffered a "serious cash flow" crisis; and (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

Compl. ¶ 23.

Notably, in May 2024, when Maxeon announced its financial results for the first quarter of 2024, it reported a decline in revenue of over "41% year-over-year." Compl. ¶ 24. It also "disclosed that it was 'facing a serious cash flow challenge' as the result of, in part, the termination of the SunPower supply agreement." Compl. ¶ 24. This forced Maxeon "to 'negotiate[] commitments for significant liquidity support' which will result in 'substantial

2

1  dilution to existing shareholders, with TZE ultimately becoming a controlling shareholder."
2  Compl. ¶ 24. "On this news, the Company's share price fell 34.7%, or $1.08, to close at $2.03 on
3  May 30, 2024, on unusually heavy trading volume." Compl. ¶ 26.

4  B.  Competing Motions to Appoint

5  Initially, five motions to appoint were filed:

6,7  - Docket No. 12. The motion was filed by Jeyakumar VS Menon; proposed Lead Counsel was the Rosen firm.

8,9  - Docket No. 16. The motion was filed by Anthony Kulesza; proposed Lead Counsel was Glancy Prongay.

10,11,12  - Docket No. 20. The motion was filed by Jeyakumar VS Menon; proposed Lead Counsel was the Faruqi firm. This was the second motion to appoint filed by Mr. Menon, this time with a different law firm.

13,14  - Docket No. 26. The motion was filed by Preston A. Ross; proposed Lead Counsel was the Pomerantz firm.

15,16  - Docket No. 30. The motion was filed by Mark Regan; proposed Lead Counsel was the Scott firm.

17 All of the motions above were filed on August 26, 2024. The following day, August 27,
18 2024, the Rosen firm withdrew the motion it had filed on Mr. Menon's behalf. *See* Docket No. 34
19 (notice of withdrawal). This left Mr. Menon with the motion for appointment in which he was
20 represented solely by the Faruqi firm.

21 Subsequently, on September 13, 2024, Mr. Kulesza filed a notice of withdrawal of his
22 motion at Docket No. 16. Implicitly, Mr. Kulesza did so out of recognition that he had the
23 smallest financial loss out of the four remaining proposed Lead Plaintiffs. *See* Docket No. 16
24 (Kulesza Mot. at 5-6) (claiming financial harm of approximately $18,015.22).

25 Thus, at this juncture, the Court has remaining three competing motions to appoint –
26 located at Docket Nos. 20, 26, and 30. The movants are Mr. Menon, Mr. Ross, and Mr. Regan.
27 Until the date of the hearing on the motions to appoint, Mr. Menon gave no reason why he had
28 two different firms file motions on his behalf. At the hearing, the Faruqi firm representing Mr.

Menon stated that it did not provide an explanation because it did not believe one was necessary – *i.e.*, because the critical substantive information contained in the two motions to appoint (in particular, regarding Mr. Menon's financial interest) was the same, and the withdrawal of the Rosen firm's motion reflected Mr. Menon's choice of counsel.

## II.     DISCUSSION

A.     Legal Standard

The governing statute from the PSLRA is 15 U.S.C. § 78u-4(a).

Section 78u-4(a)(3)(A)(i) provides that,

> [n]ot later than 20 days after the date on which the complaint is filed, the plaintiff or plaintiffs shall cause to be published, in a widely circulated national business-oriented publication or wire service, a notice advising members of the purported plaintiff class –
>
> (I)     of the pendency of the action, the claims asserted therein, and the purported class period; and
>
> (II)    that, not later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.

15 U.S.C. § 78u-4(a)(3)(A)(i).

Here, there is no dispute that the current named plaintiff in this case, Trevor Wayne, published the requisite notice on June 27, 2024, via Business Wire. *See* Omoto Decl., Ex. A (notice). (This is the same date that the complaint was filed. *See* Docket No. 1 (complaint).) There is also no dispute that the notice gave the information required by statute. All individuals seeking appointment as Lead Plaintiff timely filed their motions thereafter (*i.e.*, within 60 days after notice issued).

