Lisa T. Omoto SBN 303830
E-mail: lomoto@faruqilaw.com
**FARUQI & FARUQI, LLP**
1901 Avenue of the Stars, Suite 1060
Los Angeles, CA 90067
Telephone: 424-256-2884
Facsimile: 424-256-2885

James M. Wilson, Jr. (appearance *pro hac vice*)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email:  jwilson@faruqilaw.com

Robert W. Killorin (appearance *pro hac vice*)
**FARUQI & FARUQI, LLP**
3565 Piedmont Road NE Building Four
Suite 380
Atlanta, GA 30305
Telephone: 404-847-0617
Facsimile: 404-506-9534
Email: rkillorin@faruqilaw.com

*Attorneys for Lead Plaintiff*
*Jeyakumar VS Menon*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEYAKUMAR VS MENON, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MAXEON SOLAR TECHNOLOGIES, LTD., WILLIAM MULLIGAN, and KAI STROHBECKE,<br><br>Defendants. | Case No. 3:24-cv-03869-EMC<br><br>CLASS ACTION<br><br>**AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

NATURE AND SUMMARY OF ACTION ................................................................. 1

JURISDICTION AND VENUE ............................................................................. 7

PARTIES .................................................................................................... 8

    A.    Lead Plaintiff ................................................................................. 8

    B.    Defendants ..................................................................................... 8

    C.    Relevant Non-Parties ..................................................................... 9

    D.    Confidential Witnesses .................................................................... 9

FACTUAL ALLEGATIONS ............................................................................... 10

    A.    Background Of Maxeon And Its Businesses .................................... 10

    B.    Maxeon And SunPower .................................................................. 11

    C.    Market Headwinds Facing The Solar Panel Industry .......................... 13

    D.    Maxeon Reassures The Market Despite SunPower Loss And Market Conditions .................................................................................. 15

    E.    Revelation of Maxeon's Struggles and Restructuring ......................... 18

I.    DEFENDANTS' CLASS PERIOD MATERIAL MISREPRESENTATIONS AND OMISSIONS .................................................................................... 21

    A.    Defendants' November 2023 Misrepresentations .............................. 21

    B.    Defendants' Material Misrepresentations in 2024 .............................. 23

II.    THE TRUTH EMERGES ....................................................................... 24

III.    ADDITIONAL SCIENTER ALLEGATIONS ............................................. 28

    A.    *Respondeat Superior* and Agency Principles Apply .......................... 28

    B.    The Individual Defendants Had Access To Information That Their Statements Were False Or Misleading .............................................. 28

    C.    The Utility-Scale Business, Its Cash Flow And Liquidity And Replacing The DG Business Lost Through SunPower Were Core Operations of Maxeon .......... 30

    D.    The Temporal Proximity Between Defendants' Misleading Statements And The Revelation Of The Truth Bolsters Scienter ................................... 32

    E.    The Timing Of Strohbecke's Departures Support Scienter ................... 32

IV.    LOSS CAUSATION ............................................................................. 33

i

V.      CLASS ACTION ALLEGATIONS ..................................................... 34

VI.     CONTROL PERSON LIABILITY ...................................................... 35

VII.    APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE ......................... 36

VIII.   THE AFFILIATED *UTE* PRESUMPTION ............................................ 37

IX.     INAPPLICABILITY OF SAFE HARBOR ................................................. 38

X.      CLAIMS FOR RELIEF ............................................................ 39

PRAYER FOR RELIEF .................................................................... 42

JURY TRIAL DEMAND .................................................................... 43

**AMENDED CLASS ACTION COMPLAINT**
**Case No. 3:24-cv-03869-EMC**

1    Lead Plaintiff Jeyakumar VS Menon ("Plaintiff"), individually and on behalf himself and

2    all persons who purchased Maxeon Solar Technologies, Ltd. ("Maxeon" or the "Company")

3    common stock during the period from November 15, 2023 through May 29, 2024, inclusive (the

4    "Class Period"), alleges the following based upon personal knowledge as to Plaintiff and

5    Plaintiff's own acts, and information and belief as to all other matters.  Plaintiff's information

6    and belief is based on the substantial investigation by Plaintiff's counsel into the facts and

7    circumstances alleged herein, including the following: (i) a review and analysis of public filings

8    referenced herein made by Maxeon with the United States Securities and Exchange Commission

9    ("SEC"); (ii) a review and analysis of press releases, analyst reports, public statements, news

10   articles, and other publications referenced herein disseminated by or concerning Maxeon and

11   Defendants William Mulligan ("Mulligan") and Kai Strohbecke ("Strohbecke") named herein,

12   including the dissemination of information on the Internet; (iii) a review and analysis of

13   Company conference calls, press conferences, and related statements and other materials

14   referenced herein; and (iv) a review and analysis of those other documents referenced herein.

15   Many additional facts supporting the allegations are known only to Defendants and/or are within

16   their exclusive custody or control.  Plaintiff believes that substantial additional evidentiary

17   support for the allegations will emerge after a reasonable opportunity to conduct discovery.

18                              **NATURE AND SUMMARY OF ACTION**

19       1.      Plaintiff alleges a straightforward case of securities fraud under the Securities

20   Exchange Act of 1934 ("Exchange Act").  Specifically, Defendants intentionally misled the

21   market during the Class Period that Maxeon's business operations were performing well and that

22   its future prospects were positive even though they knew that its fractured relationship with its

23   former parent corporation, SunPower Corp. ("SunPower"), had materially negatively impacted

24   its source of sales and revenues and that industry headwinds were having a major negative

25   impact on the Company's performance and ability to meet projections.  When the Company

26   finally disclosed the truth—that it was facing a "serious cash flow challenge" and would now be

27   majority owned by its largest shareholder in a transaction requiring the issuance of new shares

28

which substantially diluted the ownership interest of current shareholders—the market reacted swiftly and negatively to this bombshell new information, as Maxeon's stock price tanked a whopping 39.55%, causing millions in damages to Maxeon investors who bought stock at inflated prices during the Class Period.

2.      Maxeon is a solar power and renewable energy company that designs, manufactures, markets and sells a comprehensive portfolio of photovoltaic solar panels and its related components worldwide.

3.      For years, Maxeon operated as a division of SunPower, a residential provider of photovoltaic solar panels, but in 2020, Maxeon went public through a strategic spin-off transaction with SunPower and began trading on the NASDAQ exchange under the ticker symbol MAXN.   Despite branching off from SunPower, Maxeon maintained a close strategic partnership with it.

4.      As part of Maxeon's partnership with SunPower, the companies entered into an agreement (the "New Master Supply Agreement") whereby Maxeon agreed to sell and SunPower agreed to purchase certain volumes of Maxeon's solar panels on an exclusive basis.  SunPower operated as a middleman, buying the panels from Maxeon and then selling them to dealers and installers.  Maxeon, in turn, was prohibited by a non-circumvention clause in its agreements with SunPower from directly selling its solar panels to SunPower's dealers and installers.

5.      An important part of Maxeon's business is its Distributed Generation ("DG") sector, through which it sells products to SunPower, as well as other suppliers, or direct to consumers for smaller centralized applications.  Maxeon's other business segment is its Utility-Scale sector, which provides solar panels and related support to solar power plants for large-scale application.

6.      Maxeon's supply relationship with SunPower became the key piece of its DG business, which historically dwarfed Maxeon's Utility-Scale business.  Maxeon's DG sector accounted for 84.9% of its revenue for the fiscal 2022 year, while Maxeon's Utility-Scale

business made up just 15.1% of its total revenue during that time.  SunPower accounted for 26.7% of Maxeon's revenue for the 2022 fiscal year.

7.    By mid-2023, however, Maxeon's partnership with SunPower turned south and the pair became embroiled in a contentious dispute, with Maxeon alleging that SunPower was withholding approximately $29 million in past due invoices and SunPower alleging that Maxeon was in breach of the New Master Supply Agreement's non-circumvention clause.  As a result, Maxeon ceased shipments to SunPower in July 2023.

8.    Around the time that Maxeon's relationship with SunPower was breaking down, the solar power market was impacted by rising interest rates, the California Public Utilities Commission ("CPUC") lowering the credits earned from excess solar energy exported to the grid for future installations, and an oversupply of Chinese solar products that depressed prices. Maxeon's future would have looked bleak to insiders with knowledge of the true state of affairs at the Company.

9.    On the first day of the Class Period, November 15, 2023, Defendants disclosed specific positive news to the market about Maxeon and its future.  Mulligan touted the Company's positive operations results and downplayed the market conditions as neither "unique" nor "unprecedented."

10.    Further, Maxeon announced that its dispute with SunPower had been settled through the execution of a settlement agreement ("Settlement") that: (i) terminated the New Master Supply Agreement; (ii) required SunPower to purchase 85 megawatts ("MW") of Interdigitated Back Contract ("IBC") modules[1] from Maxeon on a take or pay basis, requiring that SunPower pay for the entire volume of Maxeon's provided products regardless of whether SunPower took delivery; (iii) released Maxeon from its exclusivity agreement with SunPower; and (iv) released Maxeon from its non-circumvention obligations effective January 1, 2024.

---

[1]    A module is a single photovoltaic panel that is comprised of connected solar cells that absorb sunlight as a source of energy to generate electricity for the end user.  Sunrun, *What Is a Solar Module?* https://www.sunrun.com/go-solar-center/solar-terms/definition/solar-module (May 4, 2018).

1       11.     Defendants cast these developments in a positive light to the market.  For

2  example, the Company told investors on its November 15, 2023 earnings call that it had put

3  renewed focus on its Utility-Scale business as the "primary growth driver."  Maxeon noted on

4  the call that they would see "the majority of its shipments" be "to [its] [U]tility-[S]cale

5  customers" in the quarters that ensued, which would be the "new normal for the foreseeable

6  future" during the temporary slowdown of the DG business.

