Lisa T. Omoto SBN 303830
E-mail: lomoto@faruqilaw.com
**FARUQI & FARUQI, LLP**
1901 Avenue of the Stars, Suite 1060
Los Angeles, CA 90067
Telephone: 424-256-2884
Facsimile: 424-256-2885

James M. Wilson, Jr. (appearance *pro hac vice*)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email:  jwilson@faruqilaw.com

Robert W. Killorin (appearance *pro hac vice*)
**FARUQI & FARUQI, LLP**
3565 Piedmont Road NE Building Four
Suite 380
Atlanta, GA 30305
Telephone: 404-847-0617
Facsimile: 404-506-9534
Email: rkillorin@faruqilaw.com

*Attorneys for Lead Plaintiff
Jeyakumar VS Menon*

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JEYAKUMAR VS MENON, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MAXEON SOLAR TECHNOLOGIES, LTD., WILLIAM MULLIGAN, and KAI STROHBECKE,<br><br>Defendants. | Case No. 3:24-cv-03869-EMC<br><br>**LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT**<br><br>**CLASS ACTION**<br><br>Judge:  Hon. Edward M. Chen<br>Date:    April 10, 2025<br>Time:    1:30 p.m.<br>Courtroom:   5 – 17th Floor |

# TABLE OF CONTENTS

STATEMENT OF ISSUE(S) TO BE DECIDED (LOCAL RULE 7-4(a)(3)) .............................. 1

I. INTRODUCTION ........................................................................................................ 1

II. SUMMARY OF FACTUAL ALLEGATIONS ........................................................... 3

III. STANDARD ................................................................................................................ 6

IV. THE AC ADEQUATELY PLEADS MATERIALLY FALSE AND MISLEADING
STATEMENTS ............................................................................................................ 6

    A. Defendants Falsely Assured The Market That Maxeon's DG Business Would
Thrive Without SunPower .......................................................................................... 7

    B. Defendants Misled Investors About Maxeon's Finances, Utility-Scale
Business, Profitability, Cash Flow And Liquidity ...................................................... 9

        1. AC ¶90: On November 15, 2023, Strohbecke Fails To Disclose That
No Further Cash Would Be Paid In Utility-Scale Segment........................ 9

        2. AC ¶91: Statements On November 15, 2023 That Cash Will Be
Sufficient Were False Because The Company Was In A Cash And
Liquidity Crisis ....................................................................................... 10

        3. AC ¶93: Statements On April 8, 2024 Also Failed To Disclose That
Utility-Scale Customers Had Delayed Projects ....................................... 11

        4. AC ¶94: Statements On April 30, 2024 Delaying Maxeon's Annual
Report Were False For Failing To Disclose Dire Financial
Condition.................................................................................................. 12

    C. Defendants' Statements Are Not Inactionable Puffery ........................................ 13

    D. Defendants' Statements Are Not Protected By The Safe Harbor ......................... 15

V. PLAINTIFF ADEQUATELY PLEADS SCIENTER ....................................................... 17

    A. Defendants' Knowledge Of And Access To Information.................................... 17

    B. The Core Operations Theory Supports Defendants' Scienter.............................. 21

    C. The Timing Of Strohbecke's Resignation Adds To The Inference Of
Scienter ................................................................................................................ 22

    D. The Temporal Proximity Of Defendants' Misstatements And Their
Revelation Of The Truth Supports Scienter........................................................... 23

    E. The Inference Of Scienter Is At Least As Compelling As Defendant's
"Innocent" Explanation.......................................................................................... 24

i

VI.     THE COMPLAINT STATES A CLAIM UNDER SECTION 20(a)............................. 25

VII.    ALTHOUGH UNNECESSARY, AMENDMENT SHOULD BE PERMITTED ........... 25

CONCLUSION.......................................................................................................................... 25

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS     Case No. 3:24-cv-03869-EMC**

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*In re Adaptive Broadband Sec. Litig.*,
    2002 WL 989478 (N.D. Cal. Apr. 2, 2002) ...............................................................................8

*In re Amgen Inc. Sec. Litig.*,
    2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)........................................................................17

*In re Amgen Inc. Sec. Litig.*,
    544 F. Supp. 2d 1009 (C.D. Cal. 2008) ...........................................................................7, 11

*In re Amylin Pharms., Inc. Sec. Litig.*,
    2003 WL 21500525 (S.D. Cal. May 1, 2003).........................................................................12

*In re Apollo Grp., Inc. Sec. Litig.*,
    395 F. Supp. 2d 906 (D. Ariz. 2005) .......................................................................................9

*In re Apple Sec. Litig.*,
    2020 WL 2857397 (N.D. Cal. June 2, 2020) ..........................................................................14

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011)................................................................................12, 13

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) .....................................................................................7, 22, 23

*In re BofI Holding, Inc. Sec. Litig.*,
    2017 WL 2257980 (S.D. Cal. May 23, 2017).........................................................................25

*Brendon v. Allegiant Travel Co.*,
    412 F. Supp. 3d 1244 (D. Nev. 2019)........................................................................20, 21, 23

*In re Cadence Design Sys., Inc. Sec. Litig.*,
    692 F. Supp. 2d 1181 (N.D. Cal. 2010) ...................................................................................8

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
    856 F. 3d 605 (9th Cir. 2017) ..........................................................................................10, 21

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
    875 F. Supp. 2d 359 (S.D.N.Y. 2012)....................................................................................14

*City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*,
    2019 WL 6877195 (N.D. Cal. Dec. 17, 2019)........................................................................19

*In re Cloudera, Inc. Securities Litigation*,
    121 F.4th 1180 (9th Cir. 2024) ...............................................................................................7

*In re Countrywide Fin. Corp. Derivative Litig.*,
    554 F. Supp. 2d 1044 (C.D. Cal. 2008) ...................................................................................9

*In re Cutera Securities Litigation*,
    610 F.3d 1103 (9th Cir. 2010) ..................................................................................................16

*Daniels-Hall v. Nat'l Educ. Ass'n.*,
    629 F.3d 992 (9th Cir. 2010) .....................................................................................................6

*In re Daou Sys., Inc. Sec. Litig.*,
    411 F.3d 1006 (9th Cir. 2005) ...........................................................................................7, 8, 19

*E. Ohman J:or Fonder AB v. NVIDIA Corp.*,
    81 F.4th 918 (9th Cir. 2023) ....................................................................................................20

*Eminence Cap., LLC v. Aspeon, Inc.*,
    316 F.3d 1048 (9th Cir. 2003) ..................................................................................................25

*Espy v. J2 Global, Inc.*,
    99 F.4th 527 (9th Cir. 2024) ....................................................................................................22

*In re Extreme Networks, Inc. Sec. Litig.*,
    2018 WL 1411129 (N.D. Cal. Mar. 21, 2018)..........................................................................19

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
    986 F. Supp. 2d 487 (S.D.N.Y. 2013).......................................................................................15

*Ferreira v. Funko Inc.*,
    2021 WL 8820650 (C.D. Cal. Oct. 22, 2021)...........................................................................24

*Flynn v. Sientra, Inc.*,
    2016 WL 3360676 (C.D. Cal. June 9, 2016) ............................................................................15

*In re Fusion-io, Inc. Securities Litigation*,
    2015 WL 61869 (N.D. Cal. Feb. 12, 2015) ..........................................................................8, 13

*Gammel v. Hewlett-Packard Co.*,
    905 F. Supp. 2d 1052 (C.D. Cal. 2012) ....................................................................................13

*Garcia v. Hetong Guo*,
    2016 WL 102213 (C.D. Cal. Jan. 7, 2016) ...............................................................................16

*In re Gen. Elec. Co. Sec. Litig.*,
    857 F. Supp. 2d 367 (S.D.N.Y. 2012).......................................................................................16

*Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*,
    63 F.4th 747 (9th Cir. 2023) ......................................................................................................8

*Hall v. Rent-A-Center, Inc.*,
    2017 WL 6398742 (E.D. Tex. Oct. 19, 2017) ..........................................................................23

*Hatamian v. Advanced Micro Devices, Inc.*,
    87 F. Supp. 3d 1149 (N.D. Cal. 2015) ......................................................................................12

iv

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    Case No. 3:24-cv-03869-EMC

*In re Immune Response Sec. Litig.*,
    375 F. Supp. 2d 983 (S.D. Cal. 2005).................................................................................6, 16

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
    554 F. Supp. 2d 1083 (C.D. Cal. 2008) ...................................................................................13

*In re InterMune, Inc. Sec. Litig.*,
    2004 WL 1737264 (N.D. Cal. July 30, 2004)..........................................................................14

*Kipling v. Flex Ltd.*,
    2020 WL 7261314 (N.D. Cal. Dec. 10, 2020) ......................................................................9, 15

