**Pages 1 - 38**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Edward M. Chen, Judge

TREVOR WAYNE, Individually and )
on Behalf of All Others )
Similarly Situated, )
                                   )
           Plaintiffs, )
                                    )
   VS.                           ) **NO. 3:24-cv-03869-EMC**
                                    )
MAXEON SOLAR TECHNOLOGIES, )
LTD., )
                                    )
           Defendant. )
                                    )

San Francisco, California
Thursday, April 17, 2025

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff Menon:
                     FARUQI & FARUQI LLP
                     685 Third Avenue
                     New York, New York  10017
         BY: **JAMES M. WILSON, JR., ATTORNEY AT LAW**

For Defendant:
                     MORRISON & FOERSTER LLP
                     425 Market Street
                     San Francisco, California 94105
         BY: **RYAN M. KEATS, ATTORNEY AT LAW**
              **LARA ANDERS, ATTORNEY AT LAW**

Reported By:  Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
               Official Reporter, CSR No. 12219

<u>**Thursday - April 17, 2025**</u>                              <u>**3:14 p.m.**</u>

                    <u>**P R O C E E D I N G S**</u>

                         ---oOo---

        **THE CLERK:**  The Court will now be hearing the case Wayne versus Maxeon Solar Technologies, Case Number 24-3869.

        Counsel, please state your appearances for the record beginning with plaintiff.

        **MR. WILSON:**  James Wilson for plaintiff.

        **THE COURT:**  All right.  Thank you, Mr. Wilson.

        **MR. KEATS:**  Good afternoon, Your Honor.  Ryan Keats for defendants.

        **THE COURT:**  All right.

        **MR. KEATS:**  With me today is Lara Anders.

        **THE COURT:**  All right.  Thank you, Ms. Anders.

        All right.  So there are essentially, sort of, two sets of -- of I mean, I know there are seven statements, but there's essentially -- sort of they fall into two buckets.

        The first one is -- and I think these are statements 1 and 2 -- pertain to the statement about, "Our plans to aggressively ramp up our sales in the U.S. market," and what's going to happen after the SunPower, you know, settlement.

        And my question there -- and obviously things didn't work out, and as I understand it, there was information that during the SunPower contract, during the period when there's not supposed to be circumvention -- the non-circumvention

clause applied, there were -- I don't know if you want to call them sub rosa or informal attempts to reach some of the -- have some discussions with some of direct sellers, and those didn't yield anything.

But that tells you nothing about, once the deal is done and the non-circumvention clause no longer applies and it's a new day, what indication was there at the time the statement was made, let's say, in November of 2023, indicating that this was -- this was a no-go; this sales effort was going to fall flat.

**MR. WILSON:**  The sale was going to fall flat?

**THE COURT:**  The direct sales program.

**MR. WILSON:**  Oh, the direct sales program.

**THE COURT:**  Yeah, to DG.

**MR. WILSON:**  The outreach to the -- to the former SunPower --

**THE COURT:**  Yes.

**MR. WILSON:**  -- dealers was not going to happen.

**THE COURT:**  Yes.

**MR. WILSON:**  Well, we have the indication -- we have statements from the CWs, the confidential witnesses, that the prior attempt -- they knew it was going to be difficult, that this -- our allegation is that the breaking away from SunPower was not enabling; it was a problem they were going to have to overcome because the dealers and the customers were accustomed

to dealing with the SunPower folks.

**THE COURT:**  But those statements pertained to the pre-termination period when they weren't supposed to deal directly.  So obviously you would think a lot of the -- a lot of the dealers would think, you know:  This is a little underhanded, quote/unquote.  I don't want to talk with you right now.

But once it's clear, once the deal was clear and the door was open, how could you tell from that earlier conduct that the post -- the new date conduct was not going to work?

**MR. WILSON:**  Well, we have confirmation on May 30th of the problems that existed from the beginning of the class period with --

(Reporter interrupts for clarification of the record.)

**MR. WILSON:**  We have the statements on May 30th, in the collective disclosure that --

**THE COURT:**  May 30th of which year?

**MR. WILSON:**  Talking about the issues that the company was having the previous year.  They talk about the -- at paragraph 100 of the complaint. (as read):

"Since the middle of last year, Maxeon has been under significant pressure due to unprecedented market dislocations, the Chinese oversupply, high interest rates, and policy changes.  Maxeon also suffered the termination of our SunPower supply

agreement and delivery pushouts by the two of our primary utility-scale customers."

So that's confirmation that these problems existed at the beginning of class period.

It goes on --

THE COURT:  What paragraph are you looking at?

MR. WILSON:  I'm reading from paragraph 100.

THE COURT:  Paragraph 100?

MR. WILSON:  Yes, Your Honor.

"The middle of last year," that would be the summer of 2023.  They also talk about it --

THE COURT:  Where in paragraph -- I'm looking at paragraph 100.  Tell me where to look.

