UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEYAKUMAR VS MENON,<br><br>                    Plaintiff,<br><br>          v.<br><br>MAXEON SOLAR TECHNOLOGIES,<br>LTD., et al.,<br><br>                    Defendants. | Case No.  24-cv-03869-EMC<br><br>**ORDER GRANTING DEFENDANTS'<br>MOTION TO DISMISS**<br><br>Docket No. 70 |

The case at bar is a securities fraud class action.  Defendants are (1) the company Maxeon Solar Technologies, Ltd. and (2) two individuals, William Mulligan and Kai Strohbecke, who were, respectively, Maxeon's CEO and CFO during the relevant period.

As alleged in the operative amended class action complaint ("CAC"), Maxeon is a solar power energy company.  It designs, manufactures, and sells "a comprehensive portfolio of photovoltaic solar panels and related components worldwide."  CAC ¶ 42.  Plaintiff seeks to represent a class consisting of all those who purchased Maxeon common stock during the period November 15, 2023, through May 29, 2024, inclusive.  *See* Mot. at 1.  According to Plaintiff, the price of the company's stock dropped significantly after Maxeon made various disclosures on May 30, 2024, including the disclosure that, because of serious cash flow challenges, Maxeon had had to get additional capital to support continuing operations and thus had negotiated commitments for significant liquidity support from its largest shareholder, TZE (even though this would result in share dilution and could endanger getting a loan from the federal government for a new manufacturing facility in New Mexico).

Now pending before the Court is Defendants' motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** Defendants' motion.

## I.    FACTUAL BACKGROUND

The following allegations are based on the operative CAC and the judicially noticed documents.[1]

A.    Background on Maxeon

Maxeon is a solar power energy company. It designs, manufactures, and sells "a comprehensive portfolio of photovoltaic solar panels and related components worldwide." CAC ¶ 42. Initially, Maxeon was a division of a public company: SunPower. However, in 2020, there was a strategic spinoff which resulted in Maxeon becoming its own separate entity. *See* CAC ¶ 43.

Maxeon's business has two main components: the Distributed Generation ("DG") business and the Utility-Scale business.

- The DG business "provides solar panels and energy solutions for smaller and decentralized power generation applications such as residential, community and commercial applications." CAC ¶ 46. The DG business "has consistently made up the large majority of Maxeon's year-over-year revenue." CAC ¶ 46.

- The Utility-Scale business "provides support for large solar power plants that produce electricity for the utility grid." CAC ¶ 48.

---

[1] Defendants have asked the Court to take judicial notice of multiple documents. The documents can be grouped into two categories: (1) SEC filings made by Maxeon and (2) transcripts of Maxeon earnings calls.

Plaintiff has raised certain objections to the request for judicial notice. Objections based on relevance are overruled. Even if a document is dated outside of the class period, it can still provide context to the dispute between the parties, including what was the mix of information known to investors. Objections that documents may not be considered for the truth (but rather only for what they say) are moot. Defendants are relying on the documents to show what information was known to investors, and not the truth.

B.    Maxeon's Relationship with SunPower

After Maxeon was spun off from SunPower, the two companies still maintained close ties. *See* CAC ¶ 50.  The companies entered into agreements with one another.  This included the December 2022 New Master Supply Agreement ("MSA") which was significant for Maxeon's DG business.

Under the MSA, Maxeon "agreed to supply its Maxeon 6 Modules to SunPower for use in residential installations in the United States and Canada."  CAC ¶ 51.  This was an exclusive arrangement – *i.e.*, Maxeon could not sell the modules to anyone other than SunPower for use in the residential market in the United States and Canada, and, in turn, SunPower could not purchase any high efficiency modules from anyone other than Maxeon.  *See* CAC ¶ 51.  The MSA also included a non-circumvention clause that "prevented the parties from dealing with third[] parties behind the other's back in contravention of the obligations under the agreement."  CAC ¶ 51.

Maxeon's sales to SunPower "provided a significant source of revenue for Maxeon's DG business" – in fact, constituted as much as 22-27% of the company's *total* revenue.  CAC ¶ 52.  However, in mid-2023, "the relationship [between the two companies] started to sour."  CAC ¶ 53.  Maxeon claimed that SunPower was withholding about $29 million in past due invoices, while SunPower claimed that Maxeon was in breach of the MSA's non0circumvention clause.  In July 2023, Maxeon stopped shipping its products to SunPower.  *See* CAC ¶ 53.

C.    Maxeon's 2023 Q2 Financial Results

In August 2023 – about three months before the start of the class period – Maxeon filed a Form 6-K with the SEC,[2] providing information about its 2023 Q2 financial results.  *See* RJN, Ex. 2 (Form 6-K).  Attached to the form was (1) a press release and (2) the company's financial results.

In the press release, Mr. Mulligan (Maxeon's CEO) stated that the company had "'delivered another solid quarter, with year-on-year revenue growth of 46 percent and adjusted

---

[2] A Form 6-K is a form that foreign private issuers of securities are required to submit, pursuant to certain rules under the Securities Exchange Act of 1934.

United States District Court
Northern District of California

1    EBITDA above our guidance mid-point.'"  Anders Decl., Ex. 2 (ECF Page 204).

2          However, Mr. Mulligan also cautioned that

3          "[t]he demand environment in the global distributed generation
      (DG) market weakened significantly in late-Q2 due to the combined
4      effect of higher interest rates, the impact of policy disruption in
      California, and significant channel inventory industry-wide.[3]  Our
5      DG sales team was able to deliver on-plan ASP and gross profit but
      came in short of target on volume and revenue.  We expect these
6      challenging market conditions to persist at least through Q3,
      particularly in residential, and we have increased our sales focus on
7      the commercial and industrial (C&I) segment as a result.  We
      therefore expect a somewhat higher mix of C&I sales over the next
8      few quarters with some push-out of volume from Q3 to Q4 and into
      2024 due to the longer sales cycles associated with C&I projects.
9
      In DG, we believe that we are well positioned to navigate the current
10      market dynamics thanks to our differentiated panel technology,
      direct-to-installer channel model, and geographic diversification,
11      and that our overall portfolio of US utility scale and global DG
      exposure is a sound strategic platform that provides long term
12      opportunity for profitable growth while diversifying market risk."

13    Anders Decl., Ex. 2 (ECF Page 204).

14          In its financial results, Maxeon expressly noted that it had an ongoing dispute with

15    SunPower, which was one of its largest customers.  *See* Anders Decl., Ex. 2 (ECF Page 223)

16    (noting that, "[d]uring fiscal year 2022, SunPower accounted for 26.7% of our total revenue and

17    9.6% of our accounts receivable as of January 1, 2023," and, "[d]uring the six months ended July

18    _____

19    [3] In their complaint, Plaintiff provides more information about these "numerous headwinds . . .
      plaguing the solar panel industry."  CAC ¶ 57.  In particular:

20        • "[T]he Federal Reserve rapidly increased interest rates beginning in 2022 and
21          continuing into 2023, making it more financially burdensome for homeowners to
          purchase solar panels outright."  CAC ¶ 58.

22        • There were policy changes that "disincentivized solar panel users from purchasing
23          solar panels.  [For instance,] [i]n April 2023, [the] California Public Utilities
          Commission put into effect a rooftop solar rule" under which "solar users who
24          submitted interconnection applications after April 14, 2023[,] received 75% to 80%
          less utility for the extra solar energy they share with the grid. . . . Because solar
25          shoppers saw less return on their generated solar power, there was inherently less
          incentive to purchase solar panels."  CAC ¶ 59.

26        • In 2023, as well as into 2024, there was "excess production capacity and an
27          oversupply of Chinese solar products," which "triggered new lows for prices in the
          solar power supply chain."  CAC ¶ 61; *see also* CAC ¶ 62 (alleging that there was a
28          "'significant supply glut worldwide [that] caus[ed] module prices to drop and solar
          companies to cancel or suspend their production capacity").

United States District Court
Northern District of California

2, 2023, $151.0 million or 22.7% of our revenue represented sales of solar modules to

SunPower"). Maxeon then addressed what impact a loss of the relationship with SunPower would

mean. Maxeon stated that,

> [i]f the parties decide to terminate either SunPower Supply Agreement or not to extend the term of either of these agreements, such termination will negatively impact our revenues in the short term and may materially impact our results of operations for an undetermined amount of time as it may take time for us to rebuild customer demand for such products in the United States.

