Lisa T. Omoto SBN 303830
E-mail: lomoto@faruqilaw.com
**FARUQI & FARUQI, LLP**
1901 Avenue of the Stars, Suite 1060
Los Angeles, CA 90067
Telephone: 424-256-2884
Facsimile: 424-256-2885

James M. Wilson, Jr. (appearance *pro hac vice*)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email:  jwilson@faruqilaw.com

Robert W. Killorin (appearance *pro hac vice*)
**FARUQI & FARUQI, LLP**
3565 Piedmont Road NE Building Four
Suite 380
Atlanta, GA 30305
Telephone: 404-847-0617
Facsimile: 404-506-9534
Email: rkillorin@faruqilaw.com

*Attorneys for Lead Plaintiff*
*Jeyakumar VS Menon*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEYAKUMAR VS MENON, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> MAXEON SOLAR TECHNOLOGIES, LTD., WILLIAM MULLIGAN, and KAI STROHBECKE, <br><br> Defendants. | Case No. 3:24-cv-03869-EMC <br><br> CLASS ACTION <br><br> **SECOND AMENDED CLASS ACTION COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

NATURE AND SUMMARY OF ACTION ................................................................ 1

JURISDICTION AND VENUE ............................................................................... 8

PARTIES .............................................................................................................. 9

    A.    Lead Plaintiff ...................................................................................... 9

    B.    Defendants ......................................................................................... 9

    C.    Relevant Non-Parties ........................................................................ 10

    D.    Confidential Witness ......................................................................... 10

FACTUAL ALLEGATIONS ................................................................................... 11

    A.    Background Of Maxeon And Its Businesses ....................................... 11

    B.    Maxeon And SunPower ...................................................................... 12

    C.    Market Headwinds Facing The Solar Panel Industry ......................... 13

    D.    Maxeon's First U.S. Manufacturing Facility In New Mexico And The DOE Loan ........................................................................................ 15

    E.    Maxeon's Lenders Express Serious Concerns To Defendants About Maxeon's Future Operations ............................................................. 19

    F.    Maxeon Nonetheless Reassures The Market About Its Liquidity Position .......... 20

    G.    Revelation Of Maxeon's Struggles And Restructuring ....................... 25

I.    DEFENDANTS' CLASS PERIOD MATERIAL MISREPRESENTATIONS AND OMISSIONS ................................................................................................. 27

    A.    Defendants' November 2023 Misrepresentations ............................... 27

    B.    Defendants' Material Misrepresentations in 2024 .............................. 31

II.    THE TRUTH EMERGES ............................................................................... 34

III.    ADDITIONAL SCIENTER ALLEGATIONS .................................................. 38

    A.    *Respondeat Superior* and Agency Principles Apply ........................... 38

    B.    The Individual Defendants Had Access To Information That Their Statements Were False Or Misleading ............................................... 39

    C.    Maxeon's Utility-Scale Business, Cash Flow, Liquidity And Ability To Continue As A Going Concern Were Its Core Operations ................... 42

i

    D.     The Temporal Proximity Between Defendants' Misleading Statements And The Revelation Of The Truth Bolsters Scienter ................................ 43

    E.     Defendants Were Motivated To Conceal Maxeon's Financial Struggles To Lure In Potential Lenders ................................................. 44

    F.     The Timing Of Strohbecke's Departures Support Scienter ................ 45

IV.    LOSS CAUSATION ................................................................. 45

V.    CLASS ACTION ALLEGATIONS ................................................ 47

VI.    CONTROL PERSON LIABILITY .................................................. 48

VII.    APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE ......... 49

VIII.    THE AFFILIATED *UTE* PRESUMPTION ....................................... 50

IX.    INAPPLICABILITY OF SAFE HARBOR ........................................ 50

X.    CLAIMS FOR RELIEF ........................................................... 52

COUNT I .................................................................................. 52

COUNT II ................................................................................. 54

PRAYER FOR RELIEF ................................................................ 55

JURY TRIAL DEMAND ............................................................... 56

**SECOND AMENDED CLASS ACTION COMPLAINT**
**Case No. 3:24-cv-03869-EMC**

Lead Plaintiff Jeyakumar VS Menon ("Plaintiff"), individually and on behalf himself and all persons who purchased Maxeon Solar Technologies, Ltd. ("Maxeon" or the "Company") common stock during the period from November 15, 2023 through May 29, 2024, inclusive (the "Class Period"), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters. Plaintiff's information and belief is based on the substantial investigation by Plaintiff's counsel into the facts and circumstances alleged herein, including the following: (i) a review and analysis of public filings referenced herein made by Maxeon with the United States Securities and Exchange Commission ("SEC"); (ii) a review and analysis of press releases, analyst reports, public statements, news articles, and other publications referenced herein disseminated by or concerning Maxeon and Defendants William Mulligan ("Mulligan") and Kai Strohbecke ("Strohbecke") named herein, including the dissemination of information on the Internet; (iii) a review and analysis of Company conference calls, press conferences, and related statements and other materials referenced herein; and (iv) a review and analysis of those other documents referenced herein. Many additional facts supporting the allegations are known only to Defendants and/or are within their exclusive custody or control. Plaintiff believes that substantial additional evidentiary support for the allegations will emerge after a reasonable opportunity to conduct discovery.

## NATURE AND SUMMARY OF ACTION

1. Plaintiff alleges a straightforward case of securities fraud under the Securities Exchange Act of 1934 ("Exchange Act"). Specifically, Defendants intentionally misled the market during the Class Period about the serious cash flow challenges Maxeon was facing that jeopardized not only the Company's ability to develop its long-awaited U.S. manufacturing plant but Maxeon's very existence. The Company finally disclosed the truth about its struggles and that, as a result, it would be forced to cede control of the Company to its largest shareholder in exchange for $200 million of desperately needed funding to support its immediate liquidity needs. This torpedoed its chances of getting the government loan needed to execute its business plan to build a major new domestic manufacturing plant the Company had announced. It also

greatly diluted the ownership interest of current shareholders. The market reacted swiftly and negatively. Indeed, this bombshell caused Maxeon's stock price to tank a whopping 39.55% in two days, leading to millions in damages for Maxeon investors who bought stock at inflated prices during the Class Period.

2.    Maxeon is a solar power and renewable energy company that designs, manufactures, markets and sells a comprehensive portfolio of photovoltaic solar panels and its related components worldwide.

3.    For years, Maxeon operated as a division of SunPower, a residential provider of photovoltaic solar panels, but in 2020, Maxeon spun-off from SunPower, while maintaining a close working relationship. Maxeon thereafter operated in two segments: (1) Distributed Generation ("DG"), through which it sells products to SunPower and other suppliers, or direct to consumers for smaller centralized applications; and (2) Utility-Scale, through which Maxeon provides solar panels and related support to solar power plants for large-scale application.

4.    One of Maxeon's major and critical goals for its future success was to build a 3-gigawatt solar cell and module factory in the U.S. The Company had been highlighting the importance of domestic manufacturing and touting its advances to obtain financing from the Department of Energy for a domestic manufacturing facility since late 2021.[1] In August 2023, Maxeon had announced that it entered into an agreement to buy 160 acres of land in Albuquerque, New Mexico as the site to build this 3-gigawatt facility, with the option to purchase additional parcels for additional expansion.

5.    In its August 10, 2023 press release announcing the Albuquerque property acquisition, the Company stated:

---

[1]    In its 2024 annual report, Maxeon disclosed that "Our continued existence is dependent on our ability to restructure our business to focus on the U.S. market, including the development of our manufacturing facility in New Mexico which is contingent on necessary funding and other factors beyond our control." Maxeon, Annual Report 10 (Form 20-F) (Apr. 30, 2025), www.sec.gov/Archives/edgar/data/1796898/000179689825000031/0001796898-25-000031-index.html.

The new world-class, 3-gigawatt facility will be designed to produce latest-generation TOPCon PV-silicon cell technology and the Company's proprietary shingled-cell Performance Line solar modules to meet rapidly growing demand for domestically produced solar panels."

*\*\**

Due to strong customer demand and the planned availability of sufficient infrastructure at the Mesa Del Sol site, Maxeon is currently evaluating plans to upsize the scale of its U.S. manufacturing operation by approximately 50% to a nameplate capacity of 4.5 GW. A final decision regarding plant capacity is expected later this year.

6.     Essential to following through with this "greenfield" acquisition was obtaining a loan from the Department of Energy ("DOE"), a process it had started in 2021.  The factory would serve both the DG and Utility-Scale segments and was expected to increase the Company's manufacturing capabilities by 50% and ease the supply issues that come from importing the panels into the U.S. from China.  Maxeon's announcement that it had selected a site for the plant was an important milestone in obtaining the loan.  The total investment for the project was estimated to be over $1 billion and was to be funded by a mix of the DOE loan, customer co-investments, and equity investments.

7.     Defendants touted the Albuquerque acquisition as the future for the success of the Company even as it was facing serious headwinds in the form of rising interest rates, the California Public Utilities Commission ("CPUC") lowering the credits earned from excess solar energy exported to the grid for future installations, and an oversupply of Chinese solar products that depressed prices.

8.     Additionally, by mid-2023, Maxeon's partnership with SunPower turned south and the pair became embroiled in a contentious dispute, with Maxeon alleging that SunPower was withholding approximately $29 million in past due invoices and SunPower alleging that Maxeon was in breach of their agreement's non-circumvention clause by reaching out directly to SunPower's customers for new contracts rather than selling through SunPower.  As a result, Maxeon ceased shipments to SunPower in July 2023.  This was a significant negative development for Maxeon.  Even though it had branched off from SunPower in 2020, it was

highly dependent on its relationship with SunPower (which had an extensive customer base), which accounted for 26.7% of Maxeon's revenue for the 2022 fiscal year.

9.      In addition to this, Maxeon was also suffering from a hidden liquidity crisis behind the scenes.  Unbeknownst to investors, Maxeon's cash flow had begun deteriorating as early as May/June of 2023, and was considered "bad" by the Summer of 2023, according to a member of Maxeon's Treasury Team.  Its lenders, including Standard Chartered Bank ("SCB"), Bank of China and another bank in Malaysia, refused to extend Maxeon's lines of credit without shareholder guarantees[2] because of their concerns about Maxeon's overall financial condition and the Company's ability to repay its loans and continue as a going concern.[3]

10.     Such shareholder guarantees were problematic for Maxeon specifically because they would likely have to come from its largest shareholder, TCL Zhonghuan Renewable Energy Technology Co. Ltd. ("TZE")—a China-based corporation.  Although SCB did extend Maxeon's credit facility by $50 million, it only did so because of a "shareholder guaranty" it received from TZE.  TZE was clear that such guarantees and cash infusions would require Maxeon to provide it with an increased ownership stake in the Company.  An increase in TZE's ownership would jeopardize Maxeon's ability to obtain the DOE loan it needed to build its U.S. plant, as China was classified as a "foreign entity of concern" under the DOE's rules.  Indeed, according to Confidential Witness 1 ("CW-1"), the DOE made it clear to Maxeon and its entire leadership team that it should go "anywhere else" for more financing.  Notably, Maxeon was seeking about $1,207,000,000 in DOE loans for the project, according to its application for Industrial Revenue

---

[2]      As discussed more fully in Factual Allegations § E, *infra*, a shareholder guarantee requires the company receiving the loan to obtain a guarantee from a shareholder (most commonly, one of its larger shareholders) that it will repay the loan in the event the company defaults on its obligations.

[3]       "Going concern" refers to a company's ability to satisfy its financial obligations as they become due for the foreseeable future, generally defined as at least the next 12 months.  *See* https://www.investopedia.com/terms/g/goingconcern.asp.

Bonds from the City of Albuquerque, so the money from the DOE loan would be virtually impossible to replace.

11.     Maxeon's liquidity was also threatened because it was scheduled to reach the peak of its utility-scale prepayment amortization schedule in or before the first quarter of 2024, which meant that the Company would only be able to collect a portion of the sales revenue associated with customer prepayments as cash.  Unlike investors, who were told the Company's contract liabilities decreased when the sales revenue associated with its Utility-Scale contract was collected, Defendants knew that reaching the peak of this schedule would significantly negatively impact Maxeon's cash flows and liquidity.  Specifically, the previously scheduled amortization was $83 million in Q4 2023 and $67 million in Q1 2024, for a total of $150 million. For context, Maxeon's operating expenses (under Generally Accepted Accounting Principles, or GAAP) in those quarters were estimated to be approximately $66.2 million and $113 million, respectively.  The initial receipt of the $150 million in customer prepayments had provided Maxeon with significant upfront capital, which could be used for operational needs, capital expenditures, or debt reduction.  However, the amortization of these prepayments, the schedule of which was known to Defendants but not to investors, without corresponding new cash flows, set Maxeon up for negative operating cash flows.

12.     Disclosing these issues would have sent Maxeon's stock plummeting and made it near impossible for Maxeon to attract the investments it needed.  As a result, Defendants intentionally withheld that news from investors and set out to portray Maxeon as a successful Company with a promising outlook and the ability to repay its financial obligations by omitting the truth about its cash flows and liquidity status.

