Lisa T. Omoto SBN 303830
E-mail: lomoto@faruqilaw.com
**FARUQI & FARUQI, LLP**
1901 Avenue of the Stars, Suite 1060
Los Angeles, CA 90067
Telephone: 424-256-2884
Facsimile: 424-256-2885

James M. Wilson, Jr. (appearance *pro hac vice*)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor
New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: jwilson@faruqilaw.com

Robert W. Killorin (appearance *pro hac vice*)
**FARUQI & FARUQI, LLP**
3565 Piedmont Road NE Building Four
Suite 380
Atlanta, GA 30305
Telephone: 404-847-0617
Facsimile: 404-506-9534
Email: rkillorin@faruqilaw.com

*Attorneys for Lead Plaintiff*
*Jeyakumar VS Menon*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEYAKUMAR VS MENON, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>MAXEON SOLAR TECHNOLOGIES, LTD., WILLIAM MULLIGAN, and KAI STROHBECKE,<br><br>Defendants. | Case No. 3:24-cv-03869-EMC<br><br>**LEAD PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S SECOND AMENDED CLASS ACTION COMPLAINT**<br><br><u>**CLASS ACTION**</u><br><br>Judge:  Hon. Edward M. Chen<br>Date:    October 23, 2025<br>Time:    1:30 p.m.<br>Courtroom:   5 – 17th Floor |

**TABLE OF CONTENTS**

STATEMENT OF ISSUE(S) TO BE DECIDED (LOCAL RULE 7-4(a)(3)) ............................. 1

I.     INTRODUCTION ......................................................................................................... 1

II.    SUMMARY OF FACTUAL ALLEGATIONS ................................................................. 4

III.   STANDARD .................................................................................................................. 5

IV.    THE SAC ADEQUATELY PLEADS MATERIALLY FALSE AND MISLEADING
       STATEMENTS ............................................................................................................... 5

       A.     Defendants Misled Investors About Maxeon's Cash Flow, Liquidity, And
              Ability To Complete The "Transformative" 3-GW Facility On Which The
              Company Was Dependent For Its Continued Existence ....................................... 6

              1.     The SAC Alleges Particularized Facts That Statements 1 and 2 (SAC
                     ¶¶97, 98) - That Maxeon's Cash Flow Was Sufficient - Were False
                     Because Defendants Knew By June 2023 That Cash Flow And
                     Liquidity Were Insufficient To Continue Operations ................................. 6

              2.     The SAC Alleges Particularized Facts That Statements 3, 4, 5 and 6
                     (SAC ¶¶100–03) – Maxeon's Positive Statements About The Financing
                     And Startup Of The New Mexico Facility – Were False And
                     Misleading Because Defendants Knew The Promised Facility Was
                     In Jeopardy ...................................................................................................... 8

              3.     The SAC Alleges Particularized Facts That Statement 7 (SAC ¶105) -
                     April 8, 2024 Statement About Enabling Maxeon's Return To
                     Profitability – Was False Because The Company Was Not Returning
                     To Profitability And In Fact Was Days Away From Announcing
                     The Takeover By TZE ..................................................................................... 10

              4.     The SAC Alleges Particularized Facts That Statement 8 (SAC ¶106) -
                     April 30, 2024 Statement That Delay In SEC Filing Was Due To
                     Ongoing Work To Assess The Company's Ability As Going
                     Concern – Was False Because Defendants Knew The Company
                     Could Not Continue Without Outside Capital ......................................... 11

              5.     The SAC Alleges Particularized Facts That Statement 9 (SAC ¶108) -
                     The April 8, 2024 Statement That The Company Was Executing On Its
                     IBC Capacity – Was False For Failing To Disclose That The
                     Albuquerque Facility Was In Jeopardy ...................................................... 12

       B.     Defendants' Statements Are Not Inactionable Puffery ........................................ 12

       C.     Defendants' Statements Are Not Protected by the Safe Harbor .......................... 14

V.     PLAINTIFF ADEQUATELY PLEADS SCIENTER ...................................................... 16

       A.     Defendants' Knowledge Of And Access To Information ................................... 16

       B.     The Core Operations Theory Supports Defendants' Scienter ............................. 19

i

C.    Sufficient Motive Exists To Commit The Fraud Alleged Herein..........................21

D.    The Timing of Strohbecke's Resignation Adds to the Inference of Scienter .......22

E.    The Temporal Proximity Of Defendants' Misstatements And Their
Revelation Of The Truth Supports Scienter.............................................................22

VI.    PLAINTIFF ADEQUATELY PLEADS LOSS CAUSATION ........................................23

A.    The Corrective Disclosure Theory...........................................................................23

B.    The Materialization Of The Risk Theory.................................................................24

VII.    THE COMPLAINT STATES A CLAIM UNDER SECTION 20(a)..............................25

CONCLUSION.................................................................................................................................25

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    Case No. 3:24-cv-03869-EMC

**TABLE OF AUTHORITIES**

**Cases**                                                                                        **Page(s)**

*In re Accuray, Inc. Securities Litigation*,
    757 F. Supp. 2d 936 (N.D. Cal. 2010) ................................................................................10

*In re Amgen Inc. Sec. Litig.*,
    2014 WL 12585809 (C.D. Cal. Aug. 4, 2014)...............................................................16, 25

*In re Apollo Grp., Inc. Sec. Litig.*,
    395 F. Supp. 2d 906 (D. Ariz. 2005) ....................................................................................8

*In re Apple Comput., Inc.*,
    127 F. App'x 296 (9th Cir. 2005) .......................................................................................13

*Aramic LLC v. Revance Therapeutics, Inc.*,
    2024 WL 1354503 (N.D. Cal. Apr. 2, 2024) .......................................................................17

*Azar v. Yelp, Inc.*,
    2019 WL 285196 (N.D. Cal. Jan. 22, 2019) ........................................................................24

*In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*,
    763 F. Supp. 2d 423 (S.D.N.Y. 2011).................................................................................11

*Berson v. Applied Signal Tech., Inc.*,
    527 F.3d 982 (9th Cir. 2008) .........................................................................6, 8, 20, 22

*In re BofI Holding, Inc. Sec. Litig.*,
    2017 WL 2257980 (S.D. Cal. May 23, 2017).....................................................................25

*In re Bofl Holding, Inc. Sec. Litig.*,
    977 F.3d 781 (9th Cir. 2020) .............................................................................................24

*Bos. Ret. Sys. v. Uber Techs., Inc.*,
    2020 WL 4569846 (N.D. Cal. Aug. 7, 2020) .......................................................................5

*Brendon v. Allegiant Travel Co.*,
    412 F. Supp. 3d 1244 (D. Nev. 2019)..................................................................................22

*Brody v. Transitional Hospitals Corp.*,
    280 F.3d 997, 1006 (9th Cir. 2002) ....................................................................................11

*Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*,
    964 F. Supp. 2d 1128 (N.D. Cal. 2013) ..............................................................................25

*In re Charles Schwab Corp. Sec. Litig.*,
    257 F.R.D. 534 (N.D. Cal. 2009)........................................................................................23

*Chi. & Vicinity Laborers' Dist. Council Pension Fund v. Amplitude, Inc.*,
    2025 WL 82206 (N.D. Cal. Jan. 13, 2025)..........................................................................20

iii

*In re Cigna Corp. Sec. Litig.*,
   2005 WL 3536212 (E.D. Pa. Dec. 23, 2005) ............................................................................12

*City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*,
   856 F. 3d 605 (9th Cir. 2017) .........................................................................................8, 20

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
   875 F. Supp. 2d 359 (S.D.N.Y. 2012).....................................................................................13

*City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*,
   814 F. Supp. 2d 395 (S.D.N.Y. 2011).....................................................................................13

*In re Copper Mountain Sec. Litig.*,
   311 F. Supp. 2d 857 (N.D. Cal. 2004) .....................................................................................10

*In re Cutera Sec. Litig.*,
   610 F.3d 1103 (9th Cir. 2010) ........................................................................................13, 16

*In re CV Therapeutics, Inc. Sec. Litig.*,
   2004 WL 1753251 (N.D. Cal. Aug. 5, 2004) ...........................................................................21

*In re Daou Sys., Inc. Sec. Litig.*,
   411 F.3d 1006 (9th Cir. 2005) ................................................................................................19

*In re Dura Pharms., Inc., Sec. Litig.*,
   548 F. Supp. 2d 1126 (S.D. Cal. 2008)....................................................................................18

*Dura Pharms., Inc. v. Broudo*,
   544 U.S. 336 (2005)....................................................................................................................4

*In re eHealth, Inc. Securities Litigation*,
   2023 WL 6390593 (N.D. Cal. Sept. 28, 2023) .......................................................................24

*Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. HP Inc.*,
   2021 WL 4199273 (N.D. Cal. Sept. 15, 2021) .......................................................................10

*Eminence Cap., LLC v. Aspeon, Inc.*,
   316 F.3d 1048 (9th Cir. 2003) ................................................................................................25

*In re Enzymotec Sec. Litig.*,
   2015 WL 8784065 (D.N.J. Dec. 15, 2015)................................................................................8

*In re Extreme Networks, Inc. Sec. Litig.*,
   2018 WL 1411129 (N.D. Cal. Mar. 21, 2018)...........................................................................9

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
   986 F. Supp. 2d 487 (S.D.N.Y. 2013)......................................................................................15

*Flynn v. Sientra, Inc.*,
   2016 WL 3360676 (C.D. Cal. June 9, 2016) ...........................................................................14

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    Case No. 3:24-cv-03869-EMC**

*Garcia v. Hetong Guo*,
  2016 WL 102213 (C.D. Cal. Jan. 7, 2016) ...............................................................................15

*In re Genius Brands International, Inc. Securities Litigation*,
  97 F.4th 1171 (9th Cir. 2024) .................................................................................................24

*In re Gilead Scis. Sec. Litig.*,
  2009 WL 1561584 (N.D. Cal. June 3, 2009) .....................................................................18, 19

