UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JEYAKUMAR VS MENON, | Case No. 24-cv-03869-EMC |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANTS' MOTION TO DISMISS** |
| MAXEON SOLAR TECHNOLOGIES, LTD., et al., | Docket No. 100 |
| Defendants. | |

Plaintiff Jeyakumar VS Menon has filed a securities class action against (1) Maxeon Solar Technologies, Ltd. and (2) William Mulligan and Kai Strohbecke who were, respectively, Maxeon's CEO and CFO during the relevant period.[1] Plaintiff seeks to represent a class of all persons who purchased Maxeon common stock during the period November 15, 2023, through May 29, 2024, inclusive. *See* Compl. at 1. According to Plaintiff, during this time, Defendants made misrepresentations about Maxeon's financial condition. When the truth was revealed on May 30, 2024, "Maxeon's stock plummeted from $3.11 on May 29, 2024 to $2.03 on May 30, 2024 and then to $1.88 on the close of May 31, 2024, representing a cumulative drop of 39.55%." SAC ¶ 117.

Previously, the Court granted Defendants' motion to dismiss on the basis that Plaintiff had failed to adequately plead falsity. The Court, however, gave Plaintiff leave to amend. Plaintiff thereafter filed his second amended complaint ("SAC"). Now pending before the Court is Defendants' motion to dismiss the SAC. Defendants argue that Plaintiff has again failed to allege

---

[1] Mr. Mulligan was CEO from January 2023 to October 2024. *See* SAC ¶ 30. Mr. Strohbecke was CFO from March 2021 to August 2024. *See* SAC ¶ 31.

falsity.  They further contend that Plaintiff has not sufficiently alleged scienter and loss causation.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument

of counsel, the Court hereby **GRANTS** Defendants' motion.

I.      <u>FACTUAL & PROCEDURAL BACKGROUND</u>

In the operative second amended complaint ("SAC"), Plaintiff alleges as follows.

Maxeon is a Singaporean company.  *See* SAC ¶ 29.  Its CEO during the relevant period

was Mr. Mulligan, and its CFO Mr. Strohbecke.  *See* SAC ¶¶ 30-31.  Maxeon "is a solar power

and renewable energy company that designs, manufactures, markets and sells a comprehensive

portfolio of photovoltaic solar panels and its related components worldwide."  SAC ¶ 2.  Maxeon

was spun off from another company, SunPower, in 2020.  *See* SAC ¶¶ 3, 39.  Its business has two

main components: "(1) Distributed Generation ('DG'), through which [Maxeon] sells products to

SunPower and other suppliers, or direct to consumers for smaller centralized applications; and (2)

Utility[]Scale, through which Maxeon provides solar panels and related support to solar power

plants for large-scale application."  SAC ¶ 3; *see also* SAC ¶¶ 41-43.

The gist of Plaintiff's case is that, by November 15, 2023 (the first day of the class period),

Defendants knew (1) the company was facing a serious cash flow problem – so serious that it

could not continue as a going concern for the next 12 months – and (2) the only way out of the

situation would be to get liquidity support from Maxeon's largest shareholder, TZE, which would

then endanger a loan from the U.S. Department of Energy ("DOE") because TZE is a Chinese

corporation and "China was classified as a 'foreign entity of concern' under the DOE's rules."

SAC ¶ 9; *see also* SAC ¶ 64 (alleging that "DOE has classified China as a 'foreign entity of

concern' under its Interpretive Guidance and disfavored providing loans to companies under such

foreign influence").  But, according to Plaintiff, in spite of such, "Defendants . . . set out to portray

Maxeon as a successful Company with a promising outlook and the ability to repay its financial

obligations . . . ."  SAC ¶ 12.  Plaintiff alleges that the truth was not revealed until May 30, 2024,

when Defendants disclosed, *inter alia*, that Maxeon was getting approximately $200 million in

liquidity support from TZE which gave TZE an increased ownership stake in the company –

indeed, which made TZE the majority shareholder.  *See* SAC ¶ 95.