Section 78u-4(a)(3)(B) then addresses appointment of a lead plaintiff. It provides:

> (i)     In general. Not later than 90 days after the date on which a notice is published under subparagraph (A)(i), the court shall consider any motion made by a purported class member in response to the notice, including any motion by a class member who is not individually named as a plaintiff in the complaint or complaints, and shall appoint as lead plaintiff the member or members of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members (hereafter in this paragraph referred to as the "**most adequate plaintiff**") in accordance with this subparagraph.

4

> . . . .
>
> (iii) Rebuttable presumption.
>
> > (I) In general. Subject to subclause (II), for purposes of clause (i), the court shall adopt a **presumption** that the most adequate plaintiff in any private action arising under this title [15 USCS §§ 78a et seq.] is the person or group of persons that –
> >
> > > (aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(i);
> > >
> > > (bb) in the determination of the court, has the **largest financial interest** in the relief sought by the class; and
> > >
> > > (cc) **otherwise satisfies** the requirements of Rule 23 of the Federal Rules of Civil Procedure.
> >
> > (II) Rebuttal evidence. The presumption described in subclause (I) may be **rebutted** only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff –
> >
> > > (aa) will not fairly and adequately protect the interests of the class; or
> > >
> > > (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

*Id.* § 78u-4(a)(3)(B) (emphasis added).

The Ninth Circuit has summarized the approach in § 78u-4(a)(3)(B) as follows:

> [T]he presumptive lead plaintiff [is] the one who "has the largest financial interest in the relief sought by the class" and "otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure." In other words, the district court must compare the financial stakes of the various plaintiffs and determine which one has the most to gain from the lawsuit. It must then focus its attention on *that* plaintiff and determine, based on the information he has provided in his pleadings and declarations, whether he satisfies the requirements of Rule 23(a), in particular those of "typicality" and "adequacy." If the plaintiff with the largest financial stake in the controversy provides information that satisfies these requirements, he becomes the presumptively most adequate plaintiff. If the plaintiff with the greatest financial stake does not satisfy the Rule 23(a) criteria, the court must repeat the inquiry, this time considering the plaintiff with the next-largest financial stake, until it finds a plaintiff who is both willing to serve and satisfies the requirements of Rule 23.

5

*In re Cavanaugh*, 306 F.3d 726, 730 (9th Cir. 2002) (emphasis in original). The next step is "to give other plaintiffs an opportunity to rebut the presumptive lead plaintiff's showing that it satisfies Rule 23's typicality and adequacy requirements." *Id.*

B.  Largest Financial Interest

> "In calculating a movant's financial interest, courts typically consider four factors, often referred to as the *Lax-Olsten* factors: "(1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered during the class period."

*Stephens v. Maplebear Inc.*, No. 24-cv-00465-EJD, 2024 U.S. Dist. LEXIS 115921, at *8 (N.D. Cal. July 1, 2024).[1] "The final *Lax-Olsten* factor – the approximate losses suffered during the class period – commands the most weight." *Id.* at *9.

Under this approach, Mr. Menon has the largest financial interest, then Mr. Ross, and finally Mr. Regan.

- **Mr. Menon.** "Overall, during the Class Period, Menon purchased 38,150 net and 69,950 total Maxeon shares, expended $147,702.00 in net funds and suffered losses of **$124,434.32** when calculated using a last in, first out ('LIFO') methodology." Menon Mot. at 7 (emphasis added); *see also* Omoto Decl., Ex. C (chart).

- **Mr. Ross.** "During the Class Period, Ross purchased 13,115 shares of Maxeon common stock, expended $45,554 on these purchases, retained 13,115 of his shares of Maxeon common stock, and, as a result of the disclosure of Defendants' alleged fraud, incurred losses of approximately **$37,460**." Ross Mot. at 2 (emphasis added); *see also* Pafiti Decl., Ex. A (chart).

- **Mr. Regan.** "Regan lost approximately **$32,358** as a result of Defendants' wrongdoing (emphasis added)." Regan Mot. at 5; *see also* Jasnoch Decl., Ex. C (chart).

---

[1] The PSLRA requires that "[e]ach plaintiff seeking to serve as a representative party on behalf of a class shall provide a sworn certification . . . that [*inter alia*] (iv) sets forth all of the transactions of the plaintiff in the security that is the subject of the complaint during the class period specified in the complaint." 15 U.S.C. § 78u-4(a)(2)(A).