7       12.     Defendants told the market that the new deal with SunPower would have a

8  positive impact on its operational metrics because "[o]ffering panels directly to installers will

9  eliminate the markup SunPower has historically added to our products, allowing us to deliver the

10  world's best panels to customers at more competitive pricing.  This will enable our plans to

11  aggressively ramp our sales in the U.S. market."

12       13.     Additionally, Defendants affirmatively put the Company's cash position and

13  liquidity in play that day when Mulligan touted that Maxeon "struck the right balance . . .

14  between capacity for growth and *maintaining profitability and positive cash flow in the near*

15  *term* . . . ."  Strohbecke also commented that despite negative cash flow in the third quarter of

16  2023, Maxeon "*w[as] . . . in a good position to generate sufficient cash and maintain sufficient*

17  *cash levels for our existing business*."

18       14.     That same day, Defendants also falsely assured the market that Maxeon had

19  sufficient cash flow for the next year in its November 15, 2023 Form 6-K filed with the SEC,

20  stating that it believed Maxeon's "*current cash, cash equivalents . . ., along with cash expected*

21  *to be generated from operations [would] be sufficient to meet [its] obligations over the next 12*

22  *months*."

23       15.     Mulligan also reassured the market that "Kai[2] and his team [were] laser-focused

24  on cash management" which signaled to investors that Defendants were constantly in the know

25  about the status of the Company's cash position.

26

27  _____

   [2]     Kai refers to Strohbecke.

28

16.    But, according to a former employee who was a part of the Company's Treasury Team, Maxeon's cash flow began deteriorating as early as May/June of 2023, and was considered "bad" by the Summer of 2023.  In fact, lenders expressed their concern about Maxeon's ability to continue as a going concern as early as summer 2023 and as late as September 2023.  That Defendants knew about these cash flow and liquidity issues is supported by the fact that prospective lenders expressed their concerns about Maxeon's ability to continue as a going concern and the financing options of such lenders were presented to Mulligan and Strohbecke.

17.    Unbeknownst to investors, Maxeon was also not in a position to "aggressively ramp" its sales in the near term by offering panels directly to installers who were used to dealing with SunPower as Defendants had touted.  This is because Maxeon tried to do so even before the agreement was terminated, which CW-1 (defined *infra* ¶ 40), the former Maxeon Treasury Team member, stated led to "a great deal of loss" of dealers it approached.

18.    Additionally, Maxeon knew, but investors did not, that it would reach the peak of its utility-scale prepayment amortization schedule in or before the first quarter of 2024, which meant that the Company would only be able to collect a portion of the sales revenue associated with customer prepayments as cash.  Unlike investors, Defendants knew that this schedule would negatively impact Maxeon's cash flows and liquidity.

19.    Indeed, Maxeon's former Treasury Team member characterized Maxeon's cash flow and liquidity situation as "clearly dire" as of March 2024.

20.    Nonetheless, Maxeon issued a press release on April 8, 2024 announcing its preliminary fourth quarter (which ended December 31, 2023) and its fiscal year 2023 results. The press release provided that "***Maxeon delivered financial results largely in line with our expectations*** . . . . [and that] [t]he Maxeon team is highly focused on reducing manufacturing costs, OPEX rationalization and ***liquidity-management to enable a return to profitability***."

21.    Meanwhile, a cash flow and liquidity crisis had been brewing.  In addition to the reduced cash from the prepayment amortization schedule, Maxeon was informed early in the first

quarter of 2024 by two of its large Utility-Scale customers, including Origis Energy Ltd. ("Origis"), that they were experiencing project delays and "would not be in a position to accept [module] deliveries under" its agreed upon contract with Maxeon. This left Maxeon without the expected cash from these deals and unused inventory, the costs of which they were forced to absorb.

22. Then, instead of filing its Form 20-F as required, Maxeon filed a Form NT 20-F with the SEC on April 30, 2024. The Form NT 20-F cryptically provided that Maxeon would require "additional time to complete its financial statement preparation and review process" given "the additional ongoing work required in connection with the assessment of the Company's ability to continue as a going concern[.]"

23. The truth was finally revealed through a series of related disclosures on May 30, 2024. First, Defendants revealed that two of Maxeon's Utility-Scale customers were experiencing "significant project delays" causing Maxeon to absorb the costs of the unused inventory. Then, Defendants disclosed that the market "headwinds unfortunately coincided with the peak of [its] utility scale prepayment amortization, and as a result, the company has been facing a serious cash flow challenge." Thereafter, Maxeon revealed that it had "lower revenue and profit than planned," including a $39 million decrease quarter over quarter and historic lows in its DG business revenue in the first quarter of 2024. And finally, Maxeon disclosed that as a result of the foregoing, the Company's liquidity position was negatively affected, leaving substantial doubt about its ability to continue a going concern.

24. Together with this news, Maxeon announced that it required "additional capital support to . . . . support [its] immediate liquidity needs" through a dilutive share offering from its then-largest shareholder, TCL Zhonghuan Renewable Energy Technology Co. Ltd. ("TZE"), a China-based corporation. Because this takeover made Maxeon a majority Chinese-owned corporation, its ability to receive a Department of Energy ("DOE") loan needed for its touted Albuquerque, New Mexico Utility-Scale plant was now in jeopardy.

25.     On this news, Maxeon's stock experienced a significant drop, plunging from a closing price of $3.11 on May 29, 2024 to $2.03 on May 30, 2024, and then to a $1.88 closing price on May 31, 2024, representing a cumulative a drop of 39.55%.

26.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities when the true facts came to light, Plaintiff and other Class Members suffered significant losses and damages.

## JURISDICTION AND VENUE

27.     The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

28.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act (15 U.S.C. § 78aa).

29.     This Court has personal jurisdiction over each of the Defendants named herein because each Defendant is either essentially at home in the jurisdiction or has sufficient minimum contacts with the forum from which Plaintiff's claims arise out of or relate so as to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

30.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)), as many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.  In addition, Maxeon maintained its domestic corporate headquarters at 51 Rio Robles, San Jose, California 95134 which is located in this District, at all relevant times, and Defendants conduct substantial business in this District.

31.     In connection with the acts, conduct, and other wrongs alleged in this Amended Class Action Complaint (the "Complaint"), Defendants, directly or indirectly, used the means

1    and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail,

2    interstate telephone communications, and the facilities of national securities exchanges.

3                                        **PARTIES**

4    **A.    Lead Plaintiff**

5        32.    As shown in his PSLRA Certification, Lead Plaintiff Jeyakumar VS Menon

6    purchased Maxeon common stock at artificially inflated prices during the Class Period and was

7    damaged upon the revelation of the alleged corrective disclosures.  Menon was appointed Lead

8    Plaintiff on October 18, 2024.  ECF No. 61.

9    **B.    Defendants**

10        33.    Maxeon is a public company incorporated under the laws of Singapore with its

11   corporate headquarters located at 8 Marina Boulevard #05-02, Marina Bay Financial Centre,

12   Singapore 018981.  The Company's domestic corporate headquarters is located at 51 Rio Robles,

13   San Jose, California 95134.  Maxeon's ordinary shares trade on the NASDAQ exchange under

14   the symbol MAXN.

15        34.    Defendant Mulligan served as Chief Executive Officer ("CEO") of Maxeon from

16   January 2023 to October 2024.  Maxeon announced Defendant Mulligan's departure in October

17   2024.  Defendant Mulligan remained with Maxeon as an Advisor.  *See* LinkedIn, William

18   Mulligan, https://www.linkedin.com/in/bill-mulligan-787160178/.

19        35.    Defendant Strohbecke served as Chief Financial Officer ("CFO") of Maxeon from

20   March 2021 to August 2024.  *See* LinkedIn, Kai Strohbecke, https://www.linkedin.com/in/kai-

21   strohbecke-3087b66/?originalSubdomain=sg.  Strohbecke's departure was announced in

22   Maxeon's Form 6-K Filing on June 6, 2024, which stated that he would leave at the end of

23   August 2024.  Maxeon Current Report (Form 6-K) (June 6,  2024).

24        36.    Mulligan and Strohbecke are sometimes collectively referred to herein as the

25   "Individual Defendants."

26        37.    Maxeon and the Individual Defendants are collectively referred to herein as

27   "Defendants."

28

C.      **Relevant Non-Parties**

38.     Mark Babcock ("Babcock") served as Chief Revenue Officer of Maxeon from December 2020 to March 2, 2024.  Babcock also served as interim CEO of Maxeon from September 2022 until January 2023.  *See* LinkedIn, Mark Babcock, https://www.linkedin.com/in/markwbabcock/.

39.     Peter Aschenbrenner ("Aschenbrenner") serves as Maxeon's Chief Strategy Officer.  He began working at Maxeon on August 26, 2020.  Prior to joining Maxeon, Aschenbrenner served as SunPower's Executive Vice President of Corporate Strategy and Business Development.  *See* Maxeon, Management, https://corp.maxeon.com/management/peter-aschenbrenner (last visited Nov. 8, 2024).

D.      **Confidential Witnesses**

40.     Confidential Witness One ("CW-1") was employed at Maxeon as a Senior Manager of Project Finance from December 2022 to January 2024.  Within this role, and at all relevant times during CW-1's employment, CW-1 was as a member of the Company's Treasury Team and had direct dealings with Mulligan, Strohbecke and Babcock.  CW-1 had one-on-one interactions with Strohbecke and communicated with Mulligan in group settings.  Strohbecke was included "on all correspondences" regarding the various matters CW-1 worked on.  As a Finance Project Lead, CW-1 had considerable visibility to the Company's finances and spent their career reading financial statements.  CW-1 was also involved in credit underwriting and raising capital through debt and equity for "infrastructure projects."  CW-1 was also involved in developing all of the financial aspects of Maxeon's efforts to build a manufacturing plant in Albuquerque, New Mexico including its "credit application" for the DOE loan.