*In re LDK Solar Sec. Litig.*,
    584 F. Supp. 2d 1230 (N.D. Cal. 2008) ...................................................................................8

*In re LendingClub Sec. Litig.*,
    254 F. Supp. 3d 1107 (N.D. Cal. 2017) ...............................................................................24, 25

*Lipton v. Pathogenesis Corp.*,
    284 F.3d 1027 (9th Cir. 2002) .................................................................................................20

*Lloyd v. CVB Fin. Corp.*,
    811 F.3d 1200 (9th Cir. 2016) ..............................................................................................8, 17

*Loritz v. Exide Techs.*,
    2014 WL 4058752 (C.D. Cal. Aug. 7, 2014)............................................................................9

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011).................................................................................................................6, 24

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013).....................................................................................10

*Monachelli v. Hortonworks, Inc.*,
    225 F. Supp. 3d 1045 (N.D. Cal. 2016) ..............................................................................13, 16

*Mulderrig v. Amyris, Inc.*,
    492 F. Supp. 3d 999 (N.D. Cal. 2020) .....................................................................................21

*Mulligan v. Impax Labs., Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) ...................................................................................13, 22

*In re Myriad Genetics, Inc. Sec. Litig.*,
    2021 WL 977770 (D. Utah Mar. 16, 2021) ............................................................................23

*National Elevator Industry Pension Fund v. Flex Ltd.*,
    2021 WL 6101391 (9th Cir Dec. 21, 2021) .............................................................................8

*Nursing Home Pension Fund, Local 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) .................................................................................................20

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    Case No. 3:24-cv-03869-EMC**

*In re NVIDIA Corp. Sec. Litig.*,
    768 F.3d 1046 (9th Cir. 2014) ..................................................................................25

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
    780 F. App'x 480 (9th Cir. 2019) .............................................................................20

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)............................................................................................10, 21

*In re Pivotal Sec. Litig.*,
    2020 WL 4193384 (N.D. Cal. July 21, 2020)...........................................................15

*In re Plantronics, Inc. Sec. Litig.*,
    2022 WL 3653333 (N.D. Cal. Aug. 17, 2022) .........................................................21

*Plumley v. Sempra Energy*,
    847 F. App'x 426 (9th Cir. 2021) .............................................................................22

*Police Retirement System of St. Louis v. Intuitive Surgical, Inc.*,
    759 F.3d 1051 (9th Cir. 2014) ............................................................................16, 17

*In re Quality Sys., Inc. Sec. Litig.*,
    865 F.3d 1130 (9th Cir. 2017) ............................................................................13, 18

*Reese v. Malone*,
    747 F.3d 557 (9th Cir. 2014) .............................................................................21, 24

*In re Rigel Pharms., Inc. Sec. Litig.*,
    697 F.3d 869 (9th Cir. 2012) ....................................................................................25

*Roberti v. OSI Sys., Inc.*,
    2015 WL 1985562 (C.D. Cal. Feb. 27, 2015)...........................................................24

*Ronconi v. Larkin*,
    253 F.3d 423 (9th Cir. 2001) ....................................................................................16

*S. Ferry LP, # 2 v. Killinger*,
    542 F.3d 776 (9th Cir. 2008) ....................................................................................17

*S. Ferry LP # 2 v. Killinger*,
    687 F. Supp. 2d 1248 (W.D. Wash. 2009)...........................................................19, 20

*In re Secure Computing Corp. Sec. Litig.*,
    184 F. Supp. 2d 980 (N.D. Cal. 2001)......................................................................23

*Shenwick v. Twitter, Inc.*,
    282 F. Supp. 3d 1115 (N.D. Cal. 2017) ...................................................................22

*Siracusano v. Matrixx Initiatives, Inc.*,
    585 F.3d 1167 (9th Cir. 2009) ..................................................................................24

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    Case No. 3:24-cv-03869-EMC**

*Slayton v. Am. Express Co.*,
    604 F.3d 758 (2d Cir. 2010)................................................................................................16

*In re Snap Inc. Sec. Litig.*,
    2018 WL 2972528 (C.D. Cal. June 7, 2018) ......................................................................11

*In re SunPower Sec. Litig.*,
    2011 WL 7404238 (N.D. Cal. Dec. 19, 2011) ....................................................................23

*Tai Jan Bao v. SolarCity Corp.*,
    2016 WL 4192177 (N.D. Cal. Aug. 9, 2016) ......................................................................19

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007)......................................................................................................6, 17

*In re Verifone Securities Litigation*,
    784 F. Supp. 1471 (N.D. Cal. 1992) ...................................................................................13

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)................................................................................................10

*Warshaw v. Xoma Corp.*,
    74 F.3d 955 (9th Cir. 1996) ................................................................................................14

*Westley v. Oclaro*,
    897 F. Supp. 2d 902 (N.D. Cal. 2012) ................................................................................25

*Williams v. Duke Energy Int'l, Inc.*,
    681 F.3d 788 (6th Cir. 2012) ..............................................................................................11

*Wochos v. Tesla, Inc.*,
    985 F.3d 1180 (9th Cir. 2021) ............................................................................................15

*Yourish v. Cal. Amplifier*,
    191 F.3d 983 (9th Cir. 1999) ..............................................................................................24

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ..........................................................................17, 18, 22, 23

**Statutes**

15 U.S.C. §78u-5(c)(1) ...........................................................................................................15

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS      Case No. 3:24-cv-03869-EMC**

Lead Plaintiff Jeyakumar VS Menon ("Plaintiff") respectfully submits this opposition to Defendants' Motion to Dismiss ("MTD"), ECF No. 70.[1]

**STATEMENT OF ISSUE(S) TO BE DECIDED (LOCAL RULE 7-4(a)(3))**

Whether the AC adequately pleads claims under §10(b) and §20(a) of the Exchange Act.

## I.   INTRODUCTION

During the Class Period, Defendants intentionally misled investors about the success of and risks to Maxeon's two business segments: its distributed generation ("DG") and Utility Scale segments.

The DG segment is essentially Maxeon's retail (and other small-scale buyers) segment, the success of which had always been dependent on Maxeon's former parent, SunPower (from which it spun off in 2020), serving marketing functions and as the customer intermediary pursuant to an exclusivity contract.  Maxeon's smaller Utility-Scale segment provides solar panels and support to solar power plants for large-scale application. After terminating the SunPower contract, Defendants wowed the market with the false promise that Maxeon would ramp up direct DG sales – untethered to the old SunPower contractual limitations – even though Maxeon did not have anywhere near the level of customer contacts for direct sales that SunPower had.  Moreover, although Defendants knew that approaching storm clouds – rising interest rates, the imposition of a new rule in California that greatly disincentivized solar panel purchases, and the oversupply of solar products from China – would have a severe negative impact on its operations, Defendants falsely assured investors that key financial metrics cash and liquidity were sufficient.  The truth was that Maxeon:

- Had already unsuccessfully tried to solicit dealers directly without SunPower, ¶66;

- Was in the midst of a cash flow and liquidity crisis so bad that lenders doubted it could continue as a going concern even *before* the Class Period, ¶¶21, 69;

---

[1]   Unless stated otherwise, the following conventions apply: (1) "AC" refers to the Amended Class Action Complaint, ECF No. 66; (2) all "¶" references are to the AC; (3) all capitalized terms mean the same as in the AC; (4) all citations, internal quotation marks, and footnotes are omitted; and (5) all emphases are added.

1

- Was nearing the pre-set peak of its prepayment amortization schedule for its Utility-Scale contracts, meaning no further cash would be brought in from its Utility-Scale contracts and would create significant contract liabilities, ¶¶68, 79; and

- Experienced project delays by "two of its large Utility-Scale customers" that left Maxeon without the expected cash from these deals and forced them to absorb significant costs from unused inventory. ¶69

The charade – that had artificially inflated Maxeon's stock price during the Class Period – came crashing down on May 30, 2024, when Maxeon shocked investors with news that its operations were so bad and had so significantly degraded its financial condition that it was compelled to enter into a highly unfavorable **dilutive** share offering with its largest shareholder, TZE, that gave TZE a controlling interest in the Company. Due to the fact that TZE is a Chinese-owned company, the deal jeopardized Maxeon's ability to get a Department of Energy ("DOE") loan for its highly anticipated New Mexico facility. On this news, Maxeon's stock plunged an amazing 39.55% over two days.

Faced with formidable and well-pled allegations, Defendants cherry-pick, misdirect from Plaintiff's allegations and improperly rely on extrinsic evidence to try to convince the Court that the Company simply faced unfortunate setbacks that led to astonishingly bad operational and financial results. Defendants' fanciful "bad luck" explanation does not align with the allegations or the undisputed facts.