MR. WILSON:  Paragraph 100, the block quote.  So paragraph 100 starts "That afternoon, Maxeon held an earnings call."

THE COURT:  Yeah.

MR. WILSON:  Okay.  And then we block quote, from that call, the statements that were made.  This is Mr. Mulligan.

"Since the middle of last year," and he goes on to list the problems that they've been having since the middle of last year.

Your Honor, also --

THE COURT:  Well.  Wait a minute.  But this says that's caused by worldwide Chinese module oversupply, high

interest rate, and policy changes, and the termination of our SunPower deal.  But that doesn't say that the direct sales program was doomed from the beginning.  It doesn't say that.

**MR. WILSON:**  The termination of the SunPower contract was the opportunity for them to, instead of selling to SunPower, they were going to go directly to --

**THE COURT:**  Yeah.

**MR. WILSON:**  -- the dealers.

**THE COURT:**  Yes.

**MR. WILSON:**  So we're talking about what the consequences were of the termination of the SunPower --

**THE COURT:**  But the misrepresentation -- everybody knew that the deal was over, that SunPower was gone.

The misrepresentation in your Statement 1 is:  We have -- our plans to aggressively ramp up our sales in the U.S. markets through the direct sales program.

And to show that that was false, you have to show that at that time, even though they were representing to the public this is an opportunity to ramp up our sales with the direct sales to the suppliers that -- the former customers of SunPower, that that wasn't going to fly.

And the only thing I saw in the record was that some of the earlier discussions with the SunPower people, while they were still under contract with SunPower, didn't go so well.

But that didn't tell us anything about why it wouldn't

work once the way was clear to approach these SunPower sellers.

**MR. WILSON:**  Well, we allege that it was indicative of the problems they were going to have going forward because the issue also I believe CW 1 testified -- gave statements that going forward they were going to have -- the issue was not just that they were uncomfortable dealing with Maxeon at the time when the non-circumvention was in place.  It was the issue of not being familiar with who Maxeon was, that they were a direct seller, that they were going to be a direct seller.

You know, the other issue, Your Honor, is -- is SunPower had these great warranty programs and marketing packages that I understand they would, you know, present to customers.  Maxeon was -- as far as we know, didn't have any kind of program like that, marketing program that they could actually ramp up or, you know, this -- this separation was going to enable their ability to ramp up the sales to replace the sales to SunPower.

**THE COURT:**  When does CW 1 say when these dealer confusion -- when they started getting calls from Maxeon representatives occurred?  Was this during the contract or after the contract?

**MR. WILSON:**  Your Honor --

**THE COURT:**  It's unclear.

**MR. WILSON:**  So it's paragraph 65.  The CW 2 talks about September or October, the sales meeting that was held,

that the director of sales who told the employees to go to a conference and try to reach out to the SunPower customers, not to get caught having improper conversations.

(Reporter interrupts for clarification of the record.)

MR. WILSON:  I'm sorry.  I'll try.

And not to get caught having improper conversations with them.

THE COURT:  So this is before -- when was the -- November is the first day of the class period, November 15th; that is the first statement.

So this was a trade show back before that, when CW 2 attended a meeting and -- but be careful not to get into improper conversations.  He's telling salespeople, "Don't get into" -- that doesn't tell me anything.

MR. WILSON:  In November 15th, Mulligan is talking about this and he says -- again, paragraph 88.  The -- it's still in place and that remains to be the case for a number of dealers, not -- but not all of dealers, he says; but a number of dealers through the end of the year.

THE COURT:  Well, I am still puzzled how this tells anyone that the statement, made in November of 2023, expressing optimism that they're going to ramp up sales was knowingly false, because that was just in the very beginning of this process, and they're coming out of a period where you're not supposed to approach the SunPower folks and -- but now, it's a

new day.  SunPower says:  Okay.  We're done.  You're not bound by this clause anymore.  Go at it.

        **MR. WILSON:**  Well, but he does say that it didn't apply to all of the dealers.

        **THE COURT:**  What --

        **MR. WILSON:**  And so --

        **THE COURT:**  What didn't apply?

        I guess I'm confused.  He says it's a little early to see --

        **MR. WILSON:**  The contract and the restrictions on contacting the dealers directly.

        **THE COURT:**  While the contract is still in place.

        **MR. WILSON:**  Yeah.  But he says, in paragraph 88 (as read):

        "And that remains to be the case for a number of
    dealers, but not all of the dealers."

        So some of the dealers -- I don't know how many.  This is -- some of the dealers, they were allowed, according to this, to reach out to directly.  And at that time, the CWs are saying that their ability to do that and replace those sales is going to be an issue.

        **THE COURT:**  But this is being disclosed.  This is what -- this is what he states; right?  This is --

        **MR. WILSON:**  He's saying -- he's disclosing that they can reach out to some of the dealers --

**THE COURT:** Yeah.

**MR. WILSON:** -- at the beginning.

And we're saying that they knew, at this time, that ramping up the sales to these people, to these dealers, is going to be a problem because they had reached out to them.