Anders Decl., Ex. 2 (ECF Page 224).

In spite of the above concerns, Maxeon stated:

> We believe that our current cash, cash equivalents, along with cash expected to be generated from operations will be sufficient to meet our obligations over the next 12 months. . . .
>
> . . . . [However,] [g]iven the dynamic nature of the markets we operate in, the volatility in the capital markets, the current status of our business, rising inflation and interest rates, supply chain challenges, as well as the worldwide uncertainty created by the war in Ukraine, we currently lack the visibility to reasonably quantify our expected long-term capital requirements and our ability to fully meet our long-term liquidity needs. Our long-term liquidity needs would be further negatively impacted if the macro conditions set forth above last a sustained period of time.

Anders Decl., Ex. 2 (ECF Page 225).

D.    Maxeon's Preliminary 2023 Q3 Revenue and Shipment Results

In October 2023 – about a month before the start of the class period – Maxeon filed

another Form 6-K with the SEC, providing information about its preliminary 2023 Q3 revenue and

shipment results. *See* Anders Decl., Ex 5 (Form 6-K). Attached to the form was a press release.

In the press release, Mr. Mulligan again took note of Maxeon's dispute with SunPower, its

"largest DG customer," stating that "'[w]e do not have visibility into how quickly such resolution

[with SunPower] can be achieved.'" Anders Decl., Ex. 4 (ECF Page 253).

The press release also included the statement that Maxeon "currently expects third quarter

2023 revenues to be in the range of $224 to $229 million, and shipments to be in the range of 622

to 632 megawatts. As a result, the range of our Adjusted EBITDA guidance we provided for the

third quarter is expected to shift downward by approximately $30 million . . . ." Anders Decl., Ex.

United States District Court
Northern District of California

4 (ECF Page 253).

However, in spite of the above concerns, Mr. Mulligan still stated: "We believe that Maxeon is well positioned to weather this market disruption and come out stronger on the other side.'" Anders Decl., Ex. 4 (ECF Page 254).

E.    Maxeon's 2023 Q3 Financial Results

On November 15, 2023 – the first day of the class period – Maxeon filed a Form 6-K with the SEC, providing information about its financial results for 2023 Q3. *See* Anders Decl., Ex. 5 (Form 6-K). Attached to the form was (1) a press release and (2) the company's financial results.

In the press release, Mr. Mulligan noted that the third quarter was impacted by the dispute with SunPower. *See* Anders Decl., Ex. 5 (ECF Page 261). But he also announced that the dispute with SunPower was now settled. *See* Anders Decl., Ex. 5 (ECF Pages 261, 282). Under the settlement, the MSA between the companies was terminated effective November 13, 2023; SunPower was required to purchase certain products from Maxeon "on a take or pay basis"; Maxeon and SunPower would be released from reciprocal exclusivity obligations effective March 31, 2024; and Maxeon and SunPower would be released from their non-circumvention obligations effective January 1, 2024. CAC ¶ 54.

Because of the release from the non-circumvention provision, Mr. Mulligan indicated that the settlement "'ends constraints on Maxeon product sales to SunPower installers at the end of this quarter, clearing the way for Maxeon to aggressively ramp sales into the US market by leveraging its acquisition of Solaria Corporation and accelerated ramp plans for Maxeon 7 capacity.'" Anders Decl., Ex. 5 (ECF Page 261) (emphasis added). In other words, Maxeon could work directly with SunPower installers instead of having to use SunPower as a "middleman." *See* CAC ¶ 4 ("SunPower operated as a middleman, buying the panels from Maxeon and then selling them to dealers and installers.").

In its financial results, Maxeon addressed, *inter alia*, continuing market headwinds[4] as well

---

[4] *See, e.g.*, Anders Decl., Ex. 5 (ECF Page 274) ("In the three months ended October 1, 2023, we faced various factors that have affected the demand, including stiff competition and over-supply in the industry. The impact was prominent in the global DG markets and this trend may continue into the following quarter.").

1  as the settlement with SunPower.  Regarding the settlement with SunPower, Maxeon noted as

2  follows:

> 3  Due to the disputes with this significant customer and the
> 4  termination of the future relationship with SunPower, our revenues
>    have been and will continue to be materially negatively impacted in
>    the short term.  Further, our results of operations in the longer term
> 5  are expected to be materially impacted until such time as we are able
>    to rebuild customer demand for our products in the United States, if
> 6  at all.

7  Anders Decl., Ex. 5 (ECF Page 283).

8          However, in spite of these challenges, Maxeon noted: "**We believe that our current cash,**

9  **cash equivalents, along with cash expected to be generated from operations will be sufficient**

10  **to meet our obligations over the next 12 months.**"  Anders Decl., Ex. 5 (ECF Page 286); *see*

11  *also* Compl. (Chart, **Statement No. 4**).[5]

12          The same day it filed the Form 6-K (*i.e.*, November 15, 2023), Maxeon also held an

13  earnings call.  During the call, Mr. Mulligan made statements consistent with the statements

14  above.  For example, he stated that the company's "U.S. utility-scale revenue was up 10% versus

15  the previous quarter," but, "[i]n our DG business, we faced significant demand challenges caused

16  by the suspension of shipments to SunPower and the effects of a broad market dislocation in

17  Europe."  Anders Decl., Ex. 6 (ECF Page 294).  Mr. Mulligan also commented as follows with

18  respect the DG business:

> 19  Since June of this year, conditions have deteriorated rapidly due to
>     an oversupply of Chinese commodity modules in Europe, and
> 20  SunPower falling short of their contractual purchase obligations.
>     However, we continue to be bullish regarding the importance of this
> 21  sector in the mid- to long term.  This view is supported by
>     increasing global retail electric prices, the integration of battery
> 22  storage to create smart and dispatchable systems and the avoidance
>     of grid congestion as a potential barrier to continued renewable
> 23  energy penetration.
>
> 24  The DG sector is currently experiencing headwinds associated with
>     high interest rates, policy disruptions as well as excess supply and
> 25  inventory.  None of these challenges are unique or unprecedented,
>     but in combination, they have produced what is a very challenging

26

27  ──────────────────────────

28  [5] In accordance with the Court's standing order, Plaintiff attached a chart to his complaint,
    identifying each of Defendants' statements that was allegedly false or misleading.

United States District Court
Northern District of California

industry environment.

We are confident, however, that the DG sector will continue to be a vital part of the solar industry in the long run.  We remain focused on our DG strategy, mainly developing, manufacturing and selling the world's best solar panels through a differentiated direct-to-installer sales channel with increasing attachment of beyond the panel hardware and software that enables homeowners to control their energy usage.

As many of you know, our recent financial performance in DG has been severely hampered by a dispute with SunPower that led us to suspend shipments from July through the end of Q3.  I'm pleased to announce that we have reached to a settlement with SunPower earlier this week that enables us to resume shipments.

The settlement calls for the parties to transact on 85 megawatts of IBC panels through February 2024 at previously contracted prices and resolved outstanding claims and contract breaches.  The parties have also agreed to end other contractual supply obligations by the end of this quarter, including purchase obligations by SunPower beyond the 85 megawatts and constraints on Maxeon product sales to SunPower installers.

Offering panels directly to installers will eliminate the markup SunPower has historically added to our products, allowing us to deliver the world's best panels to customers at more competitive pricing.  **This will enable our plans to aggressively ramp our sales in the U.S. market.**  Leveraging our recent Solaria acquisition, which nearly doubled the number of dealers actively buying our product to over 170.

Anders Decl., Ex. 6 (ECF Page 295) (emphasis added); *see also* Compl. (Chart, **Statement No. 1**).

Mr. Mulligan further noted as follows with respect to sales to SunPower dealers:

I want to just clarify that we're actually free to approach SunPower dealers starting January 1.  We have exclusivity on the Maxeon 6 product through the end of Q1, but we are able to sell Maxeon 3 and Maxeon 7 starting the first of the year.  **It is a little early to see how that's going.**

**We've obviously been very careful not to approach SunPower dealers while the contract is still in place.  And that remains to be the case for a number of dealers, not all of the dealers, but a number of the dealers through the end of the year.**  We're just 6 weeks away or so, 3 of those weeks are holiday weeks.  So January 1 is going to be here very quickly, and we'll engage quickly at that point in time.