13.     Thus, on the first day of the Class Period, November 15, 2023, in disclosing and discussing Maxeon's results for the previous quarter including specific financial metrics impacted by the above financing, amortization, and cash flow issues, Defendants disclosed nothing of the liquidity crisis that they knew the Company faced.  Instead, Defendants touted the Company's positive operational results, its progress with respect to the Albuquerque facility,

1  assured the market of the Company's cash position, and downplayed the market conditions

2  threatening the solar power industry as neither "unique" nor "unprecedented."

3      14.    For example, Defendants falsely assured the market that Maxeon had sufficient

4  cash flow for the next year in its November 15, 2023 Form 6-K filed with the SEC, stating that it

5  believed Maxeon's "current cash, cash equivalents . . ., along with cash expected to be generated

6  from operations [would] be sufficient to meet [its] obligations over the next 12 months."

7      15.    Maxeon continued the coverup through the Class Period.  On April 8, 2024,

8  Defendants issued a press release announcing Maxeon's preliminary fourth quarter and fiscal

9  year 2023 results (both ending December 31, 2023).  The press release provided that "Maxeon

10  delivered financial results largely in line with our expectations . . . . [and that t]he Maxeon team

11  is highly focused on reducing manufacturing costs, OPEX rationalization and liquidity-

12  management to enable a return to profitability."

13      16.    Not only did this press release fail to disclose the cash flow and liquidity crisis

14  about which Defendants knew as discussed above, it also omitted the fact that Maxeon was

15  informed early in the first quarter of 2024—*i.e.*, between January and March 31, 2024—by two

16  of its large Utility-Scale customers, that they were experiencing project delays and "would not be

17  in a position to accept [module] deliveries under" its agreed upon contract with Maxeon.  This

18  left Maxeon without the cash from these deals and unused inventory, the costs of which they

19  were forced to absorb.

20      17.    Then, instead of filing its Form 20-F as required, Maxeon filed a Form NT 20-F

21  with the SEC on April 30, 2024.  The Form NT 20-F cryptically provided that Maxeon would

22  require "additional time to complete its financial statement preparation and review process"

23  given "the additional ongoing work required in connection with the assessment of the

24  Company's ability to continue as a going concern[.]"

25      18.    The truth about Maxeon's finances and operations were finally revealed to the

26  market through a series of related disclosures on May 30, 2024.  First, Defendants finally

27  revealed that two of Maxeon's Utility-Scale customers were experiencing "significant project

28

delays" causing Maxeon to absorb the costs of the unused inventory.  Then, Defendants disclosed that the market "headwinds unfortunately coincided with the peak of [its] utility scale prepayment amortization, and as a result, the company has been facing a serious cash flow challenge."  And finally, Maxeon disclosed that as a result of the foregoing, the Company's liquidity position was negatively affected, leaving substantial doubt about its ability to continue as a going concern.

19.    Maxeon's grim liquidity situation left them with only one option to continue as a going concern: obtain "additional capital support to . . . . support [its] immediate liquidity needs" through a dilutive share offering from its then-largest shareholder, TZE, the China-based corporation, which it announced together with the news of its negative liquidity position on May 30, 2024.  The transition of TZE from being Maxeon's largest shareholder to its now controlling shareholder immediately jeopardized the vital DOE loan needed for Maxeon's touted Albuquerque plant due to the DOE's concern about Chinese control.

20.    On this news, Maxeon's stock experienced a significant drop, plunging from a closing price of $3.11 on May 29, 2024 to $2.03 on May 30, 2024, and then to a $1.88 closing price on May 31, 2024, representing a cumulative a drop of 39.55%.

21.    On information and belief, the DOE still has not approved Maxeon's loan application.  Indeed, shortly after the TZE takeover, Maxeon had to disclose that it had abandoned the vital 3-gigawatt greenfield expansion in Albuquerque that Defendants had been touting and promising to investors since before the start of the Class Period.  Specifically, the Company and TZE filed a joint notice with the Committee on Foreign Investment in the United States ("CFIUS") due to TZE's acquisition of a controlling interest in Maxeon and, based on restrictions in an agreement with federal monitoring agencies pursuant to CFIUS, Maxeon is now subject to limitations on the acquisition of property interests.  On December 2, 2024, the Company announced that it was reassessing options to purchase the Albuquerque greenfield property for the 3-gigawat capacity facility and instead would have to lease a "brownfield" with an existing building with only a 2-gigawat facility that would start manufacturing in 2026.

22.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities when the true facts came to light, Plaintiff and other Class Members suffered significant losses and damages.

## JURISDICTION AND VENUE

23.     The claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

24.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and § 27 of the Exchange Act (15 U.S.C. § 78aa).

25.     This Court has personal jurisdiction over each of the Defendants named herein because each Defendant is either essentially at home in the jurisdiction or has sufficient minimum contacts with the forum from which Plaintiff's claims arise out of or relate so as to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

26.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(a)), as many of the acts and conduct that constitute the violations of law complained of herein, including dissemination to the public of materially false and misleading information, occurred in and/or were issued from this District.  In addition, Maxeon maintained its domestic corporate headquarters at 51 Rio Robles, San Jose, California 95134 which is located in this District, at all relevant times, and Defendants conduct substantial business in this District.

27.     In connection with the acts, conduct, and other wrongs alleged in this Amended Class Action Complaint (the "Complaint"), Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the U.S. mail, interstate telephone communications, and the facilities of national securities exchanges.

1    PARTIES

2    **A.    Lead Plaintiff**

3        28.    As shown in his PSLRA Certification, Lead Plaintiff Jeyakumar VS Menon

4    purchased Maxeon common stock at artificially inflated prices during the Class Period and was

5    damaged upon the revelation of the alleged corrective disclosures.  Menon was appointed Lead

6    Plaintiff on October 18, 2024.  ECF No. 61.

7    **B.    Defendants**

8        29.    Maxeon is a public company incorporated under the laws of Singapore with its

9    corporate headquarters located at 8 Marina Boulevard #05-02, Marina Bay Financial Centre,

10    Singapore 018981.  The Company's domestic corporate headquarters is located at 51 Rio Robles,

11    San Jose, California 95134.  Maxeon's ordinary shares trade on the NASDAQ exchange under

12    the symbol MAXN.

13        30.    Defendant Mulligan served as Chief Executive Officer ("CEO") of Maxeon from

14    January 2023 to October 2024.  Maxeon announced Defendant Mulligan's departure in October

15    2024.  Defendant Mulligan remained with Maxeon as an Advisor.  *See* LinkedIn, William

16    Mulligan, https://www.linkedin.com/in/bill-mulligan-787160178/.

17        31.    Defendant Strohbecke served as Chief Financial Officer ("CFO") of Maxeon from

18    March 2021 to August 2024.  *See* LinkedIn, Kai Strohbecke, https://www.linkedin.com/in/kai-

19    strohbecke-3087b66/?originalSubdomain=sg.  Strohbecke's departure was announced in

20    Maxeon's Form 6-K Filing on June 6, 2024, which stated that he would leave at the end of

21    August 2024.  Maxeon Current Report (Form 6-K) (June 6,  2024).

22        32.    Mulligan and Strohbecke are sometimes collectively referred to herein as the

23    "Individual Defendants."

24        33.    Maxeon and the Individual Defendants are collectively referred to herein as

25    "Defendants."

26

27

28
                                            9

1    **C.    Relevant Non-Parties**

2    34.    Mark Babcock ("Babcock") served as Chief Revenue Officer of Maxeon from

3    December 2020 to March 2, 2024.  Babcock also served as interim CEO of Maxeon from

4    September 2022 until January 2023.  *See* LinkedIn, Mark Babcock,

5    https://www.linkedin.com/in/markwbabcock/.

6    35.    Peter Aschenbrenner ("Aschenbrenner") serves as Maxeon's Chief Strategy

7    Officer.  He began working at Maxeon on August 26, 2020.  Prior to joining Maxeon,

8    Aschenbrenner served as SunPower's Executive Vice President of Corporate Strategy and

9    Business Development.  *See* Maxeon, Management,

10    https://corp.maxeon.com/management/peter-aschenbrenner (last visited Nov. 8, 2024).

11    36.    Phillipe Querbes ("Querbes") served as Maxeon's Group Treasurer from August

12    2020 until February 2025.  As a Group Treasurer, Querbes was involved with treasury, insurance

13    and credit management matters.  Prior to working at Maxeon, Querbes served as the "Group

14    Controller" for SunPower, where he performed primarily the same functions from approximately

15    July 2012 to July 2020.  *See* LinkedIn, Phillipe Querbes, https://www.linkedin.com/in/philippe-

16    querbes/?locale=fr_FR (last visited May 23, 2025).

17    **D.    Confidential Witness**

18    37.    Confidential Witness One ("CW-1") was employed at Maxeon as a Senior

19    Manager of Project Finance from December 2022 to January 2024.  Within this role, and at all

20    relevant times during CW-1's employment, CW-1 was as a member of the Company's Treasury

21    Team and had direct dealings with Mulligan, Strohbecke and Babcock.  CW-1 had one-on-one

22    interactions with Strohbecke and communicated with Mulligan in group settings such as

23    meetings amongst leadership.  Strohbecke was included "on all correspondences" regarding the

24    various matters CW-1 worked on.  As a Finance Project Lead, CW-1 had considerable and

25    unique visibility to the Company's "financials and corporate strategy" and spent their career

26    reading financial statements.  CW-1 was also involved in credit underwriting, raising capital

27    through debt and equity for "infrastructure projects," and going to lenders to get extensions to

28

Maxeon's credit facilities.[4]  CW-1 was also involved in developing all of the financial aspects of Maxeon's efforts to build a manufacturing plant in Albuquerque, New Mexico including its "credit application" for the DOE loan.

## FACTUAL ALLEGATIONS

### A.    Background Of Maxeon And Its Businesses

38.    Maxeon is a solar power energy company that designs, manufactures, markets and sells a comprehensive portfolio of photovoltaic solar panels and related components worldwide. Compustat Company Research, S&P Global Market Intelligence (Jan. 5, 2023).

39.    Initially operating as a division of public company SunPower, Maxeon completed a strategic spinoff transaction in 2020, forming its own separate entity to "fine tune" its focus and jointly "serve commercial and residential customers with a comprehensive solution combining [its] industry-leading equipment and software." *From Strengths to Strengths*, Tom Warner, https://us.sunpower.com/blog/sunpower-maxeon-spinoff, (last visited Oct. 31, 2024).

40.    The spin-off brought Maxeon public and it began trading on the NASDAQ exchange on August 26, 2020, under the ticker symbol MAXN.

41.    The Company operates through two segments—its DG and Utility-Scale businesses.

42.    Once considered Maxeon's "namesake," its DG business provides solar panels and energy solutions for smaller and decentralized power generation applications such as residential, community and commercial applications that offer higher efficiency and reduced degradation rates.  UBS, Initiation of Coverage 13 (Oct. 2, 2023).  Maxeon's DG business has consistently made up the large majority of Maxeon's year-over-year revenue.  For example, it accounted for 84.9% of its revenue for the fiscal 2022 year.  Maxeon, Annual Report 48 (Form 20-F) (May 30, 2024).

---

[4]    Credit facilities are loans that allow a business to take out money over an extended period of time.  James Chen, *What Is a Credit Facility, and How Does It Work*, Investopedia (Sept. 10, 2023), https://www.investopedia.com/terms/c/creditfacility.asp.

**SECOND AMENDED CLASS ACTION COMPLAINT**
**Case No. 3:24-cv-03869-EMC**

43.    The other sector of Maxeon's business—its "Utility-Scale" business—provides support for large solar power plants that produce electricity for the utility grid and, in turn, distributes electricity to end customers.

**B.    Maxeon And SunPower**

44.    Following Maxeon's spinoff from SunPower, the pair maintained close ties.  The intention behind the partnership was to leverage the "decade-long partnership" so that each company could operate as its own and leverage its individual strengths, with focused business plans and defined markets.  SunPower, Press Release, *SunPower and Maxeon Solar Technologies Close Spin-Off Transaction* (Aug. 27, 2020).

45.    As relevant here, Maxeon entered into the New Master Supply Agreement with SunPower, effective December 31, 2022, where Maxeon agreed to supply its Maxeon 6 Modules to SunPower for use in residential installations in the United States and Canada.  The New Master Supply Agreement also included exclusivity provisions that prohibited: (a) Maxeon from selling its Maxeon 6 Modules to anyone other than SunPower for use in the residential market in the United States and Canada; and (b) SunPower from purchasing high efficiency modules from anyone other than Maxeon, until December 31, 2024 and, if extended by SunPower, through December 31, 2025.  The New Master Supply Agreement also contained a non-circumvention clause that prevented the parties from dealing with third-parties behind the other's back in contravention of the obligations under the agreement.  SunPower, Press Release, *SunPower and Maxeon Extend Their Current Supply Relationship to Meet Rising Homeowner Demand*, (Jan 5, 2023).