*Hatamian v. Advanced Micro Devices, Inc.*,
  87 F. Supp. 3d 1149 (N.D. Cal. 2015) .....................................................................................10

*Homyk v. ChemoCentryx, Inc.*,
  2023 WL 3579440 (N.D. Cal. Feb. 23, 2023) ..........................................................................10

*Howard v. Everex Sys.*,
  228 F.3d 1057 (9th Cir. 2000) .................................................................................................22

*In re Immune Response Sec. Litig.*,
  375 F. Supp. 2d 983 (S.D. Cal. 2005)...................................................................................6, 15

*In re Impac Mortg. Holdings, Inc. Sec. Litig.*,
  554 F. Supp. 2d 1083 (C.D. Cal. 2008) ...................................................................................13

*In re InfoSonics Corp. Sec. Litig.*,
  2007 WL 2301757 (S.D. Cal. Aug. 7, 2007) ......................................................................15, 16

*In re InterMune, Inc. Sec. Litig.*,
  2004 WL 1737264 (N.D. Cal. July 30, 2004)...........................................................................13

*Lamontagne v. Tesla, Inc.*,
  2024 WL 4353010 (N.D. Cal. Sept. 30, 2024) ...........................................................................8

*In re LendingClub Sec. Litig.*,
  254 F. Supp. 3d 1107 (N.D. Cal. 2017) ...................................................................................21

*Lipton v. Pathogenesis Corp.*,
  284 F.3d 1027 (9th Cir. 2002) ............................................................................................16, 22

*Lloyd v. CVB Fin. Corp.*,
  811 F.3d 1200 (9th Cir. 2016) .................................................................................................16

*Loos v. Immersion Corp.*,
  762 F.3d 880 (9th Cir. 2014) ...................................................................................................24

*Magro v. Freeport-McMoran Inc.*,
  2018 WL 3725781 (D. Ariz. Aug. 3, 2018).............................................................................25

*Matrixx Initiatives, Inc. v. Siracusano*,
  563 U.S. 27 (2011)......................................................................................................................6

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**    **Case No. 3:24-cv-03869-EMC**

*In re MF Glob. Holdings Ltd. Sec. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013)..................................................................................8

*In re MGM Mirage Sec. Litig.*,
    2013 WL 5435832 (D. Nev. Sept. 26, 2013) ....................................................................10

*Mineworkers' Pension Scheme v. First Solar Inc.*,
    881 F.3d 750 (9th Cir. 2018) ...........................................................................................23

*Monachelli v. Hortonworks, Inc.*,
    225 F. Supp. 3d 1045 (N.D. Cal. 2016) .......................................................................8, 15

*Mulderrig v. Amyris, Inc.*,
    492 F. Supp. 3d 999 (N.D. Cal. 2020) ............................................................................19

*Mulligan v. Impax Laby's, Inc.*,
    36 F. Supp. 3d 942 (N.D. Cal. 2014) .........................................................................12, 21

*In re Myriad Genetics, Inc. Sec. Litig.*,
    2021 WL 977770 (D. Utah Mar. 16, 2021) .....................................................................22

*Nat'l Elevator Indus. Pension Fund v. Flex Ltd.*,
    2021 WL 6101391 (9th Cir. Dec. 21, 2021) ...................................................................15

*In re Nektar Therapeutics Sec. Litig.*,
    34 F.4th 828 (9th Cir. 2022) ...........................................................................................25

*Nguyen v. Endologix, Inc.*,
    962 F.3d 405 (9th Cir. 2020) ...........................................................................................19

*Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*,
    380 F.3d 1226 (9th Cir. 2004) .........................................................................................19

*Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*,
    730 F.3d 1111 (9th Cir. 2013) .........................................................................................23

*Oaktree Principal Fund V, LP v. Warburg Pincus LLC*,
    2017 WL 3187688 (C.D. Cal. Jan. 17, 2017) ...................................................................8

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
    780 F. App'x 480 (9th Cir. 2019) ..............................................................................10, 17

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
    575 U.S. 175 (2015)......................................................................................................8, 20

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010) ...........................................................................................16

*Oregon Public Employees Retirement Fund v. Apollo Grp. Inc.*,
    774 F.3d 598 (9th Cir. 2014) ...........................................................................................24

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS    Case No. 3:24-cv-03869-EMC**

*In re Pivotal Sec. Litig.*,
 2020 WL 4193384 (N.D. Cal. July 21, 2020)................................................................15

*Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*,
 759 F.3d 1051 (9th Cir. 2014) .......................................................................13, 16, 20

*In re Quality Sys., Inc. Sec. Litig.*,
 865 F.3d 1130 (9th Cir. 2017) ......................................................................................13

*In re Quantumscape Sec. Class Action Litig.*,
 580 F. Supp. 3d 714 (N.D. Cal. 2022) .........................................................................10

*Reese v. Malone*,
 747 F.3d 557 (9th Cir. 2014) ........................................................................19, 20, 23

*In re Rigel Pharms., Inc. Sec. Litig.*,
 697 F.3d 869 (9th Cir. 2012) .......................................................................................22

*Robb v. Fitbit Inc.*,
 216 F. Supp. 3d 1017 (N.D. Cal. 2016) .......................................................................18

*Roberti v. OSI Sys., Inc.*,
 2015 WL 1985562 (C.D. Cal. Feb. 27, 2015)...............................................................23

*S. Ferry LP, # 2 v. Killinger*,
 542 F.3d 776 (9th Cir. 2008) .......................................................................................16

*S. Ferry LP # 2 v. Killinger*,
 687 F. Supp. 2d 1248 (W.D. Wash. 2009).....................................................................19

*Sayce v. Forescout Technologies, Inc.*,
 2021 WL 1146031 (N.D. Cal. Mar. 25, 2021)...............................................................10

*In re Secure Computing Corp. Sec. Litig.*,
 184 F. Supp. 2d 980 (N.D. Cal. 2001) .........................................................................22

*In re SeraCare Life Scis., Inc. Sec. Litig.*,
 2008 WL 11508499 (S.D. Cal. Mar. 14, 2008) ............................................................18

*Siracusano v. Matrixx Initiatives, Inc.*,
 585 F.3d 1167 (9th Cir. 2009) .....................................................................................21

*Slayton v. Am. Express Co.*,
 604 F.3d 758 (2d Cir. 2010)...................................................................................15, 16

*Smilovits v. First Solar Inc.*,
 119 F. Supp. 3d 978 (D. Ariz. 2015) ............................................................................24

*In re SunPower Corp. Sec. Litig.*,
 769 F. Supp. 3d 1042 (N.D. Cal. 2025) .........................................................................8

vii

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
     551 U.S. 308 (2007)...............................................................................................5, 16, 21

*In re U.S. Aggregates, Inc. Sec. Litig.*,
     2003 WL 252138 (N.D. Cal. Jan. 24, 2003) ...............................................................22

*In re WageWorks, Inc., Secs. Litig.*,
     2020 WL 2896547 (N.D. Cal. June 1, 2020) ...............................................................23

*Wochos v. Tesla, Inc.*,
     985 F.3d 1180 (9th Cir. 2021) ....................................................................................15

*Yourish v. California Amplifier*,
     191 F.3d 983 (9th Cir. 1999) ......................................................................................23

*Zucco Partners, LLC v. Digimarc Corp.*,
     552 F.3d 981 (9th Cir. 2009) ...............................................................10, 16, 17, 19

**Statutes**

15 U.S.C. § 78u-5(c)(1) ...............................................................................................14

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**      **Case No. 3:24-cv-03869-EMC**

Lead Plaintiff Jeyakumar VS Menon ("Plaintiff") respectfully submits this opposition to Defendants' Motion to Dismiss ("MTD"), ECF No. 100.[1]

**STATEMENT OF ISSUE(S) TO BE DECIDED (LOCAL RULE 7-4(a)(3))**

Whether the SAC adequately pleads claims under §10(b) and §20(a) of the Exchange Act.

## I.    INTRODUCTION

Defendants intentionally misled the market during the Class Period (November 15, 2023 to May 29, 2024) about Maxeon's severe negative cash-flow and liquidity problems that undermined not only the Company's ability to complete its promised manufacturing facility in Albuquerque, New Mexico, but its ability to continue as a going concern. Indeed, Defendants had publicly disclosed that Maxeon's continued existence as a solar-panel manufacturer was dependent in part on developing the manufacturing facility in New Mexico. The Company tried to address these significant problems and save the plan for the new plant in Albuquerque by looking for capital from independent lenders, but the lenders refused based on their concerns of the Company's ability to continue as a going concern. Ultimately, Maxeon had no choice but to cede control of the Company to its largest shareholder, the Chinese company TZE, in order to avoid bankruptcy. While the cash infusion from TZE allowed the Company to continue to operate, it also prevented the Company from completing the promised transformative "greenfield" acquisition in Albuquerque for its domestic manufacturing facility because it could no longer obtain the key to developing the New Mexico facility -- a $1.2 billion DOE loan the Company had disclosed to the market it had been seeking. The TZE takeover also substantially diluted existing shareholders' equity positions. When the truth about Maxeon's cash flow, liquidity problems and the takeover by TZE, with all of its ramifications, was disclosed to investors Maxeon's stock nearly collapsed, dropping around 40%.

The Court dismissed Plaintiff's original complaint for failure to allege falsity ("Order,"

---

[1]    Unless stated otherwise, the following conventions apply: (1) "SAC" refers to the Second Amended Class Action Complaint, ECF No. 91; (2) "MTD" refers to Defendants' Motion to Dismiss Plaintiff's Second Amended Class Action Complaint, ECF No. 100; (3) all "¶" references are to the SAC; (4) all capitalized terms mean the same as in the SAC; (5) all citations, internal quotation marks, and footnotes are omitted; and (6) all emphases are added.