2

United States District Court
Northern District of California

As alleged, the "liquidity crisis" that Maxeon faced by November 2023, SAC ¶ 13, was the result of the following confluence of events:

- Maxeon was facing several "serious [industry] headwinds": (1) "the Federal Reserve [had] rapidly increased interest rates beginning in 2022 and continuing into 2023, making it more financially burdensome for homeowners to purchase [solar] panels," SAC ¶ 51; (2) California (which "consistently ranks first in the United States for total installed solar capacity and total solar installed") put into effect a new policy that "lower[ed] the credits earned from excess solar energy exported to the grid for future installations," meaning there was less of an incentive to purchase solar panels, SAC ¶¶ 7, 52-53; and (3) there was "excess production capacity and an oversupply of Chinese solar products, [which] triggered new lows for prices in the solar power supply chain in 2023 and into 2024." SAC ¶ 54; *see also* SAC ¶ 55 (alleging that "[t]he oversupply of Chinese solar products created a 'significant supply glut' worldwide causing module prices to drop and solar companies to cancel or suspend their production capacity").

- Maxeon's relationship with SunPower – one of Maxeon's main customers for its DG business and to whom sales accounted for a significant portion of Maxeon's total revenue – soured and essentially came to an end. *See* SAC ¶¶ 3, 8, 46-47, 49 (alleging, *inter alia*, that SunPower accounted for 26.7% of Maxeon's revenue for the 2022 fiscal year).

- For certain customer contracts in the Utility-Scale business, Maxeon was reaching the peak of its prepayment schedule which meant that (1) no more cash would be coming in from those contracts and therefore (2) cash flow and liquidity would be severely impacted unless there were new cash flows, such as from new customer contracts. SAC ¶ 11.

- When Maxeon sought financing from lenders, the lenders indicated they would not extend credit to the company without shareholder guarantees. *See* SAC ¶¶ 66-67.

- While Maxeon's largest shareholder, TZE, could be another source for financing,

3

getting financing from TZE could endanger a massive loan that Maxeon sought from DOE to fund a domestic factory in Albuquerque, New Mexico. DOE expressly told Maxeon to go anywhere else for financing but TZE. *See* SAC ¶ 59-60, 64-65.

According to Plaintiff, the liquidity crisis worsened in early 2024, when two of Maxeon's large Utility-Scale customers told the company that they were "experiencing project delays and 'would not be a position to accept [module] deliveries under' [their] agreed upon contract[s] with Maxeon. This left Maxeon without the expected cash from these deals and unused inventory, the costs of which [it was] forced to absorb." SAC ¶ 81.

Plaintiff alleges that, in November 2023 and April 2024, Defendants made nine false or misleading statements (*e.g.*, in SEC filings, earnings calls, and press releases) about Maxeon's financial condition.[2] Notably, Plaintiff concedes that Defendants *did* disclose some of the reasons behind the alleged liquidity crisis – specifically, the soured relationship with SunPower as well as the multiple industry headwinds.[3] *See, e.g.*, Ho Decl., Ex. 6 (ECF Pages 479, 497) (Maxeon's 6-K, dated August 2023); Ho Decl., Ex. 9 (ECF Pages 555-56) (Maxeon's 20-F, dated November 15, 2023); Ho Decl., Ex. 10 (ECF Page 568) (Maxeon's earnings call, dated November 15, 2023). In addition, Defendants did disclose that Maxeon *had* a prepayment amortization schedule for its Utility-Scale contracts. *See, e.g.*, Ho Decl., Ex. 9 (ECF Page 559) (Maxeon's 6-K, dated November 15, 2023) (disclosing that "customer advances are amortized based on the contractually agreed upon utilization schedule at the point of transfer of control of goods to the customer" and that "customer advances [are] included within 'Contract liabilities, current portion' and 'Contract liabilities, net of current portion in our Condensed Consolidated Balance Sheets'"); Ho Decl., Ex.

---

[2] The appendix attached to this order lists the nine statements.

[3] At the hearing, Plaintiff argued that Defendants downplayed the industry headwinds by stating that they were not unique or unprecedented. *See also* SAC ¶ 13 (alleging such); SAC ¶ 63 (alleging that Mr. Mulligan also said there was a "'very challenging environment'"). But Plaintiff has not based their claims of securities fraud on the contention that it was false or misleading for Defendants to characterize the headwinds as such – possibly because such statements would be nonactionable puffery. *See, e.g.*, SAC ¶ 99 (alleging why Statements Nos. 1 and 2 were false or misleading).

10 (ECF Page 570) (Maxeon's earnings call, dated November 15, 2023) (stating that "[c]ash levels were also impacted by lower shipments and margin dollars from our global DG business, the reduction of contract liabilities related to our U.S. utility-scale business capital expenditures during the quarter, restructuring expenses and a reduction in short-term debt").