C.     Typicality and Adequacy

There is no dispute that Mr. Menon has the largest financial interest. Thus, the Court turns to the matter of whether Mr. Menon has met the requirements of Rule 23, in particular typicality and adequacy.

Mr. Menon has submitted two declarations. *See* Docket No. 21-4 (1st Menon Decl.); Docket No. 58-1 (2d Menon Decl.). One declaration was submitted at the time the motion to appoint was filed. The second declaration was submitted, at the request of the Court, after the hearing on the competing motions for appointment. Mr. Menon's declarations reflect that he is a U.S. citizen, has a degree in electrical engineering, and currently works at Cisco Systems as an engineer. *See* 1st Menon Decl. ¶¶ 2-4; 2d Menon Decl. ¶ 2. He is not an investment advisor and has no formal training or certifications in finance, but he has been investing in the stock market since 2006 and manages his own investments. *See* 1st Menon Decl. ¶ 5; 2d Menon Decl. ¶ 2. He testifies that he is motivated to litigate given his substantial loss and understands the importance of monitoring the case. *See* 1st Menon Decl. ¶¶ 6-8.

As indicated above, Mr. Menon filed a second declaration at the Court's behest. In that declaration, he explains that he had two firms file motions to appoint because (1) he did not know he was not allowed to engage more than one firm and (2) he thought "doing so could increase [his] chances to secure appointment as Lead Plaintiff." 2d Menon Decl. ¶ 2; *see also* 2d Menon Decl. ¶ 8. Mr. Menon adds that, the day after the motions to appoint were filed, the Faruqi firm contacted him and advised that it was not appropriate to have two separate motions filed by two different firms. He then confirmed that he wanted the Faruqi firm to represent him and, after he informed the Rosen firm of such, the Rosen firm withdrew the motion it had filed. *See* 2d Menon Decl. ¶ 9. ECF reflects that the Rosen firm filed its motion on August 26, 2024, at 8:18 p.m. The Rosen firm withdrew its motion on August 27, 2024, at 12:51 p.m. – *i.e.*, less than a day after it had filed its motion.

The Court finds that Mr. Menon is both a typical plaintiff as well as an adequate one. "Lead plaintiffs' claims are typical where each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's

7

liability.'" *David v. British Am. Tobacco P.L.C.*, No. 24-CV-517 (AMD)(MMH), 2024 WL 4351311, at *5 (E.D.N.Y. Sept. 30, 2024). Mr. Menon is a typical plaintiff because he, like other members of the putative class, has claims arising from the purchase of Maxeon securities during the class period at prices artificially inflated as a result of Defendants' alleged misconduct. *See id.*

A lead plaintiff is adequate where they have qualified and experienced counsel to represent them, their interests are not antagonistic to those of the putative class, and they have a sufficient interest in the outcome of the case to ensure vigorous advocacy. *See id.* The Faruqi firm has provided evidence sufficiently establishing that it is qualified and has significant experience litigating securities fraud. *See* Omoto Decl., Ex E (firm resume); *see also* Menon Mot. at 9-11 (listing settlements successfully obtained in securities cases in various jurisdictions and current securities cases). There is no indication that Mr. Menon has interests antagonistic to the putative class; rather, he and the putative class have claims based on the same alleged facts. Finally, because Mr. Menon has the largest financial interest, and that interest is substantial, the Court is satisfied that he will vigorously litigate and advocate for the class. The Court also credits Mr. Menon's declaration testimony that he is committed to participating in and monitoring the litigation.[2]

Challenging movants argue that Mr. Menon is not adequate because (a) he submitted two motions for appointment, with those motions designating different counsel and/or (b) those motions contain conflicting information. The Court does not find these arguments convincing.

1. Submitting Two Motions

On (1), challenging movants essentially argue that

> Menon's submission of two separate, conflicting motions for lead plaintiff and lead counsel appointment, filed by two different law firms each seeking its own appointment as lead counsel to the exclusion of the other, shows that Menon either did not understand the significance of his motion or else failed to properly supervise counsel to prevent the duplicative submission of competing motions on his behalf.