41.     Confidential Witness 2 ("CW-2") was a Marketing Manager at Maxeon from August 2023 to November 2023.  CW-2 was one of two employees who worked on the U.S. marketing team.  CW-2 worked with counterparts in Europewho worked for SunPower.  CW-2 also attended weekly sales meeting where discussions typically centered around the sales team's pipeline.

1                                 **FACTUAL ALLEGATIONS**

2       **A.**     **Background Of Maxeon And Its Businesses**

3          42.     Maxeon is a solar power energy company that designs, manufactures, markets and

4 sells a comprehensive portfolio of photovoltaic solar panels and related components worldwide.

5 Compustat Company Research, S&P Global Market Intelligence (Jan. 5, 2023).

6          43.     Initially operating as a division of public company SunPower, Maxeon completed

7 a strategic spinoff transaction in 2020, forming its own separate entity to "fine tune" its focus

8 and jointly "serve commercial and residential customers with a comprehensive solution

9 combining [its] industry-leading equipment and software." *From Strengths to Strengths*, Tom

10 Warner, https://us.sunpower.com/blog/sunpower-maxeon-spinoff, (last visited Oct. 31, 2024).

11          44.     The spin-off brought Maxeon public and it began trading on the NASDAQ

12 exchange on August 26, 2020, under the ticker symbol MAXN.

13          45.     The Company operates through two segments—its DG and Utility-Scale

14 businesses.

15          46.     Considered Maxeon's "namesake," its DG business provides solar panels and

16 energy solutions for smaller and decentralized power generation applications such as residential,

17 community and commercial applications that offer higher efficiency and reduced degradation

18 rates. UBS, Initiation of Coverage 13 (Oct. 2, 2023). Maxeon's DG business has consistently

19 made up the large majority of Maxeon's year-over-year revenue.

20          47.     Over the years, SunPower and Maxeon, collectively, developed seven generations

21 of IBC modules. IBC boasts increased "efficiency, energy yield and reliability" because of its

22 back contact energy conversion that allows for the entire front of the solar cell to absorb sunlight

23 and convert more photons to energy making it less likely to lose power, fail or break. *See What*

24 *is IBC Solar Cell Technology?*, https://us.sunpower.com/solar-resources/what-ibc-solar-cell-

25 technology (last visited Nov. 8, 2024); *see also IBC Technology Manufacturing*, Dr. Markus

26 Sickmoeller, https://corp.maxeon.com/static-files/c5e8e15e-b191-4bab-96ff-cec504040019 (last

27 visited Nov. 8, 2024).

28

**AMENDED CLASS ACTION COMPLAINT**
**Case No. 3:24-cv-03869-EMC**

48.     The other sector of Maxeon's business—its "Utility-Scale" business—provides support for large solar power plants that produce electricity for the utility grid and, in turn, distributes electricity to end customers.  Maxeon has provided solar panels for some of the largest solar power plants around the world including in North America, South America, South Africa, Europe, Southeast Asia and Australia.  *See Solar for power plants*, https://maxeon.com/us/businesses/power-plants (last visited Nov. 8, 2024).

49.     One way Maxeon intended to grow both its Utility-Scale and DG businesses was through its proposed $1 billion "new world-class, 3 gigawatt facility" in New Mexico to produce "latest-generation TOPCon PV-silicon cell technology and the Company's proprietary shingled-cell Performance Line solar modules to meet rapidly growing demand for domestically produced solar panels."  The project was expected to upsize the scale of Maxeon's manufacturing operation by "50%."  At the time it was announced, Maxeon was only in the due diligence stage of its loan with the DOE, which it needed in order to build the facility.  Maxeon, Press Release, *Maxeon Solar Technologies Selects Albuquerque, New Mexico as Site for New 3-Gigawatt Solar Cell and Panel Manufacturing Facility*, (Aug. 10, 2023).

**B.     Maxeon And SunPower**

50.     Following Maxeon's spinoff from SunPower, the pair maintained close ties.  The intention behind the partnership was to leverage the "decade-long partnership" so that each company could operate as its own and leverage its individual strengths, with focused business plans and defined markets.  SunPower, Press Release, *SunPower and Maxeon Solar Technologies Close Spin-Off Transaction* (Aug. 27, 2020).

51.     As relevant here, Maxeon entered into the New Master Supply Agreement with SunPower, effective December 31, 2022, where Maxeon agreed to supply its Maxeon 6 Modules to SunPower for use in residential installations in the United States and Canada.  The New Master Supply Agreement also included exclusivity provisions that prohibited: (a) Maxeon from selling its Maxeon 6 Modules to anyone other than SunPower for use in the residential market in the United States and Canada; and (b) SunPower from purchasing high efficiency modules from

anyone other than Maxeon, until December 31, 2024 and, if extended by SunPower, through December 31, 2025. The New Master Supply Agreement also contained a non-circumvention clause that prevented the parties from dealing with third-parties behind the other's back in contravention of the obligations under the agreement. SunPower, Press Release, *SunPower and Maxeon Extend Their Current Supply Relationship to Meet Rising Homeowner Demand*, (Jan 5, 2023).

52.     The New Master Supply Agreement provided a significant source of revenue for Maxeon's DG business. For example, in its August 2023 Form 6-K, Maxeon stated that SunPower's business "account[ed] for 26.7% of our total revenue and 9.6% of our accounts receivable as of January 1, 2023" and for "the six months ended July 2, 2023, $151.0 million or 22.7% of [Maxeon's] revenue represented sales of solar modules to SunPower." Maxeon Current Report (Form 6-K) 8 (Aug 10, 2023).

53.     In mid-2023, however, the relationship started to sour. Maxeon became enmeshed in a contract dispute with SunPower wherein Maxeon alleged SunPower was withholding approximately $29 million in past due invoices and SunPower alleged that Maxeon was in breach of the New Master Supply Agreement's non-circumvention clause. As a result, Maxeon ceased shipments of its products to SunPower in July 2023.

54.     Maxeon disclosed certain issues with SunPower before the Class Period, and pinned missing its guidance on the SunPower issue, which analysts accepted with one analyst from CGS International stating:

> "Maxeon's pre-announced 3Q results were substantially below prior guidance, and the **main culprit for the miss is this: Maxeon paused shipments to SunPower amid their ongoing dispute**. Hence, broader industry read-through and longer-term impact from the pre-announced is limited . . . ."

CGS CIMB (Oct. 10, 2023)

55.     In light of its dispute with SunPower, which the Company claimed it intended to resolve "swift[ly,]" Maxeon updated its revenue guidance from $1.35 billion to $1.25 billion and

its adjusted EBITDA guidance from $100 million to $80 million.  Q2 2023 Earnings Call (Aug. 10, 2023).

56.     Eventually, Maxeon and SunPower would settle their dispute as announced on November 15, 2023 at Maxeon's 2023 Q3 earnings call through the settlement agreement, which: (1) terminated the New Master Supply Agreement effective November 13, 2023; (2) required SunPower to purchase certain products from Maxeon on a take or pay basis; (3) released Maxeon and SunPower from its reciprocal exclusivity obligations, effective March 31, 2024; and (4) released the parties from their non-circumvention obligations effective January 1, 2024.  Maxeon Current Report (Form 6-K), 7 (filed Nov. 15, 2023).

**C.     Market Headwinds Facing The Solar Panel Industry**

57.     In addition to the breakdown of its relationship with SunPower, Maxeon was facing numerous headwinds that were plaguing the solar panel industry in 2022 and early 2023.

58.     First, the Federal Reserve rapidly increased interest rates beginning in 2022 and continuing into 2023, making it more financially burdensome for homeowners to purchase solar panels outright.  This was particularly true where the costs of solar panels had traditionally been very expensive and largely reliant on government subsidies to drive its demand.  Consequently, overall sales of solar modules to homeowners became a greater challenge.  Jon Reed, *See High Interest Rates Are Making Solar Leases More Appealing*, https://www.cnet.com/home/energy-and-utilities/high-interest-rates-are-making-solar-leases-more-appealing/, (last visited Nov. 8, 2024).

59.     Second, notable policy changes also disincentivized solar panel users from purchasing solar panels.  In April 2023, California Public Utilities Commission put into effect a rooftop solar rule entitled "NEM 3," shorthand for "net energy metering."  Under NEM 3, solar users who submitted interconnection applications after April 14, 2023 received 75% to 80% less utility for the extra solar energy they share with the grid.  As a result, compensation for the extra energy went from $.30/kilowatt-hour ("kWh") to around $.05/kWh.  Because solar shoppers saw less return on their generated solar power, there was inherently less incentive to purchase solar

panels.  CNET, *After a Tumultous 2023, What's Next For Rooftop Solar*, https://www.cnet.com/home/energy-and-utilities/after-a-tumultuous-2023-whats-next-for-rooftop-solar/.

60.    California consistently ranks first in the United States for total installed solar capacity and total solar installed, so NEM 3 was a blow to the solar industry and specifically Maxeon who, according to CW-1, stated that the law's passage meant Maxeon's revenues would be reduced upwards of 75% in the California market.  *See* SEIA, California tate Solar Overview, https://seia.org/state-solar-policy/california-solar/, (last visited Oct. 29, 2024).