Defendants challenge falsity on the grounds that statements are covered by the PSLRA's "safe harbor" provision because they were forward-looking. But to be shielded by the Safe Harbor provision, such statements must be made with meaningful and accurate cautionary language. Here, Maxeon's generic and boilerplate warnings do not meet this stringent requirement. Moreover, the AC sufficiently alleges that Defendants actually knew that forward-looking statements were false and the risks in the warnings had already materialized.

Defendants' claim that statements are *ipso facto* inactionable as puffery and corporate optimism ignores settled case law that such statements – *e.g.,* predictions and forecasts – may be actionable in context, which is clearly the case here.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    Case No. 3:24-cv-03869-EMC**

Defendants next broadly argue that the AC fails to show that the challenged statements were false or misleading. Here, Defendants thinly splice the challenged public statements in order to argue that Plaintiff failed to demonstrate that the statements are contradicted by what Defendants knew at the time. Defendants are wrong. As explained below, Plaintiff sufficiently alleges that Defendants made false statements and statements rendered misleading by omission.[2]

Defendants' argument that the AC's scienter allegations are lacking clearly miss the mark. Scienter is more than adequately supported by the accounts of CWs; Defendants' own admissions; the abrupt departure of Maxeon's CFO after the truth was revealed; the closeness in time between Defendants' misstatements and the disclosure of the relevant truth; and numerous other allegations about the true state of affairs at Maxeon. Indeed, they spend considerable verbiage claiming that there was no motive to lie about Maxeon's business, when it is settled that Plaintiff does not need to plead motive and no negative inference should be drawn from a lack of motive allegations.

For all the reasons stated herein, Defendants' motion should be denied.

## II.    SUMMARY OF FACTUAL ALLEGATIONS

This is the story of a Company that falsely touted success and prospects after it terminated its exclusivity deal with SunPower and failed to disclose that in fact, it was suffering through numerous significant struggles, until it was finally forced to cede control to its largest Chinese shareholder through an unfavorable dilutive stock deal that jeopardized a massive DOE loan on which it was relying for a big new project.

Maxeon's relationship with SunPower – governed by the NMSA - was the driving force behind its DG business and its success. ¶¶4, 5, 115, n.8. Pursuant to the NMSA, SunPower purchased solar panels from Maxeon and sold them to dealers and installers. ¶¶4, 51. Maxeon was prohibited from directly selling solar panels to these dealers and installers. *Id*. The importance of the SunPower agreement to Maxeon was obvious – the DG business made up 84.9% of total revenue, in the first half of 2023, SunPower's business accounted for 26.7% of its total revenues and for "the six months ended July 2, 2023, $151.0 million or 22.7% of [the Company's] revenue

---

[2]    Plaintiff's Section 20(a) claim is dependent on his primary Section 10(b) claim surviving. MTD 22.

3

. . . ." ¶¶6, 52.

This relationship - critical to Maxeon's success - fell apart when SunPower accused Maxeon of attempting to sell directly to customers, a flagrant breach of the NMSA. ¶¶7, 53. SunPower in turn withheld approximately $29 million in payments to Maxeon, which had a material negative impact on Maxeon's third quarter 2023 results and caused the Company to revise its guidance downward significantly. ¶¶7, 53, 54, 55. The dispute was settled and the parties agreed to terminate the reciprocal exclusivity obligations effective March 31, 2024, and non-circumvention obligations, effective January 1, 2024. ¶10. Thus, Maxeon would be free to engage directly with customers and distributers. However, according to SunPower, Maxeon already had been attempting to do just that. Indeed, according to CW-1, Maxeon knew that its efforts to engage in direct sales would be problematic because dealers were confused why they were getting calls directly from Maxeon rather than SunPower, with which they had long-standing successful dealings. ¶¶64-66.

Around the time that Maxeon's relationship with SunPower was breaking down, the solar power market was negatively impacted by rising interest rates, California implementing a new rule that gave consumers less incentive to buy solar panels, and an oversupply of Chinese solar products that depressed prices. ¶¶8, 57-62.

Nonetheless, on the first day of the Class Period, November 15, 2023, Defendants downplayed the significant market headwinds the Company was facing as neither "unique" nor "unprecedented," announced the settlement agreement with SunPower and spun it as having a positive impact on Maxeon's operational metrics because "[o]ffering panels directly to installers will eliminate the markup SunPower has historically added to our products, allowing us to deliver the world's best panels to customers at more competitive pricing" and "will enable our plans to **aggressively ramp our sales** in the U.S. market." ¶¶12, 63, 88.

Strohbecke and Maxeon also, *inter alia*, falsely reassured the market about the Company's Utility-Scale business (¶90), and assured the market of their belief that "current cash, cash equivalents, along with cash expected to be generated from operations [would] be sufficient to meet [its] obligations over the next 12 months," ¶91.

4

Unbeknownst to investors, however, Maxeon's ability to "ramp up sales" without SunPower had already proven unsuccessful, and its cash flow and liquidity status was not as presented. For example, according to CW-2, a Marketing Manager who attended weekly sales meetings, the Company had been contacting dealers directly before the SunPower agreement terminated "under the rug" to obtain their business. ¶¶41, 65. This is consistent with SunPower's own allegations, and the account of CW-1, Maxeon's Senior Manager of Project Finance, who had personal contact with the Individual Defendants and stated that the Company's direct contact with its dealers "caused [them] a lot of confusion" because they were used to dealing with SunPower directly and led to "a great deal of loss" of such dealers. ¶¶17, 40, 66.

Major hurdles to ramping up sales were not the only obstacle to Maxeon's cash flow and liquidity, however. Behind the scenes, Defendants were aware that Maxeon was scheduled to reach the peak of its prepayment amortization under its utility-scale contracts before the first quarter of 2024. ¶¶18, 68.

Meanwhile, according to CW-1, a member of the **Treasury Team**, prospective lenders openly expressed their concerns about Maxeon's ability to continue as a going concern between summer 2023 and September 2023— **even before** Maxeon reached the peak of its prepayment amortization schedule. ¶71.

The situation continued to deteriorate. In early 2024, Maxeon was informed by two of its large utility-scale customers early in the first quarter of 2024 that they "would not be in a position to accept [module] deliveries under" its agreed upon contract with Maxeon, leaving the Company without the expected cash from these deals and with the costs of unused inventory to absorb. ¶¶21, 69, 101. Defendants did not disclose any information that would give investors a heads up about this but rather continued to misrepresent positive information about Maxeon. ¶¶72, 93. Less than a month later, however, the Company informed the market that it would be unable to timely file its 2023 annual report because "additional ongoing work [was] required in connection with the assessment of the Company's ability to continue as a going concern[.]" ¶94. At this point, however, Defendants were aware that Maxeon would be unable to continue as a going concern absent sufficient liquidity support. ¶¶16, 112.

5

No longer able to hide the truth, on May 30, 2024, Defendants revealed that: two of Maxeon's Utility-Scale customers were experiencing "significant project delays" causing Maxeon to absorb the costs of the unused inventory; market "headwinds unfortunately coincided with the peak of [its] utility scale prepayment amortization, and as a result, the [C]ompany has been facing a serious cash flow challenge;" and the Company's DG business revenue reached historic lows in the first quarter of 2024 leaving substantial doubts to its ability to continue (¶¶23, 75-79, 96-100, 122); and therefore, to address immediate liquidity needs, it had entered into a stock purchase deal with Chinese-owned TZE that gave TZE control of the Company. ¶¶24, 80-81, 96-103.  Because this takeover made Maxeon a majority Chinese-owned corporation, its ability to receive the DOE loan needed for its touted New Mexico Utility-Scale plant was now in jeopardy.  ¶¶24, 82.

On this news, Maxeon's stock plunged from a closing price of $3.11 on May 29, 2024, to $2.03 on May 30, 2024, and then to a $1.88 closing price on May 31, 2024, representing a cumulative a drop of 39.55%.  ¶¶25, 86, 105.  Just one week later, Maxeon announced the abrupt resignation of the Company's CFO, Strohbecke.  ¶123.

**III.    STANDARD**

In evaluating Defendants' motion, the Court must consider the complaint in its entirety, "accept all factual allegations . . . as true," and construe them in the light most favorable to the plaintiff.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007); *Daniels-Hall v. Nat'l Educ. Ass'n.*, 629 F.3d 992, 998 (9th Cir. 2010).

**IV.    THE AC ADEQUATELY PLEADS MATERIALLY FALSE AND MISLEADING STATEMENTS**

Statements are actionable if they are either false or misleading.  *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011).  An "untrue statement of a material fact" is a false statement.  *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1016 (S.D. Cal. 2005).  It is also unlawful to "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  *Matrixx*, 563 U.S.