I mean, the CW talks about the -- again, the CW talks about the sales -- the meeting with the sales director.

**THE COURT:** I guess my question remains. CW 1 is the one that says: Well, there's confusion out there. I'm now getting calls from Maxeon reps who were used to dealing with SunPower exclusively, and such approach may be considered underhanded.

What was -- was this after -- was this during the class period? It doesn't say when this was.

**MR. WILSON:** Which CW are we talking about?

**THE COURT:** 1, CW 1.

**MR. WILSON:** Oh.

**THE COURT:** It's paragraph 66.

**MR. WILSON:** CW 1 also talks about -- excuse me.

The source of the confusion, which is at paragraph 66 (as read):

"While the dealers knew generally that Maxeon made the panels that SunPower sold, the dealers were confused when they started getting calls from the Maxeon representatives, and it caused a lot of

confusion."

I submit that's not necessarily because -- that's not because they were questioning whether they were violating the -- the non-circumvention agreement.  They were -- they were -- they were unaccustomed to dealing with directly with this other entity besides SunPower.

**THE COURT:**  You're saying this occurred in the post-SunPower period, when they were free from the non-circumvention?

**MR. WILSON:**  Yes, Your Honor.

**THE COURT:**  He didn't say that.

Well, let me ask you.  If -- if this were clarified, if CW 1 said, "Now that we're past SunPower and we can ramp up," quote/unquote, "sales, our direct sales" -- but, in fact, they're having real problems from the very beginning because there were people that didn't believe it -- they didn't trust, they distrusted them, they felt somehow it was underhanded, or whatever, and it was a real impediment -- if that were the case, would that not be a basis to say, "Well there's maybe some falsity here"?

**MR. KEATS:**  Your Honor, even there, there's no specifics.

The issue here is that there's no specifics at all.  What dealers?  How many?  When?  Who at Maxeon had these conversations?  Who at Maxeon told the CW that these

conversations occurred?  When?

It's all vague, conclusory hearsay, Your Honor, the kind that the Ninth Circuit has routinely rejected.

**THE COURT:**  Well, isn't the bigger problem is that it's not just who was talked to, but what is the magnitude.  Is it one dealer?  Is it two dealers?

**MR. KEATS:**  Are they important?

**THE COURT:**  If it's statistically 99 percent of the dealers said, "I'm not going to deal with you," and you've talked to a good sampling of dealers during the class period and you don't disclose that and -- it's looking really bad; on the other hand, if you talked to two or three, that doesn't tell you much.

**MR. KEATS:**  And there's -- there's no detail of any kind about the importance or magnitude of the customers, Your Honor.

As Your Honor also pointed out, it says nothing about what anyone anticipated in terms of how this would go once the non-circumvention provision was no longer in place.  And there's no allegation that any of these conversations were improper; that any of these conversations took place before the challenged statements were made; or that anyone who made the statements knew -- knew about the conversations at the time they were made.

**THE COURT:**  I'm sorry.  Say that part again.

**MR. KEATS:** The last part, Your Honor?

**THE COURT:** Yeah.

**MR. KEATS:** And no allegations that any -- that any of these were contemporaneous facts or conditions at the time the challenged statements were made.

**THE COURT:** That it was in the class -- class period, that this information --

**MR. KEATS:** There's no allegation about -- I'm sorry, Your Honor.

**THE COURT:** That this information, I call it post-SunPower, in the new world of direct sales, that this was an observation made during that period. Because if it was made before the period, it doesn't tell you anything about how it's going to go once the door is opened.

**MR. KEATS:** That's right.

**THE COURT:** If the door is opened, no more restrictions, and you're getting all this resistance from the folks you thought you were going to sell to, that might be an indication.

**MR. KEATS:** Depending, again, on the specifics we discussed a minute ago, Your Honor; the magnitude, the importance of the customers, what the conversations were actually like.

**THE COURT:** All right. Let me understand -- now, the second set -- this is one where I had a little more trouble

understanding; this has to do with the representations about cash levels and the financial kind of projections.

And the one -- and it's statement 3, when it says cash levels were also impacted by lower shipments and margin dollars, that's adjusted saying that there's lower cash; right?

Does that -- but then it says, "The reduction of contract liabilities related to our U.S. utility-scale business capital expenditures during the quarter."

Can somebody explain to me exactly what that -- I understand there's that amortization presales; it's a little tricky.  But what does it mean for a reduction of contract liabilities related to the U.S. utility-scale?

**MR. WILSON:**  My understanding, Your Honor, is they were not replenishing contracts that provided for that prepayment that was allocated or amortized.  So as I understand it, "contract liabilities" means contracts they were concluding going forward to sort of replace the inventory, if you will, of those -- of those purchases, those contracts that provided for this allocated payment plan, I think.