Anders Decl., Ex. 6 (ECF Page 305) (emphasis added); *see also* Compl. (Chart, **Statement No. 2**).

Finally, during the earnings call, Mr. Strohbecke (Maxeon's CEO) made the following

comment regarding the company's cash levels: "**Cash levels were . . . impacted by** lower

United States District Court
Northern District of California

shipments and margin dollars from our global DG business, **the reduction of contract liabilities related to our U.S. utility-scale business capital expenditures during the quarter**, restructuring expenses and a reduction in short-term debt." Anders Decl., Ex. 6 (ECF Page 297) (emphasis added); *see also* Compl. (Chart, **Statement No. 3**); Anders Decl., Ex. 5 (ECF Page 286) ("We have collected material customer advances in connection with certain of our supply agreements we have entered into. The customer advances are amortized based on the contractually agreed upon utilization schedule at the point of transfer of control of goods to the customer. As of October 1, 2023, the customer advances included within 'Contract liabilities, current portion' and 'Contract liabilities, net of current portion' in our Condensed Consolidated Balance Sheets is $204.2 million and $120.4 million, respectively.").

F.     Maxeon's Preliminary 2023 Q4 and FY 2023 Financial Results

      On April 8, 2024, Maxeon filed another Form 6-K with the SEC, this time announcing its preliminary financial results for 2023 Q4 and FY 2023. *See* Anders Decl., Ex. 7 (Form 6-K). Attached to the form was a press release. In the press release, Mr. Mulligan stated that, "'[i]n the fourth quarter [of 2023], **Maxeon delivered financial results largely in line with our expectations**. Our U.S. utility-scale business accounted for the majority of revenues in the fourth quarter, with stable ASPs.'" Anders Decl., Ex. 7 (ECF Page 316) (emphasis added); *see also* Compl. (Chart, **Statement No. 5**).

      Mr. Mulligan also made the following comment:

> "The Maxeon team is highly focused on reducing manufacturing costs, OPEX rationalization and **liquidity management to enable a return to profitability**. Our strategy continues to be to focus on designing and building premium, differentiated products and delivering a superior customer experience across a balanced portfolio of global DG **and U.S. utility scale markets**. The Company plans to file its annual 20-F report by April 30, 2024."

Anders Decl., Ex. 7 (ECF Page 316) (emphasis added); *see also* Compl. (Chart, **Statement No.** 6).

G.     Maxeon's Notice of Late Filing for FY 2023

      On April 30, 2024, Maxeon filed a Form 12b-25 with the SEC, notifying the agency that it would be late in filing its annual report for FY 2023. *See* Anders Decl., Ex. 8 (Form 12b-25). It stated:

United States District Court
Northern District of California

The Company is unable to file the Annual Report within by the prescribed time period without unreasonable effort or expense because the Company needs additional time to complete its financial statement preparation and review process.  As a result of the foregoing, the Company has not yet completed its year-end reporting procedures required and consequently its independent registered public accounting firm has not yet completed its audit procedures.  Factors which have affected the timing of the preparation and review of the financial statements include the additional **ongoing work required in connection with the assessment of the Company's ability to continue as a going concern, including the ongoing analysis of the Company's strategic options** with the assistance of external advisors.

Anders Decl., Ex. 8 (ECF Page 327) (emphasis added); *see also* Compl. (Chart, **Statement No.** 7).

### H.    Maxeon's 2024 Q1 Financial Results

According to Plaintiff, the truth about "[1] Maxeon's struggles in the DG business and [2] its cash flow and liquidity crisis was revealed to the market on May 30, 2024."  CAC ¶ 75.

On that day, an earnings call took place for 2024 Q1.  Mr. Mulligan announced during the call that Maxeon "'has been facing a serious cash flow challenge[,]' with total operating cash flow for the fourth quarter of 2023 at negative $76 million followed by a negative operating cash flow of $73 million during the first quarter of 2024."  CAC ¶ 77.  Mr. Mulligan "acknowledged the negative impact market conditions had on Maxeon's liquidity position."  CAC ¶ 78; *see also* CAC ¶ 85 (referring to "'overall demand softness'" and a "'general market slowdown'"); CAC ¶ 100 (referring to market "headwinds").

Furthermore, during the call, Maxeon noted the loss of two of its largest Utility-Scale customers, *see* CAC ¶ 100; the amortization of the Utility-Scale prepayments, *see* CAC ¶ 102; and the

decrease in its DG sector revenue by $39 million, representing historic lows for the Company.  This was a dramatic decline in revenue from [Maxeon's] previous quarter, representing a 30.23% drop in its DG business revenue and a[] 22.02% drop in overall revenue from the previous fiscal quarters, and a 41% year-over-year decline.

CAC ¶ 84.

On the same day as the earnings call, Maxeon filed a Form 6-K with the SEC, providing its financial results for 2024 Q1.  *See* Anders Decl., Ex. 9 (Form 6-K).  Attached to the form was (1)

United States District Court
Northern District of California

a press release and (2) the company's financial results.

In the press release, Mr. Mulligan stated as follows:

> "Maxeon has been facing a very difficult market environment since the third quarter of last year, with challenging industry pricing conditions and demand disruptions in our DG business due to higher interest rates and policy changes, as well as project pushouts by two of our large-scale customers in the US. These external factors led to underutilized manufacturing operations, increased product costs, and lower revenue and profit than planned. While the Company is making progress on our announced restructuring initiatives and we are seeing some positive trends in the market, we determined that Maxeon requires additional capital to support its continuing operations. After conducting a thorough analysis with the help of financial advisors, management and the board determined that the most viable financing option to support our immediate liquidity needs was from our largest shareholder, TCL Zhonghuan Renewable Energy Technology Co. Ltd. (TZE)."

Anders Decl., Ex. 9 (ECF Page 335). Maxeon went with this option even though (1) it would result in shareholder dilution and (2) it might endanger getting a loan from the federal government for a new manufacturing facility in New Mexico (since TZE was a foreign investor). *See* CAC ¶¶ 82-83.

In its financial results, Maxeon made a number of disclosures, including but not limited to, the following:

- It was not clear whether Maxeon could continue as a going concern: "We face uncertainty regarding the adequacy of our liquidity and capital resources and have extremely limited, if any, access to additional financing. In addition to the cash necessary to fund ongoing operations, we have incurred significant professional fees and other costs in connection with the Debt Restructuring Transactions and expect to continue to incur significant professional fees and costs through the consummation of the Debt Restructuring Transactions. We cannot guarantee that cash on hand and cash flow from operations will be sufficient to continue to fund our operations and allow us to satisfy obligations until we are able to consummate the Debt Restructuring Transactions." Anders Decl., Ex. 9 (ECF Page 354); *see also* Anders Decl., Ex. 9 (ECF Page 356) (noting that "the worldwide solar industry has suffered and continues to suffer from oversupply and intense competition, as

well as lower demand in our key markets driven by regulatory changes and a higher global interest-rate environment"; "[i]f the current market condition persist and the Company is not successful in raising capital, the Company will not have sufficient liquidity to meet its financial obligation as and when they come due, and may be required to delay, limit, and/or reduce its operational activities," and, thus, "there is substantial doubt about the Company's ability to continue as a going concern").

- Part of Maxeon's liquidity problem was due to the amortization of Utility-Scale prepayments.[6] According to Plaintiff, Maxeon would "reach the peak of its utility-scale prepayment amortization schedule in or before the first quarter of 2024." CAC ¶ 68. "Reaching the peak of this schedule meant that no cash would be coming in – i.e., all the prepayments had been paid." CAC ¶ 68. Maxeon stated as follows in its financial results: "Our primary sources of liquidity are cash generated from operations, customer advances in connection with certain of our supply agreements, financing obtained through equity issuance and convertible debt issuances. Refer to 'Note 5. Revenue from contracts with customers' to our consolidated financial statements disclosure in our Annual Report on Form 20-F for the fiscal year ended December 31, 2023 for more details on the amortization of the customer advances. As of December 31, 2023, our total current liabilities exceeded our current assets by $190.1 million. We received a going concern opinion by our

---

[6] In the CAC, Plaintiff explains prepayment amortization as follows:

> Prepayment amortization is an accounting process that recognizes the expense of an asset – [here,] the solar panels to be shipped – that was paid for in advance over the specific period of time in which the prepayment is used. Prepayments must be amortized to avoid overstating revenue during the period the prepayment is received because the expense associated with the transaction can be realized in the period that the performance is completed.