46.    The New Master Supply Agreement provided a significant source of revenue for Maxeon's DG business.  For example, in its August 2023 Form 6-K, Maxeon stated that SunPower's business "account[ed] for 26.7% of our total revenue and 9.6% of our accounts receivable as of January 1, 2023" and for "the six months ended July 2, 2023, $151.0 million or 22.7% of [Maxeon's] revenue represented sales of solar modules to SunPower."  Maxeon Current Report (Form 6-K) 8 (Aug 10, 2023).

47.     In mid-2023, however, the relationship started to sour.  Maxeon became enmeshed in a contract dispute with SunPower wherein Maxeon alleged SunPower was withholding approximately $29 million in past due invoices and SunPower alleged that Maxeon was in breach of the New Master Supply Agreement's non-circumvention clause by attempting to sell products directly to SunPower's customers.  As a result, Maxeon ceased shipments of its products to SunPower in July 2023.

48.     In light of its dispute with SunPower, which the Company claimed it intended to resolve "swift[ly,]" Maxeon updated its revenue guidance from $1.35 billion to $1.25 billion and its adjusted EBITDA guidance from $100 million to $80 million.  Q2 2023 Earnings Call (Aug. 10, 2023).

49.     On November 15, 2023, Maxeon disclosed that it had settled the dispute with SunPower.  Maxeon, Current Report, Amendment, Settlement, and Release Agreement (the "Settlement Agreement") 2 (Form 6-K) (Nov. 15, 2023).  The Settlement Agreement terminated the New Master Supply Agreement and provided that SunPower would pay $2,351,173.01 for set-offs against Maxeon outstanding unpaid invoices and that SunPower would "purchase 85 MW of IBC panels at contracted pricing through February 2024 and to post a $30 million payment security bond."  *Id.* at 3; Maxeon, Current Report, Press Release (Form 6-K) (Nov. 15, 2023).  All told, with the set-off payment and purchases, the Settlement garnered Maxeon about $34 million.  *See* Form 6-K, Ex. 99.2 at 3 (Dec. 5, 2024) (stating that Maxeon received $31.4 million for the period ending September 2024 which represented the remaining volume committed under the SunPower settlement agreement).  The deal also provided that Maxeon would receive SunPower warrants to purchase shares of SunPower's common stock beginning on January 1, 2024.  Maxeon, Current Report (Form 6-K) (Nov. 15, 2023).

C.     **Market Headwinds Facing The Solar Panel Industry**

50.     In addition to the breakdown of its relationship with SunPower, Maxeon was facing numerous headwinds that were plaguing the solar panel industry in 2022 and early 2023.

13

51.     First, the Federal Reserve rapidly increased interest rates beginning in 2022 and continuing into 2023, making it more financially burdensome for homeowners to purchase solar panels outright.  This was particularly true where the costs of solar panels had traditionally been very expensive and largely reliant on government subsidies to drive its demand.  Consequently, overall sales of solar modules to homeowners became a greater challenge.  Jon Reed, *See High Interest Rates Are Making Solar Leases More Appealing*, https://www.cnet.com/home/energy-and-utilities/high-interest-rates-are-making-solar-leases-more-appealing/, (last visited Nov. 8, 2024).

52.     Second, notable policy changes also disincentivized solar panel users from purchasing solar panels.  In April 2023, California Public Utilities Commission put into effect a rooftop solar rule entitled "NEM 3," shorthand for "net energy metering."  Under NEM 3, solar users who submitted interconnection applications after April 14, 2023 received 75% to 80% less utility for the extra solar energy they share with the grid.  As a result, compensation for the extra energy went from $.30/kilowatt-hour ("kWh") to around $.05/kWh.  Because solar shoppers saw less return on their generated solar power, there was inherently less incentive to purchase solar panels.  CNET, *After a Tumultous 2023, What's Next For Rooftop Solar*, https://www.cnet.com/home/energy-and-utilities/after-a-tumultuous-2023-whats-next-for-rooftop-solar/.

53.     California consistently ranks first in the United States for total installed solar capacity and total solar installed, so NEM 3 was a blow to the solar industry and specifically Maxeon who, according to CW-1, stated that the law's passage meant Maxeon's revenues would be reduced upwards of 75% in the California market.  *See* SEIA, California State Solar Overview, https://seia.org/state-solar-policy/california-solar/, (last visited Oct. 29, 2024).

54.     Adding to an already unideal market, excess production capacity and an oversupply of Chinese solar products triggered new lows for prices in the solar power supply chain in 2023 and into 2024:

**SECOND AMENDED CLASS ACTION COMPLAINT**
**Case No. 3:24-cv-03869-EMC**

China Solar Value Chain Prices in 2023-2024

Opis-A Dow Jones Company, *Oversupply In China Weighs On Prices Across The Solar Value Chain*, Serena Seng and Summer Zheng, (Mar, 8, 2024); UB Investment Bank, *Near-term Risks with long-term reward; Initiate Neutral*, at 6, William Grippin and Jon Windham (Sep. 23, 2023).

55.    The oversupply of Chinese solar products created a "significant supply glut" worldwide causing module prices to drop and solar companies to cancel or suspend their production capacity.  S&P Global, *World stuck in major solar panel 'supply glut'; module prices plummet: IEA*, Alex Blackburne (Jan. 12, 2024); Reuters, *China solar industry faces shakeout, but rock-bottom prices to persist*, Andrew Hayley (Apr. 3, 2024).

> **D.    Maxeon's First U.S. Manufacturing Facility In New Mexico And The DOE Loan**

56.    Prior to and during the Class Period, Maxeon had publicized its intent to grow both its Utility-Scale and DG businesses through its proposed "new world-class, 3 gigawatt facility" on a greenfield site in Albuquerque, New Mexico to produce the "latest-generation TOPCon PV-silicon cell technology and the Company's proprietary shingled-cell Performance Line solar modules to meet rapidly growing demand for domestically produced solar panels." Maxeon, Press Release, *Maxeon Solar Technologies Selects Albuquerque, New Mexico as Site for New 3-Gigawatt Solar Cell and Panel Manufacturing Facility* (Aug. 10, 2023).  The project would create the Company's first United States manufacturing plant and was expected to upsize the scale of Maxeon's manufacturing operation by "50%."  *Id.*

57.     The prospect of a new large manufacturing plant excited Defendants.  For example, Mulligan announced he was "super excited about getting th[e] project up and running" and expressed the "meaningful[]" "contribut[ion]" it would provide Maxeon over the coming years.  Q2 2023 Earnings Call (Aug. 10, 2023).  Indeed, an analyst from Goldman Sachs reported that the "value proposition" for Maxeon's New Mexico facility was "strong" because it "enables assurance of supply as well as domestic content" and "will drive demand across US utility scale."  Goldman Sachs, Equity Research, 29, (Jan 23, 2024).  As a result, the analyst gave Maxeon a "buy" rating.[5]  In the latter half of 2023, Maxeon received approval for approximately $2.4B in Industrial Revenue Bonds ("IRBs") to fund the development and buildout of its proposed New Mexico facility.  *See* Matthew Narvaiz, *Albuquerque Development Commission recommends $2.4B in IRBs for Maxeon Expansion*, Albuquerque Journal (Oct. 20, 2023) ("Albuquerque J. IRB Article").  IRBs are tax-exempt municipal debt securities issued by a government agency on behalf of a private sector company intended to finance the buildout or acquisition of factories or similar structures.  James Chen, *Industrial Revenue Bonds: What They Are and How They Work*, Investopedia (Aug. 25, 2024), https://www.investopedia.com/terms/i/idrb.asp.  Oftentimes, IRBs are issued to assist a company that might otherwise be unable to obtain financing for its industrial venture.  *Id.*  The proceeds from the bond are typically used to fund the acquisition, construction/reconstruction, expansion or improvement of the property.  *Id.*  To be clear, Maxeon was not set to receive $2.4 billion from Albuquerque.  Rather, the bonds provide tax breaks.  *See* Albuquerque J. IRB Article.

58.     According to Maxeon's application for the IRBs, the $2.4B in IRBs were to be capitalized in accordance with the following capital structure:

- Applicant Equity Investment - $422,000,000

---

[5]     A "buy" rating is a recommendation to purchase a specific security, demonstrating the belief that there is significant growth potential.  Rick Wayman, *Stock Ratings: The Good, The Bad, and the Ugly*, Investopedia (Feb. 20, 2025), https://www.investopedia.com/articles/analyst/03/012103.asp#:~:text=A%20buy%20rating%20is%20a,or%20has%20significant%20growth%20potential.

- External Equity Investment - $250,000,000
- **Department of Energy Title 17 Loan - $1,207,000,000**
- Other Loans - $544,000,000

City of Albuquerque, Twenty Fifth Council, Bill No.: O-23-90, Albuquerque, NM, Albuquerque Development Commission Industrial Revenue Bond Hearing 12 (Oct. 3, 2023) (emphasis added), https://cabq.legistar.com/View.ashx?M=F&ID=12406605&GUID=524834B9-CFE5-4943-A5CA-E3A0DEDBF44D (page 26 of pdf).

59.     Thus, Defendants were relying primarily on the massive loan from the DOE to fund the project.  *Id.*; *see also* Maxeon, Press Release, *Maxeon Solar Technologies Selects Albuquerque, New Mexico as Site for New 3-Gigawatt Solar Cell and Panel Manufacturing Facility* (Aug. 10, 2023).

60.     As an analyst with Raymond James put it, the DOE loan was "expected to cover 40-70% of the 'total project investment', a broad definition that encompasses capital spending, insurance, leases, and working capital."  Pavel Molchanov, *Roadshow Recap: DOE Lean Process, SunPower Dispute, DG Business Headwinds*, Raymond James, US Research (Aug. 16, 2023).  As a result, this analyst, and the market at large, was keeping a close eye on where Maxeon stood with respect to the approval of its DOE loan.  *Id.*

61.     Additionally, New Mexico Partnership President and CEO Melinda Allen stated that the Albuquerque facility "highlights how New Mexico's investments in clean energy and manufacturing have built an ideal business environment for companies like Maxeon."  Ryan Boetel, *Maxeon Deal Gets Top Honors From Site Selection Magazine*, Albuquerque Journal (May 3, 2024).

62.     A condition precedent to obtaining the DOE Loan was "pledg[ing] collateral or surety determined by DOE to be necessary to secure the repayment of the Guaranteed Obligations" which could include such "Eligible Project assets and assets not related to the Eligible Project."  10 CFR 609.8(b)(7).  According to CW-1, who worked on the "credit

1    application" for the DOE loan, the DOE wanted Maxeon to buy the land for the facility so that it

2    could be used as a security interest.

3         63.    This presented a challenge for Maxeon because according to CW-1, Maxeon did

4    not have enough cash to independently develop the New Mexico facility.  Maxeon would

5    therefore need to look externally for financing.  Notably, Maxeon told the City of Albuquerque

6    that it would not use proceeds from the IRBs to acquire land.  *See* City of Albuquerque, Twenty

7    Fifth Council, Bill No.: O-23-90, Albuquerque, NM, Application for Industrial Revenue Bond

8    Project Approval 6,

9    https://cabq.legistar.com/View.ashx?M=F&ID=12406605&GUID=524834B9-CFE5-4943-

10    A5CA-E3A0DEDBF44D (page 29 of pdf).

11         64.    One potential source of financing was Maxeon's largest shareholder—Chinese-

12    owned TZE.  However, Defendants knew that obtaining funds from TZE to finance a greenfield

13    purchase for a new facility in the energy sector could jeopardize obtaining the DOE loan for the

14    Albuquerque project as it had been described to investors.  For one thing, TZE is partially owned

15    by China and the DOE has classified China as a "foreign entity of concern" under its

16    Interpretative Guidance and disfavored providing loans to companies under such foreign

17    influence.  *See* 42 U.S.C. 18741(a)(5); Program Guidance for Title 17 Clean Energy Financing

18    Program, at 46 (May 19, 2023) ("As DOE invests in critical infrastructure and funds the

19    deployment and manufacturing of critical technology areas, DOE considers risks of undue

20    foreign influence.  If high risks are identified and cannot be sufficiently mitigated, DOE may

21    elect to not provide a loan guarantee to the applicant.").

22         65.    Indeed, CW-1 stated that the DOE had already been "very concerned" by the

23    extent of TZE's large ownership interest in and control of Maxeon.  The DOE was so concerned

24    with TZE's potential involvement in the New Mexico project that, according to CW-1, the DOE

25    repeatedly told Maxeon in September/October 2023 to "go anywhere else" for more financing.

26    CW-1 conveyed this sentiment to Maxeon's entire leadership team in multiple meetings CW-1

27    had with Strohbecke, Querbes, and Aschenbrenner concerning where Maxeon stood with respect

28     

to the DOE loan process.  Specifically, CW-1 recounted that Maxeon's senior leadership was aware of the DOE's position regarding granting more control to Chinese investors like TZE because CW-1 had led Maxeon's discussion with the DOE and told Querbes, Strohbecke, Ascherbrenner and Mulligan in multiple meetings about the DOE's position.  Indeed, some of these individuals had been in meetings with the DOE in which the DOE had expressed its position.  For instance, the executives had asked in meetings with the DOE if by imposing "ring-fencing" around aspects of Maxeon's operations and intellectual property they could obtain more Chinese financing and were "told absolutely not."