ECF No. 90). The Court originally dismissed Plaintiff's allegations that Defendants had misrepresented cash-flow and liquidity in part because Plaintiff did not indicate why the amortization of Utility-Scale contracts was of such significance to cash flow that it alone could dictate the Company's ability as a going concern for the next 12 months (Order 25). The Court also found that the complaint did not sufficiently allege the basis for the banks' concerns for the Company as a going concern. Order 26-27.[2] **The SAC addresses all of the Court's concerns by alleging these facts with much greater particularity, to wit:**

- The negative impact on Maxeon from the Utility-Scale contracts amortizations is bolstered with detailed allegations explaining the importance and impact of the Utility-Scale business (¶105), the consequence that no cash was coming in from the Utility-Scale business (¶¶11, 77-81), and that these factors combined with the Company's overall deteriorating cash and liquidity position since May or June 2023 (¶¶76, 82)(which by January 2024 was "**dead in the water**" (¶84)) threatened its continuation as a going concern; and

- The bases for the banks' refusal to extend credit lines without a shareholder guarantee is bolstered by explaining that the banks were very concerned about the Company's business, its ability to repay due to its overall financial condition, and its status as a *de facto* start-up. ¶¶ 66-70, 99, 130.

Despite the above and many more new, detailed and particularized allegations regarding the undisclosed true state of Maxeon's affairs, Defendants argue that the SAC fails to "plead any factual basis" that the Company's ability to continue as a going concern and complete the Albuquerque facility was in jeopardy. MTD 11. This claim is demonstrably incorrect. Defendants rely on certain issues identified by the Court (MTD 13-15), but as explained above, those issues have been rectified in the SAC. Defendants ignore the bulk of the SAC's particularized factual allegations and cherry-pick others to argue against falsity. Moreover, Defendants challenge the SAC's allegations that Defendants knew about the Company's extreme cash and liquidity deficiencies at the beginning of the Class Period by discounting the CW's information as unreliable and not specific. But the CW, a member of Maxeon's treasury team who interacted with the Individual Defendants and has personal knowledge of the facts of this case, provided specific

---

[2]    Plaintiff has not pursued the allegation that Defendants falsely represented that the Company could ramp up direct-to-dealer sales without SunPower, which the Court dismissed. Order 16-21.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MTD THE SAC**        Case No. 3:24-cv-03869-EMC

information about the Company's financial condition and internal efforts to obtain credit from banks. The Court previously rejected Defendants' position that CW-1's information was too generalized as "not entirely convincing." Order 26. The information provided by CW-1 in the SAC is even more detailed than that in the previous complaint and fully supports the SAC's allegations of falsity. The Court should reject Defendants' attempt to discredit CW-1 and should find that the challenged statements were false.

Defendants argue that the false statements are forward-looking, covered by the PSLRA's "safe harbor" provision, and that certain statements expressed corporate optimism.  MTD 6-10. But to be shielded by the Safe Harbor provision, such statements – if forward-looking, which these were not - must be accompanied by meaningful cautionary language. Here, Maxeon's generic and boilerplate warnings were not meaningful and said nothing about the actual risks that were occurring contemporaneously. In any event, they do not shield Defendants' false statements because Defendants had actual knowledge that the risks warned of had already materialized. Finally, whether a statement is treated as "puffery" depends on the context.  Defendants' false statements were made in the context of the Company's ongoing struggles to find capital to fund operations since its cash flow and liquidity were insufficient and by January 2024 were "dead in the water", all of which is and was then verifiable information. ¶84.

Defendants' argument that the SAC's scienter allegations are lacking also misses the mark. MTD 16-20. This case centers around the Company's duty to disclose to investors a fair picture of its cash flow and liquidity to sustain it as a going concern and to complete the much-touted Albuquerque deal, core issues that Defendants regularly discussed (*e.g.*, ¶¶97-98, 100-03) and stated publicly that they were focused on (*e.g.*, ¶105). Defendants regularly updated the market about the Albuquerque deal, and thus had a duty to make full and fair disclosure, which they did not (*e.g.*, ¶¶100, 105). The SAC's scienter allegations are also supported by the CW's testimony, Defendant's admissions at the end of the Class Period, the departure of the CFO, and closeness in time between the false statements and disclosure of the truth.  The SAC's scienter allegations considered independently or holistically are more than sufficient to pass the PSLRA's pleading requirements.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MTD THE SAC**       Case No. 3:24-cv-03869-EMC

Additionally, Plaintiff pleads loss causation by providing "defendants with notice of what the relevant economic loss [or] the causal connection might be[.]" *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346–47 (2005). Here, Plaintiff adequately alleges that Defendants' misstatements and its related truthful disclosure on May 30, 2024 sent Maxeon's stock plunging 39.55%.

For all the reasons stated herein, Defendants' motion should be denied.

## II.    SUMMARY OF FACTUAL ALLEGATIONS

Beginning on November 15, 2023, Defendants falsely assured the market that the Company was "in a good position to generate . . . and maintain sufficient cash levels for [its] existing business," ¶97, that its "current cash, cash equivalents, along with cash expected to be generated from operations [would] be sufficient to meet [its] obligations over the next 12 months," ¶98, "[it was] advancing well in negotiations for multiple offtake agreements, which we plan to execute prior to the closing the DOE loan," ¶100; "the expectation is that [it] will secure the majority of capital needed to build the facility in the months ahead from the DOE and customer co-investments," ¶ 101; and that "suffice to say that these things have come together, the DOE loan and the customer co-investments as the two main pillars of that financing and both of these items are on track." ¶102.

Unbeknownst to investors, however, Maxeon's cash flow and liquidity situation was far worse than represented and its lenders refused to extend lines of credit absent a shareholder guarantee. ¶¶9, 76. Defendants knew that Maxeon was scheduled to reach the peak of its prepayment amortization under its Utility-Scale contracts before the first quarter of 2024. ¶77. This meant Maxeon's cash flow would be negatively impacted by $83 million in Q4 2023 and $67 million in Q1 2024 (without corresponding cash inflow)—the amount in customer prepayments Maxeon had received from these contracts in the quarters prior. ¶¶11, 80.

The situation continued to deteriorate. In the first quarter of 2024, two of Maxeon's largest Utility-Scale customers notified it that they "would not be in a position to accept [module] deliveries under" their contracts, leaving the Company without the expected cash from these deals and with the costs of unused inventory to absorb. ¶¶16, 82. ***By January 2024 the Company's outlook was not viable and the Company was "dead in the water" because of its ongoing***

4

***difficulties getting extensions to its credit facilities.*** ¶72. Despite this, Defendants failed to disclose any information that would alert investors to these mounting issues and instead continued to misrepresent Maxeon's financial condition. ¶105. Less than a month later, however, the Company informed the market that it would be unable to timely file its 2023 annual report, citing "additional ongoing work required in connection with the assessment of the Company's ability to continue as a going concern[.]" ¶106. By this point, however, Defendants were aware that, absent sufficient liquidity support, Maxeon would be unable to continue as a going concern. ¶107.

No longer able to hide the truth, on May 30, 2024, Defendants revealed that: (1) two of Maxeon's Utility-Scale customers were facing "significant project delays," causing the Company to absorb the costs of the unused inventory; (2) market "headwinds unfortunately coincided with the peak of [its] utility scale prepayment amortization," resulting in a "serious cash flow challenge"; (3) there were substantial doubts about the Company's ability to continue as a going concern, ¶¶90, 110-15; and (4) to address immediate liquidity needs, the Company had entered into a stock purchase deal with Chinese-owned TZE that gave TZE control of the Company. ¶¶19, 110, 116. Because this takeover made Maxeon a majority Chinese-owned corporation, Defendants disclosed that its ability to receive the DOE loan needed for its touted New Mexico Utility-Scale plant was now in jeopardy. ¶116.

On this news, Maxeon's stock plunged from a closing price of $3.11 on May 29, 2024, to $2.03 on May 30, 2024, and then to a $1.88 closing price on May 31, 2024, representing a cumulative a drop of 39.55%. ¶¶20, 96, 117. Just one week later, Maxeon announced the abrupt resignation of its CFO, Strohbecke. ¶150.

## III.    STANDARD

In evaluating Defendants' motion, "the court must accept all material allegations in the complaint as true, even if doubtful, and construe them in the light most favorable to the non-movant." *Bos. Ret. Sys. v. Uber Techs., Inc.*, 2020 WL 4569846, at *3 (N.D. Cal. Aug. 7, 2020); *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322–23 (2007).

## IV.    THE SAC ADEQUATELY PLEADS MATERIALLY FALSE AND MISLEADING STATEMENTS

5

Statements are actionable if they are either false or misleading.  *See Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37 (2011).  An "untrue statement of a material fact" is a false statement.  *In re Immune Response Sec. Litig.*, 375 F. Supp. 2d 983, 1016 (S.D. Cal. 2005).  It is also unlawful to "omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  *Matrixx*, 563 U.S. at 37.  "[A] statement is misleading if it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists."  *Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 985 (9th Cir. 2008).  Thus, when defendants choose to speak about a topic material to investors, they put that topic "in play" and assume a duty to speak fully and truthfully about it.  *See id*. at 987.

**A.  Defendants Misled Investors About Maxeon's Cash Flow, Liquidity, And Ability To Complete The "Transformative" 3-GW Facility On Which The Company Was Dependent For Its Continued Existence**

**1.  The SAC Alleges Particularized Facts That Statements 1 and 2 (SAC ¶¶97, 98) - That Maxeon's Cash Flow Was Sufficient - Were False Because Defendants Knew By June 2023 That Cash Flow And Liquidity Were Insufficient To Continue Operations**

Defendants argue for dismissal of Defendant's Statements 1 and 2, that the Company was "in a good position to generate **sufficient cash** and maintain **sufficient cash levels** for [its] existing business" (¶97), and that it "believe[d] that [its] current cash, cash equivalents, along with cash **expected to be generated from operations will be sufficient** to meet [its] obligations over the next 12 months." ¶98. Defendants argue that Plaintiff's alleged reasons for falsity of these statements are based on the same grounds that the Court previously. MTD 13. Defendants also argue that Plaintiff's additional basis for falsity - that it was unlikely Maxeon could get the DOE loan and would have to turn to TZE, which would jeopardize the Albuquerque facility - likewise should be rejected because neither Statements 1 nor 2 mention the DOE loan or Albuquerque. *Id*. Defendants' arguments are without merit and should be rejected.