Nevertheless, Plaintiff asserts that Defendants failed to disclose that it was facing an existential crisis – *i.e.*, could not continue as a going concern for another 12 months – because of additional factors: (1) that Maxeon was "scheduled to reach the *peak* of its utility-scale prepayment amortization schedule in or before the first quarter of 2024," SAC ¶ 11 (emphasis added); (2) that lenders had refused to extend credit without shareholder guarantees; (3) that financing would likely have to come from TZE which would then put at risk the DOE loan for the touted domestic factory; and (4) that two Utility-Scale customers had experienced project delays.

## II.   DISCUSSION

### A.   Legal Standard

Under Federal Rule of Civil Procedure 12(b)(6), a defendant may move to dismiss a cause of action for failure to state a claim for relief. To overcome a Rule 12(b)(6) motion after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014). The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). But "allegations in a complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

United States District Court
Northern District of California

Because Plaintiff is asserting that Defendants engaged in fraud, Federal Rule of Civil Procedure 9(b) is also implicated.  Rule 9(b) provides that, "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b).

Finally, since Plaintiff is claiming securities fraud specifically, the Private Securities Litigation Reform Act ("PSLRA") imposes additional requirements.

> Under the PSLRA, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Importantly for purposes here, the complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Id.* § 78u-4(b)(2)(A).
>
> The PSLRA's "strong inference" requirement has teeth. It is an "exacting" pleading obligation, *Zucco Partners*, 552 F.3d at 990, that "present[s] no small hurdle for the securities fraud plaintiff." *Schueneman*, 840 F.3d at 705 (quotations omitted). As the Supreme Court has explained, "[t]he strong inference standard unequivocally raised the bar for pleading scienter." *Tellabs*, 551 U.S. at 321 (quotations omitted) (alteration adopted). Given the substantial costs that securities fraud litigation can impose, the "strong inference" standard reflects Congress's attempt to halt early on securities litigation that lacks merit or is even abusive, while allowing plaintiffs with potentially winning claims to proceed to discovery. *See id.* at 323-24.
>
> Acknowledging these interests, the Supreme Court has held that under the PSLRA's "strong inference" standard, a complaint will survive a motion to dismiss "only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." Id. at 324.

*Nguyen v. Endologix, Inc.*, 962 F.3d 405, 414 (9th Cir. 2020).

B.    Falsity

The Court previously granted Defendants' motion to dismiss because Plaintiff failed to plausibly allege that the statements being challenged were false or misleading.  In the pending motion to dismiss, Defendants once again contend that Plaintiff has failed to sufficiently allege falsity.  Defendants also assert that some of the statements were forward looking in nature and

United States District Court
Northern District of California

United States District Court
Northern District of California

accompanied by meaningful cautionary language, *see* 15 U.S.C. § 78u-5(c)(1)(A) (providing that a person shall not be liable for a forward-looking statement if and to the extent the statement is "identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement"), and/or that some of the statements were nonactionable puffery. *See Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc.*, 759 F.3d 1051, 1060 (9th Cir. 2014) (noting that "[s]tatements of mere corporate puffery, 'vague statements of optimism like "good," "well-regarded," or other feel good monikers,' are not actionable because 'professional investors, and most amateur investors as well, know how to devalue the optimism of corporate executives'").

As an initial matter, Defendants fairly contend that at least some of the statements constituted nonactionable puffery. *See, e.g.*, St. No. 1 (in November 2023 earnings call, stating: "[W]e are in a *good position* to generate sufficient cash and maintain sufficient cash levels for our existing business.") (emphasis added); St. No. 7 (in April 2024 press release, stating: "The Maxeon team is *highly focused on . . . liquidity-management to enable a return to profitability*.") (emphasis added).