---

[2] To the extent challenging movants question Mr. Menon's ability to vigorously litigate and advocate because he did not file a declaration explaining the reason for the two motions to appoint until the Court prompted him to do so, that matter is addressed below.

8

1  Ross Opp'n at 3. The Court rejects this contention.

2        As an initial matter, the fact that Mr. Menon consulted more than one law firm reflects that he is interested in actively participating in this case and was exercising some due diligence. Furthermore, Mr. Menon has explained in his second declaration that he had two law firms submit motions on his behalf because he mistakenly thought this would bolster his application to be selected Lead Plaintiff. This layperson mistake does not mean that Mr. Menon did not understand the importance of the motion to appoint, nor does it suggest that he cannot properly supervise counsel. In fact, the day after the two motions to appoint were filed, he was informed it was not appropriate to have two separate motions from two firms, and he promptly had the Rosen firm withdraw its motion less than a day after it was filed.

      Mr. Ross and Mr. Regan maintain that Mr. Menon is inadequate because he failed to provide a declaration addressing the fact that two motions had been filed until the Court asked him to provide one.[3] They emphasize that Mr. Menon could have provided a declaration as part of his opposition to the competing motions to appoint or as part of his reply in support of his own motion, but he did not do so. The Court recognizes that the motions to appoint could have been resolved *faster* had Mr. Menon provided a declaration in conjunction with one of his briefs. Nevertheless, it was not unreasonable for him not to do so. The Faruqi firm makes a reasonable argument that the circumstances here did not clearly call for a declaration – *i.e.*, given that there were no material substantive differences between the two motions and that the Rosen firm withdrew its motion less than a day after it was filed.

      Mr. Regan also contends that the content of Mr. Menon's declaration is problematic because it is "so generic that it is essentially meaningless" and is a "carbon copy" of a declaration submitted in another case. Docket No. 60 (Regan Supp. Br. at 1-2). These assertions are not persuasive. As to the former, the declaration provides a specific explanation as to why two motions were filed; as the latter, it is not surprising that laypeople make the same or similar kind

---

[3] The challenging movants made this contention in briefs that the Court permitted them to file after Mr. Menon filed his second declaration. Mr. Regan's brief was filed a day late without any apparent explanation.

1   of mistake in this particular situation (*i.e.*, motions to appoint in securities fraud cases).

2       The Court also notes that the cases cited by the challenging movants in their papers contain
3   materially distinguishable facts. For example:

- In *Tsirekidze v. Syntax-Brillian Corp.*, No. CV-07-2204-PHX-FJM, 2008 U.S. Dist. LEXIS 118562 (D. Ariz. Apr. 4, 2008), the court questioned the adequacy of a group because the group's principal member (an individual) "was initially named as a member of a competing" group. *Id.* at *17. The principal member submitted a declaration stating that he sent his "lead-plaintiff certification to the wrong firm 'in error'" to which the court responded that "[s]uch a blatant gaffe does not bode well for the adequacy of his group to lead this litigation." *Id.* The factual situation in *Tsirekidze* is clearly different from that in the case at bar. In *Tsirekidze*, the problem was a person being a member of two different groups; that was a conflict. In this case, the issue is simply the same person choosing different counsel. *See also* Wilson Reply Decl., Ex. 1, at 8 (in *Read* case, distinguishing *Tsirekidze* because, there, "a movant filed two separate certifications on behalf of two separate groups of proposed lead plaintiffs, whose interests were antagonistic to each other," whereas, here, "Steamfitters filed both motions on its own behalf, and not on behalf of one or more groups of lead plaintiffs" – *i.e.*, "Steamfitters did not file both motions in a manner that could be antagonistic or 'competing' to itself").
- In *Pardi v. Tricida, Inc.*, No. 21-CV-00076-LHK, 2021 U.S. Dist. LEXIS 65991, at *3-4 (N.D. Cal. Apr. 2, 2021), the court held that a group would not be adequate as a lead plaintiff because it had failed to show that it would "'be able to function cohesively to monitor counsel and make critical litigation decisions as a group.'" *Id.* at *4. "The Tricida Investor Group's lack of cohesion is evident in two ways. First, the Tricida Investor Group's own declaration candidly admits that the members of the group did not 'learn[] of each other's existence' until speaking with their counsel, Bragar Eagel & Squire PC and Bernstein Liebhard LLP. Second, the Tricida Investor Group highlighted its lack of cohesion when one of its members,