61.    Adding to an already unideal market, excess production capacity and an oversupply of Chinese solar products, triggered new lows for prices in the solar power supply chain in 2023 and into 2024:



Opis-A Dow Jones Company, *Oversupply In China Weighs On Prices Across The Solar Value Chain*, Serena Seng and Summer Zheng, (Mar, 8, 2024); UB Investment Bank, *Near-term Risks with long-term reward; Initiate Neutral*, at 6, William Grippin and Jon Windham (Sep. 23, 2023).

62.    The oversupply of Chinese solar products created a "significant supply glut" worldwide causing module prices to drop and solar companies to cancel or suspend their production capacity. S&P Global, *World stuck in major solar panel 'supply glut'; module prices plummet: IEA*, Alex Blackburne (Jan. 12, 2024); Reuters, *China solar industry faces shakeout, but rock-bottom prices to persist*, Andrew Hayley (Apr. 3, 2024).

**D.     Maxeon Reassures The Market Despite SunPower Loss And Market Conditions**

63.     On November 15, 2023, the first day of the Class Period, Mulligan acknowledged that the foregoing produced a "very challenging environment[,]" but noted that these conditions were neither "unique" nor "unprecedented[.]"  He also acknowledged the settlement with SunPower, and spun it as a positive, staying, *inter alia*, that "[o]ffering panels directly to installers will eliminate the markup SunPower has historically added to our products, allowing us to deliver the world's best panels to customers at more competitive pricing. This will enable our plans to aggressively ramp our sales in the U.S. market[.]"

64.     Unbeknownst to investors, Maxeon had already hit major roadblocks trying to offer panels directly to installers.  The relationship between Maxeon and SunPower broke down in part due to SunPower's allegation that Maxeon had violated the non-circumvention clause of the New Master Supply Agreement.  While Maxeon denied this, two former employees corroborate that this occurred.

65.     For example, according to CW-2, who worked at Maxeon from August 2023 to November 2023, Maxeon employees would still have conversations with customers under the rug" despite that the non-circumvention clause was still in effect.  Additionally, prior to a trade show that occurred in late September 2023 or early October 2023, CW-2 attended a sales meeting held by a Director of Sales who told the Company's employees to get SunPower's dealers' credentials and not to get caught having improper conversations with them.  At this meeting, CW- 2 and that director discussed speaking to SunPower dealers.

66.     CW-1, who worked at Maxeon from December 2022 to January 2024, reported that SunPower's dealers had been cultivated and developed by SunPower over a long period of time and, generally, they had had positive experiences with SunPower.  While the dealers knew generally that Maxeon made the panels that SunPower sold, the dealers were confused when they started getting calls from Maxeon representatives.  Maxeon's direct contact "caused a lot of confusion with dealers" who were now getting calls from Maxeon representatives when they

**AMENDED CLASS ACTION COMPLAINT**
**Case No. 3:24-cv-03869-EMC**

were used to dealing with SunPower, exclusively.  Such an approach may have been considered an "underhanded" move by Maxeon and led to "a great deal of loss" of such dealers.  CW-1 reported that those Maxeon personnel actually dealing with the dealers said they were clearly "pretty pissed."

67.     Thus, before the Class Period, Maxeon knew that going it alone independently of its relationship with SunPower and dealing directly with the dealers and installers for whom SunPower previously served as the middleman was far more difficult than the Company let on.

68.     Meanwhile, Maxeon knew, but failed to disclose to investors, that it would reach the peak of its utility-scale prepayment amortization schedule in or before the first quarter of 2024.  Prepayment amortization is an accounting process that recognizes the expense of an asset—*i.e.*, the solar panels to be shipped—that was paid for in advance over the specific period of time in which the prepayment is used.  Dokka, *Amortization of Prepaid Expenses*, https://dokka.com/glossary/amortization-of-prepaid-expenses/ (last visited Nov. 8, 2024). Prepayments must be amortized to avoid overstating revenue during the period the prepayment is received before the expense associated with the transaction can be realized in the period that the performance is completed.  Reaching the peak of this schedule meant that no cash would be coming in—*i.e.*, all the prepayments had been paid.

69.     This, combined with industry headwinds and the loss of SunPower, set the stage for a cash flow and liquidity crisis.  Things only got worse when, unbeknownst to investors, Maxeon was informed early in the first quarter of 2024 by two of its large Utility-Scale customers, that they were experiencing project delays and "would not be in a position to accept [module] deliveries under" its agreed upon contract with Maxeon.  This left Maxeon without the expected cash from these deals and unused inventory, the costs of which they were forced to absorb, which Defendants failed to disclose to investors.

70.     One of these customers was Origis.  Based on a review of Maxeon's public filings, the Origis contract was worth approximately $144-$187 million, calculated as follows. On March 17, 2022, Maxeon entered into a supply agreement with Origis to sell approximately

400 MW which would be delivered beginning June 2023.  Form 6-K, Mar. 17, 2022, at 2.

Approximately 30% of the total supply agreement was to be given to Maxeon as a prepayment

with half of that amount, *i.e.*, 15% of the total amount, made in March 2022 and the other half,

*i.e.*, the remaining 15% of the 30%, to be paid in December 2022.  *Id*.  The Second Quarter 2022

Outlook, when the supply agreement was entered into, projected revenue to be approximately

$215-230 million for 460-490 MW shipments, which would be approximately $467-469

thousand per MW.  Form 6-K, May 26, 2022, at 1.  The Third Quarter 2023 Outlook, when the

first deliverables were to be made, projected revenue to be approximately $220-260 million for

610-650 MW shipments, which would be approximately $360-400 thousand per MW.  Form 6-

K, Nov. 15, 2023, at 7.  Thus, the Origis contract for 400 MW was worth approximately $360-

$400 thousand per MW, or $144-187 million total.

71.    Additionally, according to CW-1, a member of Maxeon's Treasury Team, the

Company's cash and liquidity position had been deteriorating since May or June of 2023 and

became "dire" in March 2024.  Indeed, CW-1 further provided that concern from lenders about

Maxeon's ability to continue as a going concern came as early as summer 2023 and no later than

September 2023.  And "a lot" of the available financing options that Maxeon did have were

presented to Strohbecke and Mulligan.

72.    Nonetheless, despite knowing that its cash flow and liquidity situation was dire,

Maxeon told the market on April 8, 2024 that its "financial results [were] largely in line with [its

expectations]" without disclosing the then-ongoing cash flow and liquidity crisis, all the while

touting that it was "highly focused on…liquidity management," consistent with Defendants'

earlier Class Period statements that they were "laser-focused on cash management" and had a

"continued focus on working capital management."

73.    Following its April 8, 2024 press release, Maxeon filed a Form NT 20-F on April

30, 2024, disclosing that it would need "additional time to complete its financial statement

preparation and review process" given "the additional ongoing work required in connection with

the assessment of the Company's ability to continue as a going concern," again failing to

disclose with certainty Maxeon's then-ongoing and known cash flow and liquidity crisis.

74.    But this was simply not the reality Maxeon was facing.  As the numbers would

later make clear, Maxeon's cash flow and liquidity became a major issue for it as early as 2023

and was made worse in 2024.  Specifically, the Company's cash position was deteriorating as

Maxeon suffered a net loss of over $275 million in 2023, amounting to a total cash flow of

negative $254.3 million by the end of that fiscal year, and then suffered an additional $80.1

million loss, in the first three months of 2024.

**E.    Revelation Of Maxeon's Struggles And Restructuring**

75.    Although its overall revenues were largely in line with its April 8, 2024

preliminary results and estimate, the market was shocked when the truth about the extent of

Maxeon's struggles in the DG business and its cash flow and liquidity crisis was revealed to the

market on May 30, 2024.

76.    Maxeon's liquidity is dependent in part on its cash flow; if cash flow decreases,

then Maxeon's ability to invest and meet ongoing operational obligations are negatively

impacted.  Maxeon Annual Report (Form 20-F), 6 (filed May 30, 2024).  While cash flow is an

indicator for liquidity, revenue is a measure of effectiveness of Maxeon's sales and marketing.

J.B. Maverick, *How Are Cash Flow and Revenue Different?*, Investopedia,

https://www.investopedia.com/ask/answers/011315/what-difference-between-cash-flow-and-

revenue.asp (last visited Nov. 8, 2024).  Although both cash flow and revenue are used to

evaluate a company's financial health, cash flow is critical for determining a company's ability

to remain functional.  *Id*.

77.    Additionally, Mulligan announced that the Company "has been facing a serious

cash flow challenge[,]" with total operating cash flow for the fourth quarter of 2023 at negative

$76 million followed by a negative operating cash flow of $73 million during the first quarter of

2024.  Q1 2024 Earnings Call (May 30, 2024).

78.    During the call, Strohbecke also acknowledged the negative impact market conditions had on Maxeon's liquidity position. *Id.*

79.    The Company also disclosed specifics about the unfavorable condition of its working capital[3] in its May 30, 2024 20-F filing, stating that:

> The unfavorable working capital movement arose from a ***net utilization of $55.1 million of contract liabilities, mainly from advance collections from customers for certain sale contracts,*** a decrease of $97.7 million in accounts payable and other accrued liabilities due to timing of settlement of invoices, an increase in inventories of $43.5 million, increase in accounts receivables of $8.3 million, primarily attributable to billing and collection cycles.

Maxeon Annual Report (Form 20-F) 75-76 (filed May 30, 2024).

80.    The crisis was so bad that Maxeon revealed it had "negotiated commitments for significant liquidity support from [its] largest shareholder TZE" through a dilutive offering at its Q1 2024 Earnings Call dated May 30, 2024.