6

at 37.[3]  "A statement or omission is misleading … if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).  Thus, when defendants choose to speak about a topic material to investors, they put that topic "in play" and assume a duty to speak fully and truthfully about it.  *See id*. at 987.

### A.  Defendants Falsely Assured The Market That Maxeon's DG Business Would Thrive Without SunPower

Mulligan told investors at the November 15, 2023, Q3 earnings call that "[o]ffering panels directly to installers will eliminate the markup SunPower has historically added to our products . . . . [t]his will enable our plans to aggressively ramp our sales in the U.S. market."  ¶88.  He also stated that Maxeon had "obviously been very careful not to approach SunPower dealers while the contract is still in place." *Id.*

These statements gave investors the materially false and misleading impression that without SunPower, Maxeon could successfully implement a direct to dealer sales strategy.  In truth, however, Maxeon knew that its ability to ramp up sales without SunPower was extremely limited because its prior attempts to contact dealers directly had already led to a loss of business. *In re Amgen Inc. Sec. Litig.*, 544 F. Supp. 2d 1009, 1027 (C.D. Cal. 2008) (company's statements about product's "growth potential" materially misleading where "[d]efendants lacked reasonable basis for projecting growth in sales").

Plaintiff's allegations are bolstered by, *inter alia*, the accounts of CWs 1 and 2, and SunPower itself.  ¶¶7, 53, 65-66.  Contrary to Defendants' contentions, the facts pleaded are more than sufficient to support "the probability that a person in the position occupied by the [CWs] would possess the information alleged" and that contain "adequate corroborating details." *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1015 (9th Cir. 2005).  For example, CW-1 was a Senior Manager of Project Finance and part of Maxeon's Treasury Team from December 2022 to January

---

[3]    Defendants cite *In re Cloudera, Inc. Securities Litigation* (MTD 12) for the proposition that "a statement is false or misleading if it directly contradicts what the defendant knew at that time."  121 F.4th 1180, 1186 (9th Cir. 2024).  The full quote, however, is, "a statement is false or misleading if it directly contradicts what the defendant knew at that time ***or omits material information***." *Id.*

7

2024, who had considerable visibility into Maxeon's finances and was also involved in credit underwriting and raising capital for the Company's "infrastructure projects." ¶40. CW-2 was a Marketing Manager on Maxeon's U.S. marketing team from August–November 2023; worked with the Company's counterparts in Europe (who worked directly for SunPower); and regularly attended weekly sales meetings with discussions typically centering around the sales pipeline, including one held before November 2023 by a Director of Sales who told the Company's employees to get SunPower's dealers' credentials and not to get caught having improper conversations with them. ¶¶41, 65.

Defendants' efforts to discount and discredit the CWs is confounding. It is more reasonable to infer "that a person in the position occupied by the [CWs] would possess the information alleged" and that contain "adequate corroborating details." *See e.g., Daou*, 411 F.3d at 1015; *In re Adaptive Broadband Sec. Litig.*, 2002 WL 989478, at *12 (N.D. Cal. Apr. 2, 2002) (crediting CW allegations where complaint set forth information including the period in which the witness was employed, their job duties, and how the witness came to know the information they describe).[4]

Additionally, courts routinely consider CWs' allegations reliable and supportive of falsity where, like here, the complaint contains "adequate corroborating details" to support that Defendants' statements were false and misleading when made. *Daou*, 411 F.3d at 1015; *Glazer Cap. Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 772 (9th Cir. 2023) (finding "that the CWs tell a reasonably plausible story" in part through "the consistency between the CW's statements");

---

[4] Therefore, unlike the CWs in *National Elevator Industry Pension Fund v. Flex Ltd.*, 2021 WL 6101391, at *1 (9th Cir Dec. 21, 2021) (MTD 13-14), the CWs here **were** "in a position to personally know the information alleged" and possess information that "directly contradict[s]" Mulligan's statement about the Company's interactions with dealers. And unlike the CWs in *In re Fusion-io, Inc. Securities Litigation*, 2015 WL 61869, at *18-20 (N.D. Cal. Feb. 12, 2015) (MTD 13), the accounts of the CWs here, one who served as a Marketing Manager (one of two employees on the US marketing team) from August–November 2023 and one who served on the Treasury Team with considerable visibility into the company's finances, **do** contradict Mulligan's November 15, 2023 statements about not approaching SunPower dealers and ramping up sales. In any event, first-hand knowledge is not a prerequisite. *In re LDK Solar Sec. Litig.*, 584 F. Supp. 2d 1230, 1243 (N.D. Cal. 2008) ("[f]or pleading purposes, it is not necessary that the source have personal firsthand knowledge."); *In re Cadence Design Sys., Inc. Sec. Litig.*, 692 F. Supp. 2d 1181, 1188 (N.D. Cal. 2010) ("'[P]ersonal knowledge' ... is not a hard-and-fast requirement."); *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1208 (9th Cir. 2016) (crediting CW account where the allegations were based on what someone else said).

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    Case No. 3:24-cv-03869-EMC

*Loritz v. Exide Techs.*, 2014 WL 4058752, at *10 (C.D. Cal. Aug. 7, 2014) (CW's account deemed reliable where it corroborated other CW statements).   Here, CW-1, CW-2, and SunPower's allegations tell "essentially the same story," to wit: that prior to and contemporaneous with Mulligan's public statements to the contrary, the Company contacted SunPower's dealers directly for business "under the rug"—in violation of the non-circumvention clause of the New Master Supply Agreement—"caused a lot of confusion" and "pissed" off dealers who were used to receiving calls directly from SunPower leading to "a great deal of loss of [those] dealers" for Maxeon.  ¶¶7, 17, 53, 64-66; *In re Countrywide Fin. Corp. Derivative Litig.*, 554 F. Supp. 2d 1044, 1058-59 (C.D. Cal. 2008).[5]

**B.    Defendants Misled Investors About Maxeon's Finances, Utility-Scale Business, Profitability, Cash Flow And Liquidity**

**1.    AC ¶90: On November 15, 2023, Strohbecke Fails To Disclose That No Further Cash Would Be Paid In Utility-Scale Segment**

Strohbecke stated during the November 15, 2023 earnings call that "[c]ash levels were also impacted by … the reduction of contract liabilities related to our US utility scale business capital expenditures during the quarter[.]"   ¶90.   Even if technically true, by volunteering material information about the Company's "cash levels," and contract liabilities related to the Utility-Scale business, Defendants put these topics in play and failed to speak "fully and truthfully" about them by omitting known and existing material facts that rendered them misleading in context—*i.e.*, its cash levels were positively impacted by its utility-scale contracts only because the Company had not yet realized the pre-paid expenses associated with these contracts and with the peak of the prepayment amortization schedule looming, the Company would soon be forced to recognize "$55.1 million [in Utility-Scale] contract liabilities," and would receive no further cash from these prepayments.  ¶¶68, 79; *In re Apollo Grp., Inc. Sec. Litig.*, 395 F. Supp. 2d 906, 920 (D. Ariz. 2005).

---

[5]    Thus, *Kipling v. Flex Ltd.*, 2020 WL 7261314, at *15 (N.D. Cal. Dec. 10, 2020), *aff'd Nat'l Elevator Indus. Pension Fund v. Flex Ltd.*, 2021 WL 6101391, at *2, *11 (9th Cir. Dec. 21, 2021), is distinguishable because the plaintiff there "points to no other allegations" besides the CWs to support falsity.  MTD 13.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    Case No. 3:24-cv-03869-EMC

**2.     AC ¶91: Statements On November 15, 2023 That Cash Will Be Sufficient Were False Because The Company Was In A Cash And Liquidity Crisis**

Maxeon's November 2023 6-K, signed by Strohbecke, contained the following: "We believe that our current cash, cash equivalents, along with cash expected to be generated from operations will be sufficient to meet our obligations over the next 12 months." ¶91. An opinion is actionable if the speaker does not hold the stated belief. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 180, 184-85 (2015). An opinion is rendered misleading by omission if the basis for the speaker's opinion is omitted and the "omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Omnicare*, 575 U.S. at 194.

Strohbecke and Maxeon were "aware of undisclosed facts tending seriously to undermine the statement's accuracy." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F. 3d 605, 616 (9th Cir. 2017). Specifically, when this statement was made, Maxeon was in the midst of a cash flow and liquidity crisis. Indeed, as CW-1 stated, the Company's cash flow began deteriorating as early as May/June of 2023 and was considered "bad" by the summer of 2023 with lenders expressing concern to Defendants about Maxeon's ability to continue as a going concern as early as summer 2023 and as late as September 2023—two months before this statement was made. ¶¶16, 19, 71. Meanwhile, the Company was nearing the peak of the prepayment amortization schedule, meaning that cash from prepayments on its Utility-Scale contracts was set to dry up in or around Q1 2024. ¶¶18, 68, 92.