**THE COURT:**  So is that your understanding?

**MR. KEATS:**  Your Honor, my understanding is that it's the deferred liability is from the prepayments coming onto the -- being accounted for as revenue in the period.  So they're explaining the impact on cash in the period.  There's no -- there's no forward-looking statement about whether --

what I now hear counsel arguing is that what they should have been doing is projecting how the -- how the contracts would have been replenished going forward that -- this is just a historical statement about -- about the impacts to cash in the period.

**THE COURT:**  Yeah.  No.  I understand that.  It's backward-looking.  But I'm just trying to understand what this means because -- just English-wise.

So is the reduction of contract liabilities a good thing or a bad thing?

**MR. WILSON:**  It's a bad thing.  It's a bad thing.

And they didn't -- the issue is they didn't state the magnitude of it.  Their sales are drying up.

**THE COURT:**  What is a contract liability?  I think that's a simple question.  What does that mean?

**MR. WILSON:**  My understanding is that's their speak, that's their way of describing contracts that they have with customers that provide the payment of these prepayments.

**THE COURT:**  Yeah.

**MR. WILSON:**  They come in tranches, I guess, you know, of 15 percent.  They get 15 percent -- you know, at one point.  And then they get another payment of 20 percent, I believe, is how they did it.

And then they would have -- additional payments would flow through.  So that way they would amortize the payments

matched with the expenditures for accounting purposes.  And what was happening is they weren't getting -- they weren't getting additional -- when they said -- when we talk about the peak --

THE COURT:  Yeah.

MR. WILSON:  That's what we're talking about.

THE COURT:  No, I understand.  They weren't getting contracts.  There's no money coming in.

MR. WILSON:  Why is there a peak because they were running out of the contracts in the future?

THE COURT:  Right.

MR. WILSON:  They weren't telling folks that that's what was happening.

THE COURT:  But when they disclosed there's been a, quote, reduction of contract liabilities related to our U.S. utility, isn't that way of saying that the number of contracts has gone down?

MR. WILSON:  It's hinting, but it's not telling the full truth of what's going on.  And when you touch on a topic like this, Your Honor --

THE COURT:  So they didn't say enough.  They said a little something about it going down, but they didn't say things had peaked and are really going to go down.

MR. WILSON:  They alluded to something bad happening. They didn't tell the full truth --

**THE COURT:**  I see.

**MR. WILSON:**  -- which they disclosed the full truth on May 30th, with the corrective disclosure.

**THE COURT:**  All right.  So you would agree that this was a disclosure of some problem, the reduction of contract liabilities, but it just -- their argument is that didn't disclose the seriousness of the problem.

**MR. KEATS:**  I wouldn't agree that it's a problem, Your Honor.  They're discussing the impacts to cash in the period; the positive impacts, the negative impacts.

And what the Ninth Circuit says in *Verifone*, what the court says in *Hortonworks*, there's no obligation to disclose additional -- additional information just along with the historical --

**THE COURT:**  I'm not there yet.

**MR. KEATS:**  Okay.

**THE COURT:**  I'm just trying to understand.

The language "The reduction in contract liabilities related to our U.S. capital scale business, capital expenditures," that means -- does that reduction in contract liabilities mean reduction in cash or increase in cash?

**MR. KEATS:**  So, Your Honor, plaintiffs don't allege that at all in the complaint.  What -- what -- what it indicates is that deferred -- deferred revenue is being accounted for in the period.

**THE COURT:**  Reduction of deferred -- is it --

**MR. KEATS:**  The contract liability is being reduced and revenue in the quarter is being increased.

So when you have customer prepayments, they are booked as deferred revenue, and then, when products are shipped, the revenue is recognized at that time in the quarter.

**THE COURT:**  So when you reduce contract liabilities, that means it's being shipped; therefore, you owe less.  That puts you in a better cash position.

**MR. KEATS:**  The revenue is being recognized in that quarter.

**THE COURT:**  So in a way, you're saying it's almost the opposite.  This shows that what was happening, then, was revenue was actually increasing.

**MR. KEATS:**  And what I hear counsel saying is:  Well, you should have said how things were going into the future.

Well, that's something different.

**THE COURT:**  No, no, no.  What counsel was telling me is that this already discloses revenues are going down, but not in the disastrous way that it was about to come down.

You're saying this actually says that revenues were going to go up; it's a favorable thing.

And his argument is that:  Well, you should have disclosed that things -- they're going up all right, because things just peaked and they were about to fall off the edge of

the cliff.

You may not buy that legally, but that's the argument.

**MR. KEATS:**  I don't understand the factual basis for that argument, Your Honor.

**THE COURT:**  Well, because his argument is that the -- they were nearing the peak or at the peak of the prepayment amortization schedule for those utility-scale.  So --

**MR. KEATS:**  But there's no specifics.  I mean, what was the magnitude of those contracts --

**THE COURT:**  No, I understand that.

**MR. KEATS:**  Okay.

**THE COURT:**  I understand that.  I just want to make sure I understood the representation relative to the claimed false -- I didn't know which way that representation was going.