CAC ¶ 68. In other words, when a customer pays for goods before they are delivered, *i.e.*, makes a prepayment, that creates a contract liability for the seller because it still has to deliver the goods. As the seller fulfills the contract and delivers the goods, the contract liability is amortized, becoming revenue and the contract liability is reduced.

United States District Court
Northern District of California

United States District Court
Northern District of California

auditors because there is substantial doubt about our ability to continue as a going concern.  The Company has also pledged certain equipment assets and inventory to serve as collateral for some of these advances from customers."  Anders Decl., Ex. 9 (ECF Page 355).

- Several of Maxeon's large customers had "cancelled or deferred their off-take commitments, which further contribut[ed] to the deterioration of the Company's financial condition."  Anders Decl., Ex. 9 (ECF Pages 355-56); *see also* CAC ¶ 69 (alleging that "two of [Maxeon's] large Utility-Scale customers . . . were experiencing project delays and thus told Maxeon that they 'would not be in a position to accept [module] deliveries under' [the] agreed upon contract with Maxeon[;] [t]his left Maxeon without the expected cash from these deals and unused inventory, the costs of which they were forced to absorb"); Anders Decl., Ex. 9 (ECF Page 351) (discussing termination of an agreement with one of the Utility-Scale customers, Origis, because Origis failed to purchase any modules as required under the parties' contract).

Based on, *inter alia*, the above disclosures on May 30, 2024, Maxeon's common stock price fell – "from a close of $3.11 on May 29, 2024 to $2.03 on May 30, 2024, and closed at $1.88 on May 31, 2024, representing a cumulative [] drop of 39.55%."  CAC ¶ 86.

I.    Alleged Misrepresentations

The above forms the backdrop for Plaintiff's claim that Defendants made misrepresentations for which they can be held liable under federal securities law.  As noted above, the alleged class period runs from November 15, 2023, through May 29, 2024, inclusive.  *See* Mot. at 1.  According to Plaintiff, Defendants made seven different misrepresentations which took place in November 2023 and April 2024.  The seven alleged misrepresentations (all identified above) can be essentially be put into one of two categories:

(1) Defendants misrepresented that, "without SunPower, Maxeon could successfully implement a direct[-]to[-]dealer sales strategy [when,] [i]n truth, . . . Maxeon knew that its ability to ramp up sales without SunPower was extremely limited because

its prior attempts to contact dealers had already led to a loss of business."  Opp'n at 7.

    (2) Defendants misrepresented its profitability, cash flow, and/or liquidity – *e.g.*, by not disclosing that no more cash would be coming in from the Utility-Scale prepayments, *see* Opp'n at 9; by not disclosing that, "as early as summer 2023 and as late as September 2023," lenders had expressed concern about Maxeon's ability to continue as a going concern, Opp'n at 10; and by not disclosing that two major Utility-Scale customers were experiencing project delays.  *See* Opp'n at 11-12.

Plaintiffs' narrative is essentially as follows:

> [U]pon the heels of losing its largest customer [SunPower] and in the face of significant capital and liquidity restraints, Defendants artificially inflated the stock price by touting implausible growth strategies they knew had already failed and were likely to be very difficult to implement [*i.e.*, selling product to SunPower installers directly;] made statements about Maxeon's present cash flow, liquidity and financial results they knew were false or misleading[;] and made statements concerning the Company's future ability to meet its capital requirements they knew were objectively unattainable.

Opp'n at 14.

Based on this narrative and, *inter alia*, the above allegations, Plaintiff has asserted two causes of action:

    (1) Violations of § 10(b) of the Securities Exchange Act and Rule 10b-5 (against all Defendants).

    (2) Violations of § 20(a) of the Securities Exchange Act (against Mr. Mulligan and Mr. Strohbecke only, *i.e.*, the individual defendants).

## II.    <u>DISCUSSION</u>

A.    <u>Legal Standard</u>

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a cause of action for failure to state a claim for relief.  To overcome a Rule 12(b)(6) motion after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . .

United States District Court
Northern District of California

United States District Court
Northern District of California

suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

Because Plaintiff is asserting that Defendants engaged in fraud, Federal Rule of Civil Procedure 9(b) is also implicated. Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Finally, since Plaintiff is claiming securities fraud specifically, the Private Securities Litigation Reform Act ("PSLRA") imposes additional requirements.

> Under the PSLRA, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Importantly for purposes here, the complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A).

> The PSLRA's "strong inference" requirement has teeth. It is an "exacting" pleading obligation, *Zucco Partners*, 552 F.3d at 990, that "present[s] no small hurdle for the securities fraud plaintiff." *Schueneman*, 840 F.3d at 705 (quotations omitted). As the Supreme Court has explained, "[t]he strong inference standard unequivocally raised the bar for pleading scienter." *Tellabs*, 551 U.S. at 321 (quotations omitted) (alteration adopted). Given the substantial costs that securities fraud litigation can impose, the "strong inference" standard reflects Congress's attempt to halt early on

1

securities litigation that lacks merit or is even abusive, while allowing plaintiffs with potentially winning claims to proceed to discovery. *See id.* at 323-24.

2

3

Acknowledging these interests, the Supreme Court has held that under the PSLRA's "strong inference" standard, a complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

4

5

6

*Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020).

7

B.    False or Misleading Statements

8

Defendants argue first that Plaintiffs' securities fraud claims are deficient because Plaintiff

9

has failed to adequately allege that any of the statements at issue were false or misleading.  For

10

each of the statements, Defendants make one or more of the following arguments: (1) the

11

statement was forward looking in nature and is protected by the safe harbor provision in the

12

PSLRA; (2) the statement was simply one of corporate optimism (puffery) and thus is not

13

actionable; (3) the statement is an inactionable statement of opinion; and (4) Plaintiff has not

14

sufficiently alleged that the statement was false or misleading.

15

1.    Statement No. 1

16

Statement No. 1 was made during the earnings call on November 15, 2023 (the first day of

17

the class period):

18

- "Offering panels directly to installers will eliminate the markup SunPower has

19

historically added to our products, allowing us to deliver the world's best panels to

20

customers at more competitive pricing.  **This will enable our plans to**

21

**aggressively ramp our sales in the U.S. market.**"  CAC ¶ 88 (emphasis in

22

original).

23

CAC ¶ 88 (emphasis added).  According to Plaintiff, the statement was false or misleading

24

because it "gave investors the materially false and misleading impression that without SunPower,

25

Maxeon could successfully implement a direct[-]to[-]dealer sales strategy" when, "[i]n truth, . . .

26

Maxeon knew that its ability to ramp up sales without SunPower was extremely limited because

27

its prior attempts to contact dealers directly had already led to a loss of business."  Opp'n at 7.

28

Defendants argue that any securities fraud claim based on Statement No. 1 should be

United States District Court
Northern District of California

1 dismissed for the following reasons: (1) the statement was forward looking in nature and is

2 protected by the safe harbor provision in the PSLRA; (2) the statement is a nonactionable

3 statement of corporate optimism; and (3) there are insufficient allegations that the statement was

4 false or misleading.

5       For purposes of this order, the Court focuses on the third argument as it is dispositive.  As

6 noted above, according to Plaintiff, Statement No. 1 was false or misleading because, at the time it

7 was made, Maxeon already knew it was not succeeding in making sales to SunPower dealers (*i.e.*,

8 even before the non-circumvention provision in the MSA was to expire), and thus it was false to

9 suggest that it could aggressively ramp up sales to the installers once the non-circumvention

10 provision was no longer in effect.  In support, Plaintiff cites testimony from two confidential

11 witnesses ("CWs").  *See* Mot. at 12-13.