### E.   Maxeon's Lenders Express Serious Concerns To Defendants About Maxeon's Future Operations

66.   Prior to and during the Class Period, Maxeon also sought financing from its lenders, including Standard Chartered Bank, Bank of China, and others, to extend its credit lines. According to CW-1, these lenders expressed concern prior to November 2023 about Maxeon's viability to continue as a going concern and its ability to repay what it owed because of the Company's overall financial condition when it sought financing from them and its status as a de facto start-up without a lengthy operating history.  Not only were "a lot" of the lender's financing options presented to Strohbecke and Mulligan, but CW-1 conveyed the lender's concerns about Maxeon's business to each Defendant directly.

67.   According to CW-1, lenders' concerns about Maxeon's financial situation were so great that the only way Maxeon could get a line of credit extension from them was to obtain "parent company guaranties" or "shareholder guarantees" around September/October 2023. CW-1 conveyed this information to Defendants.

68.   A "shareholder" or "parent-company" guarantee is a financial obligation undertaken by a shareholder of a company (typically one who owns a larger percentage of shares) to guarantee the performance of the purchaser's obligations if the vendor is concerned that the purchaser will not have sufficient assets to pay the purchase price.  Guarantee, WestLaw,

1  https://content.next.westlaw.com/practical-

2  law/document/I188aab28f92311e498db8b09b4f043e0/Guarantee?viewType=FullText&transitio

3  nType=Default&contextData=(sc.Default)&bhcp=1 (last visited May 27, 2025).

4      69.    Because TZE was Maxeon's largest shareholder at the time, it was more likely

5  than not that the Company would have to turn to Chinese-owned TZE to obtain the needed

6  guarantee for the credit extension.

7      70.    CW-1 knew the struggles Maxeon faced extending its lines of credit because CW-

8  1 spent several months prior to the beginning of the Class Period attempting to do so with the

9  Bank of China and another bank in Malaysia, neither of which were interested because of

10  Maxeon's precarious financial situation.  CW-1 informed Defendants of the failed attempts to

11  extend the Company's lines of credit.

12      71.    CW-1 also claimed that TZE made it clear to Strohbecke, who had been "leading

13  the talks with T[ZE] for additional liquidity" that as a condition to providing Maxeon with more

14  financing, TZE would need "an increased level of control over Maxeon."  CW-1 believed that

15  the more money Maxeon asked of TZE, the more TZE would ask to increase its holdings

16  therefore increasing the level of control it had over Maxeon, which CW-1 believed would cause

17  the New Mexico project to "die" given the DOE's position on China.

18      72.    Things did not improve by January 2024, either.  At that point, CW-1 stated, in

19  CW-1's view Maxeon's financial outlook was not viable and the company was "dead in the

20  water" because of its ongoing difficulties getting extensions to its credit facilities.

21      **F.    Maxeon Nonetheless Reassures The Market About Its Liquidity Position**

22      73.    On November 15, 2023, the first day of the Class Period, Mulligan acknowledged

23  that the challenges addressed in § C, *supra*, produced a "very challenging environment[,]" but

24  noted that these conditions were neither "unique" nor "unprecedented."

25      74.    To reassure investors about Maxeon's current financial and operational condition

26  and future prospects, despite Defendants' knowledge of the severe negative financial situation

27

28

1    Maxeon faced, on November 15, 2023, Strohbecke announced that "we are in a good position to

2    generate sufficient cash and maintain sufficient cash levels for our existing business."

3    Defendants also disclosed in a Form 6-K filed with the SEC that day that they believed

4    Maxeon's "current cash, cash equivalents, along with [the] cash expected to be generated from

5    operations w[ould] be sufficient to meet [its] obligations over the next 12 months."  Maxeon,

6    Current Report, Ex. 99.2 at 14 (Form 6-K) (Nov. 15, 2023).

7        75.    Mulligan also touted Maxeon's unique positioning to become a "leader in helping

8    reshore advanced solar cell and panel manufacturing to the United States at meaningful scale."

9    Mulligan highlighted the fact that the Company was "working intensively with the U.S.

10   Department of Energy's loan program office to finance a 3.5 gigawatt solar cell and panel

11   factory in Albuquerque."  Q3 2024 Earnings Call (Nov. 15, 2023).

12       76.    However, as explained above, and as Defendants knew (or were reckless in not

13   knowing), the Company's cash and liquidity position had been deteriorating since May or June

14   of 2023, and lenders were refusing to extend Maxeon's credit facilities without the highly

15   problematic shareholder guarantee.  Even with that guarantee, no other bank besides SCB was

16   willing to extend its credit facilities.   And because of these issues, Maxeon's ability to obtain the

17   DOE loan and therefore follow through with the development of its manufacturing facility in

18   Albuquerque that it had announced was significantly jeopardized.

19       77.    Additionally, Defendants knew, but failed to disclose to investors, that it would

20   reach the peak of its utility-scale prepayment amortization schedule in or before the first quarter

21   of 2024.  Prepayment amortization is an accounting process that recognizes the expense of an

22   asset—*i.e.*, the solar panels to be shipped—that was paid for in advance over the specific period

23   of time in which the prepayment is used.  Dokka, *Amortization of Prepaid Expenses*,

24   https://dokka.com/glossary/amortization-of-prepaid-expenses/ (last visited May 27, 2025).

25       78.    Specifically, Maxeon enters a contract with customer, who makes a cash

26   prepayment based on the contract's terms.  The prepayment is recorded as a contract liability on

27   the balance sheet and added to net income on the cash flow statement.  As modules are delivered

28

to the customer, the liability is amortized and the amortized amount is then reflected as a revenue entry on the income statement.  In the period that revenue is recognized, Maxeon must subtract that revenue from the cash flow statement since the cash was received at an earlier time (*i.e.*, the contract liabilities on the cash flow statement are the net of new customer pre-payments and the reduction of old cash prepayments associated with current revenue).

79.     Prepayments must be amortized to avoid overstating revenue during the period the prepayment is received before the expense associated with the transaction can be realized in the period in which the performance is completed.  ***Reaching the peak of this schedule meant that no cash would be coming in***—*i.e.*, all the prepayments had been paid.

80.     Thus, while it may have been true that Maxeon technically experienced a "reduction of contract liabilities," as announced at the November 15, 2023 earnings call, Defendants knew this was temporary and would actually result in ***increased contract liabilities*** when it reached its peak in the immediate quarters to come as evidenced by the pre-set amortization schedule written into the Company's Utility-Scale contracts.  In other words, cash flows would be negatively impacted by the pre-scheduled amortization of customer prepayments in the amount of $83 million in Q4 2023 and $67 million in Q1 2024 without corresponding new cash inflows.  *See* Maxeon, Current Report, Ex. 99.2 at 9, 12 (Form 6-K) (May 30, 2024); *see also* Q1 2024 Earnings Call (May 30, 2024).  To put these amounts in perspective, Maxeon's operating expenses (under Generally Accepted Accounting Principles, or GAAP) in those quarters were estimated to be approximately $66.5 million and $113 million, respectively, meaning that the impact of the amortization schedule were huge hits to the Company's cash flows.  Maxeon, Press Release, *Maxeon Solar Technologies Announced Third Quarter 2023 Financial Results* (Nov. 15, 2023).

81.     The cash flow situation created by Maxeon's pre-scheduled amortization schedule therefore conflicted with Defendants' statements about the Company's sufficient cash position because it would serve to exacerbate the Company's ongoing cash flow and liquidity crisis.

82.     This, combined with industry headwinds, the loss of SunPower, and the inability to get funding from lenders, set the stage for an increasingly serious cash flow and liquidity crisis and jeopardized Maxeon's ability to proceed with the greenfield 3-gigawat facility acquisition. Things only got worse when, unbeknownst to investors, Maxeon was informed early in the first quarter of 2024 that two of its large Utility-Scale customers were experiencing project delays and "would not be in a position to accept [module] deliveries under" its agreed upon contract with Maxeon. This left Maxeon without the expected cash from these deals and unused inventory, the costs of which they were forced to absorb. One of these customers was Origis. Based on a review of Maxeon's public filings, the Origis contract was worth approximately $144-$187 million, calculated as follows. On March 17, 2022, Maxeon entered into a supply agreement with Origis to sell approximately 400 MW which would be delivered beginning June 2023. Form 6-K, Mar. 17, 2022, at 2. Approximately 30% of the total supply agreement was to be given to Maxeon as a prepayment with half of that amount, *i.e.*, 15% of the total amount, made in March 2022 and the other half, *i.e.*, the remaining 15% of the 30%, to be paid in December 2022. *Id*. The Second Quarter 2022 Outlook, when the supply agreement was entered into, projected revenue to be approximately $215-230 million for 460-490 MW shipments, which would be approximately $467-469 thousand per MW. Form 6-K, May 26, 2022, at 1. The Third Quarter 2023 Outlook, when the first deliverables were to be made, projected revenue to be approximately $220-260 million for 610-650 MW shipments, which would be approximately $360-400 thousand per MW. Form 6-K, Nov. 15, 2023, at 7. Thus, the Origis contract for 400 MW was worth approximately $360-$400 thousand per MW, or $144-187 million total.

83.     Maxeon's financial condition deteriorated so significantly that in March 2024, SCB downgraded the facility limit for Maxeon's revolving credit agreement from $50M to $25M. Maxeon, Annual Report 50 (Form 20-F) (May 30, 2024). Shortly thereafter, in April 2024, SCB even requested that Maxeon maintain cash deposits equal to the amount of credit facility utilized and deposit funds equal to twice the credit utilized for any new draws. *Id*.

84.     Nonetheless, despite  cash flow and liquidity situation described above (called "dead in the water" by January 2024, according to CW-1, because of the Company's financial outlook and inability to get additional extensions on its lines of credit), Maxeon gave the market the false and misleading impression that everything was under control, touting that it was "highly focused on…liquidity management," consistent with Defendants' earlier Class Period statements that they were "laser-focused on cash management" and had a "continued focus on working capital management."

85.     On April 8, 2024, Defendants also addressed the Company's plans to beef up its manufacturing capacity, in part, through its plans to develop a "manufacturing facility in Albuquerque."  However, Defendants failed to mention that Maxeon's undisclosed cash flow and liquidity crisis and its inability to obtain credit extensions absent shareholder guarantees would significantly jeopardize, if not outright prevent, the Company from obtaining the DOE loan needed to finance the Albuquerque facility.

86.     Following its April 8, 2024 press release, Maxeon filed a Form NT 20-F on April 30, 2024, disclosing that it would need "additional time to complete its financial statement preparation and review process" given "the additional ongoing work required in connection with the assessment of the Company's ability to continue as a going concern," again failing to disclose with certainty Maxeon's then-ongoing and known cash flow and liquidity crisis.

87.     But this was not the reality Maxeon was facing.  As the numbers would later make clear to the market, Maxeon's cash flow and liquidity had already become a major issue as early as 2023 and worsened in 2024.  Specifically, the Company's cash position was deteriorating as Maxeon suffered a net loss of over $275 million in 2023, amounting to a total cash flow of negative $254.3 million by the end of that fiscal year, and then suffered an additional $80.1 million loss, in the first three months of 2024.  Maxeon, Annual Report 75 (Form 20-F) (May 30, 2024); Maxeon, Press Release 1 (Form 6-K) (May 30, 2024).

1

**G.    Revelation Of Maxeon's Struggles And Restructuring**

2

88.    The market was shocked when the truth about Maxeon's struggles, including its

3

liquidity crisis, were revealed to the market on May 30, 2024.

4

89.    Maxeon's liquidity is dependent in part on its cash flow; if cash flow decreases,

5

then Maxeon's ability to invest and meet ongoing operational obligations are negatively

6

impacted.  Maxeon, Annual Report 6 (Form 20-F) (May 30, 2024).  Cash flow is therefore

7

critical in determining a company's ability to remain functional.  *Id.*

8

90.    On May 30, 2024, Mulligan also revealed that the Company "has been facing a

9

serious cash flow challenge[,]" with total operating cash flow for the fourth quarter of 2023 at

10

negative $76 million followed by a negative operating cash flow of $73 million during the first

11

quarter of 2024.  Q1 2024 Earnings Call (May 30, 2024).

12

91.    During the call, Strohbecke also acknowledged the negative impact market

13

conditions had on Maxeon's liquidity position.  *Id.*

14

92.    The Company also disclosed specifics about the unfavorable condition of its

15

working capital[6] in its May 30, 2024 20-F filing, stating that:

16

17
The unfavorable working capital movement arose from a ***net utilization of $55.1 million of contract liabilities, mainly from advance collections from customers for certain sale contracts,*** a decrease of $97.7 million in accounts payable and other accrued liabilities due to timing of settlement of invoices, an increase in inventories of $43.5 million, increase in accounts receivables of $8.3 million, primarily attributable to billing and collection cycles.

18

19

20

Maxeon Annual Report (Form 20-F) 75-76 (filed May 30, 2024).