This Court dismissed statements about the sufficiency of Maxeon's cash flow (previously statement 4) holding that the allegation that less cash would be coming in because Maxeon was at the peak of its prepayment amortization schedule did not mean it could not continue operations for

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MTD THE SAC        Case No. 3:24-cv-03869-EMC

the next 12 months. The Court held this was because there was no allegation that the amortization of the Utility-Scale contracts was of such significance that it alone could dictate whether or not Maxeon would continue as a going concern. Order 25. The SAC cures this deficiency by alleging particularized facts of the significance of the Utility-Scale business to Maxeon (¶105), explaining in detail that having reached the peak of the amortization process meant that no cash would coming in (¶¶11, 77-81) and explaining the specific monetary impact it had on the Company's cash flow (¶¶11, 80). The SAC further bolsters the allegations for falsity by alleging that the Company's cash and liquidity position had been deteriorating since May or June 2023 and that lenders were refusing to extend Maxeon's credit facilities without a shareholder guarantee, which it could not get from TZE due to the impact that could have on the DOE loan. ¶76. These facts, plus the loss of SunPower's business and industry headwinds rendered these positive statements about cash flow false at the time they were made. ¶82.[3]

Defendants' argument that these statements were not false because they do not mention the DOE loan misses the mark. MTD 13. First, the SAC alleges in detail particularized facts that connect the serious cash flow and liquidity problems with the DOE loan. The DOE loan was one part of the financing Maxeon had to obtain to complete the greenfield acquisition in Albuquerque. ¶¶58-59. Defendants knew prior to the Class Period that Maxeon's cash flow and liquidity positions were "bad" (¶9), Maxeon needed an outside infusion of capital, but could not obtain financing from other institutions, absent a shareholder guarantee, which if obtained, would jeopardize the DOE loan. ¶¶9-10, 76. Thus, the only source for additional capital to fully fund the Albuquerque transaction was through TZE.

Moreover, Defendants had a duty to disclose the full truth about Maxeon's cash and liquidity position because they discussed these issues in Statements 1 and 2. By putting Maxeon's cash flow and liquidity into play by discussing these issues in a positive light, Defendants had a duty to speak "fully" and "truthfully" to disclose the factors that were negatively impacting cash

---

[3]    The SAC further alleges that the cash flow issue was further exacerbated when the Company learned in the first quarter 2024 that two of its large Utility-Scale customers canceled deliveries, cutting off cash flow and forcing the Company to absorb inventory costs. ¶82.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MTD THE SAC        Case No. 3:24-cv-03869-EMC

flow and its ability to continue with the promised Albuquerque facility (including the ability to obtain the DOE loan), as discussed in §IV.A.2, *infra*. *In re Apollo Grp., Inc. Sec. Litig.*, 395 F. Supp. 2d 906, 920 (D. Ariz. 2005).[4]

By omitting materially adverse information, Defendants "g[a]ve a reasonable investor the impression of a state of affairs that differ[ed] in a material way from the one that actually exist[ed]." *Applied Signal*, 527 F.3d at 985. In fact, Maxeon's finances and operations were so bad that Standard Chartered Bank ("SCB") and the Bank of China expressed doubts to Defendants about Maxeon's ability to continue as a going concern **because of** their concerns about the Company's ability to repay existing loans. ¶¶9, 66; *see also Oaktree Principal Fund V, LP v. Warburg Pincus LLC*, 2017 WL 3187688, at *19 (C.D. Cal. Jan. 17, 2017) (finding statement about company's "good liquidity position" actionable); *In re SunPower Corp. Sec. Litig.*, 769 F. Supp. 3d 1042, 1053-54 (N.D. Cal. 2025).[5]

> **2.    The SAC Alleges Particularized Facts That Statements 3, 4, 5 and 6 (SAC ¶¶100–03) – Maxeon's Positive Statements About The Financing And Startup Of The New Mexico Facility – Were False And Misleading Because Defendants Knew The Promised Facility Was In Jeopardy**

Defendants' Statements 3, 4, 5, and 6 were positive misstatements about the Company's vital Albuquerque manufacturing facility. Defendants argue that the SAC relies on information from an unreliable CW who provided vague information to allege falsity, which the Court should

---

[4]    The connection here is far stronger than omitting "safety issues" when discussing a car's functional capabilities, like in *Lamontagne v. Tesla, Inc.*, 2024 WL 4353010, at *12 (N.D. Cal. Sept. 30, 2024) (MTD 13), or omitting potential "downside impacts of [its] growth" when discussing its cash position, as was the case in *Monachelli v. Hortonworks, Inc.*, 225 F. Supp. 3d 1045, 1055 (N.D. Cal. 2016) (MTD 14).

[5]    Defendants also incorrectly argue that the statements that the Company would have sufficient cash for next 12 months are inactionable statements of opinion. An opinion is actionable if the speaker does not hold the stated belief. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 180, 184-85 (2015). An opinion is rendered misleading if the basis for the speaker's opinion is omitted and the "omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." *Id*. at 194. As discussed above, Strohbecke and Maxeon were "aware of undisclosed facts tending seriously to undermine the statement's accuracy." *City of Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc.*, 856 F. 3d 605, 616 (9th Cir. 2017). Consequently, this opinion misled investors reading it fairly and in context by concealing those facts. *See infra* § V; *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *3, *13 (D.N.J. Dec. 15, 2015); *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 298-99 (S.D.N.Y. 2013).

8

reject.

However, CW-1 was a member of Maxeon's treasury team who interacted with the Individual Defendants and provided specific information about the Company's financial condition and internal efforts to obtain credit from banks based on his firsthand experience. The Court previously rejected Defendants' arguments to discredit CW-1. Order 26. The information provided by CW-1 in the SAC is even more detailed than that in the original complaint and fully supports the SAC's allegations of falsity. The Court should again reject Defendants' recycled arguments to reject the CW-1 testimony regarding these matters.

Defendants also argue that Plaintiff fails to explain how the omitted information about cash flow, liquidity and going concern rendered the statements misleading. MTD 12. This argument likewise lacks merit. For example, in Maxeon's November 2023 earnings call, Mulligan remarked about the "closing of the DOE loan," while Strohbecke announced that "the expectation is that we will secure the majority of capital needed to build the facility in the months ahead from the DOE and customer co-investments." ¶¶100–01. During the same earnings call, Strohbecke responded to an analyst's question by misleadingly assuring him that Maxeon's "DOE loan" for its New Mexico facility remained "on track." ¶102. The SAC alleges with particularity that at the time Defendants made these statements, Maxeon was struggling to stay afloat and had upended the progress it made toward securing the DOE loan on which it was relying to fund the buildout of its New Mexico plant. According to CW-1, Maxeon's precarious cash flow position became particularly problematic because, in September/October 2023, lenders conditioned any credit extension on the Company first securing a repayment guarantee from one of its largest shareholders. ¶67. Because Chinese-owned TZE was Maxeon's largest shareholder and the DOE classified China as a "foreign entity of concern" to which it disfavored providing loans, TZE's impending financial backing and the increased control over the Company that came with it disrupted Maxeon's efforts to secure the DOE loan. ¶¶10, 64, 69, 71, 147. The true status of Maxeon's DOE loan was therefore far worse than Defendants' rosy portrayals. *See e.g.*, *In re Extreme Networks, Inc. Sec. Litig.*, 2018 WL 1411129, at *32 (N.D. Cal. Mar. 21, 2018) (statements that integration was "on track" actionable where "[d]efendants knew or . . .

9

reckless[ly]" disregarded contrary facts); *see also Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1158-59 (N.D. Cal. 2015).

This is not, as Defendants suggest, "sheer speculation," MTD 12, but a "plausible and coherent narrative" formed by a CW who "was in a position to be personally knowledgeable" about his allegations. *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484-85 n.5 (9th Cir. 2019).[6]

Maxeon's statement in its November 2023 6-K discussing its "plan[s] to re-engineer [its] line manufacturing capacity . . . ahead of the start-up of [its] planned manufacturing facility in Albuquerque," ¶103, was similarly misleading because it put the New Mexico facility in play, giving rise to a "duty to disclose" the foregoing "adverse facts" known to Defendants when making those statements. *Homyk v. ChemoCentryx, Inc.*, 2023 WL 3579440, at *12 (N.D. Cal. Feb. 23, 2023).

Courts in the Ninth Circuit have routinely found similar statements to be actionable statements of present fact and thus not protected by the PSLRA's safe harbor. *See e.g., In re Copper Mountain Sec. Litig.*, 311 F. Supp. 2d 857, 880 (N.D. Cal. 2004) (statements that business was "on track" not forward-looking); *In re MGM Mirage Sec. Litig.*, 2013 WL 5435832, at *7–8 (D. Nev. Sept. 26, 2013) (statement that project was "on track" "relat[ed] to current conditions."); *In re Quantumscape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 737 (N.D. Cal. 2022) (statement regarding cost "expect[ations]" not forward-looking because it conveyed present assessment of technology).