In addition, some of the statements related to the Albuquerque factory were forward looking in nature and accompanied by meaningful cautionary language. *See* Ho Decl., Ex. 9 (ECF Page 558) (Maxeon's 6-K, dated November 15, 2023) ("We are planning to deploy a multi-GW factory in the United States to manufacture solar products for both the DG and utility-scale power plant markets, contingent upon us securing the necessary funding and other factors beyond our control. If we are unable to secure the necessary funding, to the extent we are delayed in our projected production schedule, or if we fail to achieve our projected production volumes, our plans for the manufacture of Maxeon 7 products, TOPCon solar cells or expansion into the United States market may be significantly impaired."). Notably, Maxeon also made similar warnings in other SEC filings before November 2023. *See, e.g.*, Ho Decl., Ex. 4 (ECF Page 268) (Maxeon 20-F, for fiscal year ending January 1, 2023) ("Our plans to expand into domestic manufacturing in the United States depends on several factors which are beyond our control, including our Department

7

of Energy ('DOE') Loan Guarantee Application which is currently in the due diligence review stage. There is no assurance that we will be successful in obtaining a loan guarantee from the DOE, or that our efforts to develop a manufacturing facility in the United States will be successful."); Ho Decl., Ex. 3 (ECF Page 273) (Maxeon 20-F, dated March 7, 2023) ("We have also announced plans to deploy a multi-GW factory in the United States to manufacture solar products for both the distributed generation ("DG") and utility-scale power plant markets. This investment plan requires significant expenditures and is contingent upon us securing the necessary financing and depends on several factors which are beyond our control, including the approval of our DOE loan guarantee application. There is no assurance that we will be successful in obtaining a final loan guarantee from the DOE. Even if the DOE loan guarantee is approved, we will still have to secure additional financing or otherwise fund these capital expenditures and there is no assurance that we will be able to do so in a timely manner, on favorable terms, or at all.").

But ultimately, the fundamental problem for Plaintiff is that his claims fail because there are insufficient allegations of falsity.

### 1. Peak of Prepayment Schedule

For example, as noted above, Plaintiff argues that, at the time the statements were made, Maxeon was suffering a liquidity crisis because it was reaching the peak of its prepayment schedule for certain Utility-Scale customer contracts. When Maxeon enters into a contract with a customer, the customer makes "a cash prepayment based on the contract's terms. The prepayment is [1] recorded as a contract liability on the balance sheet and [2] added to net income on the cash flow statement." SAC ¶ 78. When modules are delivered to a customer, "the liability is amortized [*i.e.*, reduced] and the amortized amount is then reflected as a revenue entry on the income statement." SAC ¶ 78 (emphasis added). But "Maxeon must subtract that revenue from the cash flow statement since the cash was received at an earlier time . . . ." SAC ¶ 78.

According to Plaintiff, although investors knew about the *fact* of prepayments from customers, they did not know that Maxeon was reaching the *peak* of its scheduled prepayments from the Utility-Scale customers at issue. Plaintiffs asserts this was a material fact because it meant no more cash would be coming unless there were other sources for new cash flow. Because

United States District Court
Northern District of California

the Court's prior order had indicated Plaintiff should explain how "the amortization of the Utility-Scale contracts was of such significance that it alone could dictate whether or not Maxeon would continue as a going concern," Docket No. 90 (Order at 25), Plaintiff has now included the following allegation:

> [C]ash flows would be negatively impacted by the pre-scheduled amortization of customer prepayments in the amount of $83 million in Q4 2023 and $67 million in Q1 2024 without corresponding new cash inflows.  To put these amounts in perspective, Maxeon's operating expenses (under Generally Accepted Accounting Principles, or GAAP) in those quarters were estimated to be approximately $66.5 million and $113 million, respectively, meaning that the impact of the amortization schedule were huge hits to the Company's cash flows.

SAC ¶ 80; *see also* SAC ¶ 11 (alleging that "[t]he initial receipt of the $150 million in customer prepayments had provided Maxeon with significant upfront capital, which could be used for operational needs, capital expenditures, or debt reduction," but "the amortization of these prepayments, the schedule of which was known to Defendants but not to investors, without corresponding new cash flows, set Maxeon up for negative operating cash flows").

At the hearing, the Court noted that, on its face, ¶ 80 is not entirely clear.  It is unclear, for instance, how the amortization schedule affected actual cash flow either in absolute dollars or as a percentage.  Defendants agreed that the allegations are unclear, and so the Court asked Plaintiff to clarify at the hearing.  In response, Plaintiff did not provide much of an explanation.  In fact, he asserted for the first time that, although ¶ 80 expressly refers to an impact on cash flow (consistent with other paragraphs in the SAC[4]), he *meant* to allege that there was an impact on cash *reserves*.  To the extent Plaintiff is trying to inject a new theory into his pleading, the Court rejects that attempt, particularly since it was Plaintiff's prerogative to plead his case.