Michael Clynes, filed a competing individual motion with different counsel. The filing of competing motions 'clearly evidence[s]' lack of cohesion. Thus, although the Tricida Investor Group has the largest financial interest in this litigation, the Tricida Investor Group does not meet the adequacy requirement of Federal Rule of Civil Procedure 23(a)." *Id.* at *4-5. In contrast to *Pardi*, here, there is not a group proposing to be lead plaintiff, the cognizability of which was in question because of lack of cohesion therewithin. No such issue exists in the case at bar. Moreover, the problem in *Pardi* involved competing motions. *See also McDermid v. Inovio Pharms., Inc.*, 467 F. Supp. 3d 270, 279-80 (E.D. Pa. 2000) (involving a situation where an individual moved for appointment both as an individual and also joined a motion for appointment as part of a group). Here, Mr. Menon cannot compete with himself.

- In *Singer v. Nicor, Inc.*, No. 02 C 5168, 2002 U.S. Dist. LEXIS 19884 (N.D. Ill. Oct. 16, 2002), the facts are a little bit closer but still distinguishable. The proposed lead plaintiff was an entity that filed two timely motions for appointment, but with different counsel. But the court only found the situation a problem because the "two different law firms [had] arrived at significantly different figures [for losses] in the initial filings [*i.e.*, more than $640,000 claimed in one motion and only about $97,000 in the other motion], each supposedly based on the same class period." *Id.* at *6. The court, therefore, rejected the higher claimed loss and, when using the lower claimed loss, the court found that the proposed lead plaintiff did not have the largest financial interest anymore. *See id.* To be sure, the court added that, even if it were to credit the higher number, it would still have a problem: "Woodley Farra explains that its conflicting initial filings were simply the result of a 'mis-communication,' when a colleague of its principal and managing partner 'inadvertently signed a certification which authorized the law firm of Bernstein Liebhard & Lifshitz, LLP' to represent the company, when the law firm of Schiffrin & Barroway also had been authorized to do so by the principal. The

11

1 court views this 'mis-communication' as a more serious problem, however.
2 Woodley Farra's unknowing retention of two different law firms and filing of two
3 motions for appointment as lead plaintiff reveal conflicts within Woodley Farra that
4 make it unsuitable to make decisions on behalf of the class." *Id.* at *7. Though the
5 *Singer* court did find the miscommunication problematic, it was because there
6 could be "conflicts *within*" the entity. *Id.* (emphasis added). Here, there is no
7 possibility of internal conflicts within an entity because Mr. Menon is an
8 individual.

Furthermore, there are authorities that support Mr. Menon's position. For instance, in *Khunt v. Alibaba Group Holding Ltd.*, 102 F. Supp. 3d 523 (S.D.N.Y. 2015), an individual and an entity were initially two of multiple movants seeking appointment as lead plaintiff. It turned out that the individual (Tai) wholly owned the entity (CAC) and was its sole director. *See id.* at 529. The individual "admitted that he filed two competing applications in the hopes that it would increase his chance of being appointed lead plaintiff, and, having been caught, now proposes to saddle the class with the bills of not one, but two law firms." *Id.* at 537. In spite of these circumstances, the court did not find a problem appointing the individual and the entity as lead plaintiff.