81.    Moreover, during the same Earnings Call, Mulligan announced:

> TZE has agreed to invest ***$97.5 million into the company via a debt investment and has committed to an additional $100 million equity investment*** . . . . In addition, substantially all of the holders of the $200 million 2025 convertible notes have agreed to exchange their bonds and accrued interest into new bonds due in 2028, which are convertible into equity at the noteholders' option starting July 2nd and $137.2 million of which must be converted into equity upon TZE's equity investment. ***While we believe these transactions are necessary to stabilize our balance sheet and allow management to focus on returning our business to profitability***, they will also result in a substantial dilution for existing public shareholders.

Q1 2024 Earnings Call (May 30, 2024)

---

[3]    Working capital is the money available to fulfill short-term expenses—i.e., the difference between current assets (including cash and cash equivalents) and current liabilities—whereas cash flow is the net amount of cash and cash equivalents going in and out of a company. Ryan Furhmann, *What Changes in Working Capital Impact Cash Flow?*, Investopedia, https://www.investopedia.com/ask/answers/071114/how-do-changes-working-capital-affect-companys-cash-flow.asp (last visited Nov. 7, 2024). Thus, changes in working capital are reflected in cash flow—*i.e.*, Operating Cash Flow = Operating Income + Non-Cash Expenses - Taxes + Changes in Working Capital. *Id.*

82.     In addition to share dilution, the TZE takeover would also complicate the Company's operational prospects further, particularly as it related to Maxeon's "first U.S. manufacturing expansion" in New Mexico that was expected to provide long term meaningful contributions for Maxeon and the energy sector at large.  Maxeon, Press Release, Maxeon Solar Technologies Selects Albuquerque, New Mexico as Site for New 3-Gigawatt Solar Cell and Panel Manufacturing Facility, (Aug 10, 2023).  As one Roth Capital Partners' analyst report put it: "[w]ith a majority of the company now owned by a Chinese entity, the new [capital] raise calls into question [Maxeon's] ability to secure the DOE loan for its New Mexico facility."  Roth MKM (May 30, 2024).

83.     This is because the DOE program manual provides that "as DOE invests in critical infrastructure and funds the deployment and manufacturing of critical technology areas, DOE considers risks of undue foreign influence… [i]f high risks are identified and cannot be sufficiently mitigated, DOE may elect to not provide a loan guarantee to the applicant." The program loan specifically identifies China as one of the handful of foreign countries presenting such a risk.[4]

84.     Additionally, Defendants announced a decrease in its DG sector revenue by $39 million, representing historic lows for the Company.  Q1 2024 Earnings Call, Supplementary Slides, 6 (May 30, 2024).  This was a dramatic decline in revenue from its previous quarter, representing a 30.23% drop in its DG business revenue and an 22.02% drop in overall revenue from the previous fiscal quarters, and a 41% year-over-year decline: Maxeon Current Report (Form 6-K), 1, 7 (filed May 30, 2024); *see also* Q1 2024 Earnings Call, Supplementary Slides, 6 (May 30, 2024).

85.     Defendants attributed the sharp decline in Maxeon's DG business revenue and "efforts to grow volume" in its DG sector, in part, through a "combination of overall demand

---

[4]     Mulligan confirmed the complications present in obtaining a DOE loan guarantee now that Maxeon would be a Chinese majority owned corporation in Maxeon's May 30, 2024 earnings call.

softness impacting our US and European channel business […]" and because of "the general market slowdown particularly in California," suggesting that the Company's plans to "ramp up" sales were neither as plausible nor as likely as they led the market to believe in their previous earnings call.

86.    On this news, the share price fell from a close of $3.11 on May 29, 2024 to $2.03 on May 30, 2024, and closed at $1.88 on May 31, 2024, representing a cumulative a drop of 39.55%.

87.    To date, the DOE has not approved nor guaranteed Maxeon's request for a loan for its New Mexico facility.

I.    **DEFENDANTS' CLASS PERIOD MATERIAL MISREPRESENTATIONS AND OMISSIONS**

A.    **Defendants' November 2023 Misrepresentations[5]**

88.    The Class Period begins on November 15, 2023, when Maxeon held an earnings call to announce its financial and operating results for the third quarter of 2023.  At the earnings call, Mulligan made the following false and misleading statements regarding the end of its relationship with SunPower:

> Offering panels directly to installers will eliminate the markup SunPower has historically added to our products, allowing us to deliver the world's best panels to customers at more competitive pricing.  ***This will enable our plans to aggressively ramp our sales in the U.S. market***.
>
> *    *    *
>
> We have exclusivity on the Maxeon 6 product through the end of Q1, but we are able to sell Maxeon 3 and Maxeon 7 starting the first of the year. ***It is a little early to see how that's going***. ***We've obviously been very careful not to approach SunPower dealers while the contract is still in place.  And that remains to be the case for a number of dealers, not all of the dealers, but a number of the dealers through the end of the year***.

---

[5]    In sections I.A-B, bold and italicized text indicates what statements are alleged to be false and/or misleading. They are shown in context.

89.     The statements referenced in ¶ 88 were materially false and misleading when made because Defendants failed to disclose and/or misrepresented that (1) Maxeon would be unable to aggressively ramp up its sales without the benefit of the New Master Supply Agreement because dealers and customers were used to communicating directly with SunPower, not Maxeon; (2) Maxeon had tried to do business with SunPower dealers and installers before the non-circumvention clause expired but this had been largely unsuccessful; and (3) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

90.     At the same earnings call, Defendants also made materially misleading statements about Maxeon's Utility-Scale business.  Specifically, Strohbecke stated that:

> **Cash levels were also impacted by** lower shipments and margin dollars from our global DG business, **_the reduction of contract liabilities related to our US utility scale business capital expenditures during the quarter_**, restructuring expenses and a reduction in short term debt.

91.     The same day as its Q3 earnings call, Maxeon submitted its quarterly report for the period ended October 1, 2023, in a Form 6-K filed with the SEC ("November 2023 6-K"). The November 2023 6-K was signed by Strohbecke.  Appended as Exhibit 99.2 to the November 2023 6-K were the financial results for the third quarter of 2023, which stated the following about the Company's liquidity:

**Liquidity and Capital Resources**

**_Current Sources of Liquidity and Capital Resources_**

As of October 1, 2023, we had unrestricted cash and cash equivalents of $208.1 million, restricted cash of $9.2 million and short-term securities representing a 6-months time deposit of $60.0 million as compared to $227.4 million of unrestricted cash and cash equivalents, $40.5 million of restricted cash and short-term securities representing a 4-month time deposit of $76.0 million as of January 1, 2023.

*        *        *

**Anticipated Sources of Funds**

1
2

***We believe that our current cash, cash equivalents, along with cash expected to be generated from operations will be sufficient to meet our obligations over the next 12 months.***

3   92.   The statements referenced in ¶¶ 90-91 were materially false and misleading when

4   made because Defendants failed to disclose and/or misrepresented that Maxeon (1) was at or

5   nearing the peak of its prepayment amortization schedule of its Utility-Scale contracts;  (2) that,

6   as a result of the foregoing, less cash would be coming in in the near term, which risked

7   materially undermining its ability to continue as a going concern absent liquidity support; and (3)

8   lenders had expressed concern about Maxeon's ability to continue as a going concern by at least

9   September 2023.

10   **B.   Defendants' Material Misrepresentations in 2024**

11   93.   Defendants' misrepresentations extended into 2024 when Maxeon issued a press

12   release on April 8, 2024, announcing its preliminary financial results for the fiscal year 2023 and

13   first quarter of 2024.  The press release included quotes from Mulligan providing that:

14

15   In the fourth quarter, ***Maxeon delivered financial results largely in line with our expectations***.  Our U.S. utility-scale business accounted for the majority of revenues in

16   the fourth quarter, with stable ASPS.

17                          *       *       *

18   The Maxeon team is highly focused on reducing manufacturing costs, OPEX

19   rationalization and ***liquidity-management to enable a return to profitability***. Our strategy continues to be to focus on designing and building premium, differentiated products and

20   delivering a superior customer experience across a balanced portfolio of global DG ***and U.S. utility scale markets***. The Company plans to file its annual 20-F report by April 30,

21   2024.

22   94.   On April 30, 2024, instead of filing its Form 20-F as promised, the Company filed

23   a Form NT 20-F with the SEC ("2024 NT-20F").  The 2024 NT-20F, signed by Strohbecke,

24   stated that Maxeon would be unable to timely file its 2023 annual report.  It cryptically noted that

25   Maxeon required "additional time to complete its financial statement preparation and review

26   process[,]" and that:

27

28

**AMENDED CLASS ACTION COMPLAINT**
**Case No. 3:24-cv-03869-EMC**

Factors which have affected the timing of the preparation and review of the financial statements include the additional ***ongoing work required in connection with the assessment of the Company's ability to continue as a going concern***, including the ***ongoing analysis of the Company's strategic options*** with the assistance of external advisors.

95.    The statements referenced in ¶¶ 93-94 were materially false and misleading when made because Defendants failed to disclose that Maxeon: (1) was in the peak of its prepayment amortization schedule of its Utility-Scale contracts; (2) was informed by two of its large Utility-Scale customers in early Q1 2024 that they were experiencing project delays and would be unable to accept its deliveries under the contract, causing the Company to absorb the costs of unused inventory; (3) that, as a result of the foregoing, Maxeon's cash position had significantly deteriorated, giving rise to a cash flow and liquidity crisis that would inhibit the Company's ability to continue as a going concern absent liquidity support; and (4) lenders had expressed concern about Maxeon's ability to continue as a going concern by at least September 2023.