Consequently, this opinion misled investors reading them fairly and in context by concealing those facts, all of which Strohbecke was aware. *See* §V, *infra*; *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245-52 (2d Cir. 2016) (misleading to state that company was "confident of its capacity to meet its anticipated obligations over the next [year]" when facing illiquidity); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 298-99 (S.D.N.Y. 2013) (misleading to say company had "sufficient liquidity to satisfy all of [its] expected cash needs for at least one

10

year" despite existence of material undisclosed issues).[6]

Defendants complain that by failing to plead specific *internal* predictions or analyses about Maxeon's liquidity such as projections of its future collections, operating or capital expenditures, Plaintiffs do not address any of the "underlying assumptions about Maxeon's future operations" that make the "opinion" statements false or misleading. MTD 16-17. This is a red herring. Where, like here, there "has been no discovery, courts have been reluctant to dismiss the action where the facts underlying the claims are within the defendant's control." *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012); *see also In re Snap Inc. Sec. Litig.*, 2018 WL 2972528, at *6 n.16 (C.D. Cal. June 7, 2018).

Even still, Plaintiff sufficiently pleads the assumptions, written and verbal, underlying the false and misleading "opinions" about Maxeon's current and future operations. First, the peak of the prepayment amortization of Maxeon's non-public utility-scale contracts—a factor Defendants later admitted contributed to the Company's need for liquidity support, ¶100—was "preset and the timing of payments (["in or before the first quarter of 2024"]) was specifically written into its Utility-Scale contracts." ¶¶68, 113. Additionally, Defendants were aware that they would be unable to meet Maxeon's future capital requirements because lenders who were in close contact with Defendants expressed their concern about Maxeon's ability to continue as a going concern as early as summer 2023. ¶16.

### 3.    AC ¶93: Statements On April 8, 2024 Also Failed To Disclose That Utility-Scale Customers Had Delayed Projects

Despite the fact that circumstances were getting worse—indeed, internally Maxeon's cash and liquidity position had become "dire" in March 2024, ¶71—Defendants nonetheless continued to mislead the market in 2024. For example, on April 8, 2024, Maxeon issued a press release quoting Mulligan as stating that Maxeon "delivered financial results largely in line with [its]

---

[6]    That Maxeon accurately reported certain "historical data" during the Class Period does not render the challenged statements immune from §10(b) liability. *See Amgen*, 544 F. Supp. 2d at 1034 (rejecting argument that "as a matter of law [a] §10(b) violation cannot be premised upon a company's disclosure of accurate historical data," because "[i]ncomplete statements are misleading if they affirmatively create an impression of a state of affairs which differs in a material way from the one that actually exists.").

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    Case No. 3:24-cv-03869-EMC

expectations" in part because of its "utility-scale business [that] accounted for the majority of [its] revenues" and that the Company was "highly focused on . . . liquidity management to enable a return to profitability." ¶93. These statements were misleading for the same reasons described above, as well as the fact that in early Q1 2024, two of the Company's Utility-Scale customers were experiencing project delays, which left them without the expected cash from these deals and forced them to absorb the costs of unused inventory. ¶¶69, 79. Accordingly, the true state of Maxeon's finances was far worse than how Defendants portrayed them. ¶¶21, 23, 79; *Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1158-59 (N.D. Cal. 2015) (statements that defendants were "in line with [their] expectations" held materially false and misleading because of facts undermining statement's truth).

Defendants incorrectly argue that the statement that Maxeon's Q4 2023 financial results were "in line with [its] expectations" is an opinion. MTD 16. It is not, because it expressed "certainty" about the Company's financial results it delivered during that quarter. ¶93; *see, e.g.*, *Hatamian*, 87 F. Supp. 3d at 1159 (finding "nanometer yields are in line with our expectations" to be actionable). But even if it was, it was a misleading opinion because Mulligan was aware of the foregoing facts that tended "seriously to undermine the statement's accuracy." *In re Amylin Pharms., Inc. Sec. Litig.*, 2003 WL 21500525, at *9 (S.D. Cal. May 1, 2003) ("Defendants were privy to information . . . seriously undermin[ing] any belief . . . .").

### 4. AC ¶94: Statements On April 30, 2024 Delaying Maxeon's Annual Report Were False For Failing To Disclose Dire Financial Condition

A few weeks after announcing positive preliminary results for fiscal 2023, Maxeon announced that "additional time [to file its 20-F was required] to complete its financial statement preparation and review process[,]" in part because "ongoing work required in connection with the assessment of the Company's ability to continue as a going concern[.]" ¶94. This statement is objectively false, or at the very least materially misleading when made, because Defendants already knew at this time that Maxeon would be unable to continue as a going concern absent significant liquidity support. ¶¶16, 22, 94-95; *In re Bear Stearns Cos., Inc. Sec., Derivative, &*

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    Case No. 3:24-cv-03869-EMC

*ERISA Litig.*, 763 F. Supp. 2d 423, 457, 494-95, 498 (S.D.N.Y. 2011) ("deni[als] [of] a liquidity crisis" misleading).

Neither *In re Verifone Securities Litigation*, 784 F. Supp. 1471, 1477 (N.D. Cal. 1992), *aff'd*, 11 F.3d 865, 869 (9th Cir. 1993) nor *Monachelli v. Hortonworks, Inc.*, 225 F. Supp. 3d 1045 (N.D. Cal. 2016), "foreclose[s]" Plaintiff's claims.  MTD 15-16.  *Verifone* presented a situation where every allegation relied on the failure to disclose a forecast of future sales, 784 F. Supp. at 1477, which is not the case here.  And the *Hortonworks* defendants did not mislead the market by making positive statements about the company's cash burn rate where they told investors during conference calls that they "may[ ] raise cash in one form or another" which "doesn't have to be a[n] . . . equity offering," but then entered into a second public offering six weeks later. *Hortonworks*, 225 F. Supp. 3d at 1053-54.  Here, by contrast, Defendants actively misrepresented Maxeon's financial situation by failing to disclose the then-known, relevant, and material facts concerning the Company's Utility-Scale business issues and its ongoing cash flow and liquidity crisis.

### C.    Defendants' Statements Are Not Inactionable Puffery

Whether a statement amounts to puffery depends on the context in which it was made. *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014).  Statements are only considered "puffery" or corporate optimism if they are not "capable of objective verification" and are so "exaggerated" or "vague" that no reasonable investor would rely on it.  *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008).[7]  Puffery or "general statements of corporate optimism, when taken in context, may [be actionable] when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017).

As set forth in §IV.B, *supra*, these statements gave investors the misleading impression

---

[7]    Defendants' authorities are inapposite.  *See Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1071 (C.D. Cal. 2012) (finding defendants' statements that it was "happy with" a product and would "continue to invest very aggressively" to be inactionable absent any facts contradicting these statements); *Fusion-io*, 2015 WL 661869, at *6, *15 (finding defendants' "in line with expectations" statement inactionable where plaintiff failed to "ple[a]d [any] facts showing that the statements were false when made.").

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**    Case No. 3:24-cv-03869-EMC

that Maxeon had delivered specific financial results in line with set expectations and that engaging in a direct to dealer sales strategy would concretely result in the Company's ability to aggressively ramp up sales, despite being aware of facts that contradicted these statements.

For example, while Mulligan claimed that Maxeon "delivered financial results largely in line with [their] expectations," in part because of its Utility-Scale business, he knew that the Company was in the midst of a cash flow and liquidity crisis, two of its utility-scale customers were experiencing project delays, and the prepayment amortization schedule of its Utility-Scale contracts was set to reach its peak, which would exacerbate the Company's cash flow and liquidity crisis and have a material negative impact on the Company's near-term financial results. ¶¶93, 113. These are the exact type of circumstances that render a defendant's materially misleading statement capable of objective verification and therefore actionable under federal securities laws. *In re InterMune, Inc. Sec. Litig.*, 2004 WL 1737264, at \*4 (N.D. Cal. July 30, 2004) ("[p]rojections and general statements of optimism [found] actionable" where facts adverse to projections existed); *Warshaw v. Xoma Corp.*, 74 F.3d 955, 959-60 (9th Cir. 1996) ("general statements of optimism [that 'everything was going fine',] when taken in context, may form a basis for a securities fraud claim . . . .").

The late disclosure of Maxeon's utility-scale contract delays on May 30, 2024 rightfully gave an analyst pause, who asked if Maxeon was previously aware of these issues. ¶101. Aschenbrenner's admission that Maxeon "w[as] informed [in] earl[y 2024] that [its Utility-Scale customer] would not be in a position to accept those deliveries under [the] contracted schedule" (*id.*) confirms Plaintiff's allegations. *See City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368 (S.D.N.Y. 2012) (reactions of securities analysts supported inference of materiality at the MTD stage).