But I guess the main point is you can make -- you can describe what is happening now without necessarily disclosing what's around the corner --

**MR. KEATS:**  That's right.

**THE COURT:**  -- and making a prediction.

And my question to you is that:  Well, is that always true?  Is a discussion of the past in the current situation always insulated from liability, let's say, if, you know, of an impending doom, disaster, the giant contract that you just got word has been canceled?

But you don't say anything.  You say "Revenue has been

great up to now," blah-blah-blah; can there ever be liability for not disclosing, you know, a disaster around the corner that you're aware of?

**MR. KEATS:**  Not for failure to disclose, Your Honor; they have to point to a published statement that is misleading. So the omission has to render a statement misleading.

They don't do that here.  This is a historical statement explaining how -- the impacts to cash in the period. And *Verifone* and *Hortonworks* both explain, in very similar circumstances.  In *Verifone* it was, you know, one-time -- large one-time orders, growth was slowing.  The Court said that does not render your historical financials or the positive optimistic statements that accompany them false at the time they were made.

In *Hortonworks*, it was a plan to raise cash challenging a nearly identical statement to the liquidity statement here.  And what the court said is that you have no duty to disclose that you're planning to raise capital, even in a short period of time from the -- from the challenged statements.  So I would say both of those cases directly address that.

**THE COURT:**  So as long as the statement is purely historical, you can't be tagged with an omission with a misleading -- a claim of misleading omission.  Essentially, that's what you're saying.

**MR. KEATS:**  I'm saying they have to point to a published statement that is itself misleading based on the omission.

**THE COURT:**  But "something misleading" doesn't have to suggest something more than historical.

**MR. KEATS:**  Yes, Your Honor.

**MR. WILSON:**  Well, Your Honor, as I said, if you touched on the topic, which they did, they have a duty to disclose when they are --

**THE COURT:**  What if it's just describing the past? "Here is our past financial statements; we met our targets." They don't say anything about the future.  They just say, you know:  We increased revenue by X.  We executed, you know, contracts by Y.  And here's our balance sheet.  Looking pretty good.

**MR. WILSON:**  Yeah, but, Your Honor, they knew they were -- let me -- *Hortonworks* is the case where they actually said that they may need to raise cash.  They alluded to that. And then, when they -- and then they did, shortly after that, I believe.

So they had said something about that.

*Verifone* is the case where -- that you're talking about purely with projections, that they failed to disclose the negative projections.

And here we're talking about this negative -- this

peak.  You know, when you say we've -- they've accurately reported the current information, regarding these prepayments, and you know that you're at the peak and you're not going to have those prepayments after this, you have a duty to disclose that.  That's our position.

THE COURT:  How is that different from *Hortonworks*?

MR. WILSON:  I'm sorry, Your Honor?

THE COURT:  Why wouldn't *Hortonworks* cover that?

MR. WILSON:  *Hortonworks*, actually they disclosed they may need to raise cash.

THE COURT:  Well -- oh.  You think that because there was sufficient disclosure, not because of the fact that --

MR. WILSON:  Yeah.  Yes, sir.

THE COURT:  If your disclosure is limited to accurate historical -- quote/unquote, accurate historical data, that can't -- that's not actionable?

MR. WILSON:  In *Hortonworks*, the defendants disclosed growth and strength of the cash position.

THE COURT:  Yes?

MR. WILSON:  Historically accurate.

THE COURT:  Yes.

MR. WILSON:  And then, six weeks later, they made a secondary officering.  But *Hortonworks* had actually said, in the future, they may need to raise cash.

THE COURT:  And that was enough?

**MR. WILSON:** That was enough.

**THE COURT:** What's your view of that?

**MR. KEATS:** Your Honor, two things. One, that one of allegations in *Hortonworks* was that they omitted the facts and circumstances that could have shed light on the strain -- the strain its rapid growth was having on cash sources.

So, similar to here, the allegation is: You're omitting current facts and circumstances.

The Court says that's not enough.

Then they say: We may raise cash.

And what plaintiffs allege is: Well, you knew you were raising capital. You were already planning an offering.

That also wasn't enough.

**THE COURT:** Well, did the Court -- was the fact that they disclosed "may need to raise cash," enough of a disclaimer, enough of a warning to insulate itself?

**MR. WILSON:** Yes.

**THE COURT:** He says, yes. What do you say?

**MR. KEATS:** I say -- I say: No. The allegation was the same, that you're omitting current facts and circumstances. Right? That was the allegation.

Similar -- similar to the allegation that there were facts and circumstances that could have shed light on the strain the rapid growth was causing. That's essentially what they're arguing here, that there were these unspecified

prepayments of unspecified magnitude that weren't disclosed. And *Hortonworks* addresses that, as that *Verifone*, again, Your Honor.

THE COURT:  *Verifone* involved forecasts, didn't it?

MR. KEATS:  Also the alleged failure to disclose large, one-time orders, that orders had slowed, and that future revenue would be lower.