12       "[A] confidential witness[] whose statements are introduced . . . must be described with

13 sufficient particularity to establish their reliability and personal knowledge."  *Zucco Partners, LLC*

14 *v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009).  The question is "whether a complaint has

15 provided sufficient detail about a confidential witness' position within the defendant company to

16 provide a basis for attributing the facts reported by that witness to the witness' personal

17 knowledge."  *Id.*  In other words, there must be "'sufficient particularity to support the probability

18 that a person in the position occupied by the source would possess the information alleged.'"  *Id.*

19 Factors that may be considered in assessing such include the following: "the level of detail

20 provided by the confidential sources, the corroborative nature of the other facts alleged (including

21 from other sources), the coherence and plausibility of the allegations, the number of sources, the

22 reliability of the sources, and similar indicia."  *Id.* at 996 (internal quotation marks omitted).

23       CW-1 was a Senior Manager of Project Finance at Maxeon from December 2022 to

24 January 2024.  They were "a member of the Company's Treasury Team and had direct dealings

25 with Mulligan, Strohbecke, and Babcock [the Chief Revenue Officer and interim CEO]. . . .

26 Strohbecke was included 'on all correspondences' regarding the various matters CW-1 worked

27 on."  CAC ¶ 40.  In their position, "CW-1 had considerable visibility [into] the Company's

28 finances," spending "their career reading financial statements.  CW-1 was also involved in credit

United States District Court
Northern District of California

1    underwriting and raising capital through debt and equity for 'infrastructure projects.'"  CAC ¶ 40.

2    According to CW-1,

3            SunPower's dealers had been cultivated and developed by
         SunPower over a long period of time and, generally, they had had
4            positive experiences with SunPower.  While the dealers knew
         generally that Maxeon made the panels that SunPower sold, the
5            dealers were confused when they started getting calls from Maxeon
         representatives.  Maxeon's direct contact "caused a lot of confusion
6            with dealers" who were now getting calls from Maxeon
         representatives when they were used to dealing with SunPower,
7            exclusively.  Such an approach may have been considered an
         "underhanded" move by Maxeon and led to "a great deal of loss" of
8            such dealers.  CW-1 reported that those Maxeon personnel actually
         dealing with the dealers said they were clearly "pretty pissed."

9

10   CAC ¶ 66.

11          It is not clear that CW-1 was in a position to possess information about SunPower dealers.

12   Indeed, there is no indication that they were involved in sales at all.  CW-1's information appears

13   to have been gleaned from "Maxeon personnel" who did deal with SunPower installers, but it is

14   not clear why CW-1 would have a reason to interact with such personnel as part of their *own* job

15   and/or how CW-1 would have a basis for relying on what was being reported; thus, there is a

16   reliability concern.  *See Gammel v. Hewlett-Packard Co.*, 905 F. Supp. 2d 1052, 1073 (C.D. Cal.

17   2012) (stating that, "while reliance on hearsay does not automatically render confidential witness

18   statements unreliable, such reliance may indicate that particular statements are 'not sufficiently

19   reliable, plausible, or coherent to warrant . . . consideration'"); *see also In re Plantronics, Inc. Sec.*

20   *Litig.*, No. 19-cv-07481-JST, 2022 U.S. Dist. LEXIS 232564, at *16 (N.D. Cal. Nov. 7, 2022)

21   (noting that, in *Zucco*, the Ninth Circuit held "'the fact that a confidential witness reports hearsay

22   does not automatically disqualify his statement from consideration' and, instead, it simply 'may

23   indicate that a confidential witnesses' report is not sufficiently reliable, plausible, or coherent to

24   warrant further consideration"); *In re Fusion-io, Inc. Sec. Litig.*, No. 13- CV-05368-LHK, 2015

25   U.S. Dist. LEXIS 18304, *62 (N.D. Cal. Feb. 12, 2015) (stating that, "[w]here . . . a confidential

26   witness relies on hearsay, courts accord the account of that witness little weight").

27          Even if CW-1's information could be deemed reliable, the information is not sufficient to

28   establish falsity, particularly because it is not clear from the CAC what the timing of the

interactions between Maxeon and the dealers was. Did the interactions take place while the non-circumvention provision with SunPower was still in place or after? This is important because, even if it might be "underhanded" for Maxeon to reach out to SunPower dealers directly while the MSA was still binding on it, why would it be underhanded for Maxeon to work with dealers in the future after the MSA was no longer binding? If the non-circumvention provision was no longer in place, then why would it be false for Maxeon to believe that it could aggressively ramp up sales to SunPower dealers in the future since it would then be free of the non-circumvention provision?

Moreover, apart from the timing, CW-1's information is vague in that it is not clear what exactly was meant by "a great deal of loss" of dealers. No information is provided about the number of dealers making negative comments about Maxeon or the significance of the dealers (*i.e.*, whether they "big" potential customers). Such information, assuming it reflected dealer reactions after termination of the non-circumvention provision, informs whether it was reasonable for Maxeon to believe that it could aggressively ramp up sales to SunPower dealers in the future. *Cf. id.* at *66-67 (noting that, "[w]here a plaintiff relies on the accounts of confidential witnesses, the Court must evaluate the witness' account based on, *inter alia*, 'the *level of detail* provided by the confidential sources'[;] [h]ere, CW2's statements [that Fusion salespeople attended meetings where they discussed general topics such as 'pressure from a competitor' and the 'size of the potential sale in jeopardy'] are *too general* to support the implication that [defendants'] statements regarding the buying patterns of [two of Fusion's prominent customers] were false") (emphasis added); *see also Kipling v. Flex Ltd.*, No. 18-CV-02706-LHK, 2020 U.S. Dist. LEXIS 232631, at *36-37 (N.D. Cal. Dec. 10, 2020) (noting that plaintiffs had alleged false statements about Flex's profitability projections, but CWs had only testified about "operational difficulties, not missed profitability projections"; "[p]rofitability projections . . . depended on more than smooth operations," and plaintiff failed to address "other determinants of the [customer] contract's profitability for Flex"), *aff'd by Nat'l Elevator Indus. Pension Fund v. Flex Ltd.*, No. 21-15050, 2021 U.S. App. LEXIS 37868, at *3 (9th Cir. Dec. 21, 2021) (stating that "the confidential witness statements describe operational difficulties without directly contradicting Flex's statements about profitability or successes surrounding the Nike project" and thus the level of specificity required

1    by the PSLRA was not met).

2           As for CW-2, CW-2 was a Marketing Manager at Maxeon from August to November

3    2023.  "CW-2 was one of two employees who worked on the U.S. marketing team.  CW-2 worked

4    with counterparts in Europe who worked for SunPower.  CW-2 also attended weekly sales

5    meeting[s] where discussions typically centered around the sales team pipeline."  CAC ¶ 41.

6    According to CW-2,

7                 Maxeon employees would still have conversations with customers
                  ["]under the rug" despite that the non-circumvention clause was still
8                 in effect.  Additionally, prior to a trade show that occurred in late
                  September 2023 or early October 2023, CW-2 attended a sales
9                 meeting held by a Director of Sales who told the Company's
                  employees to get SunPower's dealers' credentials and not to get
10                caught having improper conversations with them.  At this meeting,
                  CW- 2 and that director discussed speaking to SunPower dealers.
11

12   CAC ¶ 65.  Even assuming CW-2 was in a position to possess the information alleged above, the

13   information does not show the alleged falsity – *i.e.*, that Maxeon was already having a hard time

14   making direct sales to SunPower dealers.  Nor does CW-2 address whether such difficulties were

15   encountered after termination of the non-circumvention provision.

16           Plaintiff protests that dismissal would be inappropriate because he has alleged

17   corroborating details for the CWs' testimonies – to wit, SunPower's allegation that Maxeon had

18   violated the MSA's non-circumvention provision.  *See* CAC ¶ 4 ("Maxeon . . . was prohibited by a

19   non-circumvention clause in its agreements with SunPower from directly selling its solar panels to

20   SunPower's dealers and installers."); CAC ¶ 51 ("The New Master Supply Agreement also

21   contained a non-circumvention clause that prevented the parties from dealing with third-parties

22   behind the other's back in contravention of the obligations under the agreement."); CAC ¶ 53

23   ("SunPower alleged that Maxeon was in breach of the New Master Supply Agreement's non-

24   circumvention clause.").  But whether Maxeon had actually violated the non-circumvention

25   provision in the MSA is beside the point; Plaintiff is claiming falsity on the basis that Maxeon's

26   alleged efforts to sell directly to SunPower's installers were not successful, not whether it had

27   previously violated the non-circumvention provision.