21

22

23
[6]    Working capital is the money available to fulfill short-term expenses—*i.e.*, the difference

24
between current assets (including cash and cash equivalents) and current liabilities—whereas cash flow is the net amount of cash and cash equivalents going in and out of a company.  Ryan

25
Furhmann, *What Changes in Working Capital Impact Cash Flow?*, Investopedia, https://www.investopedia.com/ask/answers/071114/how-do-changes-working-capital-affect-

26
companys-cash-flow.asp (last visited Nov. 7, 2024).  Thus, changes in working capital are reflected in cash flow—*i.e.*, Operating Cash Flow = Operating Income + Non-Cash Expenses -

27
Taxes + Changes in Working Capital.  *Id.*

28

93.    The Company's financial crisis was so bad that Maxeon revealed it had "negotiated commitments for significant liquidity support from [its] largest shareholder TZE" through a dilutive offering at its Q1 2024 Earnings Call dated May 30, 2024.

94.    Moreover, during the same Earnings Call, Mulligan announced:

> TZE has agreed to invest ***$97.5 million into the company via a debt investment and has committed to an additional $100 million equity investment*** . . . . In addition, substantially all of the holders of the $200 million 2025 convertible notes have agreed to exchange their bonds and accrued interest into new bonds due in 2028, which are convertible into equity at the noteholders' option starting July 2nd and $137.2 million of which must be converted into equity upon TZE's equity investment. ***While we believe these transactions are necessary to stabilize our balance sheet and allow management to focus on returning our business to profitability***, they will also result in a substantial dilution for existing public shareholders.

Q1 2024 Earnings Call (May 30, 2024)

95.    In addition to share dilution, TZE's takeover also complicated the Company's operational prospects further, particularly as it related to obtaining a DOE loan for Maxeon's "first U.S. manufacturing expansion" in New Mexico that was expected to provide long term meaningful contributions for Maxeon and the energy sector at large.  Maxeon, Press Release, Maxeon Solar Technologies Selects Albuquerque, New Mexico as Site for New 3-Gigawatt Solar Cell and Panel Manufacturing Facility, (Aug 10, 2023).  As one Roth Capital Partners' analyst report put it: "[w]ith a majority of the company now owned by a Chinese entity, the new [capital] raise calls into question [Maxeon's] ability to secure the DOE loan for its New Mexico facility."  Roth MKM (May 30, 2024).

96.    On this news, the share price fell sharply from a close of $3.11 on May 29, 2024 to $2.03 on May 30, 2024, and closed at $1.88 on May 31, 2024, representing a cumulative a drop of 39.55%.

I.    **DEFENDANTS' CLASS PERIOD MATERIAL MISREPRESENTATIONS AND OMISSIONS**

A.    **Defendants' November 2023 Misrepresentations**[7]

97.    The Class Period begins on November 15, 2023, when Maxeon held an earnings call ("November 2023 Earnings Call") to announce its financial and operating results for the third quarter of 2023. At the earnings call, Defendants made materially misleading statements about Maxeon's Utility-Scale business. Specifically, Strohbecke stated that:

> Cash levels were also impacted by lower shipments and margin dollars from our global DG business, the reduction of contract liabilities related to our US utility scale business capital expenditures during the quarter, restructuring expenses and a reduction in short term debt.
>
> ***
>
> So we think that with the current cash balance that we have and all these measures that we talked about during the call and in the prepared remarks, that ***we are in a good position to generate sufficient cash and maintain sufficient cash levels for our existing business***.

98.    The same day as its Q3 earnings call, Maxeon submitted its quarterly report for the period ended October 1, 2023, in a Form 6-K filed with the SEC ("November 2023 6-K"). The November 2023 6-K was signed by Strohbecke. Appended as Exhibit 99.2 to the November 2023 6-K were the financial results for the third quarter of 2023, which stated the following about the Company's liquidity:

> **Liquidity and Capital Resources**
>
> ***Current Sources of Liquidity and Capital Resources***
>
> As of October 1, 2023, we had unrestricted cash and cash equivalents of $208.1 million, restricted cash of $9.2 million and short-term securities representing a 6-months time deposit of $60.0 million as compared to $227.4 million of unrestricted cash and cash equivalents, $40.5 million of restricted cash and short-term securities representing a 4-month time deposit of $76.0 million as of January 1, 2023.

---

[7]    In sections I.A-B, bold and italicized text indicates what statements are alleged to be false and/or misleading. They are shown in context.

* * *

**Anticipated Sources of Funds**

***We believe that our current cash, cash equivalents, along with cash expected to be generated from operations will be sufficient to meet our obligations over the next 12 months.***

99.     The statements referenced in ¶¶ 97-98 were materially false and misleading when made because Defendants knowingly and/or with deliberate recklessness failed to disclose and/or misrepresented the following:

(a)     that Maxeon was at or nearing the peak of its prepayment amortization schedule for its Utility-Scale contracts;

(b)     that, as a result of the foregoing, less cash would be coming in in the near term, which risked materially undermining its ability to continue as a going concern absent liquidity support;

(c)     lenders had expressed concern about Maxeon's ability to continue as a going concern by at least September or October 2023, and as a result refused to extend lines of credit absent guarantees from the Company's largest shareholders;

(d)     as a result of the above negative financial and operational developments, it was highly unlikely that Maxeon could obtain the DOE loan to fund the 3-gigawatt facility through the Albuquerque greenfield acquisition Defendants had touted; and

(e)     as a result of the above, Maxeon likely would have to obtain financing from its largest shareholder, TZE, which would further jeopardize obtaining the DOE loan and the Albuquerque greenfield acquisition.

100.     During the November 2023 Earnings Call, Defendants discussed the Albuquerque facility and the DOE loan.  Mulligan stated:

The U.S. utility-scale market is a key focus for us in our primary growth driver. With our existing North America utility-scale supply chain reaching improved

operating efficiency and profitability milestones in our planned New Mexico factory entering the engineering and design stage.

We believe that Maxeon is positioned to be a leader in helping reshore advanced solar cell and panel manufacturing to the United States at meaningful scale. ***Towards this end, we are working intensively with the U.S. Department of Energy's loan program office to finance a 3.5 gigawatt solar cell and panel factory in Albuquerque. This capacity represents an increase of 500 megawatts compared with our original design. We cite preconstruction work well underway. We've hired a general manager for the facility and that secured options on adjacent parcels to allow for future capacity expansion.***

***In order to accelerate and derisk the ramp of our U.S. factory, we plan to install a TOPCon pilot line in our existing Fab 3 in Malaysia and expect this line to be up and running next year well ahead of the anticipated factory ramp in Albuquerque. We expect this pilot line will provide valuable process development experience and serve as a training platform for [indiscernible] technology transfer to our U.S. factory.***

***Finally, we are advancing well in negotiations for multiple offtake agreements, which we plan to execute prior to the closing of the DOE loan.***

101.    Strohbecke also stated during the November 2023 Earnings Call:

Fourth quarter capital expenditures are projected to be in the range of $10 million to $20 million, a majority of which is planned for our Maxeon 7 ramps and initially preparatory spending for our Albuquerque site. While this initial CapEx for the U.S. facility may be bridged by our balance sheet, ***the expectation is that we will secure the majority of capital needed to build the facility in the months ahead from the DOE and customer co-investments***.

102.    In response to analysts' questions during the same earnings call regarding customer co-investments in the New Mexico facility, Strohbecke responded:

[Analyst]: … I think, Kai, you mentioned during your prepared remarks, you alluded to some customer co-investments as it relates to the New Mexico facility. Can you maybe elaborate a little bit on that? What kind of discussions are you having? What sort of the magnitude you could potentially expect if you see those come to fruition? And then time-wise, is it right ahead of construction? Or what sort of -- what should we be thinking about as we look to that potentially being a cash in source?

[Strohbecke]: Yes. It's something, Brian, that we have talked about pretty consistently actually as the two main pillars of our financing of the U.S. manufacturing side, which are the DOE loan and customer co-investments. Customers are very, very excited about that new facility, and we've been in touch with them and discussing all these things that you just mentioned around volumes, pricing, timing, terms and conditions and so on. We're not in a position right now where we would disclose the details. ***But I think suffice it to say that these things***

***have to come together, the DOE loan and the customer co-investments as the two main pillars of that financing and both of these items are <u>on track</u>.***

103.    In the November 2023 6-K, Maxeon and Strohbecke also affirmatively put into play Maxeon's plans to develop its manufacturing facility in Albuquerque, stating that:

> ***We have recently announced on our plan to re-engineer our Maxeon line manufacturing capacity****…. We will also begin preparations to install a TOPCon solar cell pilot line in our Malaysia manufacturing facility **ahead of the start-up of our planned manufacturing facility in Albuquerque, following our site selection that took place in August 2023***.

Nov. 2023 6-K, Ex. 99.2 at 3.

104.    The statements referenced in ¶¶ 100-03 were materially false and misleading when made because Defendants knowingly and/or with deliberate recklessness failed to disclose and/or misrepresented that funding for the Albuquerque facility was in serious jeopardy because of the following:

(a)    Maxeon was at or nearing the peak of its prepayment amortization schedule for its Utility-Scale contracts;

(b)    that, as a result of the foregoing, less cash would be coming in in the near term, which risked materially undermining its ability to continue as a going concern absent liquidity support;

(c)    lenders had expressed concern about Maxeon's ability to continue as a going concern by at least September or October 2023, and as a result refused to extend lines of credit absent guarantees from the Company's largest shareholders;

(d)    as a result of the above negative financial and operational developments, it was highly unlikely that Maxeon could obtain the DOE loan to fund the 3-gigawatt facility through the Albuquerque greenfield acquisition Defendants had touted; and

(e)    as a result of the above, Maxeon likely would have to obtain financing from its largest shareholder, TZE, which would further jeopardize obtaining the DOE loan and the Albuquerque greenfield acquisition.

**B.    Defendants' Material Misrepresentations in 2024**

105.    Defendants' misrepresentations continued into 2024 when Maxeon issued a press release on April 8, 2024 ("April 2024 Press Release"), announcing its preliminary financial results for the fiscal year 2023 and first quarter of 2024 and discussing the Company's plans to transform its IBC capacity by providing a balanced portfolio across the U.S utility-scale markets, including through its plans to develop the greenfield in Albuquerque.  The press release included quotes from Mulligan providing that:

> In the fourth quarter, Maxeon delivered financial results largely in line with our expectations.  Our U.S. utility-scale business accounted for the majority of revenues in the fourth quarter, with stable ASPS.

*      *      *

> The Maxeon team is highly focused on reducing manufacturing costs, OPEX rationalization and ***liquidity-management to enable a return to profitability***. Our strategy continues to be to focus on designing and building premium, differentiated products and delivering a superior customer experience across a balanced portfolio of global DG and U.S. utility scale markets. The Company plans to file its annual 20-F report by April 30, 2024.

106.    On April 30, 2024, instead of filing its Form 20-F as promised, the Company filed a Form NT 20-F with the SEC ("2024 NT-20F").  The 2024 NT-20F, signed by Strohbecke, stated that Maxeon would be unable to timely file its 2023 annual report.  It cryptically noted that Maxeon required "additional time to complete its financial statement preparation and review process[,]" and that:

> Factors which have affected the timing of the preparation and review of the financial statements include the additional ***ongoing work required in connection with the assessment of the Company's ability to continue as a going concern***, including the ***ongoing analysis of the Company's strategic options*** with the assistance of external advisors.

107.    The statements referenced in ¶¶ 105-06 were materially false and misleading when made because Defendants knowingly and/or with deliberate recklessness failed to disclose:

(a)    that Maxeon was in the peak of its prepayment amortization schedule of its Utility-Scale contracts;

(b)    Maxeon was informed by two of its large Utility-Scale customers in early Q1 2024 that they were experiencing project delays and would be unable to accept its deliveries under the contract, causing the Company to absorb the costs of unused inventory;

(c)    lenders had expressed concern about Maxeon's ability to continue as a going concern by at least September or October 2023, and as a result refused to extend lines of credit absent guarantees from the Company's largest shareholders;

(d)    that, as a result of the foregoing, Maxeon's cash position had significantly deteriorated, giving rise to a cash flow and liquidity crisis that would inhibit the Company's ability to continue as a going concern absent liquidity support;

(e)    as a result of the above negative financial and operational developments, it was unlikely that Maxeon could obtain the DOE loan to fund the 3-gigawatt facility through the Albuquerque greenfield acquisition Defendants had touted; and

(f)    as a result of the above, Maxeon likely would have to obtain financing from its largest shareholder, TZE, which would further jeopardize obtaining the DOE loan and the Albuquerque greenfield acquisition.

108.    In the April 2024 Press Release, Mulligan is also quoted as stating: "As disclosed in our last earnings call, ***Maxeon has been executing a transformation of our IBC capacity timed to coincide with the current DG market slowdown***. As part of this initiative, we made the decision to ramp down all of our Maxeon 6 capacity faster than we had originally expected, resulting in higher than initially planned restructuring costs in the fourth quarter." This transformation concerned the Albuquerque plant. *See* November 2023 6-K, Ex. 99-2 at 3) ("We

have recently announced on our plan to re-engineer our Maxeon line manufacturing capacity. Instead of expanding capacity of Maxeon 7 products at one of our Philippines cell manufacturing facilities that is currently not in use, we will convert our legacy Maxeon 3 capacity in the Philippines to Maxeon 7 technology. We are currently in the process of making the necessary preparations for such a conversion and have reserved a portion of our 2023 planned capex for that purpose. The cell manufacturing facilities that are currently not in use are planned to be utilized for the sale-up of our next-generation Maxeon 8 technology. We will also begin preparations to install a TOPCon solar cell pilot line in our Malaysia manufacturing facility ahead of the start-up of our planned manufacturing facility in Albuquerque, following our site selection that took place in August 2023.").