**3.    The SAC Alleges Particularized Facts That Statement 7 (SAC ¶105) - April 8,**

---

[6]    Defendants' authorities to the contrary involve CWs far more removed from the conduct at issue than CW-1 was here. In *In re Accuray, Inc. Securities Litigation*, none of the CWs claimed to have discussed with the defendants any facts related to or contradicting their public statements. 757 F. Supp. 2d 936, 944-45 (N.D. Cal. 2010). MTD 12. Likewise, none of the CWs in *Sayce v. Forescout Technologies, Inc.* "reported to individual defendants . . . or personally heard individual defendants speak about" facts adverse to the challenged misstatements. 2021 WL 1146031, at *8 (N.D. Cal. Mar. 25, 2021). MTD 12. *See also Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 996 (9th Cir. 2009) (CWs not "in a position to be personally knowledgeable of the information alleged"); *Elec. Workers Pension Fund, Loc. 103, I.B.E.W. v. HP Inc.*, 2021 WL 4199273, at *7 (N.D. Cal. Sept. 15, 2021) (CWs "neither reported to, met, nor had contact with Individual Defendants"). MTD 12.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MTD THE SAC**        **Case No. 3:24-cv-03869-EMC**

**2024 Statement About Enabling Maxeon's Return To Profitability – Was False Because The Company Was Not Returning To Profitability And In Fact Was Days Away From Announcing The Takeover By TZE**

Despite Maxeon's deepening financial crisis that jeopardized the vital Albuquerque plant, Defendants continued to portray Maxeon's financial condition as stable and assured investors of its continued growth. On April 8, 2024, Mulligan stated that Maxeon was focused on "liquidity-management to enable a return to profitability." ¶105. This statement was not in line with the true state of Maxeon's finances because it put in play its liquidity crisis, giving rise to disclose the full truth about it. ¶¶17–19, 79.[7]

Defendants argue for dismissal of this Statement based on the Court's prior ruling. MTD 14. But as discussed above, those arguments no longer apply because the SAC contains far more detailed allegations that have addressed the Court's concerns establishing falsity for these Statements.

4. **The SAC Alleges Particularized Facts That Statement 8 (SAC ¶106) - April 30, 2024 Statement That Delay In SEC Filing Was Due To Ongoing Work To Assess The Company's Ability As Going Concern – Was False Because Defendants Knew The Company Could Not Continue Without Outside Capital**

Shortly after announcing positive preliminary results for fiscal year 2023, Maxeon announced that it needed "additional time [to file its 20-F] to complete its financial statement preparation and review process," citing, in part, the "ongoing work required in connection with the assessment of the Company's ability to continue as a going concern[.]" ¶106. This statement was objectively materially misleading because Defendants already knew at this time that Maxeon would be unable to continue as a going concern absent significant liquidity support. ¶¶17, 21, 94–95; *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 457, 494–95, 498 (S.D.N.Y. 2011) ("deni[als] [of] a liquidity crisis" were misleading).

By providing the specific bases for Maxeon's lenders' opinions and including the strategic steps those lenders took to convey their doubts to Defendants about Maxeon's inability to continue as a going concern (*see* §IV.A.2), Plaintiff does not merely "recycle[] the falsity allegations" made

---

[7]    *Brody v. Transitional Hospitals Corp.* is distinguishable. MTD 12-13. There, the statement at issue "neither stated nor implied anything regarding" what plaintiff alleged defendant's statement misleadingly omitted. 280 F.3d 997, 1006 (9th Cir. 2002).

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MTD THE SAC**        Case No. 3:24-cv-03869-EMC

in its previous complaint as argued by Defendants (MTD 15), but rather provides "additional allegations by [which] it can[] plausibly be said Defendants knew in April 2024 that it could not continue as a going concern." Order 31.

**5.    The SAC Alleges Particularized Facts That Statement 9 (SAC ¶108) - The April 8, 2024 Statement That The Company Was Executing On Its IBC Capacity – Was False For Failing To Disclose That The Albuquerque Facility Was In Jeopardy**

In Maxeon's April 8, 2024 press release, Mulligan discussed how Maxeon was "executing a transformation of [its] IBC capacity timed to coincide with the current DG market slowdown." ¶108. This statement was false and/or misleading because by this time, Defendants already knew that the Albuquerque facility, as promised to investors, was in jeopardy.

Defendants argue against falsity on the grounds that the statement does not reference the Albuquerque facility. MTD 15. Here again, Defendants ignore Plaintiff's well-pled allegations. Mulligan was clearly referring to the New Mexico facility that Defendants when discussing increasing capacity. *See* ¶¶100, 105 (discussing increasing capacity at New Mexico facility). Indeed, the SAC expressly alleges that the reference to a "transformation" in production capacity made on April 8 is talking about the Albuquerque facility. ¶ 108.

Defendants misrepresented the true state of this "transformation" because Mulligan failed to disclose the serious setbacks affecting the Company's New Mexico facility—the very project intended to deliver that transformation. *See e.g.*, *In re Cigna Corp. Sec. Litig.,* 2005 WL 3536212, at *11 (E.D. Pa. Dec. 23, 2005) (defendant's statement about the "progress and status" of its "[t]ransformation project" was actionable).

**B.    Defendants' Statements Are Not Inactionable Puffery**

Defendants argue that Statements 1, 3, 4, 5, and 7 are inactionable "puffing" statements of corporate optimism. MTD 9-10. But whether a statement amounts to puffery depends on the context in which it was made. *Mulligan v. Impax Laby's, Inc.*, 36 F. Supp. 3d 942, 966 (N.D. Cal. 2014). A statement is considered "puffery" or corporate optimism only if it is not "capable of objective verification" and is so "exaggerated" or "vague" that no reasonable investor would rely

12

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MTD THE SAC        Case No. 3:24-cv-03869-EMC

on it. *In re Impac Mortg. Holdings, Inc. Sec. Litig.*, 554 F. Supp. 2d 1083, 1096 (C.D. Cal. 2008).[8] Puffery or "general statements of optimism, when taken in context, may [be actionable] when those statements address specific aspects of a company's operation that the speaker knows to be performing poorly." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1143 (9th Cir. 2017).

As set forth in §§IV.A.1, 2, 3, 5, *supra*, the statements in ¶¶97, 100–02, and 105 gave investors the misleading impression that Maxeon had sufficient cash to sustain its operations for at least the next 12 months and that there had been no setbacks in obtaining the DOE loan needed to build its New Mexico facility, despite facts known to Defendants that directly contradicted these statements.

These are not the types of statements courts excuse as mere puffery because they pertain to Defendants' then-existing beliefs about Maxeon's financial results and operational prospects and were contradicted by objectively verifiable adverse facts known at the time. *In re InterMune, Inc. Sec. Litig.*, 2004 WL 1737264, at *4 (N.D. Cal. July 30, 2004) (finding "[p]rojections and general statements of optimism" actionable where facts contrary to projections existed); *see also City of Roseville Emps.' Ret. Sys. v. EnergySolutions, Inc.*, 814 F. Supp. 2d 395, 412 (S.D.N.Y. 2011).

The late disclosure of Maxeon's Utility-Scale contract delays on May 30, 2024 rightfully gave an analyst pause, who asked if Maxeon was previously aware of these issues. ¶114. Aschenbrenner's admission that Maxeon "w[as] informed [in] earl[y 2024] that [its Utility-Scale customer] would not be in a position to accept those deliveries under [the] contracted schedule," *id*., confirms Plaintiff's allegations. *See City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 368 (S.D.N.Y. 2012) (reactions of securities analysts supported inference of materiality at the MTD stage).

The same is true of Strohbecke's statement that Maxeon's "DOE loan . . . [was] on

---

[8]    Defendants' authorities are inapposite. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) ("the market already knew" the facts adverse to defendants' optimistic statements); *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1110–11 (9th Cir. 2010) (facts adverse to defendant's optimistic statements had already been disclosed); *In re Apple Comput., Inc.*, 127 F. App'x 296, 304 (9th Cir. 2005) (defendant's optimistic statements were "plausibly held"). MTD 10.

13

track"—it was made directly in response to an analyst's inquiry and contradicted his knowledge of the progress the Company was making toward securing the DOE loan.  ¶102; *see also* ¶57 (analyst reporting "strong" "value proposition" and giving Maxeon "buy rating" because its New Mexico facility "enables assurance of supply as well as domestic content" and "will drive demand across US utility scale").

### C.    Defendants' Statements Are Not Protected by the Safe Harbor

Defendants argue that Statements 2, 3, 4, 5 and 7 are forward-looking and protected by the PSLRA safe harbor. MTD 6-9. Even if Defendants' statements —that the Company was "focus[ing] on . . . liquidity-management to enable a return to profitability," ¶105; that its "***current cash*** [***position***] . . . will be sufficient to meet [its] obligations," ¶98; that Maxeon was "advancing well in negotiations for multiple offtake agreements, which [it] plan[ned] to execute prior to the closing of the DOE loan," ¶100; that Maxeon's "expectation [wa]s that [it] will secure the majority of capital needed to build the facility in the months ahead from the DOE and customer co-investments," ¶101; or that the Company's "DOE loan" was "on track," ¶102—are deemed forward-looking, they are not protected by the PSLRA's safe harbor because they were not accompanied by meaningful cautionary language and/or were made with actual knowledge of their falsity.  15 U.S.C. § 78u-5(c)(1).

First, the boilerplate risk "disclosures" in the Company's SEC filings—warning that Maxeon may not "be successful in obtaining a final loan guarantee from the DOE" and therefore successfully "develop a manufacturing facility in the United States," and the various boilerplate risk disclosures related to its liquidity, such as that Maxeon "***may*** be unable to generate sufficient cash . . . or make necessary capital expenditures," *see* ECF No. 101, page 268—were not meaningful because Defendants did not disclose that these contingencies were not mere possibilities but were in fact already occurring. Indeed, lenders had already began requiring guarantees from Maxeon's largest shareholders as a condition of continued lending—because of their concerns about Maxeon's ability to continue as a going concern and repay its loans. ¶¶9, 67 Additionally, Maxeon had already faced significant setbacks that impaired its ability to secure the DOE loan as represented.  ¶¶10, 76; *Flynn v. Sientra, Inc.*, 2016 WL 3360676, at \*2 (C.D. Cal.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MTD THE SAC        Case No. 3:24-cv-03869-EMC

June 9, 2016) (risk disclosures misleading because risk warned of already materialized); *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("[A] company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized.").[9]

Moreover, these so-called "risk disclosures" were especially meaningless because they repeated the same language that accompanied statements made months before May/June/September of 2023—*i.e.*, before the Company's cash flow situation became dire and before its efforts to obtain the DOE loan were frustrated. *Compare* Maxeon Form 20-F at 3-4 (Mar. 7, 2023) (ECF No. 101, Ex. 4) *with* Form 6-K, Ex. 99.1, Press Release 16-17 (Nov. 15, 2023) (ECF No. 101, Ex. 9). As such, they did nothing to warn investors that Maxeon's circumstances had changed materially. *See Slayton v. Am. Express Co.*, 604 F.3d 758, 773 (2d Cir. 2010); *Immune*, 375 F. Supp. 2d at 1033–34 (quoting *Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991)).