---

[4] *See, e.g.*, SAC ¶ 9 (alleging that "Maxeon's cash flow had begun deteriorating as early as May/June of 2023, and was considered 'bad' by the Summer of 2023"); SAC ¶ 14 (alleging that "Defendants falsely assured the market that Maxeon had sufficient cash flow for the next year in its November 15, 2023 Form 6-K filed with the SEC"); SAC ¶¶ 81-82 (alleging that "[t]he cash flow situation crated by Maxeon's pre-scheduled amortization schedule," "combined with industry headwinds, the loss of SunPower, and the inability to get funding from lenders, set the stage for an increasingly serious cash flow and liquidity crisis"); SAC ¶ 89 (alleging that Maxeon's liquidity is dependent in part on its cash flow; if cash flow decreases, then Maxeon's ability to invest and meet ongoing operational operations are negatively impacted").

United States District Court
Northern District of California

United States District Court
Northern District of California

Putting aside that problem, even if the Court construes ¶ 80 to mean that there was a reduction in cash flow in roughly the amount of $150 million for Q4 2023 and Q1 2024, and operating expenses for that time were anticipated to be $180 million, Plaintiff still has not shown why such a reduction in cash flow was so significant that Maxeon likely could not continue as a going concern for the next 12 months.  Plaintiff admits that whether or not there would be a cash flow problem would turn on whether Maxeon had new sources for cash flow.  A peak in the amortization schedule could be mitigated by incoming advances on new contracts.  But Plaintiff has not alleged that, at the time, there were no new sources for cash flow (or even that new sources were unlikely).  For example, Plaintiff has not alleged that the $150 million reduction in cash flow came from Maxeon's *only* Utility-Scale customers.  In fact, the SAC indicates that Maxeon had at least two large Utility-Scale customers remaining (although they later experienced project delays in Q1 2024 as discussed *infra*).  Furthermore, Plaintiff did not address customers for Maxeon's DG business, which – as alleged in his prior complaint – made up the large majority of the company's year-over-year revenue.  *See* Docket No. 90 (Order at 2) (quoting CAC ¶ 46).  Without more facts, Plaintiff has not plausibly alleged that Maxeon's reaching the peak of its scheduled prepayments from certain Utility-Scale customers meant that the company was likely to fail within 12 months.

To be sure, Maxeon's future was not at the time (November-April 2024) a bright one. Maxeon had lost its relationship with SunPower, one of its major customers, and there were significant industry headwinds.  But Defendants disclosed both of these facts to investors. Moreover, Defendants did not make any representations, *e.g.*, forecasting growth or painting a rosy picture; rather, Defendants made the much more modest claim that they anticipated the company would continue as a going concern for another 12 months.

### 2.    Financing from Lenders

Plaintiff contends still that, at the time the statements were made, Maxeon was already suffering a liquidity crisis as evidenced by the fact that three banks had "refused to extend Maxeon's lines of credit without shareholder guarantees because of their concerns about Maxeon's overall financial condition and the Company's ability to repay its loans and continue as a going

10

concern." SAC ¶ 9. As a preliminary matter, the Court notes that the allegations about the banks' concerns are somewhat vague and conclusory. The SAC does not contain any concrete allegations about why the banks tightened their lending requirements and required shareholder guarantees. Nor are there allegations demonstrating with any specificity how the tightened lending requirements actually impacted cash flow, much less how it posed an immediate existential threat to Maxeon.

Plaintiff contends this tightening of credit reflected concerns by the banks which corroborates the poor financial health of Maxeon at the time. However, Plaintiff does not sufficiently allege in the SAC that the banks' concerns reflected a well-founded belief that Maxeon was on the precipice. Indeed, there are allegations in the SAC that suggest otherwise. For instance, Plaintiff alleges in the pleading that the lenders gave "'a lot'" of financing options to Defendants. *See* SAC ¶ 66 (alleging that "'a lot' of the lender[s'] financing options" were presented to Mr. Strohbecke and Mr. Mulligan); *see also* CAC ¶ 112 (alleging that CW-1 stated that "'a lot of options were presented to [Mr. Strohbecke and Mr. Mulligan]'"). If many financing options were being given, this suggests that the lenders did not, in fact, see Maxeon as a dead end, as Plaintiff claims. In addition, there are allegations in the SAC suggesting that the shareholder guarantee requirement was more about Maxeon's status as "a de facto start-up without a lengthy operating history." SAC ¶ 66. In addition, the requirement of a shareholder guarantee could have been based on the significant industry headwinds which Defendants did disclose to the market. Neither of these situations meant that Maxeon was facing an existential crisis, particularly in light of the lenders' apparent willingness to give "a lot" of financing options to the company.