> Frankly, I view this as a tempest in a teacup. Another court confronted with such a gaffe did not view it as so serious as to preclude the preliminary finding of adequacy necessary at this stage. *See* Docket Sheet, *In Re Altisource Portfolio Solutions, S.A. Securities Litigation*, 14 Civ. 81156 (WPD) (S.D. Fla.) (appointing as lead plaintiff a pension fund that filed two competing motions for lead plaintiff status using two separate firms on the same day, but which later corrected its mistake). The competing movants make much of Tai's mistake, but, in the case cited by them, the court found that the movant who had filed competing motions against himself was inadequate for several reasons, of which the competing motion gaffe was only one. *See Tsirekidze*, 2008 U.S. Dist. LEXIS 118562, 2008 WL 942273, *passim.*
>
> Tai admits that he made a mistake. He rectified it. He seems to care very much about obtaining relief in light of the substantial losses he and his company suffered. His interests are fully aligned with those of the class. The competing movants insinuate much from Tai's mistake, but show nothing other than that Tai is an eager – if perhaps a little *over*eager – lead plaintiff.

12

*Id.* (emphasis in original).

The court in *David* had an analysis similar to that in *Khunt*:

> Retaining two separate law firms to file separate motions for the same plaintiff is not a sufficient basis for disqualification. It shows "nothing other than that [the movant] is an eager – if perhaps a little *over* eager – lead plaintiff." In fact, Lee acknowledged that she made a mistake due to her eagerness because she 'erroneously thought that signing up with two law firms would better secure and serve [her] application.' Moreover, upon discovering her mistake, she promptly directed Rosen Law to withdraw one of her motions.

*David*, 2024 WL 4351311, at *6 (emphasis in original). Notably, the Pomerantz firm, who represents Mr. Ross in the case at bar, was the other law firm who had filed a motion to appoint.

Accordingly, the Court rejects the challenging movants' contention that Mr. Menon's filing of two motions to appoint renders him inadequate.

### 2. Conflicting Motions

According to Mr. Ross (not Mr. Regan), even if the Court does not deem Mr. Menon inadequate because two motions to appoint were filed on his behalf, there are other reasons to find Mr. Menon inadequate – *i.e.*, because there is conflicting information in the two motions. Mr. Ross asserts: "[I]n his two competing motion submissions, Menon has provided conflicting information to the Court regarding [i] the prices at which he paid for and sold his Maxeon shares, [ii] the number of accounts he used to complete these transactions, [iii] his total losses suffered from these transactions, and [iv] even his own experience as an investor." Ross Opp'n at 4.

These conflicts are overblown for the reasons stated in Mr. Menon's reply brief.

#### a. Prices of Maxeon Shares

In his opposition, Mr. Ross notes as follows:

> Menon's sworn Rosen Certification[4] attests "under penalty of perjury" that he **sold** 4,800 Maxeon shares at **$5.79** per share (*see* Dkt. No. 13-2 at *2-3), whereas his sworn Faruqi Certification attests "under penalty of perjury" that he sold these same 4,800 shares at **$5.78** per share (*see* Dkt. No. 21-2 at *2-3). Likewise, Menon's sworn Rosen Certification attests "under penalty of perjury" that he **purchased** 100 Maxeon shares at **$3.99** per share (*see* Dkt. No. 13-2 at *2-3), whereas his sworn Faruqi Certification

---

[4] *See* note 1, *supra*.

13

attests "under penalty of perjury" that he purchased these same 100 shares at **$3.995** per share (*see* Dkt. No. 21-2 at *2-3).

Ross Opp'n at 14 (emphasis added).  Below are the relevant screenshots from the Rosen papers and the Faruqi papers.

**Rosen:**

**CLASS PERIOD TRANSACTIONS***

| PURCHASES | | | SALES | | |
|---|---|---|---|---|---|
| DATE | SHARES | PRICE | DATE | SHARES | PRICE |
| 11/24/2023 | 5,150 | ($4.75) | 2/16/2024 | 26,400 | $5.78 |
| 12/14/2023 | 100 | ($3.99) | 2/16/2024 | 4,800 | $5.79 |
| 12/14/2023 | 31,700 | ($4.00) | 2/16/2024 | 600 | $5.79 |
| 2/21/2024 | 33,000 | ($5.45) | | | |

*All dates listed are settlement dates.

Rosen Decl., Ex. 2.