## II.    THE TRUTH EMERGES

96.    On May 30, 2024, prior to market open, Maxeon announced, via a press release, its delayed fourth quarter and annual financial results for 2023 together with its financial results for the first quarter of 2024.  In the press release, Mulligan announced:

> Maxeon has been facing a very difficult market environment since the third quarter of last year, with challenging industry pricing conditions and demand disruptions in our DG business due to higher interest rates and policy changes, as well as ***project pushouts by two of our large-scale customers in the US***.  These external factors led to underutilized manufacturing operations, increased product costs, ***and lower revenue and profit than planned***. While the Company is making progress on our announced restructuring initiatives and we are seeing some positive trends in the market, we determined that ***Maxeon requires additional capital to support its continuing operations***. After conducting a thorough analysis with the help of financial advisors, management and the board determined that the most viable financing option to ***support our immediate liquidity needs was from our largest shareholder, TCL Zhonghuan Renewable Energy Technology Co. Ltd. (TZE).***

Maxeon, Press Release, *Maxeon Solar Technologies Announces First Quarter 2024 Financial Results* (May 30, 2024)

97.    The press release also contained a report of Maxeon's fourth quarter of 2023 revenues and first quarter of 2024 revenues as set forth in relevant part below:

| (In thousands, except shipments) | | Fiscal Q1 2024 | Fiscal Q4 2023 | Fiscal Q1 2023 |
|---|---|---|---|---|
| Shipments, in MW | | 488 | 653 | 774 |
| Revenue | $ | 187,456 $ | 228,775 $ | 318,332 |
| Gross (loss) profit [(1)] | | (14,871) | (34,461) | 53,625 |
| GAAP Operating expenses | | 48,668 | 141,007 | 41,921 |
| GAAP Net (loss) income attributable to the stockholders[(1)] | | (80,148) | (186,334) | 20,271 |
| Capital expenditures | | 19,216 | 11,656 | 16,500 |
| Other Financial Data[(1] | | | | |
| (In thousands) | | Fiscal Q1 2024 | Fiscal Q4 2023 | Fiscal Q1 2023 |
| Non-GAAP Gross (loss) profit | $ | (12,888) $ | (9,675) $ | 54,142 |
| Non-GAAP Operating expenses | | 38,520 | 36,654 | 38,056 |
| Adjusted EBITDA | | (38,977) | (37,631) | 30,984 |

98.    In conjunction with this press release, Maxeon filed its first 20-F filing ("2024 20-F") since March 7, 2023.  The 20-F was signed and certified by Mulligan. The 20-F included detailed updates on Maxeon's financial state.  The 2024 20-F stated in pertinent part that:

We have received an unqualified opinion that included an explanatory paragraph on "going concern" from our independent registered public accounting firm, ***reflecting substantial doubt about our ability to continue as a going concern***. Our consolidated financial statements contemplate that we will continue as a going concern and do not contain any adjustments that might result if we were unable to continue as a going concern.  ***Our ability to continue as a going concern is dependent upon our ability to raise additional capital and implement our business plan. If we are unable to achieve or sustain profitability or to secure additional financing on acceptable terms, we may not be able to meet our obligations as they come due, raising substantial doubts as to our ability to continue as a going concer***n ***In addition, if we are unsuccessful in raising sufficient capital to support our operations, we may be unable to pay our suppliers and other service providers on time, or at all.***

\*       \*       \*

***During the fiscal year 2023 and continuing through the date hereof, we have seen unfavorable impacts on our working capital requirements due to lower demand for our product and downward pressure in prices, that can be attributed in part to the volatility and disruption caused by the increasing competition as a result of the increase in the global supply of solar cells and panels, termination of our supply agreements with a***

25

*significant customer* . . . . *As of the date of this report, there is substantial doubt regarding our ability to continue as a going concern.*

99.     Maxeon's worsening cash and liquidity position led to operating cash flow of negative $254.3 million by the end of the 2023 fiscal year as it was also revealed in the Company's 2024 Form 20-F.  Form 20-F, May 30, 2024 at F-12.

100.     That afternoon, Maxeon held an earnings call to provide the market with updates related to the release of its Q4 2023 and Q1 2024 financial results.  During the call, Mulligan effectively conceded that information previously disclosed to the market was inaccurate:

> Since the middle of last year, Maxeon has been under significant pressure due to the unprecedented market dislocation caused by worldwide Chinese module oversupply, high interest rates and policy changes. ***Maxeon also suffered from the termination of our SunPower supply agreement and delivery pushouts by 2 of our primary utility-scale customers.***
>
> These headwinds, unfortunately coincided with the peak of our utility-scale prepayment amortization, and as a result, the company has been facing a ***serious cash flow challenge***.
>
> To address this, we recently negotiated commitments for significant ***liquidity support*** from our largest shareholder, TZE, and we successfully restructured our 2025 convertible bonds with the majority of the debt expected to be converted into equity later this year.
>
>           *     *     *
>
> On the utility scale side, two of our large customers experienced significant project delays and we have been unable to quickly reallocate the affected volumes. And as a result, our financial output for 2024 will reflect the impact of these continuing headwinds. In addition to these challenges, our liquidity was also impacted by our utility scale prepayment amortization schedule, where we have been amortizing customer prepayments that were received in 2021 and 2022 and are now collecting only a portion of the associated sales revenue as cash.
>
> ***In response to this perfect storm of cash and profitability challenges, the company and our advisors assessed all potential sources of funding and found that the only viable option involved new liquidity from our largest shareholder and secured creditor TZE***.
>
> TZE has agreed to invest $97.5 million into the company via a debt instrument and has also committed to an additional $100 million equity investment, in each case subject to regulatory approval.
>
>           *     *     *

*In DG, our efforts to grow volume in the U.S. through our new U.S. dealer channel have been impacted by the general market slowdown particularly in California*.  In Europe, the abundance of modules being sold at prices in the low teens has challenged our margin profile and further curtailed demand for our products. The dramatic market shift that started in mid-2023 left us with large amounts of inventory that tied up cash. And so far, our efforts to work down these inventories have been at a slower pace than we initially anticipated.

Q1 2024 Earnings Call (May 30, 2024)

101.    During the earnings call, one analyst asked straight out if Defendants knew about

the negative information concerning Maxeon's Utility-Scale contract delays, which

Aschenbrenner confirmed that they knew early in the year:

[Analyst]: *And so was it possible that you guys could have known about these delays earlier since modules are one of the last elements to be added to the projects.*

[Aschenbrenner]: So the-we had a 1.2 gigawatt contract with Origis . . . that was scheduled to start delivery in Q1 year of this year, ramp up in Q2 and then proceed through the end of 2025. *We were informed early this year that the company would not be in a position to accept those deliveries under those-that [sic] contracted scheduled*. . . . Our understanding was that it had to do with delays on their contracts, on their projects.

102.    The bad news continued to pour in at the earnings call when Strohbecke

announced the following updates:

Moving on to the balance sheet.  We closed the fourth quarter with cash, cash equivalents, restricted cash and short-term investments of $197 million compared to $277 million at the end of the third quarter.  Cash levels were negatively impacted by $83 million of previously collected cash advances from U.S. utility-scale customers that were amortized during the quarter and show up in our cash flow statement as a change in contract liabilities.

*                *                *

*Taking a step back, we are deeply disappointed by our negative EBITDA results over the past 3 quarters* after our successful efforts since spin, which facilitated strong earnings momentum in the first half of 2023 as well as our first positive annual EBITDA result as an independent company. *As Bill mentioned, the dramatic industry-wide reductions in pricing and demand since the middle of last year have had a material negative impact on our liquidity position at a time when we also encountered significant previously scheduled amortization of our utility-scale prepayments*

***amounting to a total of approximately $150 million in the fourth and the first quarter alone.***

103. The earnings call also included with it a supplementary informational slideshow for investors which showed that Maxeon brought in $90 million in revenue from its DG business for the first quarter of 2024, representing a $39 million or 30.23% decrease from its previous quarter. Q1 2024 Earnings Call-Supplementary Slides at 6 (May 30, 2024).

104. Recognizing the potential uncertainty TZE's takeover could have for Maxeon's future prospects—as a now predominantly Chinese owned company—one analyst asked whether this would complicate the process of getting a loan guaranteed from the DOE for its New Mexico plant. Mulligan confirmed that it would complicate the process, but that Maxeon was "work[ing] through that with the DOE."

105. Following the release of this news, Maxeon's stock plummeted from $3.11 on May 29, 2024 to $2.03 on May 30, 2024 and then to $1.88 on the close of May 31, 2024, representing a cumulative drop of 39.55%.

## III.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    *Respondeat Superior* and Agency Principles Apply

106. Maxeon is liable for the acts of the Individual Defendants and other Company officers, directors, employees, and agents under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within the scope of their employment or agency with the authority or apparent authority to do so. The scienter of the Individual Defendants and other Company officers, directors, employees, and agents is similarly imputed to Maxeon under *respondeat superior* and agency principles.

### B.    The Individual Defendants Had Access To Information That Their Statements Were False Or Misleading

107. As alleged throughout this Complaint, Defendants had ready and actual access to information, during the Class Period, that their statements about Maxeon's cash flow, liquidity,

Utility-Scale contracts and its ability to ramp up its sales after the termination of the New Master Supply Agreement with SunPower were false and/or misleading when made.

108.    For example, during the November 15, 2023 Q3 earnings call, Mulligan stated that "Kai[6] and his team are ***laser-focused on cash management and our operations growth continues to grind out cost reduction and yield improvements***."

109.    Additionally, once the truth was revealed and Defendants made future cash projections, Strohbecke stated: "[s]ubsequently, we target to maintain a cash balance above $100 million for the foreseeable future, thanks to those funding transactions, ***continued focus on working capital management*** and additional sales from inventories."

110.    Defendants' access to information about the state of Maxeon's cash flow and liquidity can also be inferred through their positions as CEO and CFO, each requiring them to periodically update the market about the Company's finances such as its cash position and liquidity and the Company's business operations and prospects such as its ability to ramp up its sales and matters concerning its Utility-Scale contracts.  In order to adequately prepare for these engagements, Defendants necessarily had access to materials containing information related to the Company's business operations and finances—including the active state of Maxeon's cash flow and liquidity and its Utility-Scale business.