The same is true of Mulligan's statements about how offering panels directly to dealers "w[ould] enable [its] plans to aggressively ramp [its] sales in the U.S. market"—it contradicted his knowledge of the objective fact that there were significant obstacles impeding Maxeon's ability to do so. ¶88; *In re Apple Sec. Litig.*, 2020 WL 2857397, at \*14-15 (N.D. Cal. June 2, 2020) (finding that a positive statement relating to the sales of the iPhone XS and XS Max actionable because it

14

was made days before production was cut, thereby creating a positive impression in an area Apple knew was doing poorly).

### D.       Defendants' Statements Are Not Protected By The Safe Harbor

Even if Defendants' statements that the Company could "aggressively ramp [its] sales in the U.S. market," ¶88, was "focus[ing] on . . . liquidity management to enable a return to profitability," ¶93 or that Maxeon's "***current cash*** [***position***] . . . will be sufficient to meet [its] obligations," ¶91, are deemed forward-looking, they are not protected by the PSLRA's safe harbor because the statements were not accompanied by meaningful cautionary language and were made with actual knowledge of their falsity.  15 U.S.C. §78u-5(c)(1).

First, the "disclosures" contained in the Company's SEC filing regarding the "risk" of "material[] impact [to Maxeon] until" Maxeon can "rebuild customer demand…if at all" and the various boilerplate risk disclosures related to its liquidity such as that Maxeon "***may*** be unable to generate sufficient cash...or make necessary capital expenditures," *see* MTD App'x B 3, 5-6, ECF No. 70-2, were not meaningful because Defendants did not disclose that these contingencies were not merely possibilities or expectations but were in fact ***already occurring***—dealers used to engaging in SunPower were not doing business with Maxeon and its cash position was already so bad that lenders questioned whether it could continue as a going concern.  ¶¶16, 17, 19, 66; *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at \*2 (C.D. Cal. June 9, 2016) (risk disclosures misleading because risk warned of already materialized); *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("[A] company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized.").[8]

---

[8]       The cases cited by Defendants involve statements concerning future events absent any undisclosed facts even undermining their likelihood of occurring.  *Flex*, 2020 WL 7261314, at \*10 (statements about "revenue grow[th] and "crossing into profitability" because of a Nike contract had operational problems, alleged by insufficiently described CWs, that were not adequately tied to success of contract); *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1190, 1192 (9th Cir. 2021) (statements about being "on track to support the ramp of Model 3" had "no issues that would prevent [Defendant-company] from achieving this goal"); *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at \*16 (N.D. Cal. July 21, 2020) (challenged statements had "cautions" that

---

15

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS     Case No. 3:24-cv-03869-EMC**

This was not the case in Defendants' authorities, *Police Retirement System of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1058 (9th Cir. 2014), *In re Cutera Securities Litigation*, 610 F.3d 1103, 1111 (9th Cir. 2010), or *Ronconi v. Larkin*, 253 F.3d 423, 430 (9th Cir. 2001), none of which involve a situation where the risks warned of had already materialized.  MTD 9, 11.

Moreover, these so-called "risk disclosures" were especially meaningless because they contained the exact same language that accompanied statements made months before May/June of 2023—*i.e.*, before their cash flow began deteriorating and was considered "bad."  *Compare* Maxeon Form 20-F (Mar. 7, 2023) (MTD Ex. 1, ECF No. 71) *with* Form 6-K (Nov. 15, 2023) (MTD Ex. 6, ECF No. 71).  As such, they did nothing to warn investors that Maxeon's circumstances had changed materially.  *See Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010) ("The consistency of the defendants' language over time despite the new information they received . . . belies any contention that the cautionary language was tailored to the specific future projection[.]").  Thus, the cautionary statements failed to "discredit the alleged misrepresentations" such "that 'the risk of real deception drop[ped] to nil.'"  *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1033-34 (S.D. Cal. 2005) (quoting *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991)).

The forward-looking statements are also not entitled to the safe harbor because Defendants knew they were false or misleading when made.  A speaker has knowledge of the falsity of a forward-looking statement if the speaker has actual knowledge that one or more of the following implicit factual representations is not true: "(i) that the statement is genuinely believed; (ii) that there is a reasonable basis for that belief; and (iii) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement."  *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 388 (S.D.N.Y. 2012) (quoting *Slayton*, 604 F.3d at 775).  As noted in

"addressed the very [risks] [p]laintiffs challenge."); *Garcia v. Hetong Guo*, 2016 WL 102213, at *8 (C.D. Cal. Jan. 7, 2016), (statements that it "expect[s] that our current cash . . . will be sufficient to meet our anticipated cash needs for working capital and certain capital expenditures for the next 12 months[.]" had no undisclosed facts that demonstrated its improbability); *Hortonworks* is inapposite because there, the defendants' risk disclosures accompanying their liquidity projections addressed the exact unmaterialized risks plaintiffs challenged.  225 F. Supp. 3d at 1056.  MTD 9-10, 13.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**    Case No. 3:24-cv-03869-EMC

§IV.B, *supra*, the statements in ¶¶88, 91, 93 were not genuinely believed. Even if they were, however, they were misleading because Defendants lacked a reasonable basis for them and were "aware of undisclosed facts tending to seriously undermine the statement's accuracy." *See* Section IV.B.2. That is, by omitting its ongoing cash flow and liquidity crisis and the impending peak of its prepayment amortization schedule, investors were misled as to the likelihood that Maxeon would be able to have sufficient cash flow to meet its existing business needs in the following 12 months or otherwise continue to operate the Company in the near-term without needing major liquidity support, as explained further in §V, *infra*.

## V.    PLAINTIFF ADEQUATELY PLEADS SCIENTER

"To plead scienter adequately, the complaint must state with particularity facts giving rise to a strong inference that defendants engaged in knowing or intentional conduct, which includes deliberate recklessness." *Lloyd*, 811 F.3d at 1206. An actor is deliberately reckless if he "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [the actor] could have done so without extraordinary effort." *Intuitive*, 759 F.3d at 1063. The Court must review the AC's allegations holistically to determine if Plaintiff has alleged a strong inference of scienter. *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 992 (9th Cir. 2009). The inference must be "cogent" and "at least as likely as any plausible opposing inference[;]" thus, a tie goes to the plaintiff. *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S.308, 324, 328 (2007). No "smoking-gun" is required, *id.* at 324; and "[v]ague or ambiguous allegations" are "properly considered[.]" *S. Ferry LP, # 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

### A.    Defendants' Knowledge Of And Access To Information

In the Ninth Circuit, plaintiffs may plead scienter by showing either that the defendants had actual knowledge of *or likely had access to facts* that contradict their contemporaneous statements or otherwise render them misleading. *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *9-10 (C.D. Cal. Aug. 4, 2014). In pleading access to contradictory information, the plaintiff need not allege that the defendant "actually received" the information, instead, proof of "close topical and temporal proximity" of the information to the defendant is sufficient. *Id*. Here, the

17

AC clearly pleads that each Individual Defendant had actual knowledge of and/or access to the truth regarding the facts that contradicted their public statements through, *inter alia*, the accounts of two CWs.

A complaint relying on statements from confidential witnesses to show scienter "must pass two hurdles to satisfy the PSLRA pleading requirements." *Zucco*, 552 F.3d at 995. First, the confidential witness "must be described with sufficient particularity to establish their reliability and personal knowledge." *Id.* "Second, those statements which are reported by confidential witnesses with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.* As set forth in §IV.A, Plaintiff overcomes the first hurdle by "describ[ing] the confidential witnesses' job titles and employment information with ample detail . . . ." *Zucco*, 552 F.3d at 996. The second hurdle is also met.

The AC explains with specificity that Mulligan and Strohbecke had actual knowledge of facts that contradicted their public statements about Maxeon's sufficient cash flow and liquidity. For example, Treasury Team member CW-1 explained that the Company's cash and liquidity position had been deteriorating since May or June of 2023, and that lenders had expressed concern about Maxeon's ability to continue as a going concern by *at least September 2023*. ¶¶16, 71. Additionally, Strohbecke was "included 'on all correspondences' regarding the various matters CW-1 worked on" and such issues came within CW-1's knowledge during his employment with Maxeon. ¶¶40, 66. CW-1 explained that the Individual Defendants were very involved in discussing financing issues and were presented with a *series of financing options from lenders who expressed their doubt about Maxeon's ability to continue as a going concern*. ¶112; *See Quality Sys*., 865 F.3d at 1144 (finding scienter where CW's allegations show defendants "had real-time access to, and knowledge of" relevant information). The fact that Maxeon had no choice but to get liquidity support from TZE further supports CW-1's knowledge—if lenders were willing to provide Maxeon the needed funds, Maxeon likely would have taken it rather than risk the DOE loan by going with TZE. ¶100.