MR. WILSON:  Your Honor, we're also talking about the magnitude of the impact of these -- of these issues.  And we're not just talking about missing, you know, your forecast or your projected earnings.  We're talking about a cash flow liquidity situation that was so severe, that they admitted was so severe, during this time period --

THE COURT:  Where?  Where was that admission that it was so severe --

MR. WILSON:  On May 30th.

THE COURT:  What?

MR. WILSON:  On May 30th.

THE COURT:  Show me the complaint.  Where in the complaint?  What are you talking about?

MR. WILSON:  Starting at paragraph 96.  The truth emerges.  It's page 24, paragraph 96, Document 66, ECF.

And from paragraph 96 through 102, we -- the allegations are -- describe the information that's disclosed by the defendants on May 30th --

**THE COURT:**  On May 30th.  But what shows that as of November 15th, they knew that there was -- because there is a statement that -- that suggests that they thought they could meet the 12 -- within the 12 -- for 12 months, that they would be okay. (as read):

"We believe that our current cash, cash equivalents, along with cash expected from generation" -- "to be generated from operation will be sufficient to meet our needs."

So where is an indication -- and that was a statement made, again, on November 15th.  Where is there an indication that they knew, as of November 15th, that that was an unrealistic projection?

**MR. WILSON:**  Well, back to paragraph 100, where Mulligan says, "Since the middle of last year," and then he goes on to describe the various issues that they knew about.

**THE COURT:**  Well, it says there was significant pressure, and it doesn't tell you that they knew they couldn't go 12 months.

**MR. WILSON:**  But it's, at this point, Your Honor, where they disclose that their cash and liquidity situation had gotten so bad -- which we alleged they knew about at the beginning of the class period, that they --

**THE COURT:**  Well, but you have to show something.  You're looking at a Q4 2023 and a Q1 2024 statement --

**MR. WILSON:**  Right, but they're saying here this is a -- this -- to us, this is a *mea culpa*.  They're admitting here that since the middle of last year they knew about this, these issues.  They say it here at paragraph 100.  They say it again at paragraph 101, when an analyst asked them about the two largest utility --

**THE COURT:**  Before you go there.  Go back to paragraph 101.

One of the things that is stated is -- first of all, it's called by worldwide Chinese module oversupply.  We don't know, you know, how much that affected their -- their cash projections, high interest rates, policy changes.

Then it says (as read):

"Maxeon also suffered from termination of our
   SunPower agreements and delivery pushed out by two of
   our primary utility-scale customers."

My understanding is that didn't happen until either late 2023 or early 2024, beyond -- after the November statement.

**MR. WILSON:**  Well, again -- but the statement starts that "Since the middle of last year," and he's talks about all these issues.

So he later says, when an analyst asks him about the utility sector -- I'm sorry the utility-scale, the two larger contractors, the two largest customers that they had that --

yes, you're right, they say at paragraph 101 he says we were informed earlier this year about that, the loss of those two customers.

THE COURT:  Yeah.

MR. WILSON:  Still -- okay.  That's not November, but it's January.  It's four months or five months before this was happening, before this disclosure.

So they -- they sat on -- they concealed that information, significant, material, negative information that every shareholder would want to know about; and they didn't disclose it.  And that had a serious impact on the cash flow and liquidity, which led to the need -- the urgent need and the going concern to sell the company to TZE.

THE COURT:  Ultimately, yes; but how was that known at the time these statements were made?

MR. WILSON:  Because we allege that they knew about the serious cash flow/liquidity issues, the failure to --

THE COURT:  Well, I know you say that --

MR. WILSON:  -- prepayment contracts from the beginning of class period through the end of the class period.

THE COURT:  And I'm asking for evidence that they knew -- timing is critical.  What they knew in the first quarter -- of 2024, is not necessarily what they knew in November of 2023.

Well, let me ask you:  If you go on to paragraph 102,

news conference, the update says (as read):

"As Bill mentioned, the dramatic industry-wide reductions in pricing and demand since the middle of last year, have had a material negative impact on our liquidity position at a time when we also encountered significant post-previously-scheduled amortization of our utility-scale prepayments amounting to a total of a $150 million in the fourth and first quarter alone."

Is the quarter -- is it a calendar quarter?

MR. KEATS:  Yes, Your Honor.

THE COURT:  So what about that?

There's a statement here that by the middle of last year they knew of a dramatic industry-wide reduction in pricing and demand.

MR. KEATS:  Your Honor, the statement was made on November 15th, 2023.

THE COURT:  Yeah.

MR. KEATS:  Plaintiffs concede that it's an opinion statement.  They don't plead any facts at all about the assumptions used in that opinion, the facts considered, whether this was taken into account, whether -- whether we still believed that we had sufficient cash for the next 12 months taking into account these demand headwinds that were disclosed, Your Honor.

The industry-wide demand issues that are pointed to in paragraph 102, are part of the quarterly updates.  They're discussed on the November call.  They're discussed in the risks factors.