28           The Court, therefore, dismisses the claims based on Statement No. 1 but with leave to

United States District Court
Northern District of California

20

1    amend.

2              2.      Statement No. 2

3              Like Statement No. 1, Statement No. 2 was made during the November 15, 2023, earnings

4    call and relates to Maxeon working with SunPower's installers or dealers.  During the call, Mr.

5    Mulligan stated as follows:

6                       We have exclusivity on the Maxeon 6 product through the end of
                        Q1, but we are able to sell Maxeon 3 and Maxeon 7 starting the first
7                       of the year.  **It is a little early to see how that's going.  We've
                        obviously been very careful not to approach SunPower dealers**
8                       **while the contract [*i.e.*, the MSA with the non-circumvention**
                        **provision] is still in place.  And that remains to be the case for a**
9                       **number of dealers, not all of the dealers but a number of the**
                        **dealers through the end of the year.**
10

11   CAC ¶ 88 (emphasis added).  According to Plaintiff, this was a misrepresentation because it

12   omitted the fact that "Maxeon had tried to do business with SunPower dealers and installers before

13   the non-circumvention clause expired but this had been largely unsuccessful . . . ."  CAC ¶ 89.

14             Defendants contend that any claim based on Statement No. 2 should be dismissed because,

15   as above, Plaintiff has failed to sufficiently allege that Maxeon tried to do business with SunPower

16   dealers before the expiration of the non-circumvention clause but was unsuccessful.  For the

17   reasons stated above, the Court agrees (*e.g.*, CW-1's testimony is not reliable and does not

18   establish that sale efforts post-non-circumvention provision were doomed to fail).

19             Consistent with the above, the Court dismisses the claims based on Statement No. 2 but

20   with leave to amend.

21             3.      Statement No. 3

22             Statement No. 3 is one of the statements related to Maxeon's cash flow and liquidity.

23   During the November 15, 2023, earnings call, Mr. Strohbecke stated: "**Cash levels were also**

24   **impacted by** lower shipments and margin dollars from our global DB business, **the reduction of**

25   **contract liabilities related to our US utility scale business capital expenditures during the**

26   **quarter**, restructuring expenses and a reduction in short term debt."  CAC ¶ 90 (emphasis in

27   original).  The bolded language above appears to relate to the amortization of Utility-Scale

28   prepayments.  If contract liabilities were being reduced, that meant Maxeon was, at the same time,

United States District Court
Northern District of California

21

1    recognizing revenue from the prepayments made under the contracts.  The latter would have a

2    positive impact on cash levels.

3         Plaintiff contends that Statement No. 3 was false and misleading because Defendants did

4    not disclose that

5         (1) [Maxeon] was at or nearing the peak of its prepayment
           amortization schedule of its Utility-Scale contracts; (2) . . . as a

6         result . . . , less cash would be coming in the near term, which
           risked materially undermining its ability to continue as a going

7         concern absent liquidity support; and (3) lenders had expressed
           concern about Maxeon's ability to continue as a going concern by at

8         least September 2023 [which was after Maxeon and SunPower had
           their falling out but before the start of the class period].

9

10   CAC ¶ 92 (emphasis added).[7]

11        Defendants argue that any securities fraud claim based on Statement No. 3 should be

12   dismissed because Plaintiff has failed to adequately allege falsity.  The Court agrees.

13        As an initial matter, the Court notes that securities law

14        prohibit[s] *only* misleading and untrue statements, not statements
           that are incomplete. . . . Often, a statement will not mislead even if it

15        is incomplete or does not include all relevant facts.  Further, a
           completeness rule such as [plaintiffs] suggest could implicate nearly

16        all public statements potentially affecting securities sales or tender
           offers.  No matter how detailed and accurate disclosure statements

17        are, there are likely to be additional details that could have been
           disclosed but were not.  To be actionable under the securities laws,

18        an omission must be misleading; in other words it must
           affirmatively create an impression of a state of affairs that differs in

19        a material way from the one that actually exists.

20   *Brody v. Transitional Hosps. Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) (emphasis in original); *see*

21   *also Zhou v. Desktop Metal, Inc.*, 120 F.4th 278, 294 (1st Cir. 2024) (stating that, "[w]hen making

22   a voluntary disclosure, a company that reveals one fact is not required to 'reveal all others that,

23   too, would be interesting, market-wise'; instead, it is required only to reveal the facts necessary to

24   make the existing statement *not 'so incomplete as to mislead'*") (emphasis added).

25

26   ───────────────

27   [7] *See also* Opp'n at 9 (asserting that Maxeon's " cash levels were positively impacted by its utility-
     scale contracts only because the Company had not yet realized the pre-paid expenses associated
     with these contracts and with the peak of the prepayment amortization schedule looming, the

28   Company would soon be forced to recognize "\$55.1 million [in Utility-Scale] contract liabilities,"
     and would receive no further cash from these prepayments").

Here, Plaintiff has not sufficiently explained how Statement No. 3 – which simply notes that cash levels were impacted, among other things, by a reduction of contract liabilities – "'would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists.'"  *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1109 (9th Cir. 2010).  There was, *e.g.*, no suggestion in the statement that there would be continued reductions of contract liabilities (or continued revenues coming in from prepayments).  *Cf. Zhou*, 120 F.4th at 294 (rejecting plaintiff's contention that CEO's "statement about 'adding capacity to meet the robust demand' for [dental product] was rendered misleading by failing to disclose that EnvisionTEC was producing some [product] at the unregistered Montreal facility"; "[t]he challenged statement is not incomplete or misleading for failing to admit that some Flexcera resin was produced at a non-compliant facility, because the statement itself leaves no impression about EnvisionTEC's regulatory compliance").

Indeed, as Defendants point out, "accurate reporting of *historical* data does not create a misleading impression of *future* growth."  *In re Verifone Sec. Litig.*, 784 F. Supp. 1471, 1477 (N.D. Cal. 1992) (emphasis added; adding that, "where actual forecasts *are* made[,] liability may be premised on false or misleading projections under Rule 10b-5") (emphasis added)[8]; *see also In re Bayer AG Sec. Litig.*, No. 03-cv-1546 (WHP), 2004 U.S. Dist. LEXIS 19593, at *33 (S.D.N.Y. Sept. 30, 2004) (holding that statements of a "strong sales" record are not actionable "since they are merely recitations of historical fact and are not alleged to be inaccurate"); *Fisher v. Acuson Corp.*, No. C 93-20477 RMW (EAI), 1995 U.S. Dist. LEXIS 19968, at *26-27 (N.D. Cal. Apr. 26,

---

[8] In *Verifone*, the court explained that accurately reported historical information, such as sales and profit data, is not actionable because it "is rarely subject to misinterpretation, even if the disclosure is accompanied by generally optimistic statements about the future by corporate officers" given that investors 'know how to devalue the optimism of corporate executives, who have a personal stake in the future success of the company."  *Verifone*, 784 F. Supp. at 1481.  The Second Circuit made a similar comment in *Boca Raton Firefighters & Police Pension Fund v. Bahash*, 506 Fed. Appx. 32, 38-39 (2d Cir. 2012) (rejecting plaintiff's argument that company's "statements about its earnings were actionable, even though literally true, because they did not acknowledge the long-term unsustainability of its business model"; "[w]hatever the scope of the responsibility not to make statements that constitute 'half-truths,' that surely does not apply to the reporting of unmanipulated corporate earnings," and "[t]o the extent that investors might impute a positive corporate outlook from omissions in earnings reports, we have explained that general expressions of corporate optimism are 'too indefinite to be actionable under the securities laws'");

1995) (noting "plaintiffs do not allege how admittedly accurate information about the past, although 'unrepresentative of what was actually occurring currently at the Company,' in and of itself would mislead an investor into thinking that the trend would continue"). *Accord Kolominsky v. Root, Inc.*, 100 F.4th 675, 686 (6th Cir. 2024) (stating that "'[t]he disclosure of accurate historical data does not become misleading *even if* less favorable results might be predictable by the company in the future'") (emphasis added); *In re Omega Healthcare Investors Secs. Litig.*, 563 F. Supp. 3d 259, 277 (S.D.N.Y. 2021) (noting that "'defendants may not be held liable under the securities laws for accurate reports of past successes, *even if* present circumstances are less rosy'") (emphasis added); *Monachelli v. Hortonworks*, 225 F. Supp. 3d 1045, 1055 (N.D. Cal. 2016) (rejecting plaintiff's claim of falsity, which was based on defendants' touting of historical financial results "without exposing 'the downside impacts of that growth on Hortonworks' strained cash position'"; "'disclosure[s] of accurate historical data accompanied by general statements of optimism' and 'failure to disclose internal forecasts of future performance' are not actionable"). *Compare In re Splash Tech. Holdings Sec. Litig.*, No. C 99-00109 SBA, 2000 U.S. Dist. LEXIS 15369, at *56 (N.D. Cal. Sept. 29, 2000) (noting that, "[a]lthough paragraph 146 also includes statements *involving* historical facts, it conveys the impression of future expansion – a premise challenged by plaintiffs") (emphasis added).