109.    The statements referenced in ¶ 108 were materially false and misleading when made because Defendants knowingly and/or with deliberate recklessness failed to disclose:

(a)    that Maxeon was in the peak of its prepayment amortization schedule of its Utility-Scale contracts;

(b)    Maxeon was informed by two of its large Utility-Scale customers in early Q1 2024 that they were experiencing project delays and would be unable to accept its deliveries under the contract, causing the Company to absorb the costs of unused inventory;

(c)    lenders had expressed concern about Maxeon's ability to continue as a going concern by at least September or October 2023, and as a result refused to extend lines of credit absent guarantees from the Company's largest shareholders;

(d)    that, as a result of the foregoing, Maxeon's cash position had significantly deteriorated, giving rise to a cash flow and liquidity crisis that would inhibit the Company's ability to continue as a going concern absent liquidity support;

(e)    as a result of the above negative financial and operational developments, it was unlikely that Maxeon could obtain the DOE loan to fund the 3-gigawatt facility

through the Albuquerque greenfield acquisition Defendants had touted and thus the "transformation of [its] IBC capacity" was in jeopardy as well; and

(f)    as a result of the above, Maxeon likely would have to obtain financing from its largest shareholder, TZE, which would further jeopardize obtaining the DOE loan and the Albuquerque greenfield acquisition.

## II.    THE TRUTH EMERGES

110.    On May 30, 2024, prior to market open, Maxeon announced, via a press release, its delayed fourth quarter and annual financial results for 2023 together with its financial results for the first quarter of 2024.  In the press release, Mulligan announced:

> Maxeon has been facing a very difficult market environment since the third quarter of last year, with challenging industry pricing conditions and demand disruptions in our DG business due to higher interest rates and policy changes, as well as *project pushouts by two of our large-scale customers in the US*.  These external factors led to underutilized manufacturing operations, increased product costs, and lower revenue and profit than planned. While the Company is making progress on our announced restructuring initiatives and we are seeing some positive trends in the market, we determined that *Maxeon requires additional capital to support its continuing operations*. *After conducting a thorough analysis with the help of financial advisors, management and the board determined that the most viable financing option to support our immediate liquidity needs was from our largest shareholder, TCL Zhonghuan Renewable Energy Technology Co. Ltd. (TZE).*

Maxeon, Press Release, *Maxeon Solar Technologies Announces First Quarter 2024 Financial Results* (May 30, 2024)

111.    In conjunction with this press release, Maxeon filed its first 20-F filing ("2024 20-F") since March 7, 2023.  The 20-F was signed and certified by Mulligan. The 20-F included detailed updates on Maxeon's financial state.  The 2024 20-F stated in pertinent part that:

> We have received an unqualified opinion that included an explanatory paragraph on "going concern" from our independent registered public accounting firm, *reflecting substantial doubt about our ability to continue as a going concern*. Our consolidated financial statements contemplate that we will continue as a going concern and do not contain any adjustments that might result if we were unable to continue as a going concern.  *Our ability to continue as a going concern is dependent upon our ability to raise additional capital and implement our business plan. If we are unable to achieve*

34

*or sustain profitability or to secure additional financing on acceptable terms, we may not be able to meet our obligations as they come due, raising substantial doubts as to our ability to continue as a going concern. In addition, if we are unsuccessful in raising sufficient capital to support our operations, we may be unable to pay our suppliers and other service providers on time, or at all.*

\*     \*     \*

*During the fiscal year 2023 and continuing through the date hereof, we have seen unfavorable impacts on our working capital requirements due to lower demand for our product and downward pressure in prices, that can be attributed in part to the volatility and disruption caused by the increasing competition as a result of the increase in the global supply of solar cells and panels, termination of our supply agreements with a significant customer . . . . As of the date of this report, there is substantial doubt regarding our ability to continue as a going concern.*

112.    Maxeon's worsening cash and liquidity position led to operating cash flow of negative $254.3 million by the end of the 2023 fiscal year as it was also revealed in the Company's 2024 Form 20-F.  Form 20-F, May 30, 2024 at F-12.

113.    That afternoon, Maxeon held an earnings call to provide the market with updates related to the release of its Q4 2023 and Q1 2024 financial results.  During the call, Mulligan effectively conceded that information previously disclosed to the market was inaccurate:

Since the middle of last year, Maxeon has been under significant pressure due to the unprecedented market dislocation caused by worldwide Chinese module oversupply, high interest rates and policy changes. Maxeon also suffered from the termination of our SunPower supply agreement and *delivery pushouts by 2 of our primary utility-scale customers.*

*These headwinds, unfortunately coincided with the peak of our utility-scale prepayment amortization*, and as a result, the company has been facing a *serious cash flow challenge*.

To address this, we recently negotiated commitments for significant *liquidity support from our largest shareholder, TZE*, and we successfully restructured our 2025 convertible bonds with the majority of the debt expected to be converted into equity later this year.

\*     \*     \*

*On the utility scale side, two of our large customers experienced significant project delays* and we have been unable to quickly reallocate the affected volumes. And as a result, our financial output for 2024 will reflect the impact of these continuing

35

headwinds. ***In addition to these challenges, our liquidity was also impacted by our utility scale prepayment amortization schedule, where we have been amortizing customer prepayments that were received in 2021 and 2022 and are now collecting only a portion of the associated sales revenue as cash.***

***In response to this perfect storm of cash and profitability challenges, the company and our advisors assessed all potential sources of funding and found that the only viable option involved new liquidity from our largest shareholder and secured creditor TZE.***

TZE has agreed to invest $97.5 million into the company via a debt instrument and has also committed to an additional $100 million equity investment, in each case subject to regulatory approval.

*    *    *

***The dramatic market shift that started in mid-2023 left us with large amounts of inventory that tied up cash.*** And so far, our efforts to work down these inventories have been at a slower pace than we initially anticipated.

Q1 2024 Earnings Call (May 30, 2024)

114.    During the earnings call, one analyst asked straight out if Defendants knew about the negative information concerning Maxeon's Utility-Scale contract delays, which Aschenbrenner confirmed that they knew early in the year:

[Analyst]: ***And so was it possible that you guys could have known about these delays earlier since modules are one of the last elements to be added to the projects.***

[Aschenbrenner]: So the-we had a 1.2 gigawatt contract with Origis . . . that was scheduled to start delivery in Q1 year of this year, ramp up in Q2 and then proceed through the end of 2025. ***We were informed early this year that the company would not be in a position to accept those deliveries under those-that [sic] contracted scheduled.*** . . . . Our understanding was that it had to do with delays on their contracts, on their projects.

115.    The bad news continued to pour in at the earnings call when Strohbecke announced the following updates:

Moving on to the balance sheet. We closed the fourth quarter with cash, cash equivalents, restricted cash and short-term investments of $197 million compared to $277 million at the end of the third quarter. Cash levels were negatively impacted by $83 million of previously collected cash advances from U.S. utility-scale customers that were

36

amortized during the quarter and show up in our cash flow statement as a change in contract liabilities.

\*        \*        \*

***Taking a step back, we are deeply disappointed by our negative EBITDA results over the past 3 quarters*** after our successful efforts since spin, which facilitated strong earnings momentum in the first half of 2023 as well as our first positive annual EBITDA result as an independent company. ***As Bill mentioned, the dramatic industry-wide reductions in pricing and demand since the middle of last year have had a material negative impact on our liquidity position at a time when we also encountered significant previously scheduled amortization of our utility-scale prepayments amounting to a total of approximately $150 million in the fourth and the first quarter alone.***

116.    Recognizing the uncertainty TZE's takeover could have for Maxeon's future prospects—as a now predominantly Chinese owned company—one analyst asked whether this would complicate the process of getting a loan guaranteed from the DOE for its New Mexico plant.  Mulligan confirmed that it would complicate the process, but that Maxeon was "work[ing] through that with the DOE."

117.    Following the release of this news, Maxeon's stock plummeted from $3.11 on May 29, 2024 to $2.03 on May 30, 2024 and then to $1.88 on the close of May 31, 2024, representing a cumulative drop of 39.55%.

118.    To date, the DOE has neither approved nor guaranteed Maxeon's request for a loan for its Albuquerque, New Mexico facility.

119.    Rather, in its December 2024 Form 6-K filing with the SEC, the Company disclosed a major modification of its much-touted Albuquerque project when it revealed that it filed a joint voluntary notice with TZE, and its subsidiary Zhonghuan Singapore Investment and Development Pte. Ltd. ("Zhonghuan Singapore") with the Committee on Foreign Investment in the United States ("CFIUS")[8] in connection with TZE's investment in Maxeon.  Maxeon, Current Report 10 (Form 6-K) (Dec. 2, 2024) (the "Dec. 2, 2024 6-K").

_____

[8]    The function of the CFIUS is to review foreign investments in the United States to assess its potential security risks.  Cathleen D. Cimino-Isaacs and Karen M. Sutter, Committee on Foreign Investment in the United States (CFIUS), Congressional Research Service, In Focus,

120.    Maxeon disclosed that the CFIUS determined that there were no unresolved national security issues associated with TZE's investment into the Company, but nevertheless the Company had to enter into a National Security Agreement ("NSA") with the Department of Defense, Department of Energy and Department of the Treasury as monitoring agencies on behalf of CFIUS, pursuant to which the Company would be subject to certain limitations on the acquisition of property interests. *Id.*

121.    An NSA is an agreement between the CFIUS and the parties to a foreign acquisition or investment in the United States, which arises when that acquisition or investment presents a national security risk.  By its very nature, an NSA contains limiting terms to mitigate the security risks posed by the foreign acquisition or investment.  DAU, National Security Agreement, https://www.dau.edu/glossary/national-security-agreement#:~:text=A%20negotiated%20agreement%20between%20CFIUS,security%20risks%20will%20be%20addressed, (last visited May 22, 2025).

122.    Indeed, as Maxeon indicated in its December 2024 6-K filing, the NSA provided "certain indefinite obligations and compliance requirements which on their own would limit the way [they] run [their] business."

123.    Significantly, Maxeon disclosed that, because of the foregoing, it was reassessing its new greenfield acquisition to build its first U.S. 3-gigawatt manufacturing facility and instead would have to lease a "brownfield" with an existing building with only a 2-gigawat facility that would start manufacturing in 2026.  *Id*.

## III.    ADDITIONAL SCIENTER ALLEGATIONS

### A.    *Respondeat Superior* and Agency Principles Apply

124.    Maxeon is liable for the acts of the Individual Defendants and other Company officers, directors, employees, and agents under the doctrine of *respondeat superior* and common law principles of agency as all of the wrongful acts complained of herein were carried out within

---

(Dec. 9, 2024),
https://www.congress.gov/crs_external_products/IF/PDF/IF10177/IF10177.36.pdf.

**SECOND AMENDED CLASS ACTION COMPLAINT**
**Case No. 3:24-cv-03869-EMC**

the scope of their employment or agency with the authority or apparent authority to do so.  The

scienter of the Individual Defendants and other Company officers, directors, employees, and

agents is similarly imputed to Maxeon under *respondeat superior* and agency principles.

### B.   The Individual Defendants Had Access To Information That Their Statements Were False Or Misleading

125.   As alleged throughout this Complaint, Defendants had ready and actual access to

information, during the Class Period, that their statements about Maxeon's cash flow, liquidity,

ability to continue as a going concern and its Utility-Scale contracts were false and/or misleading

when made.

126.   For example, during the November 15, 2023 Q3 earnings call, Mulligan stated

that "Kai[9] and his team are ***laser-focused on cash management and our operations growth***

***continues to grind out cost reduction and yield improvements***."

127.   Defendants' access to information about the negative state of Maxeon's cash flow

and liquidity can also be inferred through their positions as CEO and CFO, each requiring them

to periodically update the market about the Company's finances such as its cash position and

liquidity, its ability to continue as a going concern and matters concerning its Utility-Scale

contracts.  In order to adequately prepare for these engagements, Defendants had access to

materials containing information related to the Company's business operations and finances—

including its balance sheet and other pertinent financial documents that would have necessarily

revealed the active state of Maxeon's cash flow and liquidity and its Utility-Scale business.

128.   Likewise, according to CW-1, Strohbecke was one of two individuals who had

been "leading the talks with TCL [(TZE)] for additional liquidity" around January 2024.  Given

his involvement in these talks, Strohbecke would necessarily have been knowledgeable about the

negative state of Maxeon's cash flow, liquidity, capitalization and the Company's ability to

continue as a going concern without lender support.  At a minimum, Maxeon's financials,

---

[9]      "Kai" refers to Strohbecke.