***The forward-looking statements are also not entitled to safe harbor protection because Defendants knew they were false or misleading when made.*** A speaker has actual knowledge of a forward-looking statement's falsity if one or more of the following implicit factual representations is not true: "(1) that the statement is genuinely believed; (2) that there is [a] reasonable basis for that belief; and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement." *In re InfoSonics Corp. Sec. Litig.,*

---

[9] The cases Defendants cite are inapposite because they involve statements accompanied by cautionary language addressing risks that had not yet materialized. *Wochos v. Tesla, Inc.*, 985 F.3d 1180, 1192 (9th Cir. 2021) (Tesla's statements did not "describe[] specific, concrete circumstances that ha[d] already occurred"); *In re Pivotal Sec. Litig.*, 2020 WL 4193384, at *16 (N.D. Cal. July 21, 2020) (challenged statements had "cautions" that "addressed the very [risks] [p]laintiffs challenge"); *Nat'l Elevator Indus. Pension Fund v. Flex Ltd.*, 2021 WL 6101391, at *2 (9th Cir. Dec. 21, 2021) (court only addressed whether statements were forward looking and did not examine cautionary risk disclosures or whether risks had materialized); *Monachelli*, 225 F. Supp. 3d at 1056 (risk disclosures accompanying liquidity projections addressed the unmaterialized risks plaintiffs challenged); *Garcia v. Hetong Guo*, 2016 WL 102213, at *9 (C.D. Cal. Jan. 7, 2016) (there was no evidence that the defendant-company "was faltering, hemorrhaging money, and desperately short of operating cash" when it otherwise announced that it expected "that [its] . . . cash . . . w[ould] be sufficient . . . for the next 12 months."). MTD 7 & n.3.

---

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MTD THE SAC**        **Case No. 3:24-cv-03869-EMC**

2007 WL 2301757, at *10 (S.D. Cal. Aug. 7, 2007); *see also Slayton*, 604 F.3d at 775; *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 388 (9th Cir. 2010).[10]

## V.    PLAINTIFF ADEQUATELY PLEADS SCIENTER

"To plead scienter adequately, the complaint must state with particularity facts giving rise to a strong inference that defendants engaged in knowing or intentional conduct, which includes deliberate recklessness." *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200, 1206 (9th Cir. 2016). An actor is deliberately reckless if he "had reasonable grounds to believe material facts existed that were misstated or omitted, but nonetheless failed to obtain and disclose such facts although [the actor] could have done so without extraordinary effort." *Intuitive*, 759 F.3d at 1063. The Court must review the SAC's allegations holistically to determine if Plaintiff has alleged a strong inference of scienter. *Zucco*, 552 F.3d at 992. The inference must be "cogent" and "at least as likely as any plausible opposing inference"; thus, a tie goes to the plaintiff. *Tellabs*, 551 U.S. at 324, 328. No "smoking-gun" is required. *Id.* at 324; and "[v]ague or ambiguous allegations" are "properly considered[.]" *S. Ferry LP, # 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008).

### A.    Defendants' Knowledge Of And Access To Information

In the Ninth Circuit, plaintiffs may plead scienter by showing either that the defendants had actual knowledge of, ***or likely had access to***, facts that contradicted their contemporaneous statements or otherwise rendered them misleading. *In re Amgen Inc. Sec. Litig.*, 2014 WL 12585809, at *9-10 (C.D. Cal. Aug. 4, 2014). Here, the SAC pleads that each Individual Defendant had actual knowledge of and/or access to the truth regarding the facts that contradicted their public statements through, *inter alia*, the detailed account of a CW with close ties to Defendants and direct access to the topics at issue. ¶¶65-67, 71, 128, 130-32.[11]

---

[10]    Defendants' remaining cases are unpersuasive because the statements involved projections that were not undermined by any then-known undisclosed facts. *See Intuitive*, 759 F.3d at 1058 ("growth and revenue projections" not undermined by any "then-present effects and circumstances."); *Cutera*, 610 F.3d at 1112 (company conditioned "its ability to compete and perform in the industry" on "ability of its sales force to sell products to new customers and upgrade[] products to current customers" before risk materialized). MTD 8.

[11]    Defendants' cases to the contrary are unavailing. *See Lipton v. Pathogenesis Corp.*, 284 F.3d 1027, 1035–36 (9th Cir. 2002) (plaintiffs offered a "general assertion" about what they ***believed*** the internal data showed); *Intuitive*, 759 F.3d at 1063 (plaintiffs relied on witnesses who

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MTD THE SAC**        Case No. 3:24-cv-03869-EMC

A complaint relying on statements from CWs to show scienter "must pass two hurdles to satisfy the PSLRA pleading requirements." *Zucco*, 552 F.3d at 995. First, the CW "must be described with sufficient particularity to establish their reliability and personal knowledge." *Id.* "Second, those statements which are reported by [CWs] with sufficient reliability and personal knowledge must themselves be indicative of scienter." *Id.*

Here, the SAC explains with specificity Mulligan's and Strohbecke's access to and knowledge of facts that contradicted their public statements about Maxeon's cash flow and liquidity. For example, Senior Manager of Project Finance and Treasury Team member CW-1 explained that the Company's cash and liquidity position had been deteriorating since May or June of 2023. ¶9. The cash and liquidity problems arose due to the Company reaching the peak of its critically important Utility-Scale prepayment amortization (¶¶76-81, 137-41) and the lack of sales to SunPower. ¶¶82, 138.

The timing and amount of these prepayments were specifically written into Maxeon's contracts, and as Mulligan would later explain, their schedule was known and set to peak in "early" 2024. ¶113. Defendants' frequent discussions of their focus on liquidity management and the Utility-Scale business reinforces that they either knew or were reckless in not knowing the relevant schedule and its impact on cash flow and liquidity, as set forth in §IV.A.1, *supra*. *See e.g.*, *LifeLock, Inc.*, 780 F. App'x at 485 (public statements about topic, when "[t]aken together . . . suggest that [defendant] paid attention to . . . and received detailed information about [it]").

With the decline in cash flow, the Company was in need of capital and its liquidity was seriously problematic. CW-1—who worked with lenders to extend Maxeon's lines of credit—explained that lenders were refusing to extend Maxeon's credit facilities without a loan guarantee which Maxeon was not in a position to obtain for fear that it would negatively impact the critical pending DOE loan application. ¶¶66-67, 70, 76, 130. Even with such a guarantee, no other bank

---

lacked firsthand knowledge of "Intuitive's financial health" or what the defendants knew about it); *Aramic LLC v. Revance Therapeutics, Inc.*, 2024 WL 1354503, at *13 (N.D. Cal. Apr. 2, 2024) (declining to impute a defendant's knowledge to another solely because the defendant "report[ed]" to him). MTD 17-18.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MTD THE SAC**        Case No. 3:24-cv-03869-EMC

besides SCB was willing to extend Maxeon's credit facilities. ¶76. **CW-1 conveyed this information to Strohbecke and Mulligan directly**. ¶¶62, 65–67, 70, 130.

This allegation is also supported by Maxeon's August 2023 6-K, providing that the Company was in renewal talks with SCB to extend its Revolving Credit Agreement set to expire in October 2023. Maxeon, Report of Foreign Private Issuer, Ex. 99.1 at 27 (Form 6-K) (Aug. 10, 2023);[12] *see e.g., In re SeraCare Life Scis., Inc. Sec. Litig.,* 2008 WL 11508499, at *8-9 (S.D. Cal. Mar. 14, 2008) (finding scienter where corroborating details supported confidential witness account).

Defendants were aware of this adverse information because they received it not only from CW-1, but also, according to CW-1, from the DOE directly when they were present at Maxeon's meetings with them. ¶65. During these multiple meetings with the DOE, the DOE **made clear to Defendants**, around September/October 2023, that its position that Maxeon should "go anywhere [other than TZE] for more financing" to ensure the Company did not give TZE additional control over its operations. ¶¶65, 131. These facts belie Defendants' contention that CW-1's allegations have "no bearing on Defendants' state of mind or knowledge as of November 15, 2023, when Statements 1-6 were made." MTD 16–17.[13]

Plaintiff satisfies the standard of this Court and other Ninth Circuit courts that credit CW allegations where they "describe[] [the witness] with sufficient particularity to establish their reliability and personal knowledge." Order 17; *see also In re Dura Pharms., Inc., Sec. Litig.*, 548 F. Supp. 2d 1126, 1135 (S.D. Cal. 2008) (CW who "attend[ed] cross-functional meetings" and "work[ed] for someone who directly reported to [defendant], is a reliable source"); *In re Gilead*

---

[12]    https://www.sec.gov/Archives/edgar/data/1796898/000179689823000054/interimfinancialstatementsa.htm.