### 3. Financing from TZE

Plaintiff contends next that, at the time the challenged statements were made, Defendants should have disclosed it was likely that Maxeon would need to get financing from TZE or it could not stay afloat. According to Plaintiff, this was a problem because TZE's status as a Chinese corporation would jeopardize the critical DOE loan that would fund Maxeon's contemplated domestic factory in Albuquerque.

As above, Plaintiff has still failed to sufficiently allege that the statements at issue were

either false or misleading. The Court begins by separating the November 2023 statements from the April 2024 statements.

For the former, Plaintiff has failed to allege that, in November 2023, the likely source of financing for Maxeon would come from TZE. This allegation is inconsistent with Plaintiff's own allegation that, at or about that time, lenders were giving "a lot" of financing options to Defendants. Furthermore, lenders were apparently willing (at that time) to extend loans with shareholder guarantees. Even if TZE was the most likely shareholder to provide a guarantee because it was Maxeon's largest shareholder, that fact in and of itself did not mean that TZE would thereby obtain an increased *ownership* position in the company. At the very least, there is no specific allegation that Maxeon should have predicted this at that time. Indeed, it is notable that Maxeon did not actually enter into an agreement with TZE regarding liquidity support and ownership until May 2024, *six months later*. This timing cuts against Plaintiff's position that, some six months earlier in November 2023, it was clear that Maxeon would need to get financing from TZE, and that as part of the arrangement, TZE would gain a majority (or at least substantial increase in) ownership over Maxeon.

As for the April 2024 statements, Plaintiff has failed to show that they were related to the Albuquerque factory at all and/or that they were otherwise false. *See* St. No. 7 ("The Maxeon team is highly focused on reducing manufacturing costs, OPEX rationalization and *liquidity-management to enable a return to profitability*.") (emphasis added); St. No. 8 ("Factors which have affected the timing of the preparation and review of the financial statements include the additional *ongoing work required in connection with the assessment of the Company's ability to continue as a going concern, including the ongoing analysis of the Company's strategic options* with the assistance of external advisors.") (emphasis added); St. No. 9 ("As disclosed in our last earnings call, *Maxeon has been executing a transformation of our IBC capacity timed to coincide with the current DG market slowdown*.") (emphasis added). For example, for Statement No. 8, even if Defendants knew by April 2024 that TZE would be providing liquidity support (as announced the following month), that did not make it false or misleading for Maxeon's SEC filing to state that its inability to timely file its 2023 annual report was impacted by ongoing work related

12

to assessment of the ability of the company to continue as a going concern.  And in Statement No. 9, the phrase "transformation of our IBC capacity" is vague.  Even if it could be understood to reflect Maxeon's intent to pursue the Albuquerque factory, nothing in the record indicates that that was not Maxeon's intent; nor does the statement suggest, *e.g.*, that Maxeon was promising that the Albuquerque factory would definitively come to fruition.

### 4.    Loss of Two Utility-Scale Customers in Q1 2024

Finally, Plaintiff asserts that two of the statements at issue – Statements Nos. 7 and 8 – are false or misleading because Defendants failed to disclose that two of its large Utility-Scale customers had, in Q1 2024, experienced project delays, "causing the Company to absorb the costs of unused inventory."  SAC ¶ 107(b).  Here, as above, Plaintiff has failed to sufficiently plead falsity for either statement.

For Statement No. 7, Plaintiff has failed to explain why the two Utility-Scale customers should have been discussed simply because Defendants made the statement that Maxeon was highly focused on liquidity-management to enable a return to profitability.  Indeed, as indicated above, the statement is, if anything, inactionable puffery that "would not induce the reliance of a reasonable investor."  *Oregon Pub. Emples. Ret. Fund v. Apollo Group Inc.*, 774 F.3d 598, 606 (9th Cir. 2014).  Moreover, there is a timing problem as discussed below with Statement No. 8.

Regarding Statement No. 8, it was made in Maxeon's NT 20-F which provided disclosures about only the fiscal year *2023*.  The issue with the project delays for the two Utility-Scale customers did not arise until *Q1 2024*.  *See* SAC ¶ 16 ("Maxeon was informed early in the first quarter of 2024 – *i.e.*, between January and March 31, 2024 – by two of its large Utility-Scale customers, that they were experiencing project delays and 'would not be in a position to accept [module] deliveries under' its agreed upon contract with Maxeon," which "left Maxeon without the cash from these deals and unused inventory, the costs of which they were forced to absorb").