/ / /

**Faruqi:**

### Account 1

| Transaction (Purchase or Sale) | Share Type | Trade Date | Quantity | Price Per Share |
|---|---|---|---|---|
| Purchase | Common Stock | 11/21/2023 | 5,150 | $4.7500 |

### Account 2

| Transaction (Purchase or Sale) | Share Type | Trade Date | Quantity | Price Per Share |
|---|---|---|---|---|
| Purchase | Common Stock | 12/12/2023 | 100 | $3.9950 |
| Purchase | Common Stock | 12/12/2023 | 31,700 | $4.0000 |
| Sold | Common Stock | 2/14/2024 | (26,400) | $5.7800 |
| Sold | Common Stock | 2/14/2024 | (4,800) | $5.7800 |
| Sold | Common Stock | 2/14/2024 | (600) | $5.7900 |
| Purchase | Common Stock | 2/16/2024 | 33,000 | $5.4500 |

Omoto Decl., Ex. B.

Mr. Ross is correct that there are these differences. However, as Mr. Menon argues, these differences are *so* small (a difference of a cent or less) that they are immaterial – and probably resulted from "different law firm policies regarding managing and calculating data downloads from stock exchange reporting services." Menon Reply at 3.

Mr. Ross also points out that the Rosen firm used *settlement* dates for the transactions in Maxeon securities whereas the Faruqi firm used *trade* dates – *e.g.*, for the 4,800 shares that were sold, the trade date was February 14, 2024 (Faruqi), but the settlement date was February 16, 2024 (Rosen). *See* Ross Opp'n at 14. But as Mr. Menon points out, Mr. Ross has failed to point out that this difference results in an inaccuracy, let alone a material one. *See* Menon Reply at 9 ("[Mr. Ross] correctly notes that the Faruqi firm calculated estimated losses based on trades dates, while the other law firm [Rosen] provides settlement dates for Menon's transactions, without any explanation whatsoever of why the distinction matters for the Court's consideration of adequacy.

15

1  Indeed, Ross does not claim that information for the trade dates and settlement dates was
2  inaccurate and only claimed it was different.").

### b. Number of Accounts Held by Mr. Menon

Mr. Ross next points out that "Menon's Rosen Certification and Loss Chart indicate that he transacted in Maxeon securities during the Class Period in only a **single** account, whereas Menon's Faruqi Certification and Loss Chart both specify that Menon transacted in Maxeon securities through **two** accounts during the Class Period." Ross Opp'n at 15 (emphasis added). The screenshots above reflect this fact.

But as above, the question is: is that difference material? There does not appear to be any end-result inaccuracy because one firm separated the data from the two accounts and other did not. *See* Menon Reply at 10 ("Ross offers no explanation why this would be relevant at all and does not argue that the total number of transactions in either motion was inaccurately reported.").

### c. Total Losses Suffered

The third point made by Mr. Ross is that the Rosen papers claim a loss of $124,129.41 whereas the Faruqi papers claim a loss of $124,434.32 – a difference of about $305. *See* Menon Reply at 3. This difference is not that significant as an absolute number. Moreover, the difference is not particularly troubling in that – as reflected in the charts above – both the Rosen papers and the Faruqi papers use the same number of shares purchased and sold and largely use the same purchase and sale prices (except for the small differences identified by Mr. Ross above). In other words, though there is a difference in the losses claimed, that seems to be a slight difference in calculations made by the law firms. Furthermore, Mr. Menon has provided in his reply brief a sufficient explanation for the difference in calculation – *i.e.*, the difference is related to the "look back price"[5]:

---

[5] "Under the PSLRA, damages are not calculated based upon a single-day decline in price, but instead are given a 90-day opportunity to recover after the misrepresentations or omissions are corrected." *In re Puda Coal Sec. Inc.*, No. 11 Civ. 2598 (DLC) (HBP), 2017 U.S. Dist. LEXIS 2122, at *42 (S.D.N.Y. Jan. 6, 2017). "The legislative history of the PSLRA indicates that the purpose of the 90-day lookback is to prevent an overestimation of plaintiffs' damages by looking at the price only on the day following the corrective disclosure." *Id.*; *see also Acticon AG v. China N.E. Petroleum Holdings, Ltd.*, 692 F.3d 34, 38-39 (2d Cir. 2012) (discussing the lookback or "bounce back" provision in the PSLRA); 15 U.S.C. § 78u-4(e)(1) (providing that, "in any private