111.    Defendants' frequent Class Period updates and answers to analysts questions regarding Maxeon's cash flow, liquidity, specifics of its Utility-Scale business and recovering from the loss of the New Master Supply Agreement with SunPower also suggest that they had access to information contradicting their public statements on these topics (*i.e.*, Mulligan and Strohbecke discussing in Maxeon's November 15, 2023 earnings call how the Company's "[c]ash levels were . . . impacted," its "cash, cash, equivalents, restricted cash and short-term investment," its "***U.S. Utility-Scale business capital expenditures***"; that its "utility-scale business [wa]s on track to deliver increasing margins"; ***unrelated "potential liquidated damages***

---

[6]    "Kai" refers to Strohbecke.

1  *because of delivery delays in our utility-scale as well as the risk of further inventory write-*

2  *downs*" and measures to ensure its "***healthy liquidity***" and Mulligan discussing, in the same

3  earnings call, Maxeon's "***positive cash flow in the near term***" and responding to an analyst's

4  question that it "knew how to" ramp up its DG customer base "efficiently.").

5       112.    Indeed, CW-1 explained that lenders expressed concern about Maxeon's ability to

6  continue as a going concern ***as early as summer 2023 and no later than September 2023*** and as

7  a result, Maxeon struggled to secure needed financing.  ***Critically, CW-1 described that CW-1***

8  ***and Strohbecke were very involved in discussing issues, such as financing from lenders and***

9  ***from these conversations "a lot of options were presented to Kai and Bill.***[7]"  It is therefore

10  reasonable to infer that Defendants had access to information about the doubt surrounding

11  Maxeon's ability to continue as a going concern prior to and at the same time as their public

12  statements to the contrary.

13       113.    That Defendants had access to information concerning the prepayment

14  amortization of its Utility-Scale contract and its effect on Maxeon's cash flow and liquidity can

15  also be readily inferred through the fact that its prepayment amortization schedule was preset and

16  the timing of payments was specifically written into its Utility-Scale contracts.

17
18  **C.**    **The Utility-Scale Business, Its Cash Flow And Liquidity And Replacing The DG Business Lost Through SunPower Were Core Operations Of Maxeon**

19       114.    Because the fraud alleged herein relates to a core operation of Maxeon's business

20  —its Utility-Scale business—knowledge of the facts underlying Defendants' misstatements

21  about this topic can be imputed to them.  Indeed, during Maxeon's November 15, 2023 Q3

22  earnings call, CEO Mulligan stated that Maxeon's "U.S. utility-scale market is a ***key focus for us***

23  ***in our primary growth driver***."

24
25
26  ───────────────

27  [7]    "Kai" refers to Strohbecke and "Bill" refers to Mulligan.

28

115.    Maxeon's Utility-Scale business was particularly essential to the Company now that its DG business[8] was expected to take a hit with the loss of its New Master Supply Agreement with SunPower.  For example, Mulligan stated "[n]o, I mean, keep in mind, the other *huge segment for us is the U.S. utility-scale market.  And right now, that's becoming the major part of our shipments. . . . So that is the primary growth for us*."

116.    Strohbecke similarly remarked on the critical importance of Maxeon's Utility-Scale business going forward: "[a]nd for the first time in Maxeon's history, the majority of shipments went to utility-scale customers. We expect this to be our new normal for the foreseeable future . . . ."

117.    Strohbecke continued to express the ongoing importance of Maxeon's Utility-Scale business by stating "[g]oing into the fourth quarter, we expect that the *same dynamics that have been unfolding our [sic] utility scale* and distributed generation businesses *to largely continue*."

118.    Maxeon's cash flow, liquidity and capitalization were also critical components and of paramount importance to the Company.  In fact, at Maxeon's November 15, 2023 Q3 earnings call, Strohbecke made clear that not only had "*[c]ash and working capital management . . . been a high priority for Maxeon's finance organization*" but it was *"redoubling [its] efforts in this area*."

119.    Further, replacing the DG business that was lost through the resolution of its dispute with SunPower was essential to Maxeon's business and therefore a core operation.  That its relationship with SunPower was a key aspect of its business is supported by the fact that Maxeon's sales to SunPower accounted for 26.7% of the Company's overall revenue for the fiscal year 2022.

---

[8]    Because its DG business, and specifically Maxeon's New Master Supply Agreement with SunPower, has always been understood to be a critical aspect of the Company's revenue, Maxeon's ability to recover from its termination is also a core operation of its business.

**D.    The Temporal Proximity Between Defendants' Misleading Statements And The Revelation Of The Truth Bolsters Scienter**

120.    The temporal proximity between Defendants' misleading statements and its truthful disclosure on May 30, 2024 that Maxeon faced a serious cash flow challenge and would require additional capital to support its continuing operations supports scienter.

121.    As recently as April 8, 2024, Maxeon issued a press release stating that "[i]n the fourth quarter [of 2023], Maxeon delivered financial results largely in line with [its] expectations. . . . [and that] [t]he Maxeon team is highly focused on reducing manufacturing costs, OPEX rationalization and liquidity-management to enable a return to profitability." This disclosure inherently failed to disclose the then-existing cash flow and liquidity crisis Maxeon faced and made it seem as though the Company's finances were nothing to be concerned about.

122.    Less than two months later, however, in Maxeon's earnings call for the first quarter of 2024 and the accompanying press release, Defendants announced: that the industry headwinds coincided with "***the peak of [Maxeon's] utility scale prepayment amortization*** [that caused]… a serious cash flow challenge" and "impacted" its "liquidity"; that Maxeon "[was] informed by two large customers that they were experiencing project delays and would be unable to accept module deliveries based on the contracted schedule"; ***the "material negative*** impact [market conditions had on Maxeon's] ***liquidity position";*** that a "market shift that ***started in mid-2023*** left us with large amounts of inventory that ***tied up cash"*** and the "***additional capital [required] to support [Maxeon's] continuing operations.***"

**E.    The Timing Of Strohbecke's Departures Support Scienter**

123.    The timing and circumstances surrounding the unexpected departure of the Company's CFO Strohbecke supports an inference of scienter.  Maxeon announced that Strohbecke will "step down" from his position as CFO, just one week after the truth about Maxeon's cash flow, liquidity issues and consequential restructuring and takeover by TZE were revealed to the market.  The abrupt circumstances of Strohbecke's departure are further evidenced by the fact that Maxeon made an internal hire, Ken Olson, its Senior Vice

President/Global Treasurer, to act as interim CFO, while Maxeon found a viable replacement. On October 28, 2024, Maxeon announced that it was hiring Dimitiri Hu as Maxeon's new CFO.

**IV.    LOSS CAUSATION**

124.    Defendants' wrongful conduct, as alleged herein, directly or proximately caused Plaintiff and the Class to suffer substantial damages.

125.    During the Class Period, Plaintiff and other Class members purchased Maxeon common stock at artificially inflated prices and suffered substantial losses and damages when the true facts concealed by Defendants' fraud were revealed and/or when the risks concealed by those undisclosed facts materialized. The price of Maxeon common stock declined significantly causing Plaintiff and other Class members to suffer losses and damages when Defendants' misrepresentations, and/or information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the foreseeable risks that had been fraudulently concealed by Defendants materialized.

126.    Defendants made false and misleading statements and material omissions regarding Maxeon's ability to aggressively ramp up its sales, the events surrounding its Utility-Scale business and its cash flow, capitalization, liquidity and ability to continue as a going concern. On the strength of these false and misleading statements and material omissions, the price of the Company's common stock was artificially inflated to a Class Period high of $7.55 on December 26, 2023. Those misrepresentations and omissions that were not immediately followed by an upward movement in the price of the Company's common stock served to maintain the share price at artificially inflated levels by maintaining and supporting a false perception of Maxeon's business, operations, performance, and prospects. When these statements were corrected and/or the risks concealed by them materialized, investors suffered losses as the price of Maxeon's common stock declined.

127.    The true facts and risks regarding Maxeon's ability to aggressively ramp up its sales, the events surrounding its Utility-Scale business and its cash flow, capitalization, liquidity and ability to continue as a going concern which were omitted and/or misrepresented by

Defendants eventually caused the price of Maxeon's common stock to decline, thereby causing harm to investors.

128.    Defendants' statements were partially corrected, and the risks concealed by the undisclosed facts regarding Maxeon's inability to aggressively ramp up its sales, the prepayment amortization of and delays related to its Utility-Scale contracts and its cash flow crisis, capitalization issues, liquidity position, and the Company's inability to continue as a going concern absent financing were revealed on May 30, 2024, when Maxeon issued a press release, filed its 2024 Form 20-F and held an earnings call.  This caused investors to suffer losses because the price of Maxeon's common stock plunged from a closing price of $3.11 on May 29, 2024 to $2.03 on May 30, 2024, and then to a $1.88 closing price on May 31, 2024, representing a cumulative a drop of 39.55%, over two consecutive trading days.

129.    Accordingly, as a result of their purchases of Maxeon's publicly traded common stock during the Class Period, Plaintiff and other members of the Class suffered economic losses and damages.

## V.    CLASS ACTION ALLEGATIONS

130.    Plaintiff brings this action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all persons and entities that purchased or otherwise acquired Maxeon securities during the Class Period and were damaged thereby.

131.    Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entities in which Defendants have or had a controlling interest.

132.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Maxeon securities were actively traded on the NASDAQ stock exchange.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds of members in the proposed Class.  Members of the Class may be identified

from records maintained by Maxeon or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

133.    Plaintiff's claims are typical of the claims of the other members of the Class.  All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

134.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class actions and securities litigation.  Plaintiff has no interests that are contrary to or in conflict with those of the Class.