Defendants' continued insistence that Plaintiff needs to plead the details of an internal liquidity analysis that they were involved in is once again not the law and blind to Plaintiff's well-

18

pled facts.  §IV.B.1, *supra.*  After all, how could two of Maxeon's highest ranking officers, who received financing options from lenders, be unaware of the doubts those lenders openly expressed about the Company's ability to continue as a going concern?  ¶112.

The Individual Defendants' knowledge about the major obstacles in the way of ramping up sales without SunPower is also supported by CW-2, who explained that Maxeon employees were instructed to "get SunPower's dealers' credentials and not to get caught having improper conversations with them" and that they "ha[d] conversations with customers 'under the rug' despite that the non-circumvention clause was still in effect."  ¶65.  This is corroborated by SunPower's allegations that contributed to the demise of its relationship with Maxeon, ¶53, and CW-1, who **did have** extensive direct contact with each Individual Defendant.  ¶40.  This sort of corroboration by a CW "with respect to what was going on internally at [the Company] . . . supports the reliability of their statements" and is probative of each Defendants' scienter even where CW-2 did not have direct contact with Defendants.  *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at \*27 (N.D. Cal. Mar. 21, 2018).[9]

In addition to the CW allegations, the Individual Defendants' own statements support a strong inference of scienter.  For example, their collective admissions that Strohbecke was "laser-focused on cash management," ¶108, that Defendants had a "continued focus on working capital management," ¶109, and was "highly focused on . . . liquidity-management to enable a return to profitability" ¶93, represent "specific admissions from top executives that they . . . monitored" specifics about the Company's cash flow and liquidity which would have unquestionably contained the relevant truth.  *Daou*, 411 F.3d at 1022-23; *S. Ferry LP # 2 v. Killinger*, 687 F. Supp.

---

[9]    *Tai Jan Bao v. SolarCity Corp.*, 2016 WL 4192177, at \*9 (N.D. Cal. Aug. 9, 2016), *aff'd sub nom.*, *Webb v. SolarCity Corp.*, 884 F.3d 844 (9th Cir. 2018), is distinguishable because the CW allegations there (allegations failing to "offer [any] detail…[that] Individual Defendants . . . knew" or "were involved" in the activities at issue that contradicted their public statements) are dramatically different from the CWs' allegations in this case, establishing that Defendants were directly involved in conversations and correspondences, the substance of which contradicted their public statements about the topic.  For similar reasons, *City of Sunrise Firefighters' Pension Fund v. Oracle Corp.*, is also distinguishable.  2019 WL 6877195, at \*19 (N.D. Cal. Dec. 17, 2019) (plaintiff failed to establish that any defendant was aware of any allegations attributed to the CW, reflecting the contradictory information).

19

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS     Case No. 3:24-cv-03869-EMC

2d 1248, 1258 (W.D. Wash. 2009) (inferring scienter from defendants' admissions); *Nursing Home Pension Fund, Local 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004) (scienter allegations sufficient because they included details about the defendants' access to information within the company).  Indeed, an important piece of Maxeon's cash flow and liquidity during the relevant time period came from prepayments received from its Utility-Scale customers.  The prepayments were pre-set and the timing of payments was specifically written into Maxeon's contracts.  As Aschenbrenner would later explain, the schedule for these prepayments was known and set to peak on or around "early" 2024.  ¶101.   Given their frequent discussions of their own focus on liquidity management and the Utility-Scale business, Defendants either knew or were reckless in not knowing the relevant schedule and its implications for Maxeon's cash and liquidity.[10]  *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 485 (9th Cir. 2019) (public statements about the topic at issue "[t]aken together . . . suggest that [the defendant] paid attention to . . . and received detailed information about [it]").

Mulligan also confidently stated that he "knew how to" ramp up the Company's DG customer base "efficiently," "in the face of direct questioning" from analysts, at the Company's November 15, 2023 earnings call, further supporting his knowledge of the fact that Maxeon's strategy of offering panels "direct to dealers," if not already unsuccessful, faced material obstacles. ¶111; *S. Ferry LP # 2*, 687 F. Supp. 2d at 1259; *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1261 (D. Nev. 2019) (that defendants "responded to at least one [analyst] question . . . suggest[ed] they were familiar with the . . . issues.").

Finally, their positions as CEO and CFO of Maxeon strongly supports that the Individual

---

[10]    Defendants cite *Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1036 (9th Cir. 2002) for the proposition that Plaintiff needs to plead the contents of internal reports or data.  MTD 19. However, in the recent case *E. Ohman J:or Fonder AB v. NVIDIA Corp.*, the Ninth Circuit allowed a complaint to go forward with supporting scienter allegations that defendants had access to a report that plaintiffs reasonably concluded **would have shown data** that contradicted their public statements about the topic. 81 F.4th 918, 940 (9th Cir. 2023), *cert. dismissed as improvidently granted sub nom. NVIDIA Corp. v. E. Ohman J:or Fonder AB*, 640 U.S. 20 (2024).  Here, the AC contains detailed allegations about the information that was necessarily in Defendants' possession—*e.g*., the prepayment amortization schedule, interactions with lenders— and why that information contradicted their public statements.

20

Defendants had access to information that directly contradicted their public statements. ¶¶110-11. Both were tasked with overseeing the Company's operations and updating the market about Maxeon's finances and prospects. *Id.* Indeed, as CFO, Strohbecke was necessarily required to be informed about the Company's cash flow and liquidity situation, and his and Mulligan's Class Period statements indicate that he was "laser-focused" on it. ¶¶15, 72, 108. Additionally, the fact that Maxeon's direct approach of dealers contributed to the termination of the SunPower agreement, ¶¶7, 53, suggested that this was not a handful of isolated incidents, but a widespread practice, and its lack of success would necessarily have come to the CEO's and CFO's attention.

Such allegations are sufficient to plead, at a minimum, Defendants' deliberate recklessness. *See, e.g., In re Plantronics, Inc. Sec. Litig.*, 2022 WL 3653333, at \*18 (N.D. Cal. Aug. 17, 2022) (finding that CEO and CFO must have known about the "undisclosed sales practice and its effects on the Company's revenues and financial health"); *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1026 (N.D. Cal. 2020) (finding top executives with access to the financial information at issue by virtue of their positions supported inference of scienter); *Reese v. Malone*, 747 F.3d 557, 575-76 (9th Cir. 2014) (allegations regarding management's roles "may independently" support scienter where "they are particular and *suggest* that defendants had actual access to the disputed information.").

**B.    The Core Operations Theory Supports Defendants' Scienter**

Additionally, Plaintiff's "[a]llegations regarding management's role in [the corporate Structure]" satisfy scienter under the following prongs of the core operations theory: (1) the allegations may be viewed as part of the holistic analysis; (2) they alone suffice "where they are particular and suggest that defendants had actual access to" the information; and (3) they alone suffice where "the relevant fact[s] [are] of such prominence that it would be absurd to suggest that management" was unaware of them. *Reese*, 747 F.3d at 575-76.[11] The second prong of the doctrine closely mirrors the "access" standard for scienter and, as set forth in §V.A, Plaintiff has

---

[11]    *Reese* was overruled in part by *City of Dearborn Heights Act 345 Police & Fire Ret. Sys., v. Align Tech., Inc.*, 856 F.3d 605, 614-16 (9th Cir. 2017), to the extent that its analysis of falsity of opinions is irreconcilable with *Omnicare*. The *Align Tech.* decision does not alter *Reese*'s analysis of scienter for false or misleading statements of ***fact***.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    Case No. 3:24-cv-03869-EMC**

more than sufficiently pleaded Defendants' access to the information they concealed.[12]  Under the third prong of the doctrine, when the subject of management's misleading statements is so integral to the company that it is "absurd to suggest" that management was not aware of the misrepresentation, scienter may be presumed without any direct facts showing the defendants' knowledge.  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 988, n.5, 989 (9th Cir. 2008).

Maxeon's core operations during the Class Period were replacing the lost business from SunPower (26.7% of its prior year revenues!) by approaching dealers directly, and its Utility-Scale business, which was now "a key focus" and "primary growth driver," and the management of cash flow and liquidity in light of this new state of affairs.  ¶¶114, 119.  The prominence of these operations is supported by Defendants' overwhelming number of Class Period statements highlighting their financial importance to the Company and emphasizing their own involvement in its minutiae.  *See, e.g.,* ¶¶52, 114-19; *Mulligan*, 36 F. Supp. 3d at 970 (invoking core operations doctrine and finding it "absurd to think that the CEO and CFO . . . would be unaware of . . . [issues] pervading . . . the heart of [the] company" even without allegations of direct evidence of the officer's knowledge of the falsity of their statements.); *Shenwick v. Twitter, Inc.*, 282 F. Supp. 3d 1115, 1145-46 (N.D. Cal. 2017) (finding it "absurd" to argue defendants were unaware of trends related to "one of its five major growth factors").