None of that undermines the forward-looking opinion statement on November 15th, 2023, that we anticipate current cash and cash equivalents to be sufficient for the next 12 months.

**THE COURT:**  I mean, if that statement is made in the face of what was acknowledged to have already occurred, a dramatic downturn in pricing and demand since the middle of last year, can't an argument be made that when were they were saying, "Well, don't worry.  We have got, as of November," this is past the middle of the year, "we've got enough cash to get going for another 12 months."

**MR. KEATS:**  Your Honor, it's a forward-looking statement, what cash are we anticipating over the next 12 months, what obligations are we anticipating over the next 12 months?  Plaintiffs plead no facts -- none -- about any of those assumptions.

**THE COURT:**  So even if you take this statement, it still does not show that there was going to be a liquidity problem, a severe liquidity problem in 12 months -- because we don't know the context.  We don't know what other sources were, what other means of cash generation there were.

**MR. KEATS:**  Cash generation, cost savings, Your Honor. All the kinds of forward-looking analyses that would be done in issuing an opinion like this.

On top of that, of course, Your Honor, it's forward-looking and protected by the Safe Harbor.  And *Hortonworks* addresses an identical statement to this one and cites other cases in which courts have similarly held that -- that identical liquidity projections are forward-looking and protected by the Safe Harbor.

**THE COURT:**  All right.  I'll give you one more chance to come back at me as to why these projections back in November were -- were false.  And you'd have to show knowingly false, because the scienter requirement here, even though there were headwinds, we don't know that they were such monumental headwinds that they couldn't survive on 12 months of cash or that -- which was one of main assertions here.

**MR. WILSON:**  We're talking about Statement Number 4, paragraph 91?

**THE COURT:**  Yeah, that's Number 4.

**MR. WILSON:**  Okay.

**THE COURT:**  There's also Statement Number -- Statement Number 3.  That one just talked about, what was impacting cash levels.  It was retrospective.  There wasn't -- it wasn't a projection.

A projection, which carries with it the risk of

misleadingness is in Number 4, when they said: We believe we have we've got enough cash to make it for 12 months.

**MR. WILSON:** Well, Your Honor, as we allege, we argue statements -- take this as an opinion, statement of an opinion is rendered misleading if the individuals are aware of undisclosed facts tending to seriously undermine the accuracy of that.

And we have allegations from the CWs about the serious cash flow that was deteriorating as early as May and June of 2023. It's considered bad by the summer of 2023, with lenders expressing concern to the defendants about the company's ability as a going concern, as early as --

**THE COURT:** What do we know about the lender concern? What do they say? What was it based on?

Right now it's lender concerns. But I -- that's a bit conclusory.

**MR. WILSON:** Well, CW 1 was in the treasury department, was a finance person, who has been aware of these issues -- it might be CW 2. I'm sorry. Let me check my notes.

CW 1 was the manager of project finance and was in a position and worked there for many -- during the time period. And was -- had meetings with Mulligan, Strohbecke, and Mr. Babcock -- who's not a defendant, but was named for his involvement in this.

101, interactions with Mr. Strohbecke. This is in

paragraph 40, where we describe the particulars about CWs, background and basis for their knowledge, the personal interactions that they had with the defendants -- was involved in this the company's finances, involved in credit underwriting, raising capital through debt and equity for infrastructure projects, was involved in developing all the financial aspects of the company's efforts to build a manufacturing plant in Albuquerque.

**THE COURT:**  Well, the main point is that he's a member of the treasury team and he states that the company's cash and liquidity position had been deteriorating since May or June of 2023, and became, quote, dire in March of 2024.

So it doesn't really say what was the state as of November 2023; deteriorating, but I don't know how quickly.

What does that mean, "deteriorating"?  Was it deteriorating so severely that it became clear they wouldn't last, have enough liquidity to last 12 months?  How do we know that?

**MR. WILSON:**  CW 1 says that by the summer of 2023, lenders expressing concern to the defendants about the company's ability as a going concern, which is ultimately what did happen, which they reported -- they got the "going concern" letter from their accountants.

**THE COURT:**  Well, but what does that -- I mean, again, that's rather general.  What was this concern?  How alarming

was it?

**MR. WILSON:**  They were going concern issues, Your Honor.

**THE COURT:**  Well, what does that mean?

**MR. WILSON:**  That they're not going to be able to continue to operate.  They're going to go illiquid --

**THE COURT:**  But they had a concern, but I don't know what -- there's nothing specific here.  I mean, could those concerns be met with some kind of refinancing, could they be met with some kind of new business model or cost savings?  I don't know.  I mean, we don't --

**MR. WILSON:**  Well -- but that's the issue, Your Honor. They didn't disclose that those were the issues that they were having to deal with, which they ultimately revealed that they did have to deal with.  And we're saying that those conditions existed at the beginning of the class period.  They confirmed they existed at least at the beginning of the year, 2024.