Accordingly, the Court dismisses the claims based on Statement No. 3 but with leave to amend.

        4.    <u>Statement No. 4</u>

Statement No. 4 is another statement about Maxeon's cash flow and liquidity. In the Form 6-K filed on November 15, 2023 (providing the company's quarterly report for 2023 Q3), Maxeon stated:

> **Liquidity and Capital Resources**
>
> ***Current Sources of Liquidity and Capital Resources***
>
> As of October 1, 2023, we had unrestricted cash and cash equivalents of $208.1 million, restricted cash of $9.2 million and short-term securities representing a 6-months time deposit of $60.0 million as compared to $227.4 million of unrestricted cash and cash equivalents, $40.5 million of restricted cash and short-term

United States District Court
Northern District of California

securities representing a 4-month time deposit of $76.0 million as of January 1, 2023.

. . . .

**Anticipated Sources of Funds**

**We believe that our current cash, cash equivalents, along with cash expected to be generated from operations will be sufficient to meet our obligations over the next 12 months.**

CAC ¶ 91 (emphasis in original).

According to Plaintiff, Statement No. 4 was false because Defendants did not disclose that:

(1) [Maxeon] was at or nearing the peak of its prepayment amortization schedule of its Utility-Scale contracts; (2) . . . as a result . . . , less cash would be coming in the near term, which risked materially undermining its ability to continue as a going concern absent liquidity support; and (3) lenders had expressed concern about Maxeon's ability to continue as a going concern by at least September 2023 [which was after Maxeon and SunPower had their falling out but before the start of the class period].

CAC ¶ 92.

Defendants argue that any claim based on Statement No. 4 should be dismissed for three reasons: (1) the statement was a forward-looking statement protected by the safe harbor provision in the PSLRA; (2) the statement is a nonactionable opinion statement; and (3) there are insufficient allegations that the statement was false or misleading. Similar to above, the Court focuses on the third argument.

As an initial matter, the Court distinguishes between Plaintiff's claim that Statement No. 4 was false or misleading because (a) there was no disclosure that less cash would be coming in because of the amortized Utility-Scale contracts and (b) there was no disclosure that lenders had expressed concern about whether Maxeon could continue as a going concern.

With respect to (a), the mere fact of that Maxeon was at or near the peak of its prepayment amortization schedule did not thereby mean that Maxeon could not continue operations for the next 12 months – at least Plaintiff has failed to explain why. There is no allegation indicating, *e.g.*, that the amortization of the Utility-Scale contracts was of such significance that it alone could dictate whether or not Maxeon would continue as a going concern.

As for (b), the question is whether Statement No. 4 ("We believe that our current cash,

cash equivalents, along with cash expected to be generated from operations will be sufficient to meet our obligations over the next 12 months") – which was made in November 2023 – is problematic given that there was no disclosure that lenders had already expressed concern about whether Maxeon could continue as a going concern by at least September 2023. Plaintiff relies in large part on the testimony of CW-1:

> [A]ccording to CW-1, a member of Maxeon's Treasury Team, the Company's cash and liquidity position had been deteriorating since May or June of 2023 and became "dire" in March 2024. Indeed, CW-1 further provided that concern from lenders about Maxeon's ability to continue as a going concern came as early as summer 2023 and no later than September 2023. And "a lot" of the available financing options that Maxeon did have were presented to Strohbecke and Mulligan.

CAC ¶ 71; *see also* CAC ¶ 112 (alleging that "CW-1 described that CW-1 and Strohbecke were very involved in discussing issues, such as financing from lenders and from these conversations 'a lot of options were presented to [Strohbecke and Mulligan]") (emphasis omitted).

Defendants' main criticism here is that the information provided by CW-1 is too generalized in nature. For example, Defendants contend that, although Plaintiff alleges "Maxeon executives discussed financing and were presented with options[,] . . . [m]issing is any allegation regarding the liquidity analysis performed . . . ." Mot. at 18; *see also* Reply at 6 (arguing that there must be "particularized facts that contradict the challenged statements, not vague 'considerations' and 'concerns' expressed months earlier").

Defendants' position is not entirely convincing. Defendants have not explained why Plaintiff would have to plead details about the lenders' analyses so long as the lenders' conclusions and general basis therefor were clear. Defendants argue that one of the cases cited by Plaintiff contains more detail about why a statement similar to Statement No. 4 was found to be sufficiently false or misleading:

> On June 26, 2002, Vivendi [the defendant-company] issued a press release stating that "[o]wing to its strong free cash flow, combined with the execution of the disposals program and potential bond issues, [Vivendi] is confident of its capacity to meet its anticipated obligations over the next 12 months." Special App'x 330 (Statement 56). [But] [t]wo days earlier, on June 24, 2002, Goldman Sachs, in response to a request by Vivendi's board to analyze Vivendi's

United States District Court
Northern District of California

> liquidity situation, explained to Vivendi's board that one of four
> possible scenarios is that Vivendi would have to file for bankruptcy
> protection as early as September. Soon thereafter, Edgar Bronfman,
> Jr., whose family was one of Vivendi's largest shareholders at the
> time, wrote that Vivendi's situation was a "matter of the gravest
> concern" and that Vivendi "must install . . . new management right
> away to take charge of convincing the banks to extend some credit
> while we sell some of our assets to avoid bankruptcy. We have no
> time. Our board must act tomorrow without fail. Our company may
> fail, and we have not one minute more to waste." Trial Tr. 7361.

*In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 252 (2d Cir. 2016). While Defendants are correct that there were more details described in *Vivendi*, that case went through a jury trial. This case is only at the 12(b)(6) phase.

Nonetheless, the problem for Plaintiff is that his allegations about the lenders' conclusions are still too vague and conclusory. As alleged, lenders expressed concern about whether Maxeon could continue as a going concern but, without more information about the *basis* for that concern, it is not clear whether Statement No. 4, which said Maxeon was expected to continue for another 12 months, was false or misleading.

For the foregoing reasons, the Court dismisses the claims based on Statement No. 4, but as above with leave to amend.

### 5. Statement No. 5

On April 8, 2024, Maxeon issued a press release announcing its preliminary financial results for FY 2023 and 2024 Q1. *See* CAC ¶ 93. The press release included the following statements from Mr. Mulligan:

> - "In the fourth quarter, **Maxeon delivered financial results largely in line with**
>   **our expectations**. Our U.S. utility-scale business accounted for the majority of
>   revenues in the fourth quarter, with stable ASPs." CAC ¶ 93 (emphasis in
>   original).

According to Plaintiffs, Statement No. 5 was false and misleading because Defendants did not disclose that

> (1) [Maxeon] was in the peak of its prepayment amortization
> schedule of its Utility-Scale contracts; (2) [Maxeon] was informed
> by two of its large Utility-Scale customers in early Q1 2024 that
> they were experiencing project delays and would be unable to accept
> its deliveries under the contract, causing the Company to absorb the

> costs of unused inventory; (3) . . . as a result . . . , Maxeon's cash position had significantly deteriorated, giving rise to a cash flow and liquidity crisis that would inhibit the Company's ability to continue as a going concern absent liquidity support; and (4) lenders had expressed concern about Maxeon's ability to continue as a going concern by at least September 2023.