1    revealing the adverse information about its liquidity, capitalization and ability to continue as a

2    going concern, and inability to obtain financing for the Albuquerque acquisition would have

3    been made available to Strohbecke in order to adequately lead the talks for additional liquidity

4    support from TZE.

5         129.    Defendants' frequent Class Period updates and answers to analysts questions

6    regarding Maxeon's cash flow, liquidity, and specifics about the status of Maxeon's DOE loan

7    application for its greenfield in Albuquerque also suggest that they had access to information

8    contradicting their public statements on these topics (*i.e.*, Mulligan and Strohbecke discussing in

9    Maxeon's November 15, 2023 earnings call how the Company's "[c]ash levels were . . .

10    impacted," its "cash, cash, equivalents, restricted cash and short-term investment," its "***U.S.***

11    ***Utility-Scale business capital expenditures***"; that its "utility-scale business [wa]s on track to

12    deliver increasing margins"; ***unrelated "potential liquidated damages because of delivery delays***

13    ***in our utility-scale as well as the risk of further inventory write-downs***" and measures the

14    Company took to ensure its "***healthy liquidity***" and Mulligan discussing, in the same earnings

15    call, Maxeon's "***positive cash flow in the near term***" and Strohbecke's response to an analyst's

16    question that the "two main pillars of [Maxeon's] financing of the U.S. manufacturing side . . .

17    are the DOE loan and customer co-investments" and that these "two main pillars of that

18    financing . . . are on track.'").

19         130.    Moreover, CW-1 explained that several lenders including, *inter alia*, Standard

20    Chartered Bank and Bank of China expressed concern about Maxeon's ability to continue as a

21    going concern ***prior to November 2023*** and as a result, Maxeon struggled to secure needed

22    financing.  Notably, CW-1's account is consistent with Maxeon's disclosure that it was in

23    renewal talks with SCB.  *See* Form 6-K, Ex. 99-1 at 27 (Aug. 10, 2023) (providing that the

24    Revolving Credit Agreement with SCB would expire in October 2023 and Maxeon was in the

25    midst of renewal discussions).  ***CW-1 personally conveyed these lenders' concerns to***

26    ***Strohbecke and Mulligan,*** who responded by stating "do the best you can."  Thus, at the

27    beginning of the Class Period, Strohbecke and Mulligan knew and/or were reckless in not

28     

knowing that Maxeon did not have the financial resources to close on the Albuquerque greenfield acquisition, even if the Company could obtain the DOE loan, and that the Company likely would have to obtain financing from its largest foreign shareholder TZE, which financing could jeopardize the DOE loan also. None of this negative information and risks in proceeding with the Albuquerque acquisition were disclosed to the market.

131.    CW-1 also provided that CW-1, Strohbecke, Mulligan, and Aschenbrenner were present at multiple meetings with the DOE about the Company's Albuquerque project. At these meetings the DOE made clear its position that it did not want Maxeon to grant more control to China by allowing TZE to provide the Company with additional financing. Because each Defendant was present at these meetings, which included discussions about the active state of Maxeon's financing, Defendants would have been aware of the true facts concerning Maxeon's cash flow, liquidity position, capitalization and ability to continue as a going concern. Strohbecke and Mulligan also therefore knew that obtaining financing for the Albuquerque project from TZE would jeopardize obtaining the DOE loan.

132.    Additionally, CW-1 and Strohbecke were very involved in discussing issues, such as financing from lenders and from these conversations "a lot of options were presented to Kai and Bill."[10] It is therefore reasonable to infer that Defendants had access to information about the doubt surrounding Maxeon's ability to continue as a going concern prior to and at the same time as their public statements to the contrary.

133.    Additionally, on April 8, 2024, Defendants stated in a press release that the "***Maxeon team is highly focused*** on reducing manufacturing costs, OPEX rationalization and ***liquidity-management*** to enable a return to profitability."

134.    Indeed, Mulligan even admitted that Defendants had been monitoring matters related to Maxeon's cash flow and liquidity when he revealed the truth about it to the market in the Company's May 30, 2024 earnings call:

---

[10]    "Kai" refers to Strohbecke and "Bill" refers to Mulligan.

In response to this perfect storm of cash and profitability challenges, ***the company and our advisors assessed all potential sources of funding and found that the only viable option involved new liquidity from our largest shareholder and secured creditor TZE.***

135. At the same earnings call, Strohbecke stated: "[s]ubsequently, we target to maintain a cash balance above $100 million for the foreseeable future, thanks to those funding transactions, ***continued focus on working capital management*** and additional sales from inventories."

136. That Defendants had access to information concerning the prepayment amortization of its Utility-Scale contract and its effect on Maxeon's cash flow and liquidity can also be readily inferred through the fact that its prepayment amortization schedule was preset and the timing of payments was specifically written into its Utility-Scale contracts.

## C. Maxeon's Utility-Scale Business, Cash Flow, Liquidity And Ability To Continue As A Going Concern Were Its Core Operations

137. Because the fraud alleged herein relates to issues concerning a core operation of Maxeon's business —its Utility-Scale business—knowledge of the facts underlying Defendants' misstatements about this topic can be imputed to them. Indeed, during Maxeon's November 15, 2023 Q3 earnings call, Mulligan stated that Maxeon's "U.S. utility-scale market is a ***key focus for us in our primary growth driver***."

138. Maxeon's Utility-Scale business was particularly essential to the Company now that its DG business was expected to take a hit with the loss of its New Master Supply Agreement with SunPower. For example, Mulligan stated "[n]o, I mean, keep in mind, the other ***huge segment for us is the U.S. utility-scale market. And right now, that's becoming the major part of our shipments. . . . So that is the primary growth for us***."

139. Strohbecke similarly remarked on the critical importance of Maxeon's Utility-Scale business going forward: "[a]nd for the first time in Maxeon's history, the majority of shipments went to utility-scale customers. We expect this to be our new normal for the foreseeable future . . . ."

140.    Strohbecke continued to express the ongoing importance of Maxeon's Utility-Scale business by stating "[g]oing into the fourth quarter, we expect that the ***same dynamics that have been unfolding our [sic] utility scale*** and distributed generation businesses ***to largely continue***."

141.    Maxeon's cash flow, liquidity and capitalization were also critical components and of paramount importance to the Company.  In fact, at Maxeon's November 15, 2023 Q3 earnings call, Strohbecke made clear that not only had "***[c]ash and working capital management . . . been a high priority for Maxeon's finance organization***" but it was "***redoubling [its] efforts in this area***."  Even after the truth was revealed, Mulligan continued to emphasize the importance of and his commitment to protecting Maxeon's "balance sheet," which ***admittedly*** included matters such as the Company's cash flow, liquidity, and capitalization, by stating that "[w]e believe that the difficult steps we are taking to reinforce our balance sheet are necessary to protect the interests of all Maxeon stakeholders and position the Company for future success. ***In light of this refreshed capitalization we are optimistic about our ability to complete our transformation and return to profitable growth.***"  Q1 2024 Earnings Call (May 30, 2024).

142.    The Albuquerque facility and obtaining the DOE loan to finance it was also of high importance to Defendants and investors, as explained herein.  *See, e.g.,* Factual Allegations, §D.

**D.    The Temporal Proximity Between Defendants' Misleading Statements And The Revelation Of The Truth Bolsters Scienter**

143.    The temporal proximity between Defendants' misleading statements and its truthful disclosure on May 30, 2024 that Maxeon faced a serious cash flow challenge and would require additional capital to support its continuing operations supports scienter.

144.    As recently as April 8, 2024, Maxeon issued a press release stating that "[i]n the fourth quarter [of 2023], Maxeon delivered financial results largely in line with [its] expectations. . . . [and that] [t]he Maxeon team is highly focused on reducing manufacturing costs, OPEX rationalization and liquidity-management to enable a return to profitability." This

disclosure inherently failed to disclose the then-existing cash flow and liquidity crisis Maxeon faced and made it seem as though the Company's finances were nothing to be concerned about.

145.    Less than two months later, however, in Maxeon's earnings call for the first quarter of 2024 and the accompanying press release, Defendants announced: that the industry headwinds coincided with "***the peak of [Maxeon's] utility scale prepayment amortization*** [that caused]… a serious cash flow challenge" and "impacted" its "liquidity"; that Maxeon "[was] informed by two large customers that they were experiencing project delays and would be unable to accept module deliveries based on the contracted schedule"; ***the "material negative*** impact [market conditions had on Maxeon's] ***liquidity position";*** that a "market shift that ***started in mid-2023*** left us with large amounts of inventory that ***tied up cash***" and the "***additional capital [required] to support [Maxeon's] continuing operations.***"

**E.    Defendants Were Motivated To Conceal Maxeon's Financial Struggles To Lure In Potential Lenders**

146.    Defendants' motivation to commit the fraud alleged herein can be readily inferred through the Company's reliance on the DOE for a loan for its first U.S. manufacturing plant in Albuquerque, New Mexico, the financing from which represented over 50% of the capital (over $1.2B!) that Maxeon intended to use towards the approved IRBs for the facility's buildout and development.

147.    As discussed *supra*, the DOE expressly disfavored providing loans to "foreign entities of concern" such as China.  And because Defendants knew that revealing the Company's true state of affairs would leave them with no options other than to obtain "shareholder guarantees," or worse—direct financing, from its largest shareholder, Chinese-owned TZE, to rebuild its liquidity position and raise the capital required by the DOE loan application process, Defendants publicly portrayed the Company's future outlook as promising and its cash flow and liquidity situation as stable.

148.    Defendants' motivations can also be inferred through their own statements about the DOE loan because they consistently highlighted its critical importance and their intricate

involvement in the process.  For example, in Maxeon's November 15, 2023 earnings call Mulligan stated "we are ***working intensively*** with the US Department of Energy's loan program office to finance a 3.5 gigawatt solar cell and panel factory in Albuquerque."  Likewise, Strohbecke responded to an analyst's question about the DOE loan, stating "***the two main pillars of our financing of the US manufacturing side*** . . . ***are the DOE loan*** and customer co-investment. ***Customers are very, very excited about that new facility*** and we've been in touch with them . . . . But I think suffice it to say that these things have to come together, ***the DOE loan and the customer co-investments as the two main pillars of that financing*** and both of these items are on track."

149.    Indeed, once the Company's efforts to avoid being saved by TZE failed, Mulligan announced "we're still ***very committed to our Albuquerque, New Mexico project*** and we're better capitalized now to execute on that. . . . ***We are mindful this transaction might present some new challenges***, but we believe there are scenarios that will allow this project to proceed with the DOE[.]"

### F.    The Timing Of Strohbecke's Departures Support Scienter

150.    The timing and circumstances surrounding the unexpected departure of the Company's CFO Strohbecke supports an inference of scienter.  Maxeon announced that Strohbecke will "step down" from his position as CFO, just one week after the truth about Maxeon's cash flow, liquidity issues and consequential restructuring and takeover by TZE were revealed to the market.  The abrupt circumstances of Strohbecke's departure are further evidenced by the fact that Maxeon made an internal hire, Ken Olson, its Senior Vice President/Global Treasurer, to act as interim CFO, while Maxeon found a viable replacement. On October 28, 2024, Maxeon announced that it was hiring Dmitiri Hu as Maxeon's new CFO.

## IV.    LOSS CAUSATION

151.    Defendants' wrongful conduct, as alleged herein, directly or proximately caused Plaintiff and the Class to suffer substantial damages.

152.    During the Class Period, Plaintiff and other Class members purchased Maxeon common stock at artificially inflated prices and suffered substantial losses and damages when the true facts concealed by Defendants' fraud were revealed and/or when the risks concealed by those undisclosed facts materialized.  The price of Maxeon common stock declined significantly causing Plaintiff and other Class members to suffer losses and damages when Defendants' misrepresentations, and/or information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, and/or the foreseeable risks that had been fraudulently concealed by Defendants materialized.

153.    Defendants made false and misleading statements and material omissions regarding Maxeon's cash flow, capitalization, liquidity, ability to continue as a going concern, and its ability to obtain the DOE loan needed for the Albuquerque facility.  On the strength of these false and misleading statements and material omissions, the price of the Company's common stock was artificially inflated to a Class Period high of $7.55 on December 26, 2023. Those misrepresentations and omissions that were not immediately followed by an upward movement in the price of the Company's common stock served to maintain the share price at artificially inflated levels by maintaining and supporting a false perception of Maxeon's business, operations, performance, and prospects.  When these statements were corrected and/or the risks concealed by them materialized, investors suffered losses as the price of Maxeon's common stock declined.

154.    The true facts and risks regarding Maxeon's cash flow, capitalization, liquidity, ability to continue as a going concern, and its ability to obtain the DOE loan needed for the Albuquerque facility which were omitted and/or misrepresented by Defendants eventually caused the price of Maxeon's common stock to decline, thereby causing harm to investors.

155.    Defendants' statements were partially corrected, and the risks concealed by the undisclosed facts regarding Maxeon's prepayment amortization of and delays related to its Utility-Scale contracts and its cash flow crisis, capitalization issues, liquidity position, the Company's inability to continue as a going concern absent financing, and their effects on the

DOE loan were revealed on May 30, 2024, when Maxeon issued a press release, filed its 2024 Form 20-F and held an earnings call. This caused investors to suffer losses because the price of Maxeon's common stock plunged from a closing price of $3.11 on May 29, 2024 to $2.03 on May 30, 2024, and then to a $1.88 closing price on May 31, 2024, representing a cumulative a drop of 39.55%, over two consecutive trading days.