[13]    Defendants' argument about "what [may] have occurred in the intervening months" between when CW-1 left the Company in January 2024 and when Defendants made the challenged statements of April 2024, MTD 17, also fails because it requires the court to resolve a factual dispute and impermissibly draw unsupported inferences in Defendants' favor—both of which are inappropriate at the motion to dismiss stage. *See Robb v. Fitbit Inc.,* 216 F. Supp. 3d 1017, 1025, 1029-30 (N.D. Cal. 2016). Indeed, it remains highly unlikely that although Maxeon was already experiencing struggles with its cash flow and liquidity, and despite confirming the foregoing issues just three months later, Defendants somehow received contrary developments in the interim.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MTD THE SAC**        Case No. 3:24-cv-03869-EMC

*Scis. Sec. Litig.*, 2009 WL 1561584, at *3 (N.D. Cal. June 3, 2009) (refusing to discount CW's "allegations about his/her own experiences" such as pre-Class Period meetings).[14]

In addition to the CW's allegations, the Individual Defendants' own statements support their access to contradictory facts.  For example, their collective admissions that Strohbecke was "laser-focused on cash management," ¶126, that Defendants had a "continued focus on working capital management," ¶135, and were "highly focused on . . . liquidity-management to enable a return to profitability," ¶144, represent "specific admissions from top executives that they . . . monitored" specifics about the Company's cash flow and liquidity.  *In re Daou Sys., Inc. Sec. Litig.*, 411 F.3d 1006, 1022-23 (9th Cir. 2005). These statements also support the fact that Defendants were aware of the Company's financing options and their impacts on the status of Maxeon's DOE loan.  *See S. Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1258 (W.D. Wash. 2009) (inferring scienter from defendants' admissions); *Nursing Home Pension Fund, Loc. 144 v. Oracle Corp.*, 380 F.3d 1226, 1231 (9th Cir. 2004) (scienter allegations sufficient because they included details about the defendants' access to information within the company).

Moreover, Defendants' positions as CEO and CFO of Maxeon strongly supports their access to information that directly contradicted their public statements.  ¶127.  Both were tasked with overseeing the Company's operations and updating the market about Maxeon's finances and prospects.  *Id.*  Indeed, as CEO and CFO, Mulligan and Strohbecke, respectively, were necessarily required to be informed about the Company's cash flow and liquidity situation, its impact on a project that the Company staked its survival on, and its available financing options.  ¶¶4 n.1, 6, 56; *see, e.g.*, *Reese v. Malone*, 747 F.3d 557, 575-76 (9th Cir. 2014); *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1026 (N.D. Cal. 2020).

**B.    The Core Operations Theory Supports Defendants' Scienter**

Plaintiff's "[a]llegations regarding management's role in [the corporate structure]" also satisfy scienter under the following prongs of the core operations theory: (1) the allegations may

---

[14]    Defendants' authorities fail to undermine CW1's reliability.  In *Nguyen v. Endologix, Inc.*, the CW "lack[ed] any detail about the supposed . . . problems [the company] encountered . . . ." 962 F.3d 405, 416 (9th Cir. 2020). MTD 17. In *Zucco*, the CWs had "only secondhand information" about the fraudulent practices at issue.  552 F.3d at 996. MTD 17.

be viewed as part of the holistic analysis; (2) they alone suffice "where they are particular and suggest that defendants had actual access to" the information; and (3) they alone suffice where "the relevant fact[s] [are] of such prominence that it would be absurd to suggest that management" was unaware of them. *Reese*, 747 F.3d at 575–76.[15]  The second prong of the doctrine closely mirrors the "access" standard for scienter and, as set forth in § V.A, *supra*, Plaintiff has more than sufficiently pleaded Defendants' access to the concealed information.  Under the third prong, when the subject of management's misleading statements is so integral to the company that it is "absurd to suggest" management was unaware of the misrepresentation, scienter may be presumed without any direct facts showing the defendants' knowledge. *Applied Signal*, 527 F.3d at 988 n.5, 989.[16]

Maxeon's DG business cash-flow was hurt by the termination of the SunPower contract. Its Utility-Scale cash-flow was hurt because the Company reached the peak of its prepayment amortization schedule and was not getting new orders and/or prepayments. ¶145. The Company was telling shareholders it was shifting its focus to Utility-Scale business which it sought to expand with its transformational 3.5 GW New Mexico manufacturing facility. ¶138. Mulligan stated that the Utility-Scale market was "becoming the major part of our shipments…So that is the primary growth for us." *Id*. Strohbecke similarly confirmed that the majority of sales went to Utility-Scale customers. ¶¶ 139-40.  The greenfield acquisition in New Mexico was a critical component to grow the Utility-Scale business. ¶ 56, 108. Indeed, the Company admitted that the factory would "upsize . . . its US manufacturing operations by approximately 50%," "meet rapidly growing demand for domestically produced solar panels," and help ease the supply issues related to importing panels from the U.S. to China. ¶¶5–6, 56.  In order to fund the facility's build out—an endeavor the Company could not otherwise afford—Maxeon was heavily reliant on an over $1.2

---

[15]     *Reese* was overruled in part by *Align Technology*, 856 F.3d at 614–16, to the extent that its analysis of falsity of opinions is irreconcilable with *Omnicare*.  The *Align Technology* decision does not alter *Reese*'s analysis of scienter for false or misleading statements of fact.

[16]     Neither one of Defendants' authorities supports their position.  *See Intuitive*, 759 F.3d at 1062-63 (finding core operations satisfied but insufficient to establish scienter where no other facts alleged to support defendants' knowledge of contrary facts); *Chi. & Vicinity Laborers' Dist. Council Pension Fund v. Amplitude, Inc.*, 2025 WL 82206 at *2  (N.D. Cal. Jan. 13, 2025) ("core operations inference . . . fails because the complaint does not state with enough specificity what it is that the defendants must have known."). MTD 18.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MTD THE SAC**          Case No. 3:24-cv-03869-EMC

billion loan from the DOE. ¶146. The prominence of these operations is also supported by Mulligan's Class Period statements highlighting the "meaningful[]" "contribution" it would provide Maxeon over the coming years and his "excite[ment] about getting th[e] project up and running." ¶57.

In its 2024 annual report, Maxeon staked its very existence in part on obtaining financing for the successful buildout of the New Mexico facility, stating that: *"Our continued existence is dependent on our ability to restructure our business to focus on the U.S. Market, including the development of our manufacturing facility in New Mexico which is contingent on necessary funding . . . ."* ¶4 n.1; *see e.g.*, *In re CV Therapeutics, Inc. Sec. Litig.*, 2004 WL 1753251, at *10 (N.D. Cal. Aug. 5, 2004) (scienter adequately pled where "[t]he Company's survival depend[ed] on the approval of" the drug at issue); *Mulligan*, 36 F. Supp. 3d at 970.

Defendants' argument that core operations does not apply because the SAC does not allege that Defendants were aware of specific information contradicting challenged statements (MTD 18) is demonstrably incorrect. The SAC alleges specifically that Defendants knew and/or were reckless in not knowing that cash flows would be negatively impacted after reaching the peak of prepayment amortizations (¶80), that the Company's credit facility was downgraded (¶83), and admitted in April 2024 that the Company was assessing its ability to continue as a going concern (¶ 86).

C.      **Sufficient Motive Exists To Commit The Fraud Alleged Herein**

Although allegations of motive are not required, *see Tellabs*, 551 U.S. at 325, the SAC sufficiently alleges that Defendants had ample motive to misrepresent the truth about Maxeon's operations and financial condition in order to try to obtain capital from sources other than TZE.[17] This was essential in order to preserve the opportunity to obtain a DOE loan (over $ 1.2 billion) to

---

[17]      Defendants also argue, in passing, that SAC lacks traditional indicia of fraud, e.g., stock sales. MTD 20. This is a red herring. Stock sales are not required to show motive. The SAC contains other strong scienter allegations including a plausible motive to commit the fraud alleged herein. As such, the lack of insider stock sales is of no consequence. *See e.g.*, *Siracusano v. Matrixx Initiatives, Inc.*, 585 F.3d 1167, 1182-83 (9th Cir. 2009), *aff'd sub nom.*, *Matrixx*, 563 U.S. 27 (finding scienter without insider sales); *In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1122 (N.D. Cal. 2017). MTD 20.

21

finance Maxeon's expansion in Albuquerque*, on which the Company's "continued existence" was "dependent . . . ."* ¶4 n.1. *See e.g.*, *In re U.S. Aggregates, Inc. Sec. Litig.*, 2003 WL 252138, at *4 (N.D. Cal. Jan. 24, 2003) ("additional, powerful motive for Defendants to inflate U.S. Aggregates' revenues: to allow [them] to continue to borrow the money that it needed to operate"); *Howard v. Everex Sys.*, 228 F.3d 1057, 1064 & n.8 (9th Cir. 2000) ("motive to inflate sales to raise financing" circumstantial evidence of scienter).[18]

**D.     The Timing of Strohbecke's Resignation Adds to the Inference of Scienter**

The abrupt departure of Maxeon's CFO, Strohbecke, "just one week after the truth about Maxeon's cash flow, liquidity issues and consequential restructuring and takeover by TZE were revealed to the market," causing the stock to "drop . . . 39.55%, over two consecutive trading days," coupled with the fact that "Maxeon [had not yet] found a viable replacement," ¶¶150, 155, is clouded with the exact type of "uncharacteristic [and] . . . suspicious circumstances" courts routinely consider indicative of scienter.  *Brendon v. Allegiant Travel Co.*, 412 F. Supp. 3d 1244, 1262 (D. Nev. 2019) (citing *Zucco*, 552 F.3d at 1002); *In re Myriad Genetics, Inc. Sec. Litig.*, 2021 WL 977770, at *22 (D. Utah Mar. 16, 2021) (departure "with no successor identified," supports scienter).

**E.     The Temporal Proximity Of Defendants' Misstatements And Their Revelation Of The Truth Supports Scienter**

The temporal proximity of the relevant disclosures "bolster[] the inference that [D]efendants knew about [the problem] when they made the [misleading] statement[s]." *Applied Signal*, 527 F.3d at 988 n.5; *In re Secure Computing Corp. Sec. Litig.*, 184 F. Supp. 2d 980, 990 (N.D. Cal. 2001) (close temporal proximity between defendants' positive and negative financial disclosures was "[f]urther circumstantial support for the inference of deliberate recklessness").