### III.    CONCLUSION

For the foregoing reasons, the Court concludes that Plaintiff has failed to sufficiently allege that any of the nine challenged statements at issue are either false or misleading.  In addition to the detailed reasons described above, the reason why each of the nine alleged falsity fails to

13

United States District Court
Northern District of California

state a viable claim is listed in the Appendix hereto.  Because the Court has already given Plaintiff an opportunity to amend with respect to the issue of falsity, and Plaintiff's claims remain deficient, the Court dismisses the SAC with prejudice.

The Clerk of the Court is instructed to enter a final judgment in accordance with this order and close the file in this case.

This order disposes of Docket No. 100.

**IT IS SO ORDERED**.

Dated: February 11, 2026

_____
EDWARD M. CHEN
United States District Judge

14

**APPENDIX**

Plaintiff has identified a total of nine allegedly false or misleading statements (with the language at issue in italics below):

- **Statement No. 1.** This statement was made on November 15, 2023, during an earnings call addressing Maxeon's Q3 2023. "Cash levels were also impacted by lower shipments and margin dollars from our global DG business, the reduction of contract liabilities related to our US utility scale business capital expenditures during the quarter, restructuring expenses and a reduction in short term debt. . . . So we think that with the current cash balance that we have and all these measures that we talked about during the call and in the prepared remarks, that *we are in a good position to generate sufficient cash and maintain sufficient cash levels for our existing business*" (emphasis added). The statement is nonactionable puffery. In addition, Plaintiff has not sufficiently alleged falsity because, *e.g.*, lenders were allegedly still giving Maxeon a lot of options for financing; Plaintiff has failed to explain why the company's reaching the peak of its amortization schedule for certain Utility-Scale customers meant that Maxeon was on the precipice; and Plaintiff has not addressed why Defendants should have anticipated that they would need to get support from TZE and to such an extent that it would put into jeopardy the Albuquerque facility.

- **Statement No. 2.** The statement was made on November 15, 2023, as part of Maxeon's 6-K (filed with the SEC). "As of October 1, 2023, we had unrestricted cash and cash equivalents of $208.1 million, restricted cash of $9.2 million and short-term securities representing a 6-months time deposit of $60.0 million as compared to $427.4 million of unrestricted cash and cash equivalents, $40.5 million of restricted cash and short-term securities representing a 4-month time deposit of $76.0 million as of January 1, 2023. . . . *We believe that our current cash, cash equivalents, along with cash expected to be generated from operations will be sufficient to meet our obligations over the next 12 months*" (emphasis

15

added).  Plaintiff has failed to allege falsity for the same reasons as stated above.

- **Statement No. 3.**  The statement was made on November 15, 2023, during the earnings call addressing Maxeon's Q3 2023.  "The U.S. utility-scale market is a key focus for us in our primary growth driver.  With our existing North America utility-scale supply chain reaching improved operating efficiency and profitability milestones in our planned New Mexico factory entering the engineering and design stage.  [¶] We believe that Maxeon is positioned to be a leader in helping reshore advanced solar cell and panel manufacturing to the United States at meaningful scale.  *Towards this end, we are working intensively with the U.S. Department of Energy's loan program office to finance a 3.5 gigawatt solar cell and panel factory in Albuquerque.  This capacity represents an increase of 500 megawatts compared with our original design.  We cite preconstruction work well underway.  We've hired a general manager for the facility and that secured options on adjacent parcels to allow for future capacity expansion.  [¶] In order to accelerate and derisk the ramp of our U.S. factory, we plan to install a TOPcon pilot line in our existing Fab 3 in Malaysia and expect this line to be up and running next year well ahead of the anticipated factory ramp in Albuquerque.  We expect this pilot line will provide valuable process development experience and serve as a training platform for [indiscernible] technology transfer to our U.S. factory.  [¶] Finally, we are advancing well in negotiations for multiple offtake agreements, which we plan to execute prior to the closing of the DOE loan*" (emphasis added).  Plaintiff has failed to allege falsity for the same reasons as stated above.  In addition, at least part of the statement was forward looking and accompanied by meaningful cautionary language.

- **Statement No. 4.**  The statement was made on November 15, 2023, during the earnings call addressing Maxeon's Q3 2023.  "Fourth quarter capital expenditures are projected to be in the range of $10 million to $20 million, a majority of which is planned for our Maxeon 7 ramps and initially prepatory spending for our

16

Albuquerque site. While this initial CapEx for the U.S. facility may be bridged by our balance sheet, *the expectation is that we will secure the majority of capital needed to build the facility in the months ahead from the DOE and customer co-investments*" (emphasis added). Plaintiff has failed to allege falsity for the same reasons as stated above. In addition, at least part of the statement was forward looking and accompanied by meaningful cautionary language.

- **Statement No 5.** The statement was made on November 15, 2023, during the earnings call addressing Maxeon's Q3 2023. "Yes, it's something, Brian, that we have talked about pretty consistently actually as the two main pillars of our financing of the U.S. manufacturing side, which are the DOE loan and customer co-investments. Customers are very, very excited about that new facility, and we've been in touch with them and discussing all these things that you just mentioned around volumes, pricing, timing, terms and conditions and so on. We're not in a position right now where we would disclose the details. *But I think suffice it to say that these things have to come together, the DOE loan and the customer co-investments as the two main pillars of that financing and both of these items are on track*" (emphasis added). Plaintiff has failed to allege falsity for the same reasons as stated above. In addition, at least part of the statement was forward looking and accompanied by meaningful cautionary language.

- **Statement No. 6.** The statement was made on November 15, 2023, as part of Maxeon's 6-K (filed with the SEC). "*We have recently announced our plan to re-engineer our Maxeon line manufacturing capacity. . . .* We will also begin preparations to install a TOPCon solar cell pilot line in our Malaysia manufacturing facility *ahead of the start-up of our planned manufacturing facility in Albuquerque, following our site selection that took place in August 2023*" (emphasis added). Plaintiff has failed to allege falsity for the same reasons as stated above. In addition, at least part of the statement was forward looking and accompanied by meaningful cautionary language.

17

United States District Court
Northern District of California

- **Statement No. 7.**  The statement was made on April 8, 2024, as part of a Maxeon press release.  "In the fourth quarter, Maxeon delivered financial results largely in line with our expectations.  Our U.S. utility-scale business accounted for the majority of revenues in the fourth quarter, with stable ASPS. . . . [¶] The Maxeon team is highly focused on reducing manufacturing costs, OPEX rationalization and *liquidity-management to enable a return to profitability*.  Our strategy continues to be to focus on designing and building premium, differentiated products and delivering a superior customer experience across a balanced portfolio of global DG and U.S. utility scale markets.  The Company plans to file its annual 20-F report by April 30, 2024" (emphasis added).  The statement is nonactionable puffery.  In addition, Plaintiff has failed to allege falsity for the same reasons as stated above.  There is also a timing issue as discussed with respect to Statement No. 8.

- **Statement No. 8.**  The statement was made on April 30, 2024, in Maxeon's NT 20-F (filed with the SEC).  "Factors which have affected the timing of the preparation and review of the financial statements include the additional *ongoing work required in connection with the assessment of the Company's ability to continue as a going concern, including the ongoing analysis of the Company's strategic options* with the assistance of external advisors" (emphasis added).  Plaintiff has failed to allege falsity for the same reasons as stated above.  Furthermore, to the extent Plaintiff suggests that Defendants should have disclosed the project delays for the two Utility-Scale customers, the NT 20-F was making disclosures about only the fiscal year *2023*.  The issue with the project delays for the two Utility-Scale customers did not arise until *Q1 2024*.

- **Statement No. 9.**  The statement was made on April 8, 2024, as part of a Maxeon press release.  "As disclosed in our last earnings call, *Maxeon has been executing a transformation of our IBC capacity timed to coincide with the current DG market slowdown*.  As part of this initiative, we made the decision to ramp down all of our Maxeon 6 capacity faster than we had originally expected, resulting in higher than

initially planned restructuring costs in the fourth quarter" (emphasis added). Plaintiff has failed to allege falsity for the reasons stated above. In addition, the phrase "transformation of our IBC capacity" is vague and, even if it could be understood to reflect Maxeon's intent to pursue the Albuquerque factory, nothing in the record indicates that that was not Maxeon's intent; nor does the statement suggest, *e.g.*, that Maxeon was promising that the Albuquerque factory would definitively come to fruition.