United States District Court
Northern District of California

> [T]his discrepancy would be nothing more than the natural result of the PSLRA mandated 90-day rolling average calculation being performed a few days apart. The PSLRA caps a shareholder's damages by using the "mean trading price" of an issuer's security "during the 90-day period beginning on the date on which the information correcting the misstatement or omissions that is the basis for the action is disseminated to the market." 15 U.S.C. § 78u-4(e)(1). For accuracy, it is customary for Lead Plaintiff movants performing damage calculations that fall within that 90-day period to use the 90-day rolling average at the time of filing or reasonably close thereto. The 90-day look back average price used by the Faruqi Firm of $0.6099 was calculated on the very day of the initial filing on August 26, 2024, as shown on the chart itself. The lookback 90-day look back average price calculated by the Rosen Law Firm would simply have been computed a few days earlier as it is shown to use a rolling average of $0.61725. *Compare* Faruqi Opening Motion, ECF No. 21-3, using a 90-day look back price of $0.6099 as of August 26, 2024, *with* Rosen Opp. Motion, ECF No. 13-3, using a 90-day look back price of $0.61725.

Menon Reply at 3-4.

### d. Number of Years as Investor

Finally, Mr. Ross points out that, in the motion filed by the Rosen firm, Mr. Menon represented that he had "approximately 16 years of investing experience," Docket No. 12 (Mot. at 7); however, in a declaration submitted as part of the motion filed by the Faruqi firm, Mr. Menon testified that he has "been investing in the stock market since 2006," which would be 18 years of investing experience. Omoto Decl., Ex. D (Menon Decl. ¶ 5).

In response, Mr. Menon points out that he never testified in a *declaration* in support of the Rosen papers that he had 16 years of experience. The statement about "approximately 16 years of investing experience" was simply made in the *motion* filed by the Rosen firm. Mr. Menon is correct and, thus, in this regard, there is no conflict. Moreover, even if one were to credit Mr. Menon with the statement in the motion filed by the Rosen firm, the statement was that he has *approximately* 16 years of investing experience. He did not commit specifically to 16 years outright. Thus, again, there is no material conflict.

---

action . . . in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid . . . by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market").

17

3. <u>Summary</u>

Based on the above, the Court finds that Mr. Menon has the largest financial interest and that he is a typical and adequate plaintiff, thus satisfying the requirements of Rule 23. The Court therefore Court appoints Mr. Menon as Lead Plaintiff.

D. <u>Selection of Lead Counsel</u>

Under the PSLRA, "[t]he most adequate plaintiff *shall*, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u-4(a)(3)(B)(v) (emphasis added). "The PSLRA evidences a strong presumption in favor of approving a properly-selected lead plaintiff's decisions as to counsel selection and counsel retention." *Varghese v. China Shenghuo Pharm. Holdings, Inc.*, 589 F. Supp. 2d 388, 398 (S.D.N.Y. 2008) (internal quotation marks omitted). Courts have indicated that a court should interfere with the lead plaintiff's selection of counsel only "'when warranted to protect the interests of the class.'" *Reitan v. China Mobile Games & Entm't Group, Ltd*, 68 F. Supp. 3d 390, 401 (S.D.N.Y. 2014). Given this standard, the Court approves Mr. Menon's selection of the Faruqi firm which, as indicated above, has significant experience with securities litigation.

### III.  CONCLUSION

The Court appoints Mr. Menon as Lead Plaintiff and approves his selection of the Faruqi firm. Mr. Menon has three weeks from the date of this decision to file an amended complaint. The amended complaint shall reflect that Mr. Menon is Lead Plaintiff. Mr. Menon also has leave to make substantive amendments in the form of enhanced factual allegations and/or new legal claims based on the same underlying factual predicate.

/ / /

The parties shall meet and confer to reach agreement on a schedule for Defendants to respond to the amended complaint, whether an answer or a motion to dismiss.

In the meantime, the Court shall forthwith set a status conference for approximately ninety (90) days out as a placeholder.

This order disposes of Docket Nos. 20, 26, and 30.

**IT IS SO ORDERED**.

Dated: October 18, 2024

_____
EDWARD M. CHEN
United States District Judge

19