135.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual Class members. The questions of law and fact common to the Class include, *inter alia*:

a.    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.    Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Maxeon; and

c.    To what extent the members of the Class have sustained damages and the proper measure of damages.

136.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VI.    CONTROL PERSON LIABILITY

137.    The Individual Defendants are liable as direct participants with respect to the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as

senior executive officers, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and each had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly and indirectly, control the conduct of Maxeon's business.

138.    Specifically, because of their positions within the Company, the Individual Defendants possessed the power and authority to control the contents of Maxeon's SEC filings, annual and quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market, including those containing the materially false and misleading statements and omissions of material fact alleged herein.  Each Individual Defendant, by reason of their respective management or board position, had the opportunity to review copies of the Company's SEC filings, reports, press releases, and other statements alleged herein to be false and/or misleading, prior to, or shortly after their issuance or to cause them to be corrected.

139.    By virtue of their positions, the Individual Defendants had access to material non-public information.  Each Individual Defendant knew or recklessly disregarded the fact that the adverse facts specified herein had not been disclosed and were being concealed from the public, and that the positive representations which were being made were then materially false and misleading.

## VII.    APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE

140.    The false and/or misleading statements alleged herein were material and public and at all relevant times the market for Maxeon's securities was an efficient market for the following reasons, among others:

    a.    Maxeon's securities were listed on the NASDAQ, a highly efficient market;

    b.    As a registered and regulated issuer of securities, Maxeon filed periodic reports with the SEC, in addition to frequent voluntary dissemination of information;

c.      Maxeon communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

d.      The market reacted to public information disseminated by Maxeon; and

e.      Many analysts followed and covered Maxeon's business and wrote reports which affected the marketplace.

141.    As a result of the above, the market for Maxeon securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the securities' market prices.  The historical trading prices and volumes of Maxeon common stock are incorporated herein by reference.

142.    The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to overvalue Maxeon's securities.  Without knowledge of the misrepresented or omitted facts, Plaintiff and other Class members purchased Maxeon securities between the time that Defendants made the material misrepresentations and omissions and the time that the truth or concealed risk was revealed, during which time the price of Maxeon's securities were artificially inflated by Defendants' misrepresentations and omissions.  Thus, a presumption of reliance applies.

## VIII.    THE AFFILIATED *UTE* PRESUMPTION

143.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Maxeon's business operations and financial prospects— information Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense

that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## IX.   INAPPLICABILITY OF SAFE HARBOR

144.    The safe harbor provisions for forward-looking statements under the Private Securities Litigation Reform Act of 1995 are applicable only under certain circumstances that do not apply to any of the materially false and misleading statements and omissions alleged in this Complaint.

145.    First, many of the identified false and misleading statements and omissions herein are not forward-looking statements, but instead are statements of current of historic fact, or are actionable in context because they omit then-existing material facts.

146.    Second, many of the identified false and misleading statements herein were not identified as forward-looking statements.

147.    Third, to the extent there were any forward-looking statements that were identified as such at the time made, those statements also contained statements of present or past facts and so are not entitled to protection under the safe harbor.

148.    Fourth, to the extent there were any forward-looking statements that were identified as such at the time made, there were no meaningfully cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such statements were also not accompanied by cautionary language that was meaningful because such warnings or "risk" factors contained in, or incorporated by reference in, the relevant press release, SEC filings, earnings call, or other public statements described herein were general, "boilerplate" statements of risk that would affect any solar power or renewable energy company, and misleadingly contained no factual disclosure of any of the specific details concerning its revenue, profits, cash position and capitalization or similar important factors that would give investors adequate notice of such risks.

**AMENDED CLASS ACTION COMPLAINT**
**Case No. 3:24-cv-03869-EMC**

149.    Fifth, to the extent there were any such forward-looking statements, Defendants are liable for those false and misleading forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, or by reason of what the speaker failed to note, was materially false and/or misleading, and/or that each statement was authorized and/or approved by an executive officer of Maxeon who actually knew that each such statement was false or misleading when made.

## X.    CLAIMS FOR RELIEF

### <u>COUNT I</u>

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against Defendants**

150.    Plaintiff realleges each allegation above as if fully set forth therein.

151.    This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against Defendants.

152.    During the Class Period, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by making the false and misleading statements specified herein, including the statements in SEC filings press releases, and in earnings call concerning Maxeon's ability to aggressively ramp up its sales, its Utility-Scale contract delays, the prepayment amortization of its Utility-Scale contracts and its cash position, capitalization, liquidity, and ability to continue as a going concern, whose truth they knowingly or recklessly disregarded when they failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not false and misleading.

153.    During the Class Period, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) promulgated thereunder by employing devices, schemes, and artifices to defraud and engaging in acts, practices, and a course of conduct that operated as a fraud or deceit upon Plaintiff and other Class members in that Defendants concealed the truth about Maxeon's

cash position, capitalization, liquidity, and the ongoing events/issues with its Utility-Scale business.

154.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's operations and financial condition as reflected in the misrepresentations and omissions set forth above.

155.    Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

156.    As a result of Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiff and Class members were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

157.    Plaintiff and Class members purchased Maxeon securities without knowing that Defendants had misstated or omitted material facts about the Company's operations and financial performance or prospects.  In so doing, Plaintiff and Class members relied directly or indirectly on false and/or misleading statements made by Defendants, and/or an absence of material adverse information that was known to Defendants or recklessly disregarded by them but not disclosed in Defendants' public statements.  Plaintiff and Class members were damaged as a result of their reliance on Defendants' false statements and misrepresentations and omissions of material facts.

158.    At the time of Defendants' false statements, misrepresentations and omissions, Plaintiff and Class members were unaware of their falsity and believed them to be true.  Plaintiff

and the Class would not otherwise have purchased Maxeon securities had they known the truth about the matters discussed above.

159.    Plaintiff is filing this action within two years after discovery of the facts constituting the violation, including facts establishing scienter and other elements of Plaintiff's claims, and within five years after the violations with respect to Plaintiff's investments.

160.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

161.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their purchase of Maxeon securities.

## <u>COUNT II</u>

**For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

162.    Plaintiff realleges each allegation above as if fully set forth herein.

163.    This claim is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), on behalf of all Class members.

164.    As set forth above, the Individual Defendants committed a primary violation of Section 10(b) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period.

165.    Each Individual Defendant, by reason of their status as senior executive officers and/or directors of Maxeon, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiff and the Class, within the meaning of Section 20(a) of the Exchange Act.  The Individual Defendants directly or indirectly controlled the content of the Company's SEC statements, press releases and earnings calls related to Plaintiff's and the Class's investments in Maxeon securities within the meaning of Section 20(a) of the Exchange Act.  Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

166.    The Individual Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases.  Because of their close involvement in the

every-day activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

167.     The Individual Defendants knew or recklessly disregarded the fact that Maxeon's representations were materially false and misleading and/or omitted material facts when made. In so doing, the Individual Defendants did not act in good faith.

168.     By virtue of their high-level positions and their participation in and awareness of Maxeon's operations and public statements, the Individual Defendants were able to and did influence and control Maxeon's decision-making, including controlling the content and dissemination of the documents that Plaintiff and the Class contend contained materially false and misleading information and on which Plaintiff and the Class relied.

169.     The Individual Defendants had the power to control or influence the statements made, giving rise to the securities violations alleged herein, and as set forth more fully above.

170.     As set forth above, the Individual Defendants committed a primary violation of Section 20(a) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period as well as by concealing the facts regarding Maxeon's ability to aggressively ramp up its sales, its Utility-Scale contract delays, the prepayment amortization of its Utility-Scale contracts and its cash position, capitalization, liquidity, and ability to continue as a going concern.

171.     As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchase of Maxeon's securities.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that this action may be maintained as a class action under Federal Rule of Civil Procedure 23, certifying Plaintiff as Class Representative under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff's counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment, as allowed;

C.      Awarding extraordinary, equitable and/or injunctive relief as permitted by law including reasonable counsel fees and expert fees;

D.      Awarding Plaintiff and the Class their costs and expenses incurred in this action, including reasonable fees and expert fees; and

E.      Awarding such further relief as may be just and proper.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by jury on all triable claims.

Dated:  November 8, 2024                    Respectfully submitted,

                                            By: /s/ James M. Wilson, Jr.
                                                    James M. Wilson, Jr.

                                            James M. Wilson, Jr. (appearance *pro hac vice*)
                                            **FARUQI & FARUQI, LLP**
                                            685 Third Avenue, 26th Floor
                                            New York, NY 10017
                                            Telephone: 212-983-9330
                                            Facsimile: 212-983-9331
                                            Email: jwilson@faruqilaw.com

                                            Robert W. Killorin (appearance *pro hac vice*)
                                            **FARUQI & FARUQI, LLP**
                                            3565 Piedmont Road NE Building Four
                                            Suite 380
                                            Atlanta, GA 30305
                                            Telephone: 404-847-0617
                                            Facsimile: 404-506-9534
                                            Email: rkillorin@faruqilaw.com

                                            Lisa T. Omoto SBN 303830
                                            **FARUQI & FARUQI, LLP**
                                            1901 Avenue of the Stars, Suite 1060

Los Angeles, CA 90067
Telephone: 424-256-2884
Facsimile: 424-256-2885
E-mail: lomoto@faruqilaw.com

*Attorneys for Lead Plaintiff*
*Jeyakumar Menon and Lead*
*Counsel for the putative Class*

**AMENDED CLASS ACTION COMPLAINT**
**Case No. 3:24-cv-03869-EMC**