### C.    The Timing Of Strohbecke's Resignation Adds To The Inference Of Scienter

The abrupt departure of Maxeon's CFO, Strohbecke, "just one week after the truth about Maxeon's cash flow [and] liquidity issues . . . were revealed to the market" causing the stock to "drop . . . 39.55%" over two consecutive trading days," coupled with the fact that "Maxeon [had not yet] found a viable replacement," ¶¶123, 128, is clouded with the exact type of "uncharacteristic [and] . . . suspicious circumstances" courts consider indicative of scienter.

---

[12]    In *Espy v. J2 Global, Inc.*, 99 F.4th 527, 534, 539 (9th Cir. 2024), plaintiffs only alleged defendants' "general awareness of [the corporation's] finances" and the allegations established that "consolidated accounting [hid the] underperforming . . . acquisitions" at issue.  In *Plumley v. Sempra Energy*, 847 F. App'x 426, 431 (9th Cir. 2021), the complaint lacked any allegations of "specific admissions" by defendants about their involvement in the company or that the facts alleged were "of such prominence" to the company.  Finally, in *Zucco*, 552 F.3d at 1000, the court found that management's general discussion about inventory numbers, without more, did not support the inference that they knew that data was being manipulated.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    Case No. 3:24-cv-03869-EMC

*Allegiant*, 412 F. Supp. 3d at 1262 (citing *Zucco*, 552 F.3d at 1002); *In re SunPower Sec. Litig.*, 2011 WL 7404238, at *4 (N.D. Cal. Dec. 19, 2011) (allegations that Defendants were "terminated" and "may have been pushed out" after truth was revealed supported inference of scienter); *Hall v. Rent-A-Center, Inc.*, 2017 WL 6398742, at *34 (E.D. Tex. Oct. 19, 2017) (sudden departure coupled with admission of operational challenges enhanced scienter).[13]

### D. The Temporal Proximity Of Defendants' Misstatements And Their Revelation Of The Truth Supports Scienter

The shortness in time between a defendant's misstatements and the revelation of the truth "bolster[s] the inference that [D]efendants knew about [the problem] when they made the [misleading] statement." *Applied Signal*, 527 F.3d at 988, n.5; *In re Secure Computing Corp. Sec. Litig.*, 184 F. Supp. 2d 980, 990 (N.D. Cal. 2001) (close temporal proximity between defendants' positive and negative financial disclosures was "[f]urther circumstantial support for the inference of deliberate recklessness").

Here, Maxeon's May 30, 2024 truthful disclosure occurred (a) just around six months after Defendants' earliest misstatements about: how "[o]ffering panels directly to installers will . . . . enable [its] plans to aggressively ramp [its] sales in the U.S. market," "reduc[ing its] contract liabilities related to [its] US utility scale business,"  and the Company's "current cash . . . will be sufficient to meet [its] obligations over the next 12 months", ¶¶88-92; (b) less than two months after Defendants' misstatements about their "financial results . . . in line with [their] expectations… [in part through its] utility-scale business," and its "high[] focus . . . on liquidity management . . . . [and] return to profitability," ¶93; and (c) exactly one month before Defendants' statements about "ongoing work required…[to] assess[ ] the Company's ability to continue as a going concern . . . ." ¶94.

---

[13]    Unlike in Defendants' authority, *Zucco*, 552 F.3d at 1001, where the court found two non-Defendant controllers' resignations prior to the corrective disclosures non-suspicious because they "resigned ***during the class period***," *id.* at 1002, here Strohbecke's departure one week after the truthful disclosure "with no successor identified" was significantly more suspicious and therefore indicative of Defendants' scienter.  *In re Myriad Genetics, Inc. Sec. Litig.*, 2021 WL 977770, at *22 (D. Utah Mar. 16, 2021).

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    Case No. 3:24-cv-03869-EMC**

Ninth Circuit courts have found gaps between misstatements and their relevant truth, similar to or greater than those present here, supportive of scienter. *See e.g., Reese*, 747 F.3d at 575 (temporal proximity of three to six months supported scienter); *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *11 (C.D. Cal. Feb. 27, 2015) (disclosures occurring just less than six months after misrepresentations support scienter).[14]

**E.    The Inference Of Scienter Is At Least As Compelling As Defendant's "Innocent" Explanation**

When the parties present "two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss . . . ." *Ferreira v. Funko Inc.*, 2021 WL 8820650, at *10 (C.D. Cal. Oct. 22, 2021).

Defendants' claim that Maxeon had a long series of unfortunate events that culminated in its eleventh-hour attempt to secure financing from its largest shareholder is utterly implausible given the AC's allegations. The AC's allegations provides a far more plausible and compelling explanation: that upon the heels of losing its largest customer and in the face of significant capital and liquidity restraints, Defendants artificially inflated the stock price by touting implausible sales growth strategies they knew had already failed and were likely to be very difficult to implement, made statements about Maxeon's present cash flow, liquidity and financial results they knew were false or misleading, and made statements concerning the Company's future ability to meet its capital requirements they knew were objectively unattainable.

Although Defendants highlight a lack of motive, it is black letter law that in a securities fraud action, plaintiffs are not required to establish defendants' motives at the pleading stage. *See Matrixx*, 563 U.S. at 48 ("The absence of a motive allegation, though relevant, is not dispositive."). The same is true for Defendants' arguments about their lack of insider trading, which, given Plaintiff's other strong scienter allegations, is of no consequence. *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1182 (9th Cir. 2009), *aff'd sub nom.*, *Matrixx*, 563 U.S. 27 (finding scienter without insider sales because allegations of motive are not required); *In re LendingClub*

---

[14]    *Yourish v. Cal. Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999), is inapposite because it merely states that temporal proximity *alone* is insufficient. MTD 21.

24

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    Case No. 3:24-cv-03869-EMC**

*Sec. Litig.*, 254 F. Supp. 3d 1107, 1122 (N.D. Cal. 2017) (rejecting argument that increasing holdings in company during the class period holds "that fact is insufficient to overcome the countervailing allegations supporting a strong inference of scienter").[15]

## VI.   THE COMPLAINT STATES A CLAIM UNDER SECTION 20(a)

Because Defendants' argument for dismissal of the §20(a) claim is that a primary-violation of §10(b) and Rule 10b-5 has not been adequately alleged, their challenge to Plaintiff's §20(a) claim likewise fails.  *In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *21 (S.D. Cal. May 23, 2017).

## VII.   ALTHOUGH UNNECESSARY, AMENDMENT SHOULD BE PERMITTED

Fed. R. Civ. P. 15(a) permits a party to amend a complaint. "Generally, Rule 15 advises the court that leave shall be freely given when justice so requires." *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).  "This policy is to be applied with extreme liberality" and "[a]dherence to these principles is especially important in the context of the PSLRA."  *Id.* at 1051-52.  If the Court grants Defendants' motion, Plaintiff respectfully requests leave to amend the complaint.

**CONCLUSION**

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion in its entirety.

Dated:  February 6, 2025                         Respectfully submitted,

By: /s/ *James M. Wilson, Jr.*
             James M. Wilson, Jr.

James M. Wilson, Jr. (appearance *pro hac vice*)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor

---

[15]    The authorities Defendants use to support this point are similarly inapposite because in each case, there were several other, more significant, factors that weighed against a finding of scienter. *See e.g., In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012) (no allegations that "defendants believed that they were making false and misleading statements"); *Westley v. Oclaro*, 897 F. Supp. 2d 902, 929 (N.D. Cal. 2012) (no allegations that defendant was aware of facts adverse to their statements); *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1064 (9th Cir. 2014) ("the specific information" attributed to the CW was not what made defendants' statements false).  MTD 22.

25

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**    Case No. 3:24-cv-03869-EMC

New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: jwilson@faruqilaw.com

Robert W. Killorin (appearance *pro hac vice*)
**FARUQI & FARUQI, LLP**
3565 Piedmont Road NE Building Four
Suite 380
Atlanta, GA 30305
Telephone: 404-847-0617
Facsimile: 404-506-9534
Email: rkillorin@faruqilaw.com

Lisa T. Omoto SBN 303830
**FARUQI & FARUQI, LLP**
1901 Avenue of the Stars, Suite 1060
Los Angeles, CA 90067
Telephone: 424-256-2884
Facsimile: 424-256-2885
E-mail: lomoto@faruqilaw.com

*Attorneys for Lead Plaintiff
Jeyakumar VS Menon and Lead
Counsel for the putative Class*

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**     Case No. 3:24-cv-03869-EMC