**THE COURT:**  All right.  Some of the -- what's your response to the very specific -- I don't know if it's specific or not, but the more specific allegations by CW 1, who was a member of the treasury team, that conditions had been deteriorating since May or June, pretty early, of 2023, and that by as late as -- as early as the summer, certainly no later than September, lenders were expressing the existence -- concern about the existence of Maxeon?

**MR. KEATS:**  A couple of responses, Your Honor.

One, counsel has conceded this is an opinion statement, that means subjective falsity is required.  *Dearborn* is directly on point.

Plaintiff pleads no specific facts, none at all, about the assumptions actually used by anyone in coming up with these statements.  That's the requirement.  That's the *Dearborn versus Align* case, Your Honor.  Nothing about what was actually considered.

In terms of summer of 2023, the vague allegations about unspecified concerns by unspecified lenders expressed to unspecified people at Maxeon, those summer 2023 concerns predate the SunPower settlement which occurred in between summer 2023, and the time that the challenged statements were made in November.

Again, we don't know what any of those concerns are based on.  And in terms of CW 1, they allege that he's a member senior member of finance, but there are no specific facts, no discussions, no correspondence about any of the relevant assumptions or relevant facts with respect to the challenged statement.

**MR. WILSON:**  Your Honor --

**MR. KEATS:**  And lastly, Your Honor, in terms of -- I know you quoted the "dire" as of March 2024.  CW 1 left the company in January 2024, so he wasn't even at Maxeon at that

time.

**THE COURT:** All right. Last -- I'll give you the last comment.

**MR. WILSON:** The cash flow issues aren't tethered exclusively to the Sunpro contract issues. It's tethered to the operation of the Sunpro direct sales issues. It's tethered to the utility services aspect, the loss of the two contractors. It also deals with the other market forces.

I -- just to point out, Your Honor, at the beginning of the class period, at paragraph 63, Mr. Mulligan talks about some of these market forces, the pricing issues from the Chinese competitors, all these other issues. He says, "Oh, these are not unprecedented issues," he downplayed them. "Completely not going to affect us," that's at paragraph 63.

And then he used the term "unprecedented." On May 30th, when they're reporting this news that's so bad that the company had to sell itself to TZE to raise capital, $200 million in capital, about, he now changes his position and calls them unprecedented, you know?

So he starts out saying "Don't worry, these are not unprecedented," at the end of the class period, when things have gone badly, that they had to take this dramatic fundraising step, he now is characterizing them as "unprecedented," and -- as if they were -- well, that's what he calls them. So...

THE COURT:  Let me ask:  So the loss of the large contracts, by the first quarter and there is some specification about the size of the contract -- at least to the Origis one; right -- the contract was worth 144 to 187 million.

And -- I understand it was after the November -- so that was the -- that was after the first false statement.  So it's not until April 8 that we have statement that's alleged to be false made in April 2024.

But it simply says (as read):

"Maxeon delivered financial results largely in line with our expectations."

Is that alleged to be -- now that's backwards-looking.  It's not a projection; right?  It's just delivered results.  So that should be verifiable or not.

What's the falsity of Statement Number 5?

It says (as read):

"Our utility-scale business accounted for a majority of revenues in the fourth quarter with stable ASPS."

Is there some indication that the expectation was out of line with expectations?

MR. WILSON:  Oh, the financial results that they're reporting for the fourth quarter.

THE COURT:  Yes.

MR. WILSON:  We're not alleging that the financials

were inaccurate as reported, Your Honor; but we're saying that when they are talking about these specific metrics, these specific issues, that they have a duty -- and they know that, at the time the statement is made, they've lost the big contract, they have issues with cash liquidity.

I mean, my goodness.  This is April 8th.  A month later they're disclosing that they have -- their financial situation is so dire they have to raise $200 million from the TZE company.  They had a duty to disclose to investors these -- these -- this information about the loss of the contract, about their liquidity issue.

**THE COURT:**  All right.  So failure to disclose, I'll give you last chance to comment.

Why wouldn't there be -- at this point, they know they've lost two large utility customers.  Things are -- there's evidence at this point their cash flow is getting dire, at least CW 1 predicted.

Why isn't there a duty to disclose more by the time you get to Statement 5 and 6?

**MR. KEATS:**  *Verifone* is dispositive on that point. It's a historical -- and what Mulligan's statement is reporting on is the financial results from the quarter ending December 31, 2023.  The utility-scale pushouts are in 2024, so there's nothing contradictory about that statement.

In terms of the "dire," again, not contradictory.

But, again, CW 1 was not even at the company in March of 2024, so there's no -- there's no basis for his personal knowledge or reliability in terms of the state of the company's cash at that point in time.

THE COURT:  All right.  I'll take the matter under submission.

Thank you, Counsel.

MR. KEATS:  Thank you.

MR. WILSON:  Thank you, Your Honor.

THE CLERK:  This hearing is concluded.

(Proceedings adjourned at 4:05 p.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Sunday, April 27, 2025

_____

Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG, CSR No. 12219
Official Reporter, U.S. District Court