CAC ¶ 95; *see also* CAC ¶ 73 (alleging that "Maxeon suffered a net loss of over \$275 million in 2023, amounting to a total cash flow of negative \$254.3 million by the end of that fiscal year, and then suffered an additional \$80.1 million loss, in the first three months of 2024").

Defendants contend that any securities claim based on Statement No. 5 should be dismissed because (1) the statement was simply one of corporate optimism; (2) the statement is a nonactionable statement of opinion; and (3) Plaintiff has failed to adequately allege that the statement was false. As a practical matter, the Court can simply focus on the third argument. The Court agrees with Defendants that there is an insufficient showing that Statement No. 5 was false. First, the statement is tantamount to a reporting of historical data, and no representations were made about future growth. Second, even if there were problems related to two large Utility-Scale customers for 2024 Q1, Statement No. 5 was about 2023 Q4; thus, a failure to reference the problems in 2024 Q1 cannot be said to be false or misleading.[9] Finally, as discussed above, the

---

[9] At the hearing, Plaintiff suggested that Defendants knew about the problems with the two Utility-Scale customers as of 2023 Q3. But the CAC expressly states that "[Maxeon] was informed by two of its large Utility-Scale customers *in early Q1 2024* that they were experiencing project delays and would be unable to accept its deliveries under the contract, causing the Company to absorb the costs of unused inventory." CAC ¶ 95 (emphasis added).

To the extent Plaintiff is now relying on the May 30, 2024, earnings call in support, the language used during the call is somewhat ambiguous on timing:

> "Since the middle of last year, Maxeon has been under significant pressure due to the unprecedented market dislocation caused by worldwide Chinese module oversupply, high interest rates and policy changes. Maxeon also suffered from the termination of our SunPower supply agreement and delivery pushouts by 2 of our primary utility-scale customers."

CAC ¶ 100. It is not clear from this statement whether the pushouts also took place in 2023 Q3. *See also* Anders Decl., Ex. 9 (financial results for 2024 Q1) (ECF Pages 355-56) ("[S]ince the middle of 2023, the worldwide solar industry has suffered and continues to suffer from oversupply and intense competition, as well as lower demand in our key markets driven by regulatory changes and a higher global interest-rate environment. All these factors have contributed to a steep fall in average selling prices that has negatively impacted our revenue, profitability and cash flows. Furthermore, several large customers in the United States have cancelled or deferred their off-take commitments, further contributing to the deterioration of the Company's financial condition.").

allegations made about the lenders is vague and, without more information, cannot show that Statement No. 5 was false or misleading.

### 6.  Statement No. 6

Statement No. 6 is another statement made in Maxeon's press release issued on April 8, 2024.  To wit:

> • "The Maxeon team is highly focused on reducing manufacturing costs, OPEX rationalization and **liquidity-management to enable a return to profitability**. Our strategy continues to be to focus on designing and building premium, differentiated products and delivering a superior customer experience across a balanced portfolio of global DG **and U.S. utility-scale markets**.  The Company plans to file its annual 20-F report by April 30, 2024."  CAC ¶ 93 (emphasis in original).

According to Plaintiffs, Statement No. 6 was false and misleading because Defendants did not disclose that

> (1) [Maxeon] was in the peak of its prepayment amortization schedule of its Utility-Scale contracts; (2) [Maxeon] was informed by two of its large Utility-Scale customers in early Q1 2024 that they were experiencing project delays and would be unable to accept its deliveries under the contract, causing the Company to absorb the costs of unused inventory; (3) . . . as a result . . . , Maxeon's cash position had significantly deteriorated, giving rise to a cash flow and liquidity crisis that would inhibit the Company's ability to continue as a going concern absent liquidity support; and (4) lenders had expressed concern about Maxeon's ability to continue as a going concern by at least September 2023.

CAC ¶ 95; *see also* CAC ¶ 73 (alleging that "Maxeon suffered a net loss of over $275 million in 2023, amounting to a total cash flow of negative $254.3 million by the end of that fiscal year, and then suffered an additional $80.1 million loss, in the first three months of 2024").

For Statement No. 6, Defendants make two arguments: (1) the statement was forward looking and thus is protected by the PSLRA's safe harbor; and (2) Plaintiff has not sufficiently

---

In any event, even if the pushouts did take place during 2023 Q3, Statement No. 5 is still a reporting of accurate historical data.

United States District Court
Northern District of California

alleged that the statement is false. Here, the Court focuses on the second argument. Plaintiff has failed to explain how it was false for Defendants to say that the company's plan was to focus on liquidity management and the Utility-Scale market. That there were problems with two Utility-Scale customers does not mean that it was misleading for Defendants to indicate, *e.g.*, that they wanted to build up the Utility-Scale market. There was nothing that "affirmatively create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Brody*, 280 F.3d at 1006.

7.    Statement No. 7

Finally, on April 30, 2024, Maxeon filed with the SEC a Form NT 20-F, which was signed by Mr. Strohbecke. In the form, Maxeon stated that it would not be able to timely file its 2023 annual report. It also stated as follows:

> Factors which have affected the timing of the preparation and review of the financial statements include the additional **ongoing work required in connection with the assessment of the Company's ability to continue as a going concern**, including the **ongoing analysis of the Company's strategic options** with the assistance of external advisors.

CAC ¶ 94 (emphasis in original).

Again, according to Plaintiff, Statement No. 7 was false and misleading for the same reasons Statements Nos. 5 and 6 are false and misleading – *i.e.*, there was a failure to disclose that

> (1) [Maxeon] was in the peak of its prepayment amortization schedule of its Utility-Scale contracts; (2) [Maxeon] was informed by two of its large Utility-Scale customers in early Q1 2024 that they were experiencing project delays and would be unable to accept its deliveries under the contract, causing the Company to absorb the costs of unused inventory; (3) . . . as a result . . . , Maxeon's cash position had significantly deteriorated, giving rise to a cash flow and liquidity crisis that would inhibit the Company's ability to continue as a going concern absent liquidity support; and (4) lenders had expressed concern about Maxeon's ability to continue as a going concern by at least September 2023.

CAC ¶ 95. In essence, Plaintiff maintains that, at the time Statement No. 7 was made, "Defendants *already* knew . . . that Maxeon would be unable to continue as a going concern absent significant liquidity support." Opp'n at 12 (emphasis added).

Plaintiff's position is not entirely lacking in merit. It is somewhat suspect that, just a

United States District Court
Northern District of California

month after the above statement, Maxeon made the disclosure that it had such a serious cash flow problem that it had "'negotiated commitments for significant liquidity support from [its] largest shareholder TZE' through a dilutive offering," CAC ¶ 80 – this in spite of the fact that the "TZE takeover" would result in "share dilution" and further "complicate the Company's operational prospects" because, as explained in an analyst report, "'[w]ith a majority of the company now owned by a Chinese entity, the new [capital] raise calls into question [Maxeon's] ability to secure the DOE loan for its New Mexico [manufacturing] facility.'"  CAC ¶ 82.  On the other hand, it is not clear that Statement No. 7 was false or misleading because part of the company's evaluation of whether it could continue as a going concern was likely dependent on whether it could get liquidity support from a third party (such as TZE).  At bottom, without additional allegations by Plaintiff, it cannot plausibly be said Defendants knew in April 2024 that it could not continue as a going concern.

The Court therefore dismisses the claims based on Statement No. 7 but with leave to amend.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

### III.    CONCLUSION

As discussed above, the claims based on all seven statements identified by Plaintiff are dismissed, but with leave to amend.  Dismissal is based on failure to sufficiently plead falsity. The Court does not address Defendants' arguments that Plaintiff has also failed to allege scienter. Whether or not there are sufficient allegations to support scienter may turn on what Plaintiff pleads with respect to falsity.

Plaintiff may file an amended complaint within four weeks of the date of this order.  If no amended complaint is filed, then the dismissal shall be deemed with prejudice at that point and the case will be closed.  If an amended complaint is filed, Defendants shall have four weeks thereafter to file a response, whether an answer or a motion to dismiss.

This order disposes of Docket No. 70.


**IT IS SO ORDERED**.


Dated: April 28, 2025


_____
EDWARD M. CHEN
United States District Judge