156.    Accordingly, as a result of their purchases of Maxeon's publicly traded common stock during the Class Period, Plaintiff and other members of the Class suffered economic losses and damages.

## V.    CLASS ACTION ALLEGATIONS

157.    Plaintiff brings this action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all persons and entities that purchased or otherwise acquired Maxeon securities during the Class Period and were damaged thereby.

158.    Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entities in which Defendants have or had a controlling interest.

159.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Maxeon securities were actively traded on the NASDAQ stock exchange. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds of members in the proposed Class. Members of the Class may be identified from records maintained by Maxeon or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

160.    Plaintiff's claims are typical of the claims of the other members of the Class. All members of the Class were similarly affected by Defendants' allegedly wrongful conduct in violation of the Exchange Act as complained of herein.

161.    Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class actions and securities litigation.  Plaintiff has no interests that are contrary to or in conflict with those of the Class.

162.    Common questions of law and fact exist as to all members of the Class, and predominate over any questions solely affecting individual Class members.  The questions of law and fact common to the Class include, *inter alia*:

a.    Whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.    Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations, and management of Maxeon; and

c.    To what extent the members of the Class have sustained damages and the proper measure of damages.

163.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for Class members to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## VI.    CONTROL PERSON LIABILITY

164.    The Individual Defendants are liable as direct participants with respect to the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act, and each had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly and indirectly, control the conduct of Maxeon's business.

165.    Specifically, because of their positions within the Company, the Individual Defendants possessed the power and authority to control the contents of Maxeon's SEC filings, annual and quarterly reports, press releases, and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market, including those containing the materially false and misleading statements and omissions of material fact alleged herein.  Each Individual Defendant, by reason of their respective management or board position, had the opportunity to review copies of the Company's SEC filings, reports, press releases, and other statements alleged herein to be false and/or misleading, prior to, or shortly after their issuance or to cause them to be corrected.

166.    By virtue of their positions, the Individual Defendants had access to material non-public information.  Each Individual Defendant knew or recklessly disregarded the fact that the adverse facts specified herein had not been disclosed and were being concealed from the public, and that the positive representations which were being made were then materially false and misleading.

## VII.    APPLICABILITY OF THE FRAUD ON THE MARKET DOCTRINE

167.    The false and/or misleading statements alleged herein were material and public and at all relevant times the market for Maxeon's securities was an efficient market for the following reasons, among others:

a.    Maxeon's securities were listed on the NASDAQ, a highly efficient market;

b.    As a registered and regulated issuer of securities, Maxeon filed periodic reports with the SEC, in addition to frequent voluntary dissemination of information;

c.    Maxeon communicated with public investors through established market communication mechanisms, including through regular dissemination of press releases on national circuits of major newswire services and through other wide-ranging public disclosures such as communications with the financial press and other similar reporting services;

d.    The market reacted to public information disseminated by Maxeon; and

e.   Many analysts followed and covered Maxeon's business and wrote reports which affected the marketplace.

168.   As a result of the above, the market for Maxeon securities promptly digested current information with respect to the Company from all publicly available sources and reflected such information in the securities' market prices.  The historical trading prices and volumes of Maxeon common stock are incorporated herein by reference.

169.   The material misrepresentations and omissions alleged herein would tend to induce a reasonable investor to overvalue Maxeon's securities.  Without knowledge of the misrepresented or omitted facts, Plaintiff and other Class members purchased Maxeon securities between the time that Defendants made the material misrepresentations and omissions and the time that the truth or concealed risk was revealed, during which time the price of Maxeon's securities were artificially inflated by Defendants' misrepresentations and omissions.  Thus, a presumption of reliance applies.

## VIII.   THE AFFILIATED *UTE* PRESUMPTION

170.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Maxeon's business operations and financial prospects— information Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## IX.   INAPPLICABILITY OF SAFE HARBOR

171.   The safe harbor provisions for forward-looking statements under the Private Securities Litigation Reform Act of 1995 are applicable only under certain circumstances that do

1  not apply to any of the materially false and misleading statements and omissions alleged in this

2  Complaint.

3      172.    First, many of the identified false and misleading statements and omissions herein

4  are not forward-looking statements, but instead are statements of current of historic fact, or are

5  actionable in context because they omit then-existing material facts.

6      173.    Second, many of the identified false and misleading statements herein were not

7  identified as forward-looking statements.

8      174.    Third, to the extent there were any forward-looking statements that were

9  identified as such at the time made, those statements also contained statements of present or past

10  facts and so are not entitled to protection under the safe harbor.

11      175.    Fourth, to the extent there were any forward-looking statements that were

12  identified as such at the time made, there were no meaningfully cautionary statements identifying

13  important factors that could cause actual results to differ materially from those in the purportedly

14  forward-looking statements.  Such statements were also not accompanied by cautionary language

15  that was meaningful because such warnings or "risk" factors contained in, or incorporated by

16  reference in, the relevant press release, SEC filings, earnings call, or other public statements

17  described herein were general, "boilerplate" statements of risk that would affect any solar power

18  or renewable energy company, and misleadingly contained no factual disclosure of any of the

19  specific details concerning its cash position, liquidity or capitalization or similar important

20  factors that would give investors adequate notice of such risks.

21      176.    Fifth, to the extent there were any such forward-looking statements, Defendants

22  are liable for those false and misleading forward-looking statements because at the time each of

23  those forward-looking statements was made, the particular speaker knew that the particular

24  forward-looking statement was false, or by reason of what the speaker failed to note, was

25  materially false and/or misleading, and/or that each statement was authorized and/or approved by

26  an executive officer of Maxeon who actually knew that each such statement was false or

27  misleading when made.

28

X.    **CLAIMS FOR RELIEF**

## COUNT I

**For Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Against Defendants**

177.    Plaintiff realleges each allegation above as if fully set forth therein.

178.    This claim is brought under Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5, against Defendants.

179.    During the Class Period, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(b) promulgated thereunder by making the false and misleading statements specified herein, including the statements in SEC filings press releases, and in earnings call concerning Maxeon's Utility-Scale contract delays, the prepayment amortization of its Utility-Scale contracts and its cash position, capitalization, liquidity, ability to continue as a going concern, and its ability to obtain the DOE loan needed for the Albuquerque facility, whose truth they knowingly or recklessly disregarded when they failed to disclose material facts necessary to make the statements made, in light of the circumstances under which they were made, not false and misleading.

180.    During the Class Period, Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5(a) & (c) promulgated thereunder by employing devices, schemes, and artifices to defraud and engaging in acts, practices, and a course of conduct that operated as a fraud or deceit upon Plaintiff and other Class members in that Defendants concealed the truth about Maxeon's cash position, capitalization, liquidity, and the ongoing events/issues with its Utility-Scale business.

181.    Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or the mails, engaged and participated in a continuous course of conduct to conceal non-public, adverse material information about the Company's operations and financial condition as reflected in the misrepresentations and omissions set forth above.

182.    Defendants each had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth by failing to ascertain and to disclose such facts even though such facts were available to them, or deliberately refrained from taking steps necessary to discover whether the material facts were false or misleading.

183.    As a result of Defendants' dissemination of materially false and misleading information and their failure to disclose material facts, Plaintiff and Class members were misled into believing that the Company's statements and other disclosures were true, accurate, and complete.

184.    Plaintiff and Class members purchased Maxeon securities without knowing that Defendants had misstated or omitted material facts about the Company's operations, financial performance or prospects, cash flow and liquidity position, ability to continue as a going concern, and its ability to obtain the DOE loan needed for the Albuquerque facility.  In so doing, Plaintiff and Class members relied directly or indirectly on false and/or misleading statements made by Defendants, and/or an absence of material adverse information that was known to Defendants or recklessly disregarded by them but not disclosed in Defendants' public statements. Plaintiff and Class members were damaged as a result of their reliance on Defendants' false statements and misrepresentations and omissions of material facts.

185.    At the time of Defendants' false statements, misrepresentations and omissions, Plaintiff and Class members were unaware of their falsity and believed them to be true.  Plaintiff and the Class would not otherwise have purchased Maxeon securities had they known the truth about the matters discussed above.

186.    Plaintiff is filing this action within two years after discovery of the facts constituting the violation, including facts establishing scienter and other elements of Plaintiff's claims, and within five years after the violations with respect to Plaintiff's investments.

187.    By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

188.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the Class have suffered damages in connection with their purchase of Maxeon securities.

## COUNT II

**For Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

189.     Plaintiff realleges each allegation above as if fully set forth herein.

190.     This claim is asserted against the Individual Defendants for violations of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a), on behalf of all Class members.

191.     As set forth above, the Individual Defendants committed a primary violation of Section 10(b) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period.

192.     Each Individual Defendant, by reason of their status as senior executive officers and/or directors of Maxeon, directly or indirectly, controlled the conduct of the Company's business and its representations to Plaintiff and the Class, within the meaning of Section 20(a) of the Exchange Act.  The Individual Defendants directly or indirectly controlled the content of the Company's SEC statements, press releases and earnings calls related to Plaintiff's and the Class's investments in Maxeon securities within the meaning of Section 20(a) of the Exchange Act.  Therefore, the Individual Defendants are jointly and severally liable for the Company's fraud, as alleged herein.

193.     The Individual Defendants controlled and had the authority to control the content of the Company's SEC statements and press releases.  Because of their close involvement in the every-day activities of the Company, and because of their wide-ranging supervisory authority, the Individual Defendants reviewed or had the opportunity to review these documents prior to their issuance, or could have prevented their issuance or caused them to be corrected.

194.     The Individual Defendants knew or recklessly disregarded the fact that Maxeon's representations were materially false and misleading and/or omitted material facts when made.  In so doing, the Individual Defendants did not act in good faith.

**SECOND AMENDED CLASS ACTION COMPLAINT**
**Case No. 3:24-cv-03869-EMC**

195.    By virtue of their high-level positions and their participation in and awareness of Maxeon's operations and public statements, the Individual Defendants were able to and did influence and control Maxeon's decision-making, including controlling the content and dissemination of the documents that Plaintiff and the Class contend contained materially false and misleading information and on which Plaintiff and the Class relied.

196.    The Individual Defendants had the power to control or influence the statements made, giving rise to the securities violations alleged herein, and as set forth more fully above.

197.    As set forth above, the Individual Defendants committed a primary violation of Section 20(a) of the Exchange Act by knowingly and/or recklessly disseminating materially false and misleading statements and/or omissions throughout the Class Period as well as by concealing the facts regarding Maxeon's Utility-Scale contract delays, the prepayment amortization of its Utility-Scale contracts, its cash position, capitalization, liquidity, ability to continue as a going concern, and its ability to obtain the DOE loan needed for the Albuquerque facility.

198.    As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and the Class suffered damages in connection with their purchase of Maxeon's securities.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that this action may be maintained as a class action under Federal Rule of Civil Procedure 23, certifying Plaintiff as Class Representative under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff's counsel as Class Counsel;

B.    Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be determined at trial, including pre-judgment and post-judgment, as allowed;

C.    Awarding extraordinary, equitable and/or injunctive relief as permitted by law including reasonable counsel fees and expert fees;

1      D.       Awarding Plaintiff and the Class their costs and expenses incurred in this action,

2 including reasonable fees and expert fees; and

3      E.       Awarding such further relief as may be just and proper.

4                               **JURY TRIAL DEMAND**

5       Plaintiff hereby demands a trial by jury on all triable claims.

6

7

8 Dated:  May 27, 2025                       Respectfully submitted,

9                                By: _/s/ James M. Wilson, Jr._
                                   James M. Wilson, Jr.

10                            James M. Wilson, Jr. (appearance *pro hac vice*)

11                            **FARUQI & FARUQI, LLP**
                           685 Third Avenue, 26th Floor

12                            New York, NY 10017
                           Telephone: 212-983-9330

13                            Facsimile: 212-983-9331
                           Email: jwilson@faruqilaw.com

14

15                            Robert W. Killorin (appearance *pro hac vice*)

16                            **FARUQI & FARUQI, LLP**
                           3565 Piedmont Road NE Building Four

17                            Suite 380
                           Atlanta, GA 30305

18                            Telephone: 404-847-0617
                           Facsimile: 404-506-9534

19                            Email: rkillorin@faruqilaw.com

20                            Lisa T. Omoto SBN 303830
                           **FARUQI & FARUQI, LLP**

21                            1901 Avenue of the Stars, Suite 1060
                           Los Angeles, CA 90067

22                            Telephone: 424-256-2884
                           Facsimile: 424-256-2885

23                            E-mail: lomoto@faruqilaw.com

24                            *Attorneys for Lead Plaintiff*
                           *Jeyakumar Menon and Lead*

25                            *Counsel for the putative Class*

26

27

28

**SECOND AMENDED CLASS ACTION COMPLAINT**
**Case No. 3:24-cv-03869-EMC**