On May 30, 2024, Maxeon disclosed that its cash-flow and liquidity problems were so severe (and risked its future as a going concern) that it had to obtain financing through a dilutive

---

[18]    Defendants' cited authorities against Defendants' motivation are unpersuasive. Indeed, ensuring Maxeon's ability to "exist[]", ¶4 n.1, goes far beyond the "routine business objectives" at issue in Defendants' cases. *See e.g,.  In re Rigel Pharms., Inc. Sec. Litig.*, 697 F.3d 869, 884 (9th Cir. 2012); *Lipton*, 284 F.3d at 1038.  MTD 19.

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MTD THE SAC**          **Case No. 3:24-cv-03869-EMC**

equity investment from TZE, which jeopardized its DOE loan and the transitional expansion in New Mexico on which the Company's "continued existence" was dependent. ¶¶4 n.1, 110-16. This disclosure occurred approximately six months after Defendants' November 15, 2023 misstatements that misrepresented the Company's cash flow, liquidity and state of the Albuquerque facility. ¶¶97, 100. Ninth Circuit courts have found gaps between misstatements and their relevant truth, similar to or greater than those present here, to be supportive of scienter. *See e.g.*, *Reese*, 747 F.3d at 575; *Roberti v. OSI Sys., Inc.*, 2015 WL 1985562, at *11 (C.D. Cal. Feb. 27, 2015).[19]

## VI.    PLAINTIFF ADEQUATELY PLEADS LOSS CAUSATION

Pleading loss causation is a "low bar," *In re WageWorks, Inc., Secs. Litig.*, 2020 WL 2896547, at *8 (N.D. Cal. June 1, 2020), as the allegations need only meet "the familiar test for proximate cause," which can be met in "an infinite variety of ways . . . ." *Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750, 753 (9th Cir. 2018).  For example, to prove loss causation under the corrective disclosure theory, it must be shown that "the revelation of that misrepresentation or omission was a substantial factor in causing a decline in the security's price, thus creating an actual economic loss for the plaintiff." *Nuveen Mun. High Income Opportunity Fund v. City of Alameda, Cal.*, 730 F.3d 1111, 1119 (9th Cir. 2013).  Alternatively, under a materialization of the risk theory, "a plaintiff may establish loss causation by alleging that . . . defendants' misstatements and omissions concealed the price-volatility risk (or some other risk) that materialized and played some part in diminishing the market value of the security." *In re Charles Schwab Corp. Sec. Litig.*, 257 F.R.D. 534, 547 (N.D. Cal. 2009).

### A.    The Corrective Disclosure Theory

Defendants' misled investors by touting the progress Maxeon was making toward receiving the loan from the DOE while concealing that its financial condition caused the Company to suffer significant setbacks.  Plaintiff alleges the truth was revealed to the market in an earnings call held

---

[19]    *Yourish v. California Amplifier*, 191 F.3d 983, 997 (9th Cir. 1999), is inapposite because it merely states that temporal proximity *alone* is insufficient.  MTD 19. That is not Plaintiff's sole basis for scienter allegations in the SAC.

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MTD THE SAC        Case No. 3:24-cv-03869-EMC

on May 30, 2024, ¶¶113-16, when it was disclosed that receiving liquidity from TZE would "present new challenges" which was followed by a precipitous decline in Maxeon's share price by a whopping 39.55%. *See also* ¶¶116-17, 149 (alleging that Mulligan disclosed the TZE takeover would complicate Maxeon's DOE loan process). This disclosure and the accompanying decline in Maxeon's share price therefore has a causal nexus to Defendants' statements. *Loos v. Immersion Corp.*, 762 F.3d 880, 887 (9th Cir. 2014) ("[a]t the pleading stage . . . plaintiff need only allege that the decline in the . . . stock price was . . . caused by a revelation of fraudulent activity").[20]

Defendants' argument that the analyst's concerns "cannot serve as a corrective disclosure," MTD 21, about TZE's investment in Maxeon ignores well-accepted Ninth Circuit case law. MTD 21. Indeed, in the Ninth Circuit, a "basic ground rule[]" for pleading loss causation is that "a corrective disclosure need not consist of an admission of fraud by the defendant," but "can instead come from any source," including "analysts[.]" *In re Bofl Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020); *Azar v. Yelp, Inc.*, 2019 WL 285196, at *5 (N.D. Cal. Jan. 22, 2019).[21]

**B.    The Materialization Of The Risk Theory**

The SAC also adequately pleads loss causation by alleging that Defendants failed to disclose that the risk of inadequate cash flow and liquidity ***had already materialized, but that fact was not disclosed to investors.*** There is no statutory safe harbor for such a failure to disclose.

[20]    Defendants' rely on *Oregon Public Employees Retirement Fund v. Apollo Grp. Inc.* to argue that its May 30, 2024 disclosure was "an expression of concern" that does not constitute a corrective disclosure. 774 F.3d 598, 608 (9th Cir. 2014) (MTD 21). However, *Apollo Group* involved allegations that defendants falsely touted "enrollment, revenue growth [and their] business model," which plaintiffs claimed was corrected solely by a disclosure about a "concern that some students enroll and begin attending classes before completely understanding the implications of enrollment[.]" *Id.* at 606, 608. In this case by contrast, Defendants disclosed negative information that was contrary to the positive, false information touted by Defendants. Additionally, in the more recent decision, *In re Genius Brands International, Inc. Securities Litigation*, the court found that a disclosure is corrective so long as it "reveals new facts that, taken as true, render some aspect of the defendant's prior statement false or misleading[.]" 97 F.4th 1171, 1184 (9th Cir. 2024). That is what happened in this case. Moreover, the corrective disclosure need not "preciously mirror" the misrepresentations and omissions. *Id.; see also Smilovits v. First Solar Inc.*, 119 F. Supp. 3d 978, 990-91 (D. Ariz. 2015), *aff'd sub nom. Mineworkers' Pension Scheme v. First Solar Inc.*, 881 F.3d 750 (9th Cir. 2018) (declining to adopt the "more restrictive view of loss causation" in *Apollo Group*, 774 F. 3d at 608).

[21]    *In re eHealth, Inc. Securities Litigation* is similarly inapposite because the corrective disclosure at issue was an earnings call that "confirmed" concerns outlined in a short seller report. 2023 WL 6390593, at *8 (N.D. Cal. Sept. 28, 2023). MTD 22.

24

**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MTD THE SAC**         **Case No. 3:24-cv-03869-EMC**

Defendants knew this and sought to conceal it with false and misleading statements. *Amgen*, 2014 WL 12585809, at *20.

Thus, when the truth was revealed through Defendants' revelations that its cash flow and liquidity position was so dire that it was in jeopardy of going out of business and that it had no choice but give up control of the company to TZE in order to get financing, it "played some part in diminishing the market value" of Maxeon's stock.  ¶149; *see Amgen*, 2014 WL 12585809, at *20; *Cement & Concrete Workers Dist. Council Pension Fund v. Hewlett Packard Co.*, 964 F. Supp. 2d 1128, 1145 (N.D. Cal. 2013).[22]

**VII.    THE COMPLAINT STATES A CLAIM UNDER SECTION 20(a)**

Plaintiff's Section 20(a) claim derives from the primary-violation under Section 10(b) and Rule 10b-5, which as argued above should be sustained. Consequently, Defendants' challenge to Plaintiff's Section 20(a), which is based solely on the dismissal of the Section 10(b) claim, fails. *In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *21 (S.D. Cal. May 23, 2017).

**CONCLUSION**

Plaintiff has corrected all deficiencies in the Amended Complaint and the well-pled allegations in the SAC should stand.   Plaintiff respectfully requests that the Court deny Defendants' Motion in its entirety.[23]

Dated:  August 8, 2025                              Respectfully submitted,

By: /s/ *James M. Wilson, Jr.*
             James M. Wilson, Jr.

James M. Wilson, Jr. (appearance *pro hac vice*)
**FARUQI & FARUQI, LLP**
685 Third Avenue, 26th Floor

---

[22]    The Ninth Circuit has not expressly adopted the materialization of risk theory for loss causation. *See In re Nektar Therapeutics Sec. Litig.*, 34 F.4th 828, 838 n.6 (9th Cir. 2022); *Magro v. Freeport-McMoran Inc.*, 2018 WL 3725781, at *9 (D. Ariz. Aug. 3, 2018). MTD 21 n.7. The Ninth Circuit observed in *Nektar* that it is unclear whether those courts adopting this theory require allegations lesser than what is required by the Ninth Circuit, *i.e.*, allegations that the defendant lied about the very facts causing plaintiffs' losses, which in any event has been alleged in the SAC.

[23]    In the event the Court identifies pleading issues that do not satisfy the pleading requirements of the PSLRA and Federal Rules of Civil Procedure, Plaintiff believes they can be remedied through amendment and respectfully requests permission to amend the SAC in that event. *Eminence Cap., LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1051 (9th Cir. 2003).

25

New York, NY 10017
Telephone: 212-983-9330
Facsimile: 212-983-9331
Email: jwilson@faruqilaw.com

Robert W. Killorin (appearance *pro hac vice*)
**FARUQI & FARUQI, LLP**
3565 Piedmont Road NE Building Four
Suite 380
Atlanta, GA 30305
Telephone: 404-847-0617
Facsimile: 404-506-9534
Email: rkillorin@faruqilaw.com

Lisa T. Omoto SBN 303830
**FARUQI & FARUQI, LLP**
1901 Avenue of the Stars, Suite 1060
Los Angeles, CA 90067
Telephone: 424-256-2884
Facsimile: 424-256-2885
E-mail: lomoto@faruqilaw.com

*Attorneys for Lead Plaintiff
Jeyakumar VS Menon and Lead
Counsel for the putative Class*

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MTD THE SAC        Case No. 3:24-cv